

| MARK A. LaROSE •<br>JOSEPH A. BOSCO •<br>DAVID KOPPELMAN<br>DAVID ROSEMEYER<br>DAVID J. ARON | LaROSE & BOSCO, LTD.<br>ATTORNEYS AT LAW | 200 N. LaSALLE STREET<br>SUITE 2810<br>CHICAGO, IL 60501<br>P: (312) 642-4414<br>F: (312) 642-0434 |

OF COUNSEL
HON. ANTHONY J. BOSCO (1928-2008)
JOSEPH G. ALIOTO **
ALBERTO QUIROS JAEN***

135 S. WHITTAKER
NEW BUFFALO, MI 49117
P: (269) 469-8440
F: (269) 469-8442

• ADMITTED IN MICHIGAN ALSO
** ADMITTED IN WISCONSIN ONLY
*** ADMITTED IN PANAMA ONLY

September 7, 2017

**By Hand Delivery**
Ms. Carmelia Shipp
Ms. Mildred Blount
Ms. Edna Anthony
Mr. Darrell Dildy
Mr. William Taylor
Riverdale Zoning Board of Appeals
Village of Riverdale
157 W. 144th Street
Riverdale, IL   60827-2707

      RE:   **Zoning Application by Riverdale Materials, LLC**

Dear Members of the Zoning Board of Appeals,

      I represent Tri-State Disposal, Inc. located at 13903 S. Ashland Avenue, Riverdale, Illinois 60827, in close proximity to the proposed transfer station at 1201 W. 138th Street. We intend to appear with a court reporter at the public hearing scheduled for Thursday, September 7, 2017 at 7:00 p.m. with regard to the zoning application submitted by Riverdale Materials, LLC. We request that Tri-State be heard at that time and be put on the agenda.

      As you should be aware, Tri-State Disposal has a long-standing agreement with the Village of Riverdale to pick up municipal solid waste in Riverdale, and since 2002 pursuant to a host community fee agreement has paid Riverdale more than $1,000,000 in host fees. Before Tri-State Disposal began operations, it was required to go through a local siting process (not zoning) involving public hearings pursuant to Section 39.2 of the Illinois Environmental Protection Agency (415 ILCS 5/39.2).



Chicago, IL · New Buffalo, MI · Panama City, Panama
www.laroseboscolaw.com

September 7, 2017
Page 2

On behalf of Tri-State Disposal, the purpose of this letter is to state for the official record strenuous objections to the application, and to demand that the Zoning Board of Appeals either take no action on the zoning application or deny it for any or all of the reasons stated below.

(1)  Both the application and the proceeding of any zoning hearings on this matter are not in accordance with Illinois law.  Section 39.2 of the Illinois Environmental Protection Act takes precedent over any zoning, and applies to pollution control facilities, including transfer stations that handle municipal solid waste.

Since the application admittedly applies to a transfer station that will handle municipal solid waste, all zoning procedures are inapplicable, and the applicant must go through the local siting process as set forth in Section 39.2 of the Act.  A copy of Section 39.2 of the Act is **attached**.  It specifically says:

"The siting approval procedures, criteria and appeal procedures provided for in this Act for new pollution control facilities shall be the exclusive siting procedures and rules and appeal procedures for facilities subject to such procedures. Local zoning or other local land use requirements shall **NOT** be applicable to such siting decisions." (Emphasis added.) *See* 415 ILCS 5/39.2(g).

Also, in order for the applicant to receive a permit from the Illinois Environmental Protection Agency, Village approval through the local siting process (**not through zoning**) is required.  In order to sustain its burden under the local siting law, the applicant must prove to the Village Board's satisfaction:

(i)  The facility is **necessary** to accommodate the waste needs of the area it is intended to serve;

(ii)  The facility is so designed, located and proposed to be operated that the public health, safety and welfare will be protected;

(iii)  The facility is located so as to minimize incompatibility with the character of the surrounding area and to minimize the effect on the value of the surrounding property;

(iv)  (A) for a facility other than a sanitary landfill or waste disposal site, the facility is located outside the boundary of the 100 year flood plain or the site is flood-proofed; (B) for a facility that is a sanitary landfill or waste disposal site, the facility is located outside the boundary of the 100-year floodplain, or if the facility is a facility described in subsection (b)(3) of Section 22.19a, the site is flood-proofed;

(v)  the plan of operations for the facility is designed to minimize the danger to the surrounding area from fire, spills, or other operational accidents;

September 7, 2017
Page 3

 (vi) the traffic patterns to or from the facility are so designed as to minimize the impact on existing traffic flows;

 (vii) if the facility will be treating, storing or disposing of hazardous waste, an emergency response plan exists for the facility which includes notification, containment and evacuation procedures to be used in case of an accidental release;

 (viii) if the facility is to be located in a county where the county board has adopted a solid waste management plan consistent with the planning requirements of the Local Solid Waste Disposal Act or the Solid Waste Planning and Recycling Act, the facility is consistent with that plan; for purposes of this criterion (viii), the "solid waste management plan" means the plan that is in effect as of the date the application for siting approval is filed; **AND**

 (ix) if the facility will be located within a regulated recharge area, any applicable requirements specified by the Board for such areas have been met.

 (2) Even in the zoning application as filed, the applicant must include a statement in writing with adequate evidence showing that the proposed conditional use will conform to the following standards:

 a. That the establishment, maintenance or operation of the conditional use will not be detrimental to or endanger the public health, safety, morals, comfort or general welfare;

 b. That the conditional use will not be injurious to the uses and enjoyment of other property in the immediate vicinity for the purpose already permitted or substantially diminish and impair property values with the neighborhood;

 c. That the establishment of the conditional use will not impede the normal and orderly development and improvement of the surrounding property for uses permitted in the district;

 d. That adequate utilities, access roads, drainage and/or necessary facilities have been or are being provided;

 e. That adequate measures have been or will be taken to provide ingress and egress so designed as to minimize traffic congestion in the public streets;

 f. That the proposed conditional use is not contrary to the objectives of the current land use plan for the Village of Riverdale;

September 7, 2017
Page 4

      g.    That the conditional use shall, in all other respects, conform to the applicable regulations of the district in which it is located, except as such regulations may, in each instance, be modified pursuant to the recommendations of the Zoning Board of Appeals.

