

MARK A. LaRose •
JOSEPH A. BOSCO •
DAVID KOPPELMAN
DAVID ROSEMEYER
DAVID J. ARON

OF COUNSEL
HON. ANTHONY J. BOSCO (1928-2008)
JOSEPH G. ALIOTO ••
ALBERTO QUIROS JAEN•••

• ADMITTED IN MICHIGAN ALSO
•• ADMITTED IN WISCONSIN ONLY
••• ADMITTED IN PANAMA ONLY

## LaRose & Bosco, Ltd.
### ATTORNEYS AT LAW

200 N. LaSALLE STREET
SUITE 2810
CHICAGO, IL 60601
P: (312) 642-4414
F: (312) 642-0434

135 S. WHITTAKER
NEW BUFFALO, MI 49117
P: (269) 469-8440
F: (269) 469-8442

November 2, 2017

**By Hand Delivery**
Ms. Mildred Blount
Ms. Edna Anthony
Mr. William Taylor
Mr. AJ Cunningham
Ms. Andrea Johnson
Ms. Helen Griffin
Mr. Gus Stone
Riverdale Zoning Board of Appeals
Village of Riverdale
157 W. 144th Street
Riverdale, IL   60827-2707

RE:     **Zoning Application by Riverdale Materials, LLC**

Dear Members of the Zoning Board of Appeals,

At the hearing on September 7, 2017, the Board tabled consideration of the conditional use application submitted by Riverdale Materials, LLC, so that it could consider the matter further, including any additional evidence.

This letter supplements my letter dated September 7, 2017, on behalf of my client Tri State Disposal, Inc.  As you know, Tri State owns and operates the solid waste transfer station in Riverdale, and pays the Village of Riverdale substantial royalties for each ton of material delivered to the site.

This additional information is provided for your consideration for the hearing on the conditional use application to be held on November 2, 2017 at 7:00 p.m. in the Village Board Chambers, 157 W. 144th Street, Riverdale.



EXHIBIT
3

Chicago, IL · New Buffalo, MI · Panama City, Panama
www.laroseboscolaw.com

Riverdale Zoning Board of Appeals
November 2, 2017
Page 2

(1)  <u>Improper Makeup of the Board</u>.  When the original application in this case was filed, we were advised that the makeup of the board was Carmelia Shipp – Chairperson, Mildred Blount, Edna Anthony, Darrell Dildy and William Taylor.  Even though the Zoning Board of Appeals is supposed to have seven (7) members, only five (5) had been appointed by the time the application was filed.  An evidentiary hearing was held with a quorum on September 7, 2017. The Board agreed to table this matter for further consideration. (*See* **Exhibit A**, Transcript at pp. 84-86) The matter was reset for October 5, 2017.  On October 5, 2017, allegedly there was no quorum as only three (3) of the five (5) members were present in the hearing room at the time the hearing was called to order.

At that time, Chairperson Shipp had indicated her opposition to the application.

Five (5) days later, on October 10, 2017, Mayor Lawrence Jackson terminated Ms. Shipp's appointment to the Zoning Board of Appeals.  The purported reason was that Ms. Shipp's term had expired. In fact, Ms. Shipp's term had expired two (2) years earlier. No action to terminate Ms. Shipp was taken until she indicated her opposition to the proposed application. At the same time, it is more than evident that Mayor Jackson is a strong proponent of the application.  *See* **Exhibit B,** picture of Mayor Jackson on the Riverdale recycling facility "Another business brought to you by the Honorable Mayor Lawrence Jackson. Coming soon . . . Riverdale Materials."

On the very same day of Ms. Shipp's termination, October 10, 2017, the Mayor appointed three (3) new Members to the ZBA: Andrea Johnson, Helen Griffin, and Gus Stone.

Despite the obvious political ramifications from the termination of Chairperson Shipp, the action has left the board with an improper makeup.  Chairperson Shipp was on the board during the original hearing, and heard the evidence presented. The ZBA voted to table the matter for further consideration, yet she is not being allowed to participate in further consideration. Moreover, the newly appointed members to the Board are unable to properly vote on this matter as they were not seated as board members during the original presentation to the ZBA and the evidence taken on September 7, 2017.  Therefore, the current makeup of the ZBA is not authorized to proceed on this matter.

(2)  <u>Riverdale Materials is already operating.</u>  Even though Riverdale Materials is here requesting permission to operate, it is obvious that they are already operating the facility and dumping materials on the ground.  *See* picture attached as **Group Exhibit C.** Therefore, Riverdale Materials is already operating before the ZBA and the Village Board has voted on its application for conditional use. For this reason alone, the application should be denied.

Riverdale Materials is requesting the ZBA to allow a conditional use for a recycling facility and transfer station. In specific cases, and after public hearing, the Riverdale Municipal Code allows for variation of its Title 17 zoning regulations. *See* Riverdale Municipal Code 17.03.080. Amongst other requirements, the ZBA shall vary its zoning regulations if the alleged difficulty or hardship is caused by Title 17's regulations, and has not been created by any persons presently having an interest in the property. *Id.*

Riverdale Zoning Board of Appeals
November 2, 2017
Page 3

Riverdale Materials purchased the property in question, and alleges that it is unable to operate a recycling facility and transfer station on its property without approval of its application for conditional use. Despite this request for conditional use, Riverdale Materials began unlawfully operating on site without the required permit from the Village of Riverdale. Thus, Riverdale Materials has created its own hardship and difficulty to lawfully operate a recycling facility and transfer station on the property. Accordingly, the ZBA may not vary its Title 17 zoning regulations to allow for conditional use, and therefore, Riverdale Materials' application for conditional use must be denied.

