**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TRI-STATE DISPOSAL, INC., an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 18-CV-02138 |
| vs. | ) ) | Judge Sara L. Ellis |
| THE VILLAGE OF RIVERDALE, a municipal corporation; and LAWRENCE L. JACKSON, Mayor of the Village of Riverdale, | ) ) ) ) ) | Magistrate Judge Mary M. Rowland |
| Defendants. | ) ) | |

**~~SECOND~~ THIRD AMENDED COMPLAINT**

Plaintiff, Tri-State Disposal, Inc., an Illinois corporation ("Tri-State"), by and through its attorneys, Mark A. LaRose, Marissa Alaska and LaRose & Bosco, Ltd, hereby brings its ~~Second~~Third Amended Complaint against The Village of Riverdale, and Lawrence L. Jackson, Mayor of the Village of Riverdale, and in support hereof states as follows:

**I.      Introduction and Summary**

1.      This Complaint challenges Ordinance Number 2017-22 passed by the Village of Riverdale on November 28, 2017 granting a conditional use of Riverdale Materials, LLC to allow it to conduct a waste collection operation at 1201 W. 138th Street, Riverdale, Illinois. *(See* **Exhibit 1,** Village of Riverdale Ordinance Number 2017-22). It also challenges the Village's actions in retaliating against the plaintiff for the plaintiff's exercise of its first amendment rights.

2.      At every stage of the proceedings before the Village of Riverdale Zoning Board of Appeals and the Village Board, Tri-State challenged the ordinance on procedural and substantive grounds.

**EXHIBIT A**

3.     This lawsuit challenges the procedure (or lack thereof) that resulted in the Village passing said arbitrary and capricious ordinance, not only because the ordinance is detrimental to the public health, safety and environment of the Village of Riverdale, but because it is specifically detrimental to Tri-State, as the ordinance results in unequal treatment of Tri-State.

## II.     The Parties

4.     Tri-State Disposal, Inc. is an Illinois corporation that operates a solid waste transfer station at 13903 S. Ashland Avenue in the Village of Riverdale, County of Cook, Illinois.

5.     The Village of Riverdale is a municipal corporation operating in Riverdale, County of Cook, Illinois.

6.     Lawrence L. Jackson is the Mayor of the Village of Riverdale, and is an elected official who resides in Riverdale, County of Cook, Illinois.

## III.     Jurisdiction and Venue

7.     Jurisdiction for the federal claims (Counts I, II, III, and IV ) is proper in the Northern District of Illinois, Eastern Division, pursuant to 42 U.S.C. §1983 and 28 U.S.C. § 1331, which provides that the district court shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States. Jurisdiction for the non-federal claims (Count V) is proper pursuant to 28 U.S. Code § 1367(a), which provides that the district court shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

8.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because defendants reside in this district, and all of the actions of the defendant(s) occurred in this district.

IV.     **Common Allegations**

A.     **Tri-State Disposal, Inc.**

9.      Tri-State is an Illinois corporation that operates a solid waste and construction and demolition transfer station at 13903 S. Ashland Avenue, Riverdale, Illinois.

10.     As part of its operation, the Village of Riverdale requires Tri-State to post a $50,000 CD as security for closure/post-closure and clean up of the site. This CD is still in place for the benefit of the Village of Riverdale and its residents.

11.     The Village of Riverdale also requires Tri-State to pay royalties to the Village of Riverdale based on every ton of waste that is processed through its site.

12.     Tri-State also has rigorous requirements for permitting and environmental matters through the Illinois Environmental Protection Agency, Cook County Department of Environment, the Village of Riverdale, etc.

13.     Tri-State's facility is less than one mile from Riverdale Materials' site.

14.     Tri-State also owns real property immediately adjacent to the Riverdale Materials site, an approximate one acre retention pond.  ("Retention Pond").

15.     The Retention Pond is adversely affected by runoff and other drainage from the Riverdale Materials site.

16.     Tri-State appeared at the Zoning Board of Appeals hearings on September 7, 2017 and November 2, 2017, and submitted documents at those hearings.  See **Exhibit 2**, Tri-State submittal dated September 7, 2017, and **Exhibit 3**, Tri-State submittal dated November 2, 2017.

17.     Tri-State also appeared at the Village Board Meeting where the subject ordinance was passed, and attempted to present additional materials in opposition to the ordinance.  See **Exhibit 4**, Tri-State's proposed verified submittal dated November 28, 2017. That attempt was

denied by the Village attorney at the board meeting. See **Exhibit 5**, Transcript of hearing held on November 28, 2017, at pp. 7-10.

18.     Transcripts of all of the hearings are attached hereto as **Exhibit 5** Transcript of hearing held on November 28, 2017; **Exhibit 6**, Transcript of hearing held on November 2, 2017; **Exhibit 7**, Transcript of hearing held on September 7, 2017.

**B.     Riverdale Materials, LLC**

19.     Riverdale Materials, LLC is a start-up company that originally applied for a solid waste transfer station, construction demolition transfer station, dirt transfer station, and stone processing facility. (See **Exhibit 8**, Riverdale Materials Conditional Use Application)

20.     After Tri-State objected, Riverdale Materials deleted from its application its request for a solid waste (trash) transfer station, but the remainder of its application stood unaffected. (See **Exhibit 9**, Riverdale Materials Amended Conditional Use Application)

21.     During the course of the hearings before the Zoning Board of Appeals, representatives from Riverdale Materials made material misrepresentations of fact in testifying in support of its application, including the following:

        (a)     misrepresentations about drainage and runoff into the retention pond that Riverdale Materials does not own and has no right to use;

        (b)     misrepresentations about the environmental condition of the property;

        (c)     misrepresentations about having all of the necessary permits to operate the site.