The application contains no such statement addressing these standards, and certainly contains no proof of satisfaction of same.

    (3)    The applicant apparently wrote in a section on page 1 of the application that it is an "operator." Nowhere does the application show any ownership or other land title interest in the land in the name of the applicant Riverdale Materials, LLC.

    (4)    The Secretary of State reports that Riverdale Materials, LLC is a newly formed limited liability company having been formed on November 7, 2016. The application does not explain any of the experience in running significant pollution control activities, nor does it provide the Village with any financial information to show that the applicant has the resources necessary to conduct the proposed operations.

    (5)    There is not a need for another recycling transfer station in the Village of Riverdale since Tri-State Disposal's transfer station is less than ½ mile from the proposed site.

    (6)    The application admits that piles of uncovered materials will be left out in the open for up to six (6) months before they are transported off-site. That does not conform to Illinois law, nor is it a safe or prudent practice.

    (7)    The site itself is of questionable environmental quality even before any additional recycling operations or transfer stations were contemplated or will commence. In March of 2007, the Village filed suit regarding the environmental condition of the property proposed in the application, as well as several neighboring properties. (*See* copy of Complaint, **attached**.) While that suit was voluntarily dismissed by the Village of Riverdale in April of 2008, no environmental clean-up work that we are aware of has been conducted on the property. The proposal to have a recycling/transfer station that will bring additional waste into the property and leave some of it in exposed piles around the property for up to six (6) months would potentially add to the already distressed environmental condition of the property.

    (8)    The applicant has not shown that the site has sufficient drainage or sewers to safely handle storm water and other runoff from site operations.

September 7, 2017
Page 5

      For these reasons, we urge the Zoning Board of Appeals to either take no action on the application, or to deny the same. Please make this correspondence part of the official record in this case. As stated above, we intend to appear at the hearing with a court reporter to record the proceedings, and to make public comment in opposition to the application.

              Very truly yours,

              Mark A. LaRose

MAL/mk
Enclosures

cc:      • Tri-State Disposal, Inc.
          • P. Joseph Montana, Esq., Montana & Welch, LLC, Attorney for Village of Riverdale
          (jmontana@montanawelch.com)
          • Michael J. Synowiecki, Registered Agent, Riverdale Materials, LLC (by e-mail
          msynowiecki@daleygeorges.com)

9/5/2017                          Illinois General Assembly - Illinois Compiled Statutes

 **Illinois General Assembly**

Home    Legislation & Laws    Senate    House    My Legislation    Site Map

| | |
|---|---|
| Bills & Resolutions | ## Illinois Compiled Statutes |
| **Compiled Statutes** | |
| Public Acts | _ILCS Listing_   _Public Acts_   _Search_   _Guide_   _Disclaimer_ |
| Legislative Reports | **Information maintained by the Legislative Reference Bureau** |
| IL Constitution | Updating the database of the Illinois Compiled Statutes (ILCS) is an ongoing |
| Legislative Guide | process. Recent laws may not yet be included in the ILCS database, but they are |
| Legislative Glossary | found on this site as _Public Acts_ soon after they become law. For information |
| | concerning the relationship between statutes and Public Acts, refer to the _Guide_. |

 Search By Number
(example: HB0001)

 :Go:  Search Tips

Search By Keyword

 :Go:
Search Tips

Advanced Search



Because the statute database is maintained primarily for legislative drafting
purposes, statutory changes are sometimes included in the statute database before
they take effect. If the source note at the end of a Section of the statutes includes a
Public Act that has not yet taken effect, the version of the law that is currently in
effect may have already been removed from the database and you should refer to
that Public Act to see the changes made to the current law.

      (415 ILCS 5/39.2) (from Ch. 111 1/2, par. 1039.2)
      Sec. 39.2. Local siting review.
      (a) The county board or the county or the governing body of
the municipality, as determined by paragraph (c) of Section 39
of this Act, shall approve or disapprove the request for local
siting approval for each pollution control facility which is
subject to such review. An applicant for local siting approval
shall submit sufficient details describing the proposed facility
to demonstrate compliance, and local siting approval shall be
granted only if the proposed facility meets the following
criteria:
           (i) the facility is necessary to accommodate the
      waste needs of the area it is intended to serve;
           (ii) the facility is so designed, located and
      proposed to be operated that the public health, safety and
      welfare will be protected;
           (iii) the facility is located so as to minimize
      incompatibility with the character of the surrounding area
      and to minimize the effect on the value of the surrounding
      property;
           (iv) (A) for a facility other than a sanitary
      landfill or waste disposal site, the facility is located
      outside the boundary of the 100 year flood plain or the
      site is flood-proofed; (B) for a facility that is a
      sanitary landfill or waste disposal site, the facility is
      located outside the boundary of the 100-year floodplain, or
      if the facility is a facility described in subsection (b)
      (3) of Section 22.19a, the site is flood-proofed;
           (v) the plan of operations for the facility is
      designed to minimize the danger to the surrounding area
      from fire, spills, or other operational accidents;
           (vi) the traffic patterns to or from the facility are
      so designed as to minimize the impact on existing traffic
      flows;
           (vii) if the facility will be treating, storing or
      disposing of hazardous waste, an emergency response plan
      exists for the facility which includes notification,
      containment and evacuation procedures to be used in case of
      an accidental release;
           (viii) if the facility is to be located in a county

where the county board has adopted a solid waste management plan consistent with the planning requirements of the Local Solid Waste Disposal Act or the Solid Waste Planning and Recycling Act, the facility is consistent with that plan; for purposes of this criterion (viii), the "solid waste management plan" means the plan that is in effect as of the date the application for siting approval is filed; and

(ix) if the facility will be located within a regulated recharge area, any applicable requirements specified by the Board for such areas have been met.

The county board or the governing body of the municipality may also consider as evidence the previous operating experience and past record of convictions or admissions of violations of the applicant (and any subsidiary or parent corporation) in the field of solid waste management when considering criteria (ii) and (v) under this Section.