(3)     Additional Information Regarding Environmental Condition of the Property.

At the previous hearing, Ken Liss, President of Andrew Engineering, testified that the environmental condition of the property was a non-issue. Richard Toth, counsel for Riverdale Materials, LLC and 1201 West 138th Street, LLC, asked the following question:

"Are there are any environmental problems with the site now that would prevent us from doing what we're going to do?"

Ken Liss replied: "No."

*See* **Exhibit D**, page 43. Additionally, Richard Toth asked:

"So there's no contamination there now to worry about?"

Ken Liss again replied "No."

*Id.* at 44.

At the same proceeding, I testified that the property's environmental condition is significantly worse than Ken Liss had led the ZBA to believe. I quoted excerpts from a lawsuit filed by the Village:

"[The] whole property that used to be a landfill is contaminated with a minimum soluble materials, phenyl and greases, fecal coliform, cyanide, zinc, copper, iron, lead, arsenic, manganese, mercury, chromium, nickle [sic]. . ." *Id.* at 50.

"[The property's] leachate is contaminated and threatens to contaminate further the land, surface face, the ground water included in the aquifer." *Id.* at 51.

Moreover, I stated that:

"[T]his whole thing was a hole in the ground that people dumped trash and chemicals into," and that when "they [threw] a match in there . . . the whole thing would start on fire." *Id.* at 51-52.

Riverdale Zoning Board of Appeals
November 2, 2017
Page 4

Ken Liss testified a second time to counter my testimony, stating:

"We looked at Phase one . . . It looks at anything that was published out there." *Id.* at 68.

He further stated that:

"[T]he former owners cleaned out whatever they were supposed to clean out," and "there is no environmental sampling or U.S. EPA charges or report or Illinois EPA charges or reports during all those times. So frankly, I have no idea what he's talking about. There's no truth to it." *Id.* at 68-69.

In fact, in 1962 the Illinois Appellate Court held that the dump located on the property was both a statutory public nuisance violative of the Illinois Criminal Code and a common law public nuisance, and operation of the dump was permanently enjoined. *City of Chicago v. Fritz*, 36 Ill. App. 2d 457, 184 N.E.2d 713 (Ill. App. Ct. 1962) (*see* **Exhibit E** attached). The dump was used for the deposit of garbage, refuse, chemicals, sludge, waste material and other substances. *Id.* at 460. Additionally, the Court found that the "dump burned seven days a week; that about fifty trucks a day dumped garbage and that chemical and septic tank waste were also dumped there." *Id.* at 463. The Court also found that the dump was burned on a 24-hour basis, and "flames in the dump shoot hundreds of feet into the air, that the flames were caused by magnesium burning, and that the magnesium smoke would rise hundreds of feet in the air and then explode." *Id.* Accordingly, the Appellate Court affirmed permanently closing the dump due to the horrendous and dangerous environmental condition of the property.

The site remains an unremediated, unlined hazardous waste landfill. As I stated at the last hearing, it is unlikely that anyone will pay the tens of millions of dollars necessary to remediate the site. However, adding more waste to the top of an already contaminated site is not a good idea. If the ZBA is considering granting the application, it should condition the grant on requiring the applicant to pave the site with either concrete or asphalt.

(4)     New Company; Security for the Village. The applicant is a newly formed company (formed in November 2016), and the property is owned through a newly formed company (formed in May of 2016).

While this might be standard operating procedure for people forming new ventures, it is to protect them from liability in the event that the venture is not successful. In this case, if the venture is not successful, the applicant can merely walk away, bankrupt the new company that has no assets, and leave the Village of Riverdale holding the bag with unprocessed waste on the site.

In September, 2002, Tri State Disposal was required to post a $50,000 cash certificate of deposit (CD) that remains in effect today. The purpose for the certificate of deposit was for some security to Riverdale in the event that Tri State abandoned the site. Similar types of protections should be required of the applicant in this matter.

Riverdale Zoning Board of Appeals
November 2, 2017
Page 5

     (5)    <u>The Need for a Host Community Fee Agreement</u>. Tri State Disposal is required to and in fact does pay royalties to the Village of Riverdale for the material brought into the transfer station. Over the last 15 years, Tri State has paid the Village of Riverdale substantially more than One Million Dollars in royalties. If the ZBA wants to grant this conditional use, it should require a similar host community agreement as a condition, and require the applicant to pay royalties to the Village.

     Please make this correspondence part of the official record in this case.

     Very truly yours,

     Mark A. LaRose

MAL/mk
Enclosures

cc:    •Richard Toth, Attorney for Riverdale Materials, LLC, Daley & Georges
       •Montana & Welch, LLC, Attorney for Village of Riverdale

1        I understand he says he works here all the

2   time, but his family doesn't live here.  So that's

3   different.  So I need more time.  Those are

4   unanswered questions for me.  Like the fact that

5   they want to come to Riverdale, but still it's a lot

6   of unanswered questions.  I need to do some more

7   reading, researching.  That's what I need.

8        CHAIRMAN INGERSOLL:  Okay.  If the Board wants

9   to do some more research, is there a motion to table

10  consideration of this application to operate a

11  recycling facility at 1201 West 138th Street?

12       MS. SHIPP:  Yes.

13       CHAIRMAN INGERSOLL:  Do we have a second?

14       MS. ANTHONY:  She doesn't agree?

15       CHAIRMAN INGERSOLL:  You don't want to table

16  it?