22.     Riverdale Materials was operating the site during the entire period that its application for a conditional use was pending, despite the fact that it did not have the proper permits, nor did it have a conditional use approval.

C. **The Riverdale Materials Site**

23. The Riverdale Materials' site is the site of a former landfill that operated from the 1940's to 1962, when the operation was shut down by the courts.

24. In 1962 the Illinois Appellate Court held that the dump located on the property was both a statutory public nuisance violative of the Illinois Criminal Code and a common law public nuisance, and operation of the dump was permanently enjoined. *City of Chicago v. Fritz*, 36 Ill. App. 2d 457, 184 N.E.2d 713 (Ill. App. Ct. 1962) (*see* **Exhibit 10,** attached).

25. The dump was used for the deposit of garbage, refuse, chemicals, sludge, waste material and other substances. (**Exhibit 10**).

26. Additionally, the Court found that the "dump burned seven days a week; that about fifty trucks a day dumped garbage and that chemical and septic tank waste were also dumped there." (**Exhibit 10** at 463).

27. The Court also found that the dump was burned on a 24-hour basis, and "flames in the dump shoot hundreds of feet into the air, that the flames were caused by magnesium burning, and that the magnesium smoke would rise hundreds of feet in the air and then explode." (**Exhibit 10**)

28. Accordingly, the Appellate Court affirmed permanently closing the dump due to the horrendous and dangerous environmental condition of the property.

29. The site remains an unremediated, unlined hazardous waste landfill.

30. The environmental condition of the site is such that the surface is unimproved, and placing more waste on top of the site will only increase the detrimental and environmental condition of the site.

31.     Riverdale Materials' application states that it proposes to use the site for delivery and processing of municipal solid waste in the form of street sweepings from the City of Chicago.

32.     Riverdale Materials' application and testimony identified an "on-site" retention pond to be used for drainage and storm water control. In reality, the retention pond is not "on" Riverdale Materials' site, is not owned by Riverdale Materials, and Riverdale Materials has no right to use the retention pond.

33.     The site has a substantial adverse effect on the adjacent Retention Pond owned by Tri-State.

**D.      The Village of Riverdale Zoning Board of Appeals Hearings**

34.     The Village ordinance requires that a conditional use be subject to hearings and recommendation by the Village Plan Commission.  Riverdale, Illinois, Municipal Code §17.03.040 and § 17.03.110.

35.     However, the Village of Riverdale does not have a Plan Commission. The Public Notices with respect to the hearings identify that the hearings would be held before the Zoning Board of Appeals "sitting as the Plan Commission."  (See **Exhibit 11**, Public Notices for September 7, 2017 and November 2, 2017 Zoning Board of Appeals hearings)

36.     There are no documents, records, etc. identifying that the Zoning Board of Appeals was ever compiled, appointed, or certified as the Plan Commission, or to "act" as the Plan Commission.

37.     As such, the entire process under which the hearings was not in accordance with the Village Zoning Ordinance.

38.     The hearings before the Zoning Board of Appeals were also improper and illegal, since in the middle of the hearing process, and after substantive testimony had been given, Mayor Lawrence Jackson fired the chairperson of the Zoning Board of Appeals, and loaded the Zoning Board of Appeals with persons politically connected to the mayor.

39.     The newly-appointed persons had not heard any of the substantive testimony to date, were unfamiliar with the situation.

40.     The Zoning Board of Appeals hearings were also improper because they were chaired by Village Attorney Matt Welch or Matthew Ingersoll, from the law firm Montana and Welch, without any authority to do so. There is no statute, rule, regulation or ordinance that allows for or authorizes the Village attorney to chair the Zoning Board of Appeals and/or Plan Commission meetings.

41.     Not only did Matt Welch chair the hearings, make rulings on evidence, but he specifically persuaded the members of the Zoning Board of Appeals that the ordinance should be passed, and which conditions should apply.

42.     The involvement of the Village Attorney in *de facto* chairing the Zoning Board of Appeals meetings was objected to both by Tri-State and several members of the public during the hearings.

43.     During the Zoning Board of Appeals hearing on November 2, 2017, **thirteen (13)** members of the public gave testimony and opposition on the proposed conditional use, including Carmelia Shipp, Ms. Horton, Thomas Watson, James Reynolds, Deyon Dean, Roy McKay, William Clark, Cynthia Gilmore, Kay Randall, Janice Sims, Paula Williams, Patricia Plevens, and Ms. Meadors. The objections included:

(a)    Riverdale Materials' proposed facility would endanger public health due to a history of contamination at the proposed site, which was previously the subject of a lawsuit due to the pollution;

(b)    Riverdale residents suffer the effects of low property values, and granting the conditional use would cause property values to decline and worsen the issue;

(c)    Riverdale Materials' facility did not have adequate drainage;

(d)    Riverdale has no need for a new transfer station, particularly in such close proximity (within .5 miles) of a transfer station that performs the same functions proposed by Riverdale Materials;

(e)    Riverdale Materials was already operating without the required permits;

(f)    Riverdale Materials was illegally dumping and covering it up.

44.    On November 2, 2017, Riverdale Materials submitted documentation to the Zoning Board of Appeals in an attempt to support its false contention that it had obtained all of the permits required in order to operate, when in reality it began operating before it obtained an IEPA permit. (See **Exhibit 12**, Permit Summary).

45.    Riverdale Materials testified at the November 2, 2017 hearing that it covered up contaminated dirt at the site. Tom Mate, general manager of the facility, testified, "You could see where the land was, and I put 2 feet of bricks and concrete over the contaminated stuff because that's what we were told to do. Then we covered with crush stone. Then we put asphalt grinds six inches thick on the material." (See **Exhibit 6**, November 2, 2017 transcript of hearing at p. 80).