If the facility is subject to the location restrictions in Section 22.14 of this Act, compliance with that Section shall be determined as of the date the application for siting approval is filed.

(b) No later than 14 days before the date on which the county board or governing body of the municipality receives a request for site approval, the applicant shall cause written notice of such request to be served either in person or by registered mail, return receipt requested, on the owners of all property within the subject area not solely owned by the applicant, and on the owners of all property within 250 feet in each direction of the lot line of the subject property, said owners being such persons or entities which appear from the authentic tax records of the County in which such facility is to be located; provided, that the number of all feet occupied by all public roads, streets, alleys and other public ways shall be excluded in computing the 250 feet requirement; provided further, that in no event shall this requirement exceed 400 feet, including public streets, alleys and other public ways.

Such written notice shall also be served upon members of the General Assembly from the legislative district in which the proposed facility is located and shall be published in a newspaper of general circulation published in the county in which the site is located.

Such notice shall state the name and address of the applicant, the location of the proposed site, the nature and size of the development, the nature of the activity proposed, the probable life of the proposed activity, the date when the request for site approval will be submitted, and a description of the right of persons to comment on such request as hereafter provided.

(c) An applicant shall file a copy of its request with the county board of the county or the governing body of the municipality in which the proposed site is located. The request shall include (i) the substance of the applicant's proposal and (ii) all documents, if any, submitted as of that date to the Agency pertaining to the proposed facility, except trade secrets as determined under Section 7.1 of this Act. All such documents or other materials on file with the county board or governing body of the municipality shall be made available for public inspection at the office of the county board or the governing body of the municipality and may be copied upon payment of the actual cost of reproduction.

Any person may file written comment with the county board or governing body of the municipality concerning the appropriateness of the proposed site for its intended purpose. The county board or governing body of the municipality shall consider any comment received or postmarked not later than 30

days after the date of the last public hearing.

(d) At least one public hearing is to be held by the county board or governing body of the municipality no sooner than 90 days but no later than 120 days after the date on which it received the request for site approval. No later than 14 days prior to such hearing, notice shall be published in a newspaper of general circulation published in the county of the proposed site, and delivered by certified mail to all members of the General Assembly from the district in which the proposed site is located, to the governing authority of every municipality contiguous to the proposed site or contiguous to the municipality in which the proposed site is to be located, to the county board of the county where the proposed site is to be located, if the proposed site is located within the boundaries of a municipality, and to the Agency. Members or representatives of the governing authority of a municipality contiguous to the proposed site or contiguous to the municipality in which the proposed site is to be located and, if the proposed site is located in a municipality, members or representatives of the county board of a county in which the proposed site is to be located may appear at and participate in public hearings held pursuant to this Section. The public hearing shall develop a record sufficient to form the basis of appeal of the decision in accordance with Section 40.1 of this Act. The fact that a member of the county board or governing body of the municipality has publicly expressed an opinion on an issue related to a site review proceeding shall not preclude the member from taking part in the proceeding and voting on the issue.

(e) Decisions of the county board or governing body of the municipality are to be in writing, specifying the reasons for the decision, such reasons to be in conformance with subsection (a) of this Section. In granting approval for a site the county board or governing body of the municipality may impose such conditions as may be reasonable and necessary to accomplish the purposes of this Section and as are not inconsistent with regulations promulgated by the Board. Such decision shall be available for public inspection at the office of the county board or governing body of the municipality and may be copied upon payment of the actual cost of reproduction. If there is no final action by the county board or governing body of the municipality within 180 days after the date on which it received the request for site approval, the applicant may deem the request approved.

At any time prior to completion by the applicant of the presentation of the applicant's factual evidence and an opportunity for cross-questioning by the county board or governing body of the municipality and any participants, the applicant may file not more than one amended application upon payment of additional fees pursuant to subsection (k); in which case the time limitation for final action set forth in this subsection (e) shall be extended for an additional period of 90 days.

If, prior to making a final local siting decision, a county board or governing body of a municipality has negotiated and entered into a host agreement with the local siting applicant, the terms and conditions of the host agreement, whether written or oral, shall be disclosed and made a part of the hearing record for that local siting proceeding. In the case of an oral agreement, the disclosure shall be made in the form of a written summary jointly prepared and submitted by the county board or governing body of the municipality and the siting applicant and shall describe the terms and conditions of the oral agreement.

(e-5) Siting approval obtained pursuant to this Section is transferable and may be transferred to a subsequent owner or operator. In the event that siting approval has been transferred

to a subsequent owner or operator, that subsequent owner or operator assumes and takes subject to any and all conditions imposed upon the prior owner or operator by the county board of the county or governing body of the municipality pursuant to subsection (e). However, any such conditions imposed pursuant to this Section may be modified by agreement between the subsequent owner or operator and the appropriate county board or governing body. Further, in the event that siting approval obtained pursuant to this Section has been transferred to a subsequent owner or operator, that subsequent owner or operator assumes all rights and obligations and takes the facility subject to any and all terms and conditions of any existing host agreement between the prior owner or operator and the appropriate county board or governing body.

(f) A local siting approval granted under this Section shall expire at the end of 2 calendar years from the date upon which it was granted, unless the local siting approval granted under this Section is for a sanitary landfill operation, in which case the approval shall expire at the end of 3 calendar years from the date upon which it was granted, and unless within that period the applicant has made application to the Agency for a permit to develop the site. In the event that the local siting decision has been appealed, such expiration period shall be deemed to begin on the date upon which the appeal process is concluded.

Except as otherwise provided in this subsection, upon the expiration of a development permit under subsection (k) of Section 39, any associated local siting approval granted for the facility under this Section shall also expire.

If a first development permit for a municipal waste incineration facility expires under subsection (k) of Section 39 after September 30, 1989 due to circumstances beyond the control of the applicant, any associated local siting approval granted for the facility under this Section may be used to fulfill the local siting approval requirement upon application for a second development permit for the same site, provided that the proposal in the new application is materially the same, with respect to the criteria in subsection (a) of this Section, as the proposal that received the original siting approval, and application for the second development permit is made before January 1, 1990.