17       MS. SHIPP:  It's a vote.

18       MR. CUNNINGHAM:  We're tabling it to bring it

19  back up.

20       CHAIRMAN INGERSOLL:  There's a motion.  We need

21  a second.

22       MR. CUNNINGHAM:  We're not voting on it today.

23  We're tabling it for us to do the research, like you

24  people want to do.

EXHIBIT
4
tabler

1          MS. ANTHONY:  Yes, we will do that.

2          MS. BLOUNT:  We got so much at the last minute.

3          MR. CUNNINGHAM:  I'll second.

4          CHAIRMAN INGERSOLL:  So the record is clear --

5          MS. SHIPP:  A motion to come back the next

6     Zoning Board meeting to further discuss the

7     possibility.

8          MR. CUNNINGHAM:  So we are tabling it.

9          CHAIRMAN INGERSOLL:  Do we have a second?

10         MS. BLOUNT:  Second.

11         CHAIRMAN INGERSOLL:  All those in favor.

12         MS. SHIPP:  Aye.

13         MS. ANTHONY:  Aye.

14         CHAIRMAN INGERSOLL:  We will do a roll call

15    vote to make sure we got it.

16         THE SECRETARY:  Member Blount?

17         MS. BLOUNT:  Yes.

18         THE SECRETARY:  Member Anthony?

19         MS. ANTHONY:  Yes.

20         THE SECRETARY:  Member Cunningham?

21         MR. CUNNINGHAM:  Yes.

22         CHAIRMAN INGERSOLL:  The motion carries.  And

23    just to make it abundantly clear, this matter is

24    going to be considered again at the next zoning

1    Board meeting, which I believe is October 5th.

2        I will now move to public comment.  Is there

3    anyone who would like to address the Board?  If so,

4    please approach the podium.  State your name.

5    Seeing none, this will conclude public comment.  Is

6    there a motion to adjourn?

7        MR. CUNNINGHAM:  Aye.

8        Do I have a second?

9        MS. SHIPP:  Second.

10       CHAIRMAN INGERSOLL:  All in favor.

11       MR. CUNNINGHAM:  Aye.

12       MS. ANTHONY:  Aye.

13       CHAIRMAN INGERSOLL:  The motion carries.  We're

14   adjourned.

15

16

17

18

19

20

21

22

23

24

































1  egress and to avoid congestion, is that correct?

2       MR. LISS:  Yes.

3       MR. TOTH:  When the uses are all established,

4  will it conform to the applicable regulations of the

5  district except as to subject it to what we're

6  including here?

7       MR. LISS:  Yes.  It's our job to make sure that

8  everything is in there properly.  The permit,

9  whatever comes to the City, the State or in the case

10  of the type of facility that you have, you wouldn't

11  get approved.

12       MR. TOTH:  Beyond that, you're going to make

13  state regulators happy and anybody else, the fire

14  chief happy?

15       MR. LISS:  They come out and inspect it.

16       MR. TOTH:  All of the processing that you

17  described today and as we described in our

18  application is in conformance with Illinois law, is

19  that correct?

20       MR. LISS:  Yes.

21       MR. TOTH:  Are there any environmental problems

22  with the site now that would prevent us from doing

23  what we're going to do?

24       MR. LISS:  No.

EXHIBIT
D

1       MR. TOTH:  There was a phase one study that

2    gave us comfort in that respect?

3       MR. LISS:  Before purchasing the property,

4    there was a phase one study done.  We did not do it.

5    It was performed by another engineering firm that

6    identified that there was some fill, they call it

7    fluff.

8         It is the interior of a car when you tear

9    apart cars, and you take it to a car shredder,

10   things they can't get rid of.  That's what was

11   buried at the site there.

12      MR. CUNNINGHAM:  Was a soil sample taken?

13      MR. LISS:  Not by us.  It was done before that,

14   and the State is well aware of it.  They never

15   pursued anything on it.

16        As far as I know, it was done in accordance

17   with State standards.  The place closed up, and it's

18   just there.  So it shows that there is that car

19   fluff.

20      MR. TOTH:  So there's no contamination there

21   now to worry about?

22      MR. LISS:  No.

23      MR. TOTH:  And there's no contamination we're

24   going to be adding with our work?

1   environmental condition. I attached to my letter a

2   lawsuit that was filed by the Village of Riverdale

3   against the owners of this property.  Not just this,

4   but this here and all of this (indicating).

5          And there used to be a company there called

6   Hanche Chemical.  This lawsuit was filed in 2007

7   against these property owners by the Village of

8   Riverdale asking them to do something to clean it

9   up.  Before you rule on this thing, take a look at

10  this lawsuit.

11         On page 11, the Village is informed and

12  believes that leachate generated within the waste

13  disposal site, that is that whole property that used

14  to be a landfill is contaminated with a minimum

15  soluble materials, phenyl and greases, fecal

16  coliform, cyanide, zinc, copper, iron, lead,

17  arsenic, manganese, mercury, chromium, nickle, which

18  contaminates have leached from the waste disposal

19  site into the waste at the site.

20         Leachate is also characterized by high

21  biochemical oxygen demand and high suspended solids.

22  Mr. Liss knows exactly what this is.  He is a ground

23  water geologist.  The phase one had to pick this up.

24  It's a records review.  You review everything.  He

1    had to pick up this lawsuit.

2          The Village is informed and believes

3    theleachate is contaminated and threatens to

4    contaminate further the land, surface face, the

5    ground water included in the aquifer.  Now, I'm not

6    saying that grinding up stone here is going to make

7    that any worse, but to say that this property

8    doesn't have environmental problems.