46.    On November 2, 2017, the Zoning Board of Appeals voted 4 to 2 to recommend to the Village Board granting the conditional use.

**E.      Actions of the Village of Riverdale**

47.      At the time that the ordinance passed at the hearing on November 28, 2017, Mayor Lawrence L. Jackson was the President of the Village Board.

48.      Despite strong opposition from the plaintiff and the public, this matter was politically rigged from the beginning in favor of Riverdale Materials and to the detriment of the people of the Village of Riverdale, and their health, safety, welfare and environment, and to other businesses in Riverdale, including that of the plaintiff.

49.      Mayor Jackson was a vocal proponent of the project. He even had a sign with his picture posted at the Riverdale Materials' site stating "ANOTHER BUSINESS BROUGHT TO YOU BY THE HONORABLE MAYOR LAWRENCE JACKSON."

**F.      The Ordinance**

50.      On November 28, 2017, ordinance number 2017-22 was passed by unanimous vote without any ability for the public to present any public comment to the board.

51.       This arbitrary and capricious ordinance was passed without any requirement that Riverdale Materials post any bond, CD, or security for closure, post-closure, or clean-up of the site, and without any requirement for Riverdale Materials to pay any royalties to the Village. Yet, unlike Riverdale Materials, Tri-Sate has been burdened to comply with all of these requirements as well as others.

52.      The ordinance also passed despite the documented history of environmental contamination and the lack of any on site storm water or drainage facility.

G.      **First Amendment Retaliation**

**i.        General**

53.      Prior to August 2017, the Plaintiff generally supported the administration of Lawrence J. Jackson.

54.      When it became known that a competing disposal business was proposing to come into Riverdale and was supported by Mayor Jackson's regime, Mayor Jackson assured representatives of the plaintiff that all proper procedures for giving permits and necessary authorizations to Riverdale Materials would be followed, and that Riverdale Materials would be required to post security and to pay royalties to the Village like the plaintiff has been required to do for many years.

55.      It soon became evident that none of that was true.

56.      The proceedings were a mere sham for the will of the Jackson administration, and did not include any provisions to protect the public health and safety, to require Riverdale Materials to post any security, or to require Riverdale Materials to pay royalties.

57.      Once this became evident, Tri-State issued public statements protected by the first amendment critical of the process, critical of Mayor Jackson's administration, and critical of the lack of any protection afforded to the general public regarding the health, safety and welfare of the residents of the Village of Riverdale.

58.      Those criticisms include:

(a)      Criticisms about hazardous waste;

(b)      Criticisms about the already contaminated state of the proposed Riverdale Materials'' site;

(c)      Criticisms about storm water runoff and the lack of adequate drainage;

(d)     Criticisms about the lack of any financial security required by the Village to be posted by Riverdale Materials;

(e)     Criticisms about the lack of any requirement that Riverdale Materials pay any royalties to the Village;

(f)     Criticisms about how Riverdale Materials' site will cause a decline in adjoining property values;

(g)     Criticisms about there being no need for an additional waste transfer station in Riverdale;

(h)     Criticisms about Mayor Jackson stacking the deck with the planning commission and the zoning board of appeals;

(i)     Criticisms about improper procedures used at the public hearings; and,

(j)     Various other criticisms.

59.     All the criticisms set forth in paragraph 54(a)-(j), above, are set forth in the following exhibits to Plaintiff's original Verified Complaint: **Exhibit 2** (Tri-State's September 7, 2017 submittal); **Exhibit 3** (Tri-State's November 2, 2017 submittal); **Exhibit 4** (Tri-State's November 28, 2017 proposed verified submittal); **Exhibit 5** (November 28, 2017 transcript of hearing); **Exhibit 6** (November 2, 2017 transcript of hearing); **Exhibit 7** (September 7, 2017 transcript of hearing); **Exhibit 10** (Illinois Appellate court case *City of Chicago v. Fritz*, 36 Ill.App.2d 457, 184 N.E.2d 713 (Ill. App. Ct. 1962); and **Exhibit 14** (Photo of Mayor Jackson posted on a sign at Riverdale Materials' site).

60.     At the final public hearing, Mayor Jackson did not allow any further criticism or testimony before a vote was taken in the Riverdale Materials' matter, and he and the village attorney refused to put into the record additional written criticisms by the plaintiff and its

representatives. (*See* **Exhibit 4** to Plaintiff's original Verified Complaint, Tri-State's proposed verified submittal dated November 28, 2017)

61.     The Village of Riverdale and the plaintiff have entered into a long-term written contract that requires, among other things:

        (a)     Tri-State to pick up trash from the Village residents;

        (b)     Tri-State to conduct a spring clean-up;

        (c)     Village of Riverdale to pay Tri-State for invoices within 15 days;

        (d)     Tri-State to post a $50,000 CD for the benefit of Village of Riverdale as security for its site;

        (e)     Tri-State to pay royalties to Village of Riverdale, which it has done, in excess of $1 million over the last 15 years.

62.     The contract between the Village of Riverdale and the Plaintiff that relates to paragraph 57(a)-(c), above, is entitled Agreement for Refuse, Recyclable, Yard Waste Material Collection/Processing/Disposal Services. This agreement is dated July 24, 2012, is in full force and effect and ~~runs~~ ran until July 31, 2019. Tri-State Disposal has fulfilled all of its obligations under this contract, without incident or complaint.

63.     The provisions that relate to paragraph 57(d)-(e), above, are pursuant to a settlement agreement between the Village of Riverdale and the Plaintiff, which addresses Village Host Benefit Fees. Tri-State Disposal has fulfilled all of its obligations under this contract, without incident or complaint.

### ii.  The Spring Clean-Up

64.  On or before March 16, 2018, Tri-State representatives made at least two phone calls to the public works department in order to schedule the Spring Clean Up and comply with its contract.