(g) The siting approval procedures, criteria and appeal procedures provided for in this Act for new pollution control facilities shall be the exclusive siting procedures and rules and appeal procedures for facilities subject to such procedures. Local zoning or other local land use requirements shall not be applicable to such siting decisions.

(h) Nothing in this Section shall apply to any existing or new pollution control facility located within the corporate limits of a municipality with a population of over 1,000,000.

(i) (Blank.)

The Board shall adopt regulations establishing the geologic and hydrologic siting criteria necessary to protect usable groundwater resources which are to be followed by the Agency in its review of permit applications for new pollution control facilities. Such regulations, insofar as they apply to new pollution control facilities authorized to store, treat or dispose of any hazardous waste, shall be at least as stringent as the requirements of the Resource Conservation and Recovery Act and any State or federal regulations adopted pursuant thereto.

(j) Any new pollution control facility which has never obtained local siting approval under the provisions of this Section shall be required to obtain such approval after a final decision on an appeal of a permit denial.

(k) A county board or governing body of a municipality may charge applicants for siting review under this Section a reasonable fee to cover the reasonable and necessary costs incurred by such county or municipality in the siting review process.

(l) The governing Authority as determined by subsection (c) of Section 39 of this Act may request the Department of Transportation to perform traffic impact studies of proposed or potential locations for required pollution control facilities.

(m) An applicant may not file a request for local siting approval which is substantially the same as a request which was disapproved pursuant to a finding against the applicant under any of criteria (i) through (ix) of subsection (a) of this Section within the preceding 2 years.

(n) In any review proceeding of a decision of the county board or governing body of a municipality made pursuant to the local siting review process, the petitioner in the review proceeding shall pay to the county or municipality the cost of preparing and certifying the record of proceedings. Should the petitioner in the review proceeding fail to make payment, the provisions of Section 3-109 of the Code of Civil Procedure shall apply.

In the event the petitioner is a citizens' group that participated in the siting proceeding and is so located as to be affected by the proposed facility, such petitioner shall be exempt from paying the costs of preparing and certifying the record.

(o) Notwithstanding any other provision of this Section, a transfer station used exclusively for landscape waste, where landscape waste is held no longer than 24 hours from the time it was received, is not subject to the requirements of local siting approval under this Section, but is subject only to local zoning approval.
(Source: P.A. 94-591, eff. 8-15-05; 95-288, eff. 8-20-07.)

---

Home | Legislation & Laws | House | Senate | My Legislation | Disclaimers | Email



This site is maintained for the Illinois General Assembly by the
Legislative Information System, 705 Stratton Building, Springfield, Illinois 62706
217-782-3944   217-782-2050 (TTY)

RECEIVED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAR 12 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

VILLAGE OF RIVERDALE, an Illinois
municipal corporation,

           Plaintiff,

v.

138TH STREET JOINT VENTURE, A.B.C.
AUTO PARTS & SALES, INC., BEVERLY
BANK AS TRUSTEE UNDER TRUST NO. 8-
1523, CIRCUS AUTO PARTS, INC., FIRST
NATIONAL BANK OF BLUE ISLAND AS
TRUSTEE UNDER TRUST NO. 88133,
FIRST NATIONAL BANK OF BLUE ISLAND
AS TRUSTEE UNDER TRUST NO. 83097,
FRITZ ENTERPRISES, INC., GREATBANC
TRUST COMPANY AS TRUSTEE UNDER
TRUST NO. 5375 AND AS SUCCESSOR IN
INTEREST TO FIRST NATIONAL BANK IN
CHICAGO HEIGHTS AS TRUSTEE UNDER
TRUST NO. 5375, GREAT LAKES TRUST
COMPANY AS TRUSTEE UNDER TRUST
NO. 01064, HANDSCHY INDUSTRIES, INC.,
HURON VALLEY STEEL CORPORATION,
METAL MANAGEMENT MIDWEST, INC.,
METAL RECYCLING SYSTEMS, INC.,
PINNACLE BANK AS TRUSTEE UNDER
TRUST NO. 2899 AND AS SUCCESSOR IN
INTEREST TO SUBURBAN TRUST AND
SAVINGS BANK AS TRUSTEE UNDER
TRUST NO. 2899, and RIVERDALE
INDUSTRIES, INC.,

           Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

07C 1388

Case No.

PINs: 29-05-100-005-0000, 29-05-
100-008-0000, 29-05-100-011-0000,
29-05-100-016-0000, 29-05-100-019-
0000, 29-05-100-020-0000, 29-05-
100-025-0000, 29-05-100-026-0000,
29-05-100-027-0000, 29-05-100-028-
0000, 29-05-100-029-0000, 29-05-
100-030-0000, 29-05-100-032-0000,
29-05-100-033-0000, 29-05-100-034-
0000, 29-05-100-035-0000, 29-05-
100-036-0000, 29-05-100-037-0000,
29-05-100-038-0000, 29-05-100-039-
0000, 29-05-100-040-0000, and 29-
05-100-041-0000

JUDGE COAR

JUDGE COAR

MAGISTRATE JUDGE
GERALDINE SOAT BROWN

## COMPLAINT

Now comes Plaintiff, VILLAGE OF RIVERDALE (the "Village" or "Riverdale"), by and through its attorneys, and for its Complaint against Defendants, 138th STREET JOINT VENTURE ("138th Street"), A.B.C. AUTO PARTS & SALES, INC. ("ABC"), BEVERLY BANK AS TRUSTEE UNDER TRUST NO. 8-1523 ("TRUST NO. 8-1523"), CIRCUS AUTO PARTS, INC. ("Circus"), FIRST NATIONAL BANK OF BLUE ISLAND AS TRUSTEE UNDER TRUST NO. 88133 ("TRUST NO. 88133"), FIRST NATIONAL BANK OF BLUE ISLAND AS TRUSTEE UNDER TRUST NO. 83097 ("TRUST NO. 83097"), GREATBANC TRUST COMPANY AS TRUSTEE UNDER TRUST NO. 5375 AND AS SUCCESSOR IN INTEREST TO FIRST NATIONAL BANK IN CHICAGO HEIGHTS AS TRUSTEE UNDER TRUST NO. 5375 ("TRUST NO. 5375"), GREAT LAKES TRUST COMPANY AS TRUSTEE UNDER TRUST NO. 01064 ("TRUST NO. 01064"), HANDSCHY INDUSTRIES, INC. ("Handschy"), HURON VALLEY STEEL CORPORATION ("HVSC"), METAL MANAGEMENT MIDWEST, INC. ("MMMI"), METAL RECYCLING SYSTEMS, INC. ("MRSI"), PINNACLE BANK AS TRUSTEE UNDER TRUST NO. 2899 AND AS SUCCESSOR IN INTEREST TO SUBURBAN TRUST AND SAVINGS BANK AS TRUSTEE UNDER TRUST NO. 2899 ("TRUST NO. 2899), and RIVERDALE INDUSTRIES, INC. ("Riverdale Industries"), states:

## ALLEGATIONS COMMON TO ALL COUNTS

### Nature of the Action

1.     This is a civil action for declaratory and injunctive relief, fines and penalties brought pursuant to (1) Section 7002 of the Resource Conservation and Recovery Act, ("RCRA") 42 U.S.C. §6972; (2) Article I, Chapter 5.02, Section 5.02.100 of the Riverdale Code of Ordinances, (the "Nuisance Ordinance") RIVERDALE, Ill, CODE OF ORDINANCES, ch. 5.02, art I, § 5.02.100 (2006); (3) the Illinois common law of public nuisance.

2.     This Complaint concerns the disposal of contaminants on, and the release of contaminants to and from, certain properties located in Riverdale, Illinois (hereafter referred to as the Subject Property). The Subject Property encompasses approximately a 57 acre multi-parcel property north of 138th Street and east of Ashland Avenue in Riverdale, (Cook County), Illinois, together with its improvements, including underground and above ground tanks and pits, and its surface and subsurface soils, sediment, surface water and groundwater. The Subject Property is more specifically described as including all land identified by the following parcel index numbers (PINs): 29-05-100-005-0000, 29-05-100-008-0000, 29-05-100-011-0000, 29-05-100-016-0000, 29-05-100-019-0000, 29-05-100-020-0000, 29-05-100-025-0000, 29-05-100-026-0000, 29-05-100-027-0000, 29-05-100-028-0000, 29-05-100-029-0000, 29-05-100-030-0000, 29-05-100-032-0000, 29-05-100-033-0000, 29-05-100-034-0000, 29-05-100-035-0000, 29-05-100-036-0000, 29-05-100-037-0000, 29-05-100-038-0000, 29-05-100-039-0000, 29-05-100-040-0000, and 29-05-100-041-0000, and shown in Exhibit A.

3

3.     The Village seeks, among other things, injunctive relief requiring the Defendants to investigate and remediate any releases or threatened releases of hazardous substances into the environment at or from the Subject Property.

<u>The Parties</u>

4.     The Village is a Home Rule municipal corporation located in Cook County, Illinois.

5.     The Village is informed and believes that 138th Street is a joint venture whose managing partner is Fritz.   On information and belief, at various times material hereto, 138th Street owned all or a portion of the Subject Property.

6.     The Village is informed and believes that ABC is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Riverdale, Cook County, Illinois.

7.     The Village is informed and believes that TRUST NO. 8-1523, at various times material hereto, was the owner of all or a portion of the Subject Property.

8.     The Village is informed and believes that Circus is an Illinois corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Riverdale.

9.     The Village is informed and believes that TRUST NO. 88133, is the current owner of the property identified by PINs 29-05-100-040-0000 and 29-05-100-041-0000.

10.    The Village is informed and believes that TRUST NO. 83097, is the current owner of the property identified by PIN 29-05-100-016-0000.

11.    The Village is informed and believes that TRUST NO. 01064, is the current owner of the property identified by PINs 29-05-100-019-0000 and 29-05-100-026-0000.

4

12. The Village is informed and believes that TRUST NO. 5375, is the Successor in Interest to First National Bank in Chicago Heights as Trustee under Trust No. 5375 and, at various times, has owned the property identified by PINs 29-05-100-019-0000, 29-05-100-026-0000, 29-05-100-020-0000, 29-05-100-028-0000, 29-05-100-029-0000, 29-05-100-030-0000, 29-05-100-039-0000. Further, the Village is informed and believes that TRUST NO. 5375 is the current owner of the property identified by PINs 29-05-100-033-0000, 29-05-100-034-0000, 29-05-100-035-0000, 29-05-100-025-0000, 29-05-100-036-0000, 29-05-100-037-0000, and 29-05-100-038-0000.

13. The Village is informed and believes that Handschy is a Delaware corporation authorized to transact business, and doing business, in the State of Illinois.

14. The Village is informed and believes that HVSC is a Michigan corporation authorized to transact business, and doing business, in the State of Illinois.

15. The Village is informed and believes that MMMI is an Illinois corporation organized and existing under the laws of the State of Illinois and doing business in Riverdale.

16. The Village is informed and believes that MRSI is a corporation organized and existing under the laws of the State of Illinois and doing business in Riverdale.

17. The Village is informed and believes that TRUST NO. 2899, is the Successor in Interest to Suburban Trust and Savings Bank as Trustee under Trust No. 2899, and at various times, owned the property identified by PIN 29-05-100-020-0000,

18. The Village is informed and believes that Riverdale Industries is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Bellwood, Illinois.

5

Ownership and Operation of the Subject Property

19. On information and belief, at various times, all or a portion of the Subject Property was used as a dump for the disposal of various types of waste materials.

20. On information and belief, 138th Street, operated an auto shredding and foundry sand reclamation operation on all or a portion of the Subject Property.

21. On information and belief, ABC is the owner of the property identified by PINs 29-05-100-008-0000 and 29-05-100-011-0000 and 29-05-100-027-0000.

22. At various times material hereto, Circus has and continues to operate an auto salvage and scrap yard operation on the property identified by PINs 29-05-100-019-0000, 29-05-100-026-0000 and 29-05-100-040-0000.

23. On information and belief, at various times, TRUST NO. 8-1523, was the owner of all or a portion of the Subject Property and all or a portion of the Subject Property was used as a dump for the disposal of various types of waste materials.