9          The City ran out of money.  They ultimately

10   withdrew the lawsuit.  They didn't lose the lawsuit,

11   they just withdrew it.  And that was in I think 2008

12   or 2009 because they couldn't pay the lawyers.  But

13   this property was a landfill that there's cases back

14   in 1959 and 1960 that would say at night they throw

15   a match in there, and the whole thing would start on

16   fire.

17         It's not a great site, and I want to tell you

18   two things about this.  This whole thing back here,

19   asphalt, forget about that because for the transfer

20   station it's not going to be there, and it's not

21   there now.  This is all just dirt.  There's no

22   asphalt there.  There is no concrete there.  There's

23   some concrete up here, right.

24         And there's another key element to this

1    thing. They talk about drainage from the site into

2    an unnamed onsite retention pond.  The retention

3    pond right here (indicating).   There's one real

4    problem with that.  They don't own that.

5         You look on their application, look at the

6    application, and you could look at the survey.

7    Right here, this one right here, this retention pond

8    says not included.  You know why it's not included?

9    They don't own that.  So that is going to drain the

10   site into some retention pond they don't own.

11        And what the retention pond really is, it is

12   a permitted pond that was designed as a leachae

13   collection system.  This whole thing was a hole in

14   the ground that people dumped trash and chemicals

15   into way back when government made them do a leacha

16   collection system, and this is where most of it

17   goes.  They don't own the retention pond.  Yet they

18   kind of sneakily put it in their application.

19        If you look a couple of pages beyond that,

20   here it is right here.  It says not included on one

21   site.  Boom.  All of a sudden it's included on this

22   site.  They don't own it, and I know who does.  So

23   I'm not going to read this whole thing to you.  Take

24   a look at it.  It's not a great site for this type

1  companies are new doesn't mean anything.  People

2  have long standing experience and knowledge working

3  in this.

4          I will ask Mr. Ken Liss to come up again.

5  Where you talked about the environmental condition

6  of the site, can you revisit that topic, please?

7          MR. LISS:  The phase one?

8          MR. TOTH:  Yes.

9          MR. LISS:  We looked at the phase one.  Phase

10 one is a records review.  It looks at anything that

11 was published out there.

12         It included whether or not there was State

13 violations.  The property was this parcel right here

14 that we're talking about today.  The former owners

15 cleaned out whatever they were supposed to clean

16 out.  They're paying their taxes is what that phase

17 one indicated.  There were no violations.

18         Yes, there's buried fluff.  Apparently it

19 was done in accordance with whatever permitting or

20 whatever state law was allowed because there are no

21 violations against it.  U.S. EPA has not issued a

22 report against it.  It's a process.  So there was a

23 lawsuit.  I looked at that, but there was no

24 sampling or information at all where all these

1  parcels were included in that lawsuit.  So there's

2  no information to look at their allegations.

3        There were no samples to substantiate

4  whatever those charges were, whatever the purpose

5  was.  Maybe it was to motivate everyone in that area

6  to clean up their site, I don't know.  But it was

7  ended.  I don't know why it was ended.

8        There is no environmental sampling or U.S.

9  EPA charges or reports or Illinois EPA charges or

10  reports during all those times.  So frankly, I have

11  no idea what he's talking about.  There's no truth

12  to it.

13        MR. TOTH:  Any questions for Mr. Liss?  No

14  questions.  Anything more that you have?

15        MR. LISS:  No.  I could go on for a long time.

16  If there's any questions they want to ask.

17        MR. TOTH:  I will ask Jim to come up for a

18  second again.

19        Jim, I think you were accused of wanting to

20  conduct business there in violation of approvals and

21  permits.  Is that your plan?

22        MR. BRACKEN:  No, it's not my plan.

23        MR. TOTH:  How do you conduct business?

24        MR. BRACKEN:  In a professional manner.  I will

WESTLAW

Distinguished by People ex rel. Traiteur v. Abbott, Ill.App. 5 Dist., March 27, 1975

Original Image of 184 N.E.2d 713 (PDF)

City of Chicago v. Fritz
Appellate Court of Illinois, First District, Second Division.    July 24, 1962    36 Ill.App.2d 457    184 N.E.2d 713    (Approx. 7 pages)

CITY OF CHICAGO, a municipal corporation, Plaintiff-Appellee,

v.

Charles H. FRITZ and Industrial Scrap Material Corporation, an Illinois
corporation, Defendants-Appellants;
Village of Riverdale and Riverdale Area Property Owner's Association,
City of Blue Island, and Baltimore and Ohio Railroad Company,
Intervening Petitioners-Appellees.

Gen. No. 48671.
July 24, 1962.

Action to enjoin defendants' use of a certain tract of land for operation of a dump. The
Superior Court, Cook County, Samuel B. Epstein, J., entered an injunctive decree, and an
appeal was taken. The Appellate Court, Bryant, P. J., held that a dump in which garbage
was burned, located within one mile of a municipality, was both a statutory public nuisance
violative of the Criminal Code of the state and a common law public nuisance, and
operation thereof was properly abated by injunction.

Decree affirmed.

West Headnotes (10)

Change View

1    Nuisance     Persons by or Against Whom Proceedings May Be Brought
      City of Chicago had right to maintain an action for an injunction against
      defendants' use of certain land for a dump, where the dump was located within
      one mile of the city limits, under statutes authorizing authorities of municipalities
      to abate nuisances and to prohibit any offensive business or establishment
      within distance of one mile beyond municipal limits. S.H.A. ch. 24, §§ 1-1-5, 11-
      42-9, 11-60-2.