65.  Having had no response from the Village, on March 16, 2018, Tri-State sent an e-mail to Mr. Russell regarding scheduling the Spring Clean Up.

66.  Still having received no response from anyone from the Village regarding the Spring Clean Up, on March 20, 2018, Tri-State sent an e-mail to Mayor Jackson and copied the Village Trustees following up on scheduling the Spring Clean Up.

67.  In prior years, it was the Village who reached out to Tri-State to schedule the Spring Clean Up.

68.  Without any response to Tri-State's phone calls or e-mails, the Village advertised the May 5, 2018 Clean Up, and on information and belief, conducted the Clean Up with another waste contractor, Flood Brothers.  Also on information and belief, the Village incurred costs of approximately $20,000.00 to the third-party contractor to perform the clean up.

69.  Although the Spring Clean-Up was included under Tri-State's Contract with the Village at no additional cost to the Village, the Village instead paid Flood Brothers $18,540.40 to complete the Spring Clean-Up. (*See* **Exhibit** 16, Flood Bros. Invoices to Village of Riverdale).

70.  Tri-State representatives received several phone calls from customers in the Village on various dates in March and April of 2018, inquiring about the date and logistics of the 2018 Spring Clean-Up.

71.  In past years, Tri-State had answered residents' questions based on information that was coordinated with the Village.

72.     Tri-State was unable to answer residents' questions, due to the Village's refusal to respond to Tri-State's communications to establish a date and logistics for the Clean-Up. (*See* **Exhibit 17**, Jeff Germany's emails to Village of Riverdale RE: 2018 Spring Clean-Up).

73.     When Tri-State was unable to answer customers' basic questions regarding the Spring Clean-Up it traditionally performed, Tri-State appeared uninformed and incompetent regarding its own services.

74.     The Village's refusal to coordinate the 2018 Spring Clean-Up with Tri-State inflicted harm on Tri-State's reputation.

**iii.     No Opportunity to Bid**

75..     On October 23, 2017, Tri-State received a letter from Mayor Jackson, informing Tri-State that the Village was contemplating new vendors for the provision of refuse, recyclable, yard waste, material collection and disposal services in the Village (*See* **Exhibit** 18, October 23, 2017 letter from Lawrence Jackson to Tri-State).

76.     At a March 27, 2018 Village of Riverdale Board of Trustees' meeting, a motion was passed directing the Chief of Staff, on behalf of the Village:

(a)     to provide notice to Tri-State that the Village is declining any and all extensions provided in its July 24, 2012 agreement with Tri-State, and inform Tri-State that said agreement shall therefore expire on July 19, 2019; and

(b)     to obtain proposals from alternative waste disposal contractors for review by the Village Board on or before June 15, 2018.

77.     On April 18, 2018, Tri-State received- a notice of "cancellation" of Waste Disposal Agreement letter from a Village representative. Tri-State received this letter an

unprecedented one year and three months prior to the expiration of its Contract with the Village, significantly earlier than the industry standard. (*See* **Exhibit 25**, Cancellation Letter).

78.     Tri-State was promised that the new contract for the provision of refuse, recyclable, yard waste, material collection and disposal services in the Village with the Village would be bid, and Tri-State was encouraged to bid by Mayor Jackson. (*See* **Exhibit 18**, October 23, 2017 letter from Lawrence Jackson to Tri-State).

79.     The Village did not, in fact, bid the contract  for  the provision of refuse, recyclable, yard waste, material collection and disposal services in the Village as promised.

80.     Instead, on October 9, 2018, the Village Board passed Resolution 2018-44 signed by Mayor Jackson as Village President, authorizing the execution of an agreement with Flood Brothers Disposal Company for Residential Waste Collection.  (*See* **Exhibit 19**).

81.     Ultimately, on November 11, 2018, the Village of Riverdale entered into an Agreement with Flood Brothers for Refuse, Recyclable, Yard Waste Material Collection/Processing/Disposal Services.

82.     The motion to terminate the Village's agreement with Tri-State and subsequent decision to retain Flood Brothers on a no-bid contract were made in retaliation for Plaintiff's free speech and because Plaintiff filed this lawsuit, and was not as a result of any alleged complaint against Tri-State for failure to perform its obligations under the contract.  In fact, Tri-State performed all of its obligations under the contract, without incident or complaint.

83.     On February 23, 2018, Tri-State filed this lawsuit, which was removed to this court by the defendants on March 23, 2018.

### iv.     Restrictions of Business with Multi-Family Units

84.     The Village of Riverdale, prior to October 9, 2018, had historically permitted multi-family residential locations within the Village to procure their own separate refuse and sanitation services, separate from any refuse and sanitation services contracted by the Village.

85.     On October 9, 2018, the Village Board passed Ordinance 2018-22. *See* **Exhibit 20**, Village of Riverdale Ordinance 2018-22.

86.     Ordinance 2018-22 dictates that all Residential Locations, including multi-family residential locations with three (3) or more residential dwelling units, must utilize the refuse contractor retained by the Village: Flood Bros.

87.     The Ordinance cites collection of refuse as "inconsistent" and "often failing to comply with applicable regulations and thereby undermining the health, safety, and welfare of the Village" as the reasons behind the passage.

88.     The Village never approached Tri-State with any complaints regarding Tri-State's multi-family residential services.

89.     On information and belief, the Village did not maintain records citing any customer complaints or other records of health or safety issues related to waste collection from multi-family residential units, and no such records have been provided to Tri-State by the Village.

90.     Ordinance 2018-22 was approved and signed by Mayor Jackson on October 9, 2018.

91.     At the time of passage of Ordinance 2018-22 Tri-State maintained valid service agreements with several multi-family residential locations within the Village of Riverdale. *See* **Exhibit 21,** Tri-State Multi-Family Residential Agreements.