24. On information and belief, TRUST NO. 83097 is the current owner of the property identified by PIN 29-05-100-016-0000 and has owned the property since September 1983. Furthermore, on information and belief, at various times, all or a portion of this property was used as a dump for the disposal of various types of waste materials. Additionally, on information and belief, at various times, ABC has and continues to operate an auto salvage and scrap yard operation on this property.

25. On information and belief, TRUST NO. 01064 is the current owner of property identified by PINs 29-05-100-019-0000 and 29-05-100-026-0000 and has owned the property since April 2001. Furthermore, on information and belief, HVSC owned this property from April 1996 to April 2001 and TRUST NO. 5375 owned this

6

property from September 1982 to April 1996. Additionally, on information and belief, at various times, all or a portion of this property was used as a dump for the disposal of various types of waste materials. Moreover, on information and belief, HVSC, at various times, operated an aluminum shredding and metal reclamation and recycling operation on this property. On information and belief, Circus has and continues to operate an auto salvage and scrap yard operation on this property.

26. On information and belief, HVSC is the current owner of the property identified by PIN 29-05-100-020-0000 and has owned the property since April 1996. Furthermore, on information and belief, at various times, Fritz Enterprises, Inc., a former Illinois corporation, owned this property and operated an auto shredding and sand reclamation operation thereon. Additionally, on information and belief, TRUST NO. 5375 owned this property from September 1982 to April 1996 and TRUST NO. 2899 owned this property from April 1977 to September 1982. Moreover, on information and belief, at various times, all or a portion of this property was used as a dump for the disposal of various types of waste materials. HVSC, at various times, has operated an aluminum shredding and metal reclamation and recycling operation including above ground storage tanks for the storage of fuel on this property.

27. On information and belief, TRUST NO. 5375 is the current owner of the property identified by PIN 29-05-100-025-0000 and has owned the property since September 1982. Furthermore, on information and belief, at various times, all or a portion of this property was used as a dump for the disposal of various types of waste materials. Additionally, on information and belief, MMMI has and continues to operate a scrap metal processing and recycling operation on this property.

7

28. On information and belief, HVSC is the current owner of the property identified by PINs 29-05-100-028-0000, 29-05-100-029-0000 and 29-05-100-030-0000 and has owned the property since April 1994. Furthermore, on information and belief, at various times, Fritz Enterprises, Inc. owned this property. On information and belief,, TRUST NO. 5375 owned this property from September 1982 to February 1985. On information and belief, at various times, all or a portion of this property was used as a dump for the disposal of various types of waste materials. On information and belief, at various times, Fritz Enterprises, Inc., operated an auto shredding and sand reclamation operation including a propane aluminum sweat furnace on this property. On information and belief, HVSC, at various times, has and continues to operate an aluminum shredding and metal reclamation and recycling operation on this property. On information and belief, at various times, MMMI operated a metal recycling operation including the storage of fuel on all or a portion of this property.

29. On information and belief, Riverdale Industries is the current owner of the property identified as PIN 29-05-100-032-0000 and has owned the property since December 1989. Furthermore, on information and belief, Handschy owned this property from April 1963 to December 1988. Additionally, on information and belief, at various times, Handschy and Riverdale Industries operated an ink and chemical manufacturing operation including multiple underground storage tanks containing various volatile chemicals on this property.

30. On information and belief, TRUST NO. 5375 is the current owner of the property identified by PINs 29-05-100-033-0000, 29-05-100-034-0000 and 29-05-100-035-0000 and has owned the property since September 1982. Furthermore, on

information and belief, at various times, Fritz Enterprises, Inc. owned this property. Additionally, on information and belief, at various times, all or a portion of this property was used as a dump for the disposal of various types of waste materials. Moreover, on information and belief, MMMI has and continues to operate a scrap metal processing and recycling operation including the storage of fuel on this property. On information and belief, at various times, MRSI operated a metal recycling operation on all or a portion of this property.

31. On information and belief, TRUST NO. 5375 is the current owner of the property identified by PINs 29-05-100-036-0000, 29-05-100-037-0000 and 29-05-100-038-0000 and has owned the property since July 1990. Furthermore, on information and belief, at various times, Fritz Enterprises, Inc., owned each of these properties. Additionally, on information and belief, at various times, all or a portion of this property was used as a dump for the disposal of various types of waste materials. Moreover, on information and belief, MMMI has and continues to operate a scrap metal processing and recycling operation including the storage of fuel on this property. On information and belief, at various times, MRSI operated a metal recycling operation on all or a portion of this property.

32. On information and belief, HVSC is the current owner of PIN 29-05-100-039-0000 and has owned the property since September 1996. On information and belief, TRUST NO. 5375 owned this property from July 1990 until September 1996. On information and belief, at various times, Fritz Enterprises, Inc. owned this property. On information and belief, at various times, all or a portion of this property was used as a dump for the disposal of various types of waste materials. On information and belief,

MMMI has and continues to operate a scrap metal processing and recycling operation on this property. HVSC, at various times material hereto, has operated an aluminum shredding and metal reclamation and recycling operation on this property.

33. On information and belief, TRUST NO. 88133 is the owner of the property identified by PINs 29-05-100-040-0000 and 29-05-100-041-0000 and has owned the property since December 1988, Illinois. Furthermore, on information and belief, Handschy owned this property from April 1983 to December 1988. Additionally, on information and belief, at various times, Circus has and continues to operate an auto salvage and scrap yard operation on this property.

### Factual Background

34. The Village is informed and believes that most of the Subject Property was mined for clay many years ago and the excavated area ("dump", "clay pit" or "waste disposal site") was filled with waste at some time(s) during the period between at least 1930 and 1972.

35. The Village is informed and believes that the former clay pit was operated as a waste disposal site and received garbage, other household waste and industrial wastes, including slag waste and pickling liquor from nearby steel mills.

36. The Village is informed and believes that at some time in the early 1970s, the particulars of which are unknown to the Village, the waste disposal site was covered with steel mill slag and earthen materials. The cover material does not retard rainfall and snowmelt percolation, allowing precipitation water to enter the waste disposal site and generate additional leachate. Further, as the waste disposal site was constructed

below one or more of the Subject Property groundwater strata, the waste disposal site continues to fill with groundwater infiltration.