      2 Cases that cite this headnote

2    Nuisance     Persons by or Against Whom Proceedings May Be Brought
      Municipal corporations may call upon a court of equity for assistance to abate
      nuisances.

3    Nuisance     Nuisances Subject to Abatement or Injunction
      Fact that a nuisance is a violation of criminal laws will not bar equitable
      interference if other facts afford a basis for equitable jurisdiction.

4    Nuisance     Matters Constituting Public Nuisances in General
      Nuisance     Grounds for Injunction
      A dump in which garbage was burned, located within one mile of a municipality,
      was both a statutory public nuisance violative of the Criminal Code of the state
      and a common law public nuisance, and operation thereof was properly abated
      by injunction. S.H.A. ch. 24, § 1-1-5; ch. 100½, § 26.

SELECTED TOPICS

Torts

Private Nuisances
   Nuisance per se

Environmental Law

Waste Disposal and Management
   Land Solid Waste Disposal Act

Public Nuisances

Public Nuisance Abatement Injunction

Secondary Sources

s 4.  Legislative power and control

29 Ill. Law and Prac. Nuisances § 4
...The imposition of a statutory duty not to
create or maintain a nuisance is merely
declaratory of the common law applicable to
all concerned. The General Assembly has
power to declare places in which it...

s 1.03. RESOURCE CONSERVATION
AND RECOVERY ACT.

34 E. Min. L. Found § 1.03
...The Resource Conservation and Recovery
Act's (RCRA or the Act) central feature is a
two-track regulatory structure for "hazardous
solid wastes" and "nonhazardous solid
wastes." RCRA is administered b...

Hog Breeding, Confining, or
Processing Facility as Constituting
Nuisance

93 A.L.R.5th 621 (Originally published in
2001)
...This annotation collects and discusses
cases in which a number of pigs are being
raised or maintained by a defendant as a
continuing operation and it was alleged that
such a continuing operation constit...

See More Secondary Sources

Briefs

Brief for Respondents Connecticut,
New York, California, Iowa, Rhode
Island, Vermont, and the City of New
York

2011 WL 915093
AMERICAN ELECTRIC POWER COMPANY
INC., et al., Petitioners, v. STATE OF
CONNECTICUT, et al., Respondents.
Supreme Court of the United States
Mar. 11, 2011
...FN* Counsel of Record 1. In 2004, plaintiffs
Connecticut, New York, California, Iowa, New
Jersey, Rhode Island, Vermont, Wisconsin,
and the City of New York sued defendants,
the five largest emitters o...

Brief of Madison County, New York as
Amicus Curiae in Support of
Respondents

2006 WL 3606642
UNITED HAULERS ASSOCIATION, INC., et
al., Petitioners, v. ONEIDA-HERKIMER
SOLID WASTE MANAGEMENT
AUTHORITY, et al., Respondents.
Supreme Court of the United States
Dec. 07, 2006
...FN1  All references are to this edition



EXHIBIT
E

10/4/2017          City of Chicago v. Fritz | Cases | Illinois | Westlaw

3 Cases that cite this headnote

5   Environmental Law   Regulation in General
Purpose of statute making it unlawful for any person to dump or place garbage within corporate limits of any city or within one mile of any city is to protect health and welfare of the public by controlling dumping of garbage or other offensive substances. S.H.A. ch. 100½, § 27.

6   Nuisance   Grounds for Injunction
A court of equity had jurisdiction and properly issued injunctive relief against operation of a dump, although conduct objected to was also a crime, where operation of the dump constituted a public nuisance. S.H.A. ch. 100½, § 27.

3 Cases that cite this headnote

7   Nuisance   Public Annoyance, Injury, or Danger
There is no general rule applicable to all cases for determining when offensive odors constitute a common law nuisance, but each case must be decided upon its own peculiar facts.

2 Cases that cite this headnote

8   Nuisance   Exercise of Legal Right
A business which is lawful in itself may become a nuisance either because of the locality in which it is carried on or because it is conducted in an improper manner.

9   Nuisance   Public Annoyance, Injury, or Danger
Impregnation of the atmosphere with disagreeable or offensive odors may become a nuisance where the atmosphere is contaminated to such an extent as to substantially impair comfort or enjoyment of adjacent occupants.

10   Nuisance   Grounds for Injunction
Question of nuisance did not have to be first determined in a suit at law, where right to injunctive relief was established because of unreasonable and unlawful use of defendants' dump to injury of others.

**Attorneys and Law Firms**

*459 **714 Morris S. Bromberg, Benjamin Bromberg, Chicago, Irving Goodman, Julia M. Hagerty, Chicago, of counsel, for appellants,

John C. Melaniphy, Herbert F. Zornow, John H. Gobel, Paul R. Schreiber, Chicago, Sydney R. Drebin, Harry H. Pollack, Chicago, of counsel, for appellee.

**Opinion**

BRYANT, Presiding Justice.