92.    Tri-State's service agreements with these multi-family residential locations were three-year service agreement contracts which were in performance at the time of enactment of Ordinance 2018-22.

93.    Tri-State earned approximately $7,000.00 per month in income from multi-family residential location service agreements it serviced within the Village of Riverdale.

94.    Tri-State's valid service agreements with each multi-family residential location provided for six months of liquidated damages to be paid to Tri-State in the event of early termination. (*See* **Exhibit 21**, Tri-State Multi-Family Residential Agreements).

95.    In order to comply with the Village's Ordinance, Ordinance 2018-22, Tri-State's multi-family residential location customers were forced to terminate their service agreements with Tri-State early and instead utilize the Village's contractor, Flood Bros., for their refuse disposal services.

96.    Tri-State did not receive any compensation or damages for the early termination of these service agreements under Ordinance 2018-22.

**v.    Refusal to Pay Tri-State/Delay in Payments to Tri-State**

97.    Payments from the Village of Riverdale to Tri-State Disposal under the Contract began to be substantially delayed on a regular basis beginning in January of 2018.

98.    While the Village had previously paid Tri-State's invoices within 30 days of issuance, the Village began to pay most Tri-State invoices more than190 days late. (*See* **Exhibit 22**, Tri-State Invoices to Riverdale).

99.    The Village did not pay the final invoiced amount due to Tri-State of $65,653.49 until February 28, 2020; nearly seven months after Tri-State's contract with the Village terminated.

100.     The Village made its final invoiced payment to Tri-State on February 28, 2020. (*See* **Exhibit 23**, Village of Riverdale check to Tri-State dated 2/28/2020).

101.     Despite the Village's recurring late and/or nonexistent payments to Tri-State, during the same time period, the Village made payments to Flood Brothers which had been incurred and invoiced subsequent to Tri-State's charges. (*See* **Exhibit 16**, Flood Bros. Invoices to Village of Riverdale).

102.     The Village's recurring delayed and/or nonexistent payments to Tri-State has negatively impacted Tri-State's business, as Tri-State was obligated to keep paying its employees and vendors out of its own funds due to the Village's nonperformance.

103.     The Village currently owes Tri-State unpaid late fees that were incurred throughout the duration of the Contract, at a rate of 1.5% per month. (*See* **Exhibit** 24, Outstanding Late Fees Owed by Riverdale.)

104.     Ever since Tri-State began its free speech criticisms of Mayor Jackson, Mayor Jackson has taken retaliatory actions against Tri-State and contrary to the interests of the general public, welfare, and safety of the residents of the Village of Riverdale.

105.     Those actions include:

(a)     soliciting competitors for the Spring Clean-Up even though this was part of Tri-State's existing contract;

(b)     failing to cooperate with Tri-State to schedule and conduct the Spring Clean Up as provided in Tri-State's contract, and instead bidding it to someone else;

(c)     issuing a letter falsely stating that Tri-State representatives have harassed the Mayor and his staff (*see* **Exhibit 15 attached hereto**, Mayor Jackson's letter to Tri-State dated April 25, 2018);

(d)     failing and refusing to pay any invoices and late fees that the Village is obligated to pay to Tri-State which on 6-08-2019 (when the First Amended Complaint was filed) amounted to more than $260,000.00 for the months of January, February, March, and April of 2018 and to date amounts to more than $199,000, for the months of February, March, and April of 2019, despite demand by Tri-State that these delinquent amounts be paid; and,.

(e)     failing to allow Tri-State to bid on a contract with the Village as promised, and instead awarding a no-bid contract to Flood Brothers;

(f)     passing Ordinance 2018-22, forcing multi-family residential Tri-State customers with existing service contracts within the Village to utilize the Village's contractor for refuse and sanitation services and forcing them to terminate their existing service agreements with Tri-State; and,

(g)     other acts of retaliation.

## COUNT I

### (Violation of Procedural Due Process – Village of Riverdale)

106.     Two counts from Plaintiff's Second Amended Complaint have been removed from this Third Amended Complaint: Count I, Violation of Procedural Due Process—Village of Riverdale, and Count II, Violation of Substantive Due Process—Village of Riverdale. These were removed due to dismissal with prejudice by the Court in the January 28, 2020 order. Plaintiff reserves its right to appeal the decision on these counts.

74.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 73, above, as though fully stated herein.

75.     The Village of Riverdale Zoning Ordinance sets forth the procedure to be followed for the administrative granting or denying a request for a conditional use.  (*See* **Exhibit**

**13**, attached, portions of Riverdale Municipal Code, Zoning Code § 17.03.040 (The plan commission) and § 17.03.110 (Conditional use).

76.     Among the procedures to be followed is that hearing(s) are to be held before the Village of Riverdale Plan Commission, and at the end of those hearings, the Plan Commission is to make a recommendation to deny or grant, with or without conditions, the conditional use to the full Village Board.