37. The Village is informed and believes that leachate generated within the waste disposal site is contaminated with, at a minimum, hexane soluble materials, phenols, oil and grease, fecal coliform, cyanide, zinc, copper, iron, lead, arsenic, manganese, mercury, chromium and nickel, which contaminants have leached from the wastes disposed in the waste disposal site. The leachate is also characterized by high biochemical oxygen demand and high suspended solids.

38. The Village is informed and believes that the leachate has contaminated, and threatens to contaminate further, the land, surface water, and groundwater, including an aquifer.

39. The Village is informed and believes that during 1971 through 1975 significant volumes of leachate, including visible oil, broke through the surface of the disposal site and were discharged, through a drainage ditch, directly to the Calumet River, less than a quarter of a mile away.

40. The Village is informed and believes that solid and liquid wastes have been filled in the waste disposal site to a measured depth of between 23.5 and 33.5 feet below ground surface and wastes have been disposed in some portions of the disposal site at depths of 85 feet below grade.

41. The Village is informed and believes that groundwater under the waste disposal site contains, at a minimum, all of those contaminants found in site leachate.

42. The Village is informed and believes that beginning in approximately 1960, one or more of the Defendants owned or operated auto shredding operations on top of

11

the covered waste disposal site, which have resulted in the disposal of additional solid waste on the Subject Property.

43. The Village is informed and believes that shredding residue, waste lead-acid batteries and auto fluff have been and continue to be stored and disposed on portions of the Subject Property as a result of the shredding operations.

44. The Village is informed and believes that the shredding operations have also resulted in the leaking or dumping of grease, oil, heavy metals, PCBs, and other petroleum products on the ground and to subsurface soils, and fires have occurred in connection with the auto shredding operations, including burning rubber, auto upholstery and waste oils and hydraulic fluids. Such fires cause releases to the environment via the air pathway and deposition to land while also producing partially combusted materials as hazardous substances, which have entered and remained in surface soils, sediment, and have the potential to migrate to surface water and groundwater.

45. The Village is informed and believes that one or more of the Defendants has owned or operated a foundry sand reclamation operation (or the land on which it operated), on top of the covered waste disposal site.

46. The Village is informed and believes that such foundry sands containing heavy metals concentrations were screened for metals, and the foundry sand was resold and were and are stored, uncovered, on the ground surface, on the cover of the waste disposal site.

47. The Village is informed and believes that one or more of the Defendants has owned or operated a metals cleaning system (or the land on which it operated), on top

of the covered waste disposal site, which such metal cleaning typically utilizes tetrachloroethene and other chlorinated solvents.

48. The Village is informed and believes that one or more of the Defendants owns or operates or has owned or operated (including filling operations) underground storage tanks, or the land on which they have been operated, on the Subject Property.

49. The Village is informed and believes that such tanks contain or have contained and may have released or may be releasing organic chemicals, including varnish, methyl ethyl ketone, ethyl acetate, heptane, acetone, toluol and ethyl alcohol, as well as petroleum products.

50. The Village is informed and believes that one or more of the Defendants owns or operates or has owned or operated aboveground storage tanks, or the land on which they have operated, which may have released or may be releasing fuel and/or petroleum related products onto the Subject Property.

51. The Village is informed and believes that one or more of the Defendants manufactured, handled, stored, or kept for sale hazardous materials and/or flammable liquids, or owned the land on which such materials were utilized, which may have been spilled or released onto the Subject Property.

52. The Village is informed and believes that in approximately 1984, one or more of the Defendants stored and disposed at the Subject Property, including on top of the covered waste disposal site, waste wood shavings and sand contaminated with pentachlorophenol.

53. The Village is informed and believes that one or more of the Defendants have disposed or caused the disposal of human fecal wastes into the Subject Property

13

and its groundwater, which such disposal occurred through construction and operation of a septic system at the Subject Property, below the water table.

54. The Village is informed and believes that one or more of the Defendants own or operate, or have owned or operated, an existing surface water and waste impoundment on the Subject Property, the contents of which are contaminated with waste draining from the contaminated surface of the Subject Property and waste infiltrating the impoundment through groundwater flow.

55. The Village is informed and believes that borings conducted in the waste and soils below ground level on a portion of the Subject Property are characterized by a paint, solvent or petroleum odor.

56. The Village is informed and believes that solid waste and hazardous substances have been released, or there is a threat that solid waste and hazardous substances will be released, into the soil, groundwater, sediments, and surface waters of the Subject Property.

57. The Village is informed and believes that one or more of the Defendants has contributed or is contributing to the handling, storage, disposal or transport of solid waste and hazardous substances which have been released or have been threatened to be released.

## Jurisdiction and Venue

58. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331, and 42 U.S.C. §6972(a), because this case arises under the laws of the United States and the claims in Count I are predicated upon and seek relief under RCRA, as amended.

14

59. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over the State law claims herein, all of which are so related to the claims in Count I that they form part of the same case or controversy. The claim in Count II is predicated upon and seeks relief under the Village's Nuisance Ordinance. The claim in Count III is predicated upon the common law of public nuisance.

60. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) and 42 U.S.C. §6972(a) because the damages and claims arose in this judicial district.

COUNT I

RCRA, 42 U.S.C. § 6972(a)(1)(B)

1-62. The Village adopts and realleges paragraphs 1 through 62 of the Allegations Common to All Counts as paragraphs 1 through 62 of this Count I, as though fully set forth herein.

63. This Court has jurisdiction over this matter pursuant to the notice requirements for citizen suits under RCRA, 42 U.S.C. §6972(b)(2)(A). A Notice of Intent to Sue was served upon each of the Defendants, the Administrator of the U.S. Environmental Protection Agency ("USEPA"), the USEPA Regional Administrator, the Attorney General and the Director of the Illinois Environmental Protection Agency ("IEPA") more than 90 days prior to the filing of this Complaint. A copy of the Notice of Intent to Sue served upon each of the Defendants, with proofs of service, is attached hereto as Exhibit B. A copy of the Notice of Intent to Sue served upon the Administrator of USEPA, the USEPA Regional Administrator, the Attorney General, and the Director of the IEPA, with proofs of service, is attached hereto as Exhibit C.