This appeal is taken from a decree of the Superior Court finding defendants' use of a certain tract of land and operation of a dump to be a nuisance and a hazard, and permanently restraining and enjoining defendants from using the land for the purpose of dumping, piling, accumulating or burning garbage or other refuse on the land. The land has been in continuous use as a *460 dump for over thirty years and is located in an unincorporated area of Cook County at 138th Street and Racine Avenue, and is within one mile of the Chicago city limits. The complaint filed in chancery by the City of Chicago on December 29, 1960 alleged that defendants' use of its land constituted a hazard to the health and safety of the residents of Chicago and violated Section 466a of the Illinois Criminal Code. Ill.Rev.Stat.1959, ch. 38 § 466a (now transferred to ch. 100 1/2 § 27). The complaint was amended on July 31, 1961 to include section 99.3 of the Municipal Code of Chicago. The answer to the complaint denied generally the allegations. On February 23, 1961, the case was referred to a Master for hearing. Shortly thereafter petitions to intervene were filed by the Village of Riverdale, the Riverdale Area Property Owner's Association,

Brief of Amici Curiae National Federation of Independent Business Small Business Legal Center, American Tort Reform Association, and CropLife America in Support of Petitioners

2011 WL 1321235
AMERICAN ELECTRIC POWER COMPANY, INC., et al., Petitioners, v. STATE OF CONNECTICUT, et al., Respondents.
Supreme Court of the United States
Feb. 07, 2011

...FN* Counsel of Record FN1. The parties consented to the filing of this brief and their letters of consent have been lodged with the Clerk of the Court. Pursuant to Rule 37.6, amici state that no counse...

See More Briefs

Trial Court Documents

Stephen YOUNG, Special Administrator of the Estate of Andrew Young, individually and on behalf of a class of similarly situated persons, Arlene Macias, Special Administrator of the Estate of Miguel Macias, Deceased, individually and on behalf of a class of similarly situated persons, Plaintiffs, v. BRYCO ARMS, et. al., Defendants; Orbrelia Smith, Special Administrator of the Estate of Salada Smith, individually and on behalf of a class of similarly

2001 WL 35913207
Stephen YOUNG, Special Administrator of the Estate of Andrew Young, individually and on behalf of a class of similarly situated persons, Arlene Macias, Special Administrator of the Estate of Miguel Macias, Deceased, individually and on behalf of a class of similarly situated persons, Plaintiffs, v. BRYCO ARMS, et. al., Defendants; Orbrelia Smith, Special Administrator of the Estate of Salada Smith, individually and on behalf of a class of similarly
Circuit Court of Illinois
Feb. 14, 2001

...The families of Michael Ceriale, Andrew Young and Salada Smith filed Complaints on behalf of their decedents against various firearm manufacturers, distributors and retail sellers. Their Complaints, co...

In re Tallygenicom, L.P.

2009 WL 8188933
In re: TALLYGENICOM, L.P., et al., Debtors.
United States Bankruptcy Court, D. Delaware.
Jan. 27, 2009

...FN1. The Debtors are the following entities (followed by their tax identification numbers): TallyGenicom, L.P. (54-1996340), TallyGenicom Holdings, LLC (65-1160834), and Printing Solutions, Inc. (01-07...

Doe v. United States of America

2015 WL 10571522
Jane DOE, Petitioner, v. UNITED STATES OF AMERICA, Respondent.
United States District Court, N.D. California.
May 29, 2015

...JOHN GLEESON, United States District Judge: Jane Doe filed an application on October 30, 2014, asking me to expunge her thirteen-year old fraud conviction because of the undue hardship it has created f...

See More Trial Court Documents

The City of Blue Island and the Baltimore and Ohio Chicago Terminal Railroad Company (hereinafter referred to as the B. & O.).

The Master's report found that defendants' dump was located in an unincorporated area in Cook County, Illinois, within one mile of the corporate limits of the City of Chicago, Village of Riverdale, and City of Blue Island; that defendants' dump was used as a dump for the deposit of garbage, refuse, rubbish, chemicals, sludge, waste material, and other substances collected from various sources as alleged in the complaint and the intervening petitions; that the defendants, by admission of defendant Charles H. Fritz, have taken in the aforesaid matter which originated in and was collected from the City of Harvey, Village of Lansing, Village of South Holland, Village of Dixmoor, Village of Tinley Park, as well as from various industries, scavengers, and private sources, and that the defendants have burned the aforesaid matter for the purpose of disposing of same; that as a result of such burning, clouds of dense black smoke were blown from defendants' *461 dump into Chicago and Riverdale, and over and into the yards of the B. & O.; that such burning has resulted in a smoke or haze and a nauseous odor of burning garbage and chemicals permeating an area within a radius of two miles or more of defendants' dump; that said smoke, haze and nauseous odors have deprived the residents of Chicago, Riverdale and Riverdale Area Property Owner's Association of the comfortable and peaceful use and enjoyment of their properties, and has also interfered with and restricted the operations of the B. & O. yards lying in part immediately north of and adjacent to the north line of defendants' dump; that in addition to smoke and odors from defendants' dump, ashes and particulate matter from defendants' dump are blown onto the premises **715 of the residents of Chicago, Riverdale, and the B. & O.; that as a result thereof such residents and employees of the B. & O. have suffered great annoyance and discomfort, and the use of their premises has been greatly impaired; that the smoke from defendants' dump has obstructed the vision of the public using 138th Street and other public streets in the vicinity of defendants' dump; that such smoke has made driving conditions on such streets dangerous; that defendants' dump constituted a nuisance and a hazard to the health of the residents of Chicago, Riverdale, and Riverdale Area Property Owner's Association; that defendants' dump violates section 466a of the Illinois Criminal Code because it is within one mile of the corporate limits of Chicago, Riverdale and Blue Island; that defendants' dump constituted a nuisance and a hazard in the operation of the B. & O. yards because of the smoke, nauseous odors, ashes and particulate matter which blows from defendants' dump onto the B. & O. premises; that the allegations have been proven and that the equities are with the plaintiff and intervening petitioners; that the plaintiff and intervening petitioners are entitled *462 to an order requiring the defendants forthwith to remove from their dump or to cover forthwith all garbage, refuse, rubbish, chemicals and sludge and waste materials or other foreign substances on said dump, and to cease and desist from burning such matter; and that defendants be perpetually restrained from using said premises as a garbage or refuse dump and from dumping or receiving for dumping, piling, accumulating, burning or scattering garbage, refuse, rubbish, chemicals, sludge, waste materials, or other foreign substances.