77.     These procedures were not followed in many respects, including but not limited to:

(a)     The Plan Commission did not do anything with respect to this matter, as the Village of Riverdale does not have a Plan Commission;

(b)     The Village of Riverdale allowed the Zoning Board of Appeals to conduct the hearings in this matter, not the Plan Commission. The Zoning Board of Appeals previously was never authorized, compiled or constituted to act as the Plan Commission;

(c)     After the initial hearing was held on September 7, 2017, at which testimony was presented by the applicant and Tri-State, the Chairman of the Zoning Board of Appeals, Carmelia Shipp, expressed some reservation in opposition to the application.  Almost immediately following her expressed opposition, she was fired from the Zoning Board of Appeals by Mayor Jackson under the pretext that her term had expired, even though it had expired two years earlier, and she was allowed to participate in the first and probably most significant round of hearings;

(d)     That same day, Mayor Jackson appointed three new members to the Zoning Board of Appeals, all of whom were politically aligned with the mayor;

(e)     The new members of the Zoning Board of Appeals had not heard any of the testimony prior to this, and, therefore, were improperly seated in the middle of the pending

administrative hearing process to render a recommendation with respect to this application that they neither knew about, heard testimony about, or were qualified to recommend;

(f) The Village Attorney is the law firm of Montana & Welch. The Village Attorney has no statutory or other authority that authorizes it to chair meetings of the Zoning Board of Appeals or Plan Commission;

(g) That is exactly what Montana & Welch did – they chaired the meetings of the Zoning Board of Appeals, ruling on evidence and objections, and improperly advising the Zoning Board of Appeals as to how they should vote on this ordinance and what conditions they should include. This improper involvement by the Village attorney, and tainted the entire process;

(h) The Village allowed the applicant to operate the site even before any application was filed, and before any hearings or recommendations were made;

(i) In response to FOIA requests, there were no documents of any kind supporting the Village's decision to allow the applicant to operate "temporarily" pending the conditional use application and hearings related thereto.

78. Because of the improper procedure followed as outlined in paragraph 73(a)-(i), above, the entire process and the recommendation from the Zoning Board of Appeals to the full Village Board was tainted, improper, and void *ab initio*.

79. Tri-State objected to all of these improper procedures during the course of the hearings. *See* **Exhibit 2** (September 7, 2017 submittal), **Exhibit 3** (November 2, 2017 submittal), **Exhibit 6** (Transcript of hearing held November 2, 2017 hearing, at pp. 65-77), and **Exhibit 7** (Transcript of hearing held September 7, 2017 hearing, at pp. 47-64).

80. As a direct and proximate result of the actions of the Village of Riverdale, Tri-State has and will continue to suffer damages by loss of income through unequal treatment and competitive disadvantage due to the challenged Village ordinance, as well as threat of imminent harm to the health, safety and environment as a corporate resident of the Village of Riverdale.

81. Tri-State has suffered a deprivation of its Constitutional property rights regarding its business in the Village of Riverdale, as well as threat of imminent harm to the health, safety and environment as a corporate resident of the Village of Riverdale.

82. Tri-State's adjacent property ownership of the Retention Pond is adversely affected by illegal drainage and runoff from the Riverdale Materials site.

83. Tri-State has furthermore suffered a deprivation of its property interest in not being allowed to render its services, established by virtue of its contract with the Village of Riverdale to provide services.

84. The procedures followed by the Village of Riverdale Zoning Board of Appeals were inadequate under the due process clause of the 14th Amendment to the United States Constitution.

85. Tri-State has suffered an invasion of its legally protected interest which is concrete and actual/imminent.

86. Tri-State has a significant personal stake in the outcome of this controversy.

87. Tri-State's injury is fairly traceable to the actions of the Village of Riverdale.

88. Tri-State's injury will likely be redressed by a favorable decision.

89. This matter was politically wired from the outset. Even before the application was filed, Mayor Jackson posted a sign at Riverdale Materials' site stating "ANOTHER

BUSINESS BROUGHT TO YOU BY THE HONORABLE MAYOR LAWRENCE JACKSON." *See* **Exhibit 14**, photo**.**

90.     The board members voted on this ordinance without allowing any comment from Tri-State or members of the public, reserving public comment to after the trustees voted on the ordinance.

91.     Tri-State objected to this procedure.

92.     The board members that voted on this did not have the benefit of public comment.

93.     Tri-State had prepared written submissions and comments to be considered by the board.  The written submissions were not allowed to become part of the record, or read into the record, and the Village attorney improperly made that decision.

94.     Because of the flaws in the procedural process before the Zoning Board of Appeals set forth in Count I, paragraph 77 (a)-(i), above, the entire process before the Village board was procedurally flawed.

**WHEREFORE,** because the entire process was procedurally flawed and violated the due process clause of the 14th Amendment to the United States Constitution, Tri-State respectfully prays that this Court:

(1)     Find that the Defendant Village of Riverdale violated Tri-State's rights to due process;

(2)     Declare that Ordinance Number 2017-22 is null and void *ab initio*;

(3)     Declare that any operation at the site by Riverdale Materials, LLC is not authorized;

(4)     Award compensatory damages to Tri-State;

(5)     Award costs to Tri-State;

~~(6)　　For such other relief as this court deems necessary and appropriate.~~

**COUNT II**

**(Violation of Substantive Due Process – Village of Riverdale)**

107.　　Two counts from Plaintiff's Second Amended Complaint have been removed from this Third Amended Complaint: Count I, Violation of Procedural Due Process—Village of Riverdale, and Count II, Violation of Substantive Due Process—Village of Riverdale. These were removed due to dismissal with prejudice by the Court in the January 28, 2020 order. Plaintiff reserves its right to appeal the decision on these counts.