64.     Each of the Defendants are "persons" as defined in Section 1004(15) of RCRA, 42 U.S.C. § 6903(15).

65.     Since approximately 1930 and continuing to the present, the Defendants, at various times, have contributed to the past or present handling, treatment, storage or disposal at the Subject Property of "solid wastes" within the meaning of Section 1004(27) of RCRA, 42 U.S.C. §6903(27) (hereafter referred to collectively as the "management" of solid waste).

66.     The aforesaid management activities have caused, and continue to cause, the release of solid wastes to air, soils, subsurface soils, sediments, surface water and groundwater and physical structures at the Subject Property, which release presents an imminent and substantial endangerment to health or the environment, within the meaning of 42 U.S.C. §6972(a)(1)(B).

67.     Each of the Defendants are subject to suit pursuant to Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B).

68.     This Court has jurisdiction pursuant to Section 7002(a) of RCRA, 42 U.S.C. §6972(a), to order the Defendants to take any actions necessary to abate the conditions which present an imminent and substantial endangerment to health or the environment and to refrain from taking actions in violation of RCRA and the regulations promulgated pursuant thereto, and to impose appropriate civil penalties.

WHEREFORE, the Village prays as follows:

A.     For a preliminary and permanent injunction restraining and enjoining Defendants from continuing to permit the presence of solid and hazardous waste contamination at, in, on, beneath or adjacent to the Subject

16

Property which may present an imminent and substantial endangerment to health or the environment, and requiring Defendants to immediately investigate and remedy such contamination, pursuant to Section 7002 of RCRA, 42 U.S.C. § 6972;

B.     For the imposition of civil penalties against Defendants pursuant to Section 7002(a) of RCRA, 42 U.S.C. § 6972(a);

C.     For an award of the Village's costs of litigation (including reasonable attorneys' and expert witness fees), pursuant to Section 7002(e) of RCRA, 42 U.S.C. § 6972(e);

D.     For an order requiring Defendants to file a bond or equivalent security, pursuant to Section 7002(e) of RCRA, 42 U.S.C. § 6972(e).

E.     For such other relief as the Court deems appropriate under the circumstances.

## COUNT II
### RIVERDALE NUISANCE ORDINANCE

1-62. The Village adopts and realleges paragraphs 1 through 62 of the Allegations Common to All Counts as paragraphs 1 through 62 of this Count II, as though fully set forth herein.

63.     Pursuant to the provisions of the Riverdale Nuisance Ordinance, Article I, Chapter 5.02, Section 5.02.100 of the Riverdale Code of Ordinances (the "Nuisance Ordinance"), "No business, licensed or not, shall be so conducted or operated as to amount to a nuisance in fact."

64.     The Subject Property is located within the Village's corporate limits.

65. The Defendants have contributed or are contributing to the past or present treatment, storage, or disposal at the Subject Property of solid waste and hazardous substances.

66. The presence of the solid and hazardous substances in the soils, subsurface soils, sediment and groundwater at the Subject Property constitutes the maintenance of a nuisance in fact under the Nuisance Ordinance.

67. Pursuant to Section 1.04.060 of the Riverdale Code of Ordinances, "Whenever in the ordinances of the Village of Riverdale, any act or omission is made unlawful, it shall include causing, allowing, permitting, aiding, abetting, suffering, or concealing the fact of such an act or omission."

68. Defendants have violated the Riverdale Code of Ordinances by, jointly and severally, causing, allowing, permitting, aiding, abetting, suffering or concealing a nuisance in fact.

WHEREFORE, the Village prays as follows:

A. That this Court preliminarily and permanently enjoin Defendants from the conduct of a nuisance in fact.

B. That this Court enter a preliminary and permanent injunction requiring Defendants, and each of them, to remove all waste materials, from the Site and requiring Defendants to immediately investigate and remedy solid and hazardous waste contamination at, in, on, beneath or adjacent to the Subject Property.

C. For the imposition of civil penalties against Defendants, and each of them, pursuant to Section 1.20.010 of the Riverdale Code of Ordinances, in the

amount of $500 for each day the Defendants have violated the Riverdale Nuisance Ordinance.

D.    For such other relief as the Court deems appropriate under the circumstances.

## COUNT III
## COMMON LAW PUBLIC NUISANCE

1-62.    The Village adopts and realleges paragraphs 1 through 62 of the Allegations Common to All Counts as paragraphs 1 through 62 of this Count III, as though fully set forth herein.

63.    A common law public nuisance is an act or failure to act which injures the safety, health or morals of the public; or which causes substantial public annoyance, inconvenience or injury.

64.    The general public has a right to be free from unreasonable jeopardy to their health, welfare, and safety, and from unreasonable threats of danger to person and property, caused by the presence of hazardous substances in the soil and/or groundwater.

65.    Defendants have caused and allowed hazardous substances to become released to air, located in soils, subsurface soils, sediment, surface water and/or groundwater at the Subject Property and continue to cause and/or allow such hazardous substances to remain in soils, subsurface soils, sediments, surface water and/or groundwater at the Subject Property.

66.    Such hazardous substances have migrated via air, land and water pathways and/or have the potential to migrate onto adjacent property, causing adjacent property to be unsuitable for some uses, including commercial uses.

67. The existence of such hazardous substances in soils, subsurface soils, sediment, surface water and groundwater at the Subject Property injures the safety and health of the public and causes a public injury.

WHEREFORE, the Village prays as follows:

A. For compensatory damages in an amount in excess of $75,000;

B. For such other relief as the Court deems appropriate under the circumstances.

THE VILLAGE OF RIVERDALE

By: _____
One of its attorneys

Michael S. Blazer (ARDC No. 6183002)
Thomas S. Yu (ARDC No. 6273289)
Jeep & Blazer, L.L.C.
24 N. Hillside Ave, Suite A
Hillside, IL 60162
(708) 236-0830
Fax (708) 236-0828
mblazer@enviroatty.com
tsyu@enviroatty.com

30