The defendants' objections to the Master's report were overruled and allowed to stand as exceptions. On November 14, 1961, the chancellor entered the decree herein, overruling the defendants' exceptions and approving the Master's report, and granted the injunction recommended by the Master.

The Abstract of Record in the instant case covers 289 pages and the report of proceedings covers 2706 pages. Sixty-six witnesses testified before the Master: forty-one for plaintiffs, and twenty-five for defendants. Numerous pictures and exhibits were admitted into evidence. It would be difficult and of no advantage to summarize the entire contents of the report of proceedings. After reviewing the evidence, we think it is quite clear from the testimony and exhibits that defendants' dump is full, that garbage and refuse is piled high above the ground and that there have been numerous fires and much smoke that constitute a hazard and a nuisance to the public. Although defendant Fritz denied in his testimony that he had to burn the refuse, this was contradicted by affidavits filed in this court in support of defendants' repeated motions for a supersedeas. Fritz stated in these affidavits that he could not operate the dump without burning because the dump was full.

*463 A few examples of plaintiffs' evidence should suffice to give color to the case, showing the facts upon which the case rests, and why defendants' dump constituted a nuisance. Charles Spoo, plaintiffs' witness who worked for 20 years for the B. & O. testified as follows: that defendants' dump burned seven days a week; that about fifty trucks a day dumped garbage and that chemicals and septic tank waste were also dumped there; that the stench from the chemicals 'can knock anybody down within a half mile' of the dump; that the

garbage in the dump was burned on a 24-hour basis; that on March 27, 1961, he saw flames in the dump shoot hundreds of feet into the air, that the flames were caused by magnesium burning, and that the magnesium smoke would rise hundreds of feet in the air and then explode; that on said date and whenever the wind blew towards Chicago he smelled odors from the dump in Chicago; that on March 27, 1961, there were 20 fires burning in various parts of the dump; that he called the State Fire Marshal; that he had **716 to change his clothes practically every day because of odors from the dump; that the upholstery in his automobile reeked from the smoke and stench from the dump; that the dump was overrun with rats; that he saw fires in the dump every day since March 27th; that when he was about 600 feet from the fires in the dump, the smoke was so thick that he could not see his hand in front of his face; that he saw thousands of rats in the dump; that every day he saw fifty to a hundred rats there; that when he drove near the dump, his life was in danger because the smoke and smog from the dump was so thick that he had to slow down to a standstill on 138th Street; that when he operated his engine for the B. & O., his life was in danger because burning papers and embers from the dump got into the cab of his engine and almost set him on fire; *464 that, as far as he knew, no one else in the vicinity was burning anything except the dump, which burned fifty truckloads of garbage every day.

Charles K. Cook, Chief of Police of Riverdale, testified: that garbage was burned in the dump, that on April 15, 1961 he issued a summons to defendant Fritz because of the burning garbage in the dump; that in the last five years he received sixty-one complaints about burning and smoke from the dump; and that on December 28, 1956 Fritz called him because the fire at the dump was out of control; and that the operation of the dump was mostly above ground except for one or two acres in the northeast corner.

1    Defendants summarize this case as presenting two principle issues: 1. Is the operation of defendants' dump a nuisance in law or fact under any of the criteria, rules or standards established either by common law or by any statute or ordinance in the State of Illinois? 2. Did the plaintiff or any of the intervenors have the right to institute or pursue this action? We will initially dispose of defendants' second point, since it is beyond doubt that plaintiff has the right to maintain this action by virtue of the relevant provisions of the Illinois Municipal Code. Ill.Rev.Stat.1961, ch. 24, §§ 11-60-2, 11-42-9, 1-1-5. Section 11-60-2 provides:

'The corporate authorities of each municipality may define, prevent, and abate nuisances.' (Formerly section 23-61 of Revised Cities and Villages Act.)

Section 11-42-9 provides:

'The corporate authorities of each municipality may prohibit any offensive or unwholesome business or establishment * * * within the distance of one mile beyond the municipal limits.'

*465 Section 1-1-5 provides:

'The corporate authorities of each municipality may exercise jointly, with one or more other municipalities, all of the powers set forth in this Code unless expressly provided otherwise.'

Section 99-3 of the Municipal Code of Chicago provides:

'In all cases where no provision is herein made defining what are nuisances and how the same may be removed, abated, or prevented, in addition to what may be declared such herein those offenses which are known to the common law of the land and the statutes of Illinois as nuisances may, in case the same exist within the city limits or within one mile thereof, be treated as such, and proceeded against as is provided in this code, or in accordance with any other provision of law.'

2    3    Municipal corporations may call upon a court of equity for assistance to abate nuisances. City of Pana v. Central Washed Coal Co., 260 Ill. 111, 123, 102 N.E. 992. The fact that the nuisance is a violation of criminal laws will not bar equitable interference if other facts afford a basis for equitable jurisdiction, 17 McQuillin, Municipal Corporations 297, 298 (3rd. ed. 1950), and the facts presented here clearly afford such a basis.