~~95.　　Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 73, above, as though fully stated herein.~~

~~96.　　The Ordinance required the Zoning Board of Appeals to make findings with respect to various conditions, including but not limited to the following:~~

~~(a)　　That the establishment, maintenance, or operation of the conditional use will not be detrimental to, or endanger the public health, safety, morals, comfort, or general welfare;~~

~~(b)　　That the conditional use will not be injurious to the uses and enjoyment of other property in the immediate vicinity for the purposes already permitted, nor substantially diminish and impair property values within the neighborhood; and,~~

~~(c)　　That adequate utilities, access roads, drainage and/or necessary facilities have been or are being provided.~~

~~(Riverdale, Illinois, Municipal Code §17.03.110).~~

~~97.　　The Zoning Board of Appeals findings in favor of these three conditions is against the manifest weight of the evidence and is arbitrary and capricious because:~~

(a)     There was substantial testimony that the proposed waste operation at Riverdale Materials would be detrimental to the community and the neighboring properties, and detrimental to their property value;

(b)     The Riverdale Materials property is an unclosed, highly contaminated, hazardous waste site, and its operation on the site will only aggravate an already horrendous environmental condition;

(c)     The applicant misrepresented testimony with respect to at least the following points:

(i)     that the site did not have any environmental problems;

(ii)     that they had all the permits necessary to operate the site (which they were already operating at the time of the hearings); and

(iii)     that they had proper drainage into an on-site retention pond when in fact the retention pond is on a neighboring site, and the applicant has absolutely no right, title or interest to the retention pond or the use thereof.

(d)     Several members of the public and Tri-State objected to these matters at the various hearings.

98.     The Zoning Board of Appeals' recommendation to the Village Board that the applicant met the conditions necessary to grant a conditional use permit is against the manifest weight of the evidence and is arbitrary and capricious.

99.     As a direct and proximate result of the actions of the Village of Riverdale, Tri-State has and will continue to suffer damages by loss of income through unequal treatment and competitive disadvantage due to the challenged Village ordinance, as well as threat of imminent harm to the health, safety and environment as a corporate resident of the Village of Riverdale.

100.    Tri-State has suffered a deprivation of its property rights regarding its business in the Village of Riverdale, as well as threat of imminent harm to the health, safety and environment as a corporate resident of the Village of Riverdale.

101.    Tri-State's adjacent property ownership of the Retention Pond is adversely affected by illegal drainage and runoff from the Riverdale Materials site.

102.    Tri-State has furthermore suffered a deprivation of its property interest in not being allowed to render its services, established by virtue of its contract with the Village of Riverdale to provide services.

103.    The substantive effects of Riverdale's arbitrary and capricious approval of Ordinance 2017-22 are severely detrimental to Tri-State and its ability to conduct business.

104.    Tri-State has suffered an invasion of its legally protected interest which is concrete and actual/imminent.

105.    Tri-State has a significant personal stake in the outcome of this controversy.

106.    Tri-State's injury is fairly traceable to the actions of the Village of Riverdale.

107.    Tri-State's injury will likely be redressed by a favorable decision.

**WHEREFORE,** because defendants violated substantive portions of the Village of Riverdale Ordinance, Tri-State respectfully prays that this Court:

(1)    Find that the Defendant Village of Riverdale violated Tri-State's rights to due process;

(2)    Declare that Ordinance Number 2017-22 is null and void *ab initio*;

(3)    Declare that any operation at the site by Riverdale Materials, LLC is not authorized;

(4)    Award compensatory damages to Tri-State;

(5)    Grant costs to Tri-State;

(6)    For such other relief that this court deems necessary and appropriate.

## COUNT III

**(First Amendment Political Retaliation -
Village of Riverdale and Mayor Jackson)**

108.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through

73105, above, as though fully stated herein.

109.    The retaliatory actions set forth in paragraphs 53-73105, above, were made by

policymaker Village President Defendant Mayor Jackson.

110.    The retaliatory actions were in response to protected first amendment speech by

the plaintiff.

111.    The retaliatory actions were designed to quell first amendment speech and to deter

free speech.

112.    The plaintiff's speech involved matters of public concern and concern and desire

to protect the public health, safety and welfare.

113.    The first amendment speech was the "but for" cause for the retaliation.

114.    The retaliation by the Village has caused substantial damage to the plaintiff., in

excess of $260,000 at the filing of the First Amended Complaint and more than $199,000 at the

time of filing this Second Amended Complaint

115.    The retaliation was engaged in as a policy of the Village of Riverdale and its

mayor - Defendant Jackson.

116.    It has long been federal law that municipalities and their policy makers cannot

retaliate against independent contractors for engaging in protected first amendment speech.

O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712, 116 S. Ct. 2353, 135 L. Ed. 2d 874 (1996).

117.     Mayor Jackson was not acting in his legislative capacity and, in fact, acted outside of the sphere of legitimate legislative activity in his retaliation against Tri-State.

118.     The actions of Mayor Jackson were willful, wanton, intentional, malicious, and outrageous.

119.     As a direct and proximate result of the actions of the Village of Riverdale and Mayor Jackson, Tri-State has and will continue to suffer damages by loss of income through unequal treatment and competitive disadvantage due to the challenged Village ordinance 2017-22,  and Resolution 2018-44, and Ordinance 2018-22, as well as threat of imminent harm to the health, safety and environment as a corporate resident of the Village of Riverdale.

**WHEREFORE,** Tri-State respectfully prays that this Court enter an Order:

(1)     Finding the Defendants liable under 42 U.S.C. § 1983 for first amendment retaliation;

(2)     Granting damages to the Plaintiff compensatory damages, in excessan amount to be determined by the jury, for the following items:

> a.   Tri-State's loss of  $199,000ability to bid on the Village's current Agreement for Refuse, Recyclable, Yard Waste Material Collection/Processing/Disposal Services, which was awarded to Flood Bros. no-bid;
>
> b.   Six months of liquidated damages, due to forced early termination of service agreements by Tri-State's multi-residential unit customers;
>
> c.   Overdue late fees;

    d.   Reputational damages, stemming from Tri-State being barred from

        performing the Village's 2018 Spring Clean-Up, to be calculated by a jury.

    (3)     Granting to the Plaintiff punitive damages, in an amount to be determined by the

jury, against Mayor Lawrence L. Jackson, individually;

    (4)     Granting Plaintiff reasonable attorneys' fees as the prevailing party pursuant to 42

U.S.C.A. § 1988.