4    **717 As to the merits of the injunction itself, defendants' dump is both a statutory public nuisance that violates the Criminal Code of Illinois and a common law public nuisance, and the Chancellor properly abated it. Section 221 of the Criminal Code (Ill.Rev.Stat.1961, ch. 100 1/2 § 26) provides:

*466 'It is a public nuisance:

'1. To cause or suffer * * * any offal, filth or noisome substance to be collected, deposited or to remain in any place, to the prejudice of others. * * *'

'8. To erect, continue or use any building or other place for the exercise of any trade, employment or manufacture, which, by occasioning noxious exhalations, offensive smells or otherwise, is offensive or dangerous to the health of individuals, or of the public.'

Section 221a of the Criminal Code provides:

'It is unlawful for any person to dump or place any garbage or other offensive substance within the corporate limits of any city, village or incorporated town other than (1) the city, village or incorporated town within the corporate limits of which, such garbage or other offensive substance shall have originated, or (2) a city, village or incorporated town which has contracted with the city, village or incorporated town within which the garbage has originated, for the joint collection and disposal of garbage; nor shall any such garbage or other offensive substance be dumped or placed within a distance of one mile of the corporate limits of any other city, village or incorporated town.

'Any person violating any provisions of this section is guilty of a misdemeanor and upon conviction shall be fined not less than one hundred ($100.00) dollars nor more than five hundred ($500.00) dollars.'

5     The purpose of this statute is to protect the health and welfare of the public by controlling the dumping of garbage or other offensive substances. County of Cook v. Triem Steel & Processing, Inc., 19 Ill.App.2d 126, 129, 153 N.E.2d 277. The Triem case *467 holds that no garbage or other offensive substances can be dumped by anyone, including municipalities, within a distance of one mile of any other municipality.

6     Defendants' contention that the statute and ordinances cannot be enforced in a chancery action because they are of a criminal nature is without merit. It has long been recognized that a court of equity has jurisdiction where the enforcement of the criminal law is incidental to the general relief sought. Village of Spillertown v. Prewitt, 21 Ill.2d 228, 171 N.E.2d 582; Stead v. Fortner, 255 Ill. 468, 99 N.E. 680. See also People v. Billburg, 175 Ill.App. 136, and Cella v. People, 112 Ill.App. 376. Since the facts presented here justify equitable intervention, an injunction may issue even though the conduct objected to is also a crime, and the dumping constitutes a public nuisance which equity will abate.

7    8    9     There is no general rule applicable in all cases for determining when offensive odors constitute a common law nuisance. Each case must be decided upon its own peculiar facts, taking into consideration the location and all surrounding circumstances. City of Pana v. Central Washed Coal Co., supra; 39 Am.Jur., Nuisances § 59. A business which is lawful in itself may become a nuisance either because of the locality in which it is carried on or because it is conducted in an improper manner. 39 Am.Jur., Nuisances § 43. Impregnation of the atmosphere with disagreeable or offensive odors or stenches may become a nuisance where the atmosphere is contaminated to such an extent as to substantially impair the comfort or enjoyment of adjacent occupants. 39 Am.Jur., Nuisances § 59.

The record shows that defendants' dump constituted not only a statutory nuisance under the statutes quoted above, but also **718 constituted a common law nuisance that was properly abated. People v. Metropolitan Disposal Co., 345 Ill.App. 570, 104 N.E.2d 107. *468 The equitable remedy should be fashioned to fit the particular facts of the case. The alteration of the remedy in the Metropolitan Disposal case, supra, so as to best serve the public interest by filling the dump by means of accelerated dumping under supervision and then covered over, does not distinguish that case from the instant one.

Defendants continuously call attention to the fact that their dump has been in operation for over thirty years. This is of no consequence. The dump in the Metropolitan Disposal case was in operation for more than forty years but when the facts evidenced that it had become a public nuisance it had to be closed. Defendants' dump is full, reeking, hazardous and a nuisance under the relevant statutes and the common law. It should be abated.

Defendants' heavy reliance on Ward v. Illiopolis Food Lockers, Inc., 9 Ill.App.2d 129, 132 N.E.2d 591, and Gardner v. International Shoe Co., 386 Ill. 418, 54 N.E.2d 482, is inappropriate. Although both cases have language and abstract propositions of law that would be helpful to defendants, they are factually quite different from the instant case and the weight of the evidence in both those cases does not nearly measure up to the evidence presented here.

10    Defendants mustered some testimony in their own behalf, but plaintiffs' evidence is
      overwhelming in establishing the existence of a nuisance. Therefore, defendants'
contention that a trial at law is required to establish the fact that the dump is a nuisance
before equity will intervene is without merit. Since the right to equitable relief is clearly
established here because of the unreasonable and unlawful use of defendants' dump to the
injury of others, it is not necessary that the question of nuisance should first have been
determined in a suit at law. City of Pana v. Central Washed Coal Co., supra; *469 Wente v.
Commonwealth Fuel Co., 232 Ill. 526, 83 N.E. 1049; Oehler v. Levy, 234 Ill. 595, 85 N.E.
271, 17 L.R.A.,N.S., 1025.

The decree is affirmed.

Decree affirmed.


BURKE, J., and FRIEND, J., concur.

**All Citations**

36 Ill.App.2d 457, 184 N.E.2d 713

---

**End of**                     © 2017 Thomson Reuters. No claim to original U.S. Government Works.
**Document**