    (5~~3~~)    Granting costs to Tri-State;

    (6~~4~~)    For such other relief that this court deems necessary and appropriate.

## COUNT IV

**(Political Retaliation for Filing a Lawsuit -**
**Village of Riverdale and Mayor Jackson)**

120.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through

~~73~~105, above, as though fully stated herein.

121.    The retaliatory actions set forth in paragraphs 53-~~73~~105, above, were made by

policymaker Village President Defendant Mayor Jackson.

122.    The retaliatory actions were in response to plaintiff filing its lawsuit.

123.    The retaliatory actions were designed to quell the plaintiff from pursuing its

lawsuit.

124.    The plaintiff's lawsuit involved matters of public concern, and concern and desire

to protect the public health, safety and welfare.

125.    The retaliation by the Village has caused substantial damage to the plaintiff. ~~in~~

~~excess of $199,000~~.

126.    The retaliation was engaged in as a policy of the Village of Riverdale and its mayor - Defendant Jackson.

127.    It has long been federal law that municipalities and their policy makers cannot retaliate against persons for engaging in filing a lawsuit.

128. The actions of Mayor Jackson were willful, wanton, intentional, malicious, and outrageous.

129.    As a direct and proximate result of the actions of the Village of Riverdale and Mayor Jackson, Tri-State has and will continue to suffer damages by loss of income through unequal treatment and competitive disadvantage due to the challenged Village ordinance 2017-22, Resolution 2018-44, and Ordinance 2018-22, as well as threat of imminent harm to the health, safety and environment as a corporate resident of the Village of Riverdale.

**WHEREFORE,** Tri-State respectfully prays that this Court enter an Order:

(1)    Finding the Defendants liable under 42 U.S.C. § 1983 for first amendment retaliation;

(2)    Granting damages to the Plaintiff compensatory damages, in excessan amount to be determined by the jury, for the following items:

        a.   Tri-State's loss of $199,000ability to bid on the Village's current Agreement for Refuse, Recyclable, Yard Waste Material Collection/Processing/Disposal Services, which was awarded to Flood Bros. no-bid;

        b.   Six months of liquidated damages, due to forced early termination of service agreements by Tri-State's multi-residential unit customers;

        c.   Overdue late fees;

        d.  Reputational damages, stemming from Tri-State being barred from

          performing the Village's 2018 Spring Clean-Up, to be calculated by a jury.

(3)      Granting to the Plaintiff punitive damages, in an amount to be determined by the

jury,  against Mayor Lawrence L. Jackson, individually;

    (4)      Granting Plaintiff reasonable attorneys' fees as the prevailing party pursuant to 42

U.S.C.A. § 1988.

    (5)      Granting costs to Tri-State;

(6)      For such other relief that this court deems necessary and appropriate.

## COUNT V

### (Breach of Contract – Village of Riverdale)

130.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through

73105, above, as though fully stated herein.

131.     On or before March 16, 2018, Tri-State representatives made at least two phone

calls to the public works department in order to schedule the Spring Clean Up and comply with

its contract.

132.     Having had no response from the Village, on March 16, 2018, Tri-State sent an e-

mail to Mr. Russell regarding scheduling the Spring Clean Up.

133.     Still having received no response from anyone from the Village regarding the

Spring Clean Up, on March 20, 2018, Tri-State sent an e-mail to Mayor Jackson and copied the

Village Trustees following up on scheduling the Spring Clean Up.

134.     Without any response to Tri-State's phone calls and e-mails, the Village

advertised the May 5, 2018 Spring Clean Up, and on information and belief, conducted the

Spring Clean Up.  As a result, the Village paid a third-party contractor to perform the clean-up.

135.    In prior years, it was the Village who reached out to Tri-State to schedule the Spring Clean Up.

136.    In at least the past fifteen (15) years, the Village conducted only a single Spring Clean Up per year, and that event was conducted by Tri-State in April or May.

137.    Pursuant to the Agreement for Refuse, Recyclable, Yard Waste Material Collection/Processing/Disposal Services between the Village of Riverdale and Tri-State, the Village breached its contract as follows:

(a)    Failing to pay Tri-State for invoices for January, February, March, and April 2018, though payments are due within 15 days of receipt of invoice;

(b)    Failing to cooperate with Tri-State to schedule and conduct the Spring Clean Up as provided in Tri-State's contract, and hiring another company to do it; and,

(c)    other breaches of the Agreement.

138.    After demand, the Village has failed and refused to pay Plaintiff over $199,000 in disposal late fees owed by the Village, and has refused to cooperate with Plaintiff to conduct the Spring Clean Up.

139.    Plaintiff has at all times complied with its contractual obligations with the Village.

**WHEREFORE,** Tri-State respectfully prays that this Court enter an Order:

(1)    Finding that the defendants breached the contract with plaintiff;

(2)    Granting damages to the Plaintiff in excess of $199,000 plus preas follows:

    a.    Overdue late fees;

    b.    Pre-judgment interest; on overdue amounts,

     c.   Damages to Tri-State's reputation due to the Village's actions regarding the

        Spring Clean-Up, to be calculated by a jury.

(3)     Granting costs to Tri-State;

(4)     For such other relief that this court deems necessary and appropriate.


Respectfully submitted,

TRI-STATE DISPOSAL, INC., an
Illinois corporation, Plaintiff


By:    /s/ Mark A. LaRose
       Mark A. LaRose, One of Its Attorneys

Mark A. LaRose (ARDC No. 6183288)
Marissa R. Alaska (ARDC No. 6315171)
LaRose & Bosco, Ltd.
200 N. LaSalle Street, Suite 2810
Chicago, IL 60601
(312) 642-4414
Fax (312) 642-0434
mlarose@laroseboscolaw.com
m.alaska@laroseboscolaw.com