# EXHIBIT C

**Sheryl Germany**                                      **March 3, 2020**

1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


TRI-STATE DISPOSAL, INC., an          )
Illinois corporation,                 )
                                      )
          Plaintiff,                  )
                                      ) No. 1:18-cv-02138
     -vs-                             )
                                      ) Judge Sara L. Ellis
THE VILLAGE OF RIVERDALE, a           )
municipal corporation;                ) Magistrate Judge
LAWRENCE L. JACKSON, Mayor of         ) Mary M. Rowland
the Village of Riverdale,             )
                                      )
          Defendants.                 )



          The deposition of SHERYL GERMANY, taken
pursuant to the Federal Rules of Civil Procedure of
the United States District Courts pertaining to the
taking of depositions, taken before STACEY L. PARR,
Certified Shorthand Reporter of the State of
Illinois, at 11950 South Harlem Avenue, Suite 102,
Palos Heights, Illinois, commencing at 10:05 a.m., on
March 3, 2020.

**Sheryl Germany**                                    **March 3, 2020**

---

**2**

```
 1   PRESENT:
 2
 3        LAROSE & BOSCO by
          MR. MARK A. LAROSE
 4        MS. MARISSA R. ALASKA
          200 North LaSalle Street
 5        Suite 2810
          Chicago, Illinois 60601
 6        (312) 642-4414
          mlarose@laroseboscolaw.com
 7        m.alaska@laroseboscolaw.com
 8
              on behalf of the Plaintiff;
 9
10
          MONTANA & WELCH by
11        MS. ERIN E. BLAKE
          11950 South Harlem Avenue
12        Suite 102
          Palos Heights, Illinois 60463
13        (708) 448-7005
          eblake@montanawelch.com
14
15            on behalf of the Defendants.
16
17
18
19
20
21
22
23
24
```

---

**4**

```
 1              SHERYL GERMANY,
 2   called as a witness herein, having been first duly
 3   sworn, was examined upon oral interrogatories and
 4   testified as follows:
 5              EXAMINATION
 6   BY MS. BLAKE:
 7     Q  Please state and spell your name for the
 8   court reporter.
 9     A  Sheryl Germany.  S-h-e-r-y-l, G-e-r-m-a-n-y.
10        MS. BLAKE:  Let the record reflect that this
11   is the discovery deposition of Sheryl Germany, taken
12   pursuant to federal rules and all applicable Supreme
13   Court rules.
14        Ms. Germany, I introduced myself
15   earlier.  My name is Erin Blake.  I'm an attorney for
16   the Village of Riverdale.  I'm going to be taking
17   your deposition today in regards to the lawsuit that
18   you have filed against the Village.
19   BY MS. BLAKE:
20     Q  Have you given depositions before?
21     A  Yes, but probably 35 years ago.
22     Q  Okay.  I'm going to just briefly tell you
23   some ground rules.  The first is keep all of your
24   answers out loud and verbal so that the court
```

---

**3**

```
 1              DEPOSITION OF
                SHERYL GERMANY
 2           taken March 3, 2020
 3
 4   EXAMINATION BY                        PAGE
 5
     Ms. Blake:                        4, 125
 6
 7   Mr. LaRose:                     117, 129
 8
                * * * * * * * *
 9
                   EXHIBITS
10               (Attached)
11                                       PAGE
12
     S. Germany Exhibit A                  30
13
     S. Germany Exhibit B                  39
14
     S. Germany Exhibit C                  82
15
     S. Germany Exhibit D                  86
16
     S. Germany Exhibit E                 116
17
     S. Germany Exhibit F                 119
18
19              * * * * * * * *
20
            CERTIFIED QUESTIONS
21
     Page 7, line 21
22   (And what's your current address?)
23
     Page 10, lines 22-23
24   (What is your cell phone number and current carrier?)
```

---

**5**

```
 1   reporter can take down everything that's being said.
 2   She can't take down when you nod your head or point
 3   your fingers.  Do you understand?
 4     A  Yes.
 5     Q  Okay.  I will try to wait for you to finish
 6   your answer before asking my next question.  I ask
 7   that you wait for me to finish my question before
 8   beginning your answer, even if you know where the
 9   question is going, just so that we can have a clear
10   record and make things easier on the court reporter.
11        MR. LAROSE:  And if everybody could wait for
12   me if I have anything to say or an objection, so
13   we're not talking over each other.
14        MS. BLAKE:  You're going to have something
15   to say during the dep, Mr. LaRose?
16        MR. LAROSE:  Maybe.
17        MS. BLAKE:  Okay.
18        MR. LAROSE:  I don't know.
19   BY MS. BLAKE:
20     Q  If you answer one of my questions, I'll
21   assume you understood what I asked.  So if at any
22   time what I'm asking you doesn't make sense, just
23   stop me and tell me.
24        And, then, finally, I ask -- you can
```

Pages 2 to 5

**Sheryl Germany**                                                        **March 3, 2020**

---

6

1  take a break at any time. We're not in jail. I'd
2  just ask that you finish answering the question
3  that's pending before you take your break.
4          Ms. Germany, have you ever been known
5  by any other names?
6      **A  My maiden name.**
7      Q  And what's that?
8      **A  Streitberger. S-t-r-e-i-t-b-e-r-g-e-r.**
9          MR. LAROSE: Hey Erin?
10         MS. BLAKE: Yes.
11         MR. LAROSE: Before we go any further, I
12  just want to make a statement on the record about the
13  exclusion of Jeff Germany. Jeff Germany's the
14  secretary of the corporation, Plaintiff corporation.
15  His deposition's next. He's here. Erin asked if he
16  was going to sit in. I asked if she minded. She
17  said yes. I said I wasn't going to argue with her,
18  but I believe that if we were at trial and the
19  president of the corporation was on the witness
20  stand, that the corporation would be entitled to have
21  a representative present, even with the rule
22  excluding witnesses. So Jeffrey's not here.
23         After you finish with Sheryl, are you
24  going to exclude her from Jeff's?

---

7

1          MS. BLAKE: I mean, yes.
2          MR. LAROSE: Okay. I'm just wondering
3  what -- how that works because somebody's the
4  corporate representative and the corporate
5  representative --
6          MS. BLAKE: All right. Sheryl can stay in
7  Jeff's.
8          MR. LAROSE: Okay. That's all. I just
9  wanted to state that for the record.
10  BY MS. BLAKE:
11     Q  Your date of birth, please, Ms. Germany?
12     **A  7-23-1957.**
13     Q  Are you married?
14     **A  Yes.**
15     Q  To whom?
16     **A  Tommy, T-o-m-m-y, Germany.**
17     Q  And how many children do you have?
18     **A  Two. One is deceased.**
19     Q  And Jeff is your son?
20     **A  Correct.**
21     Q  And what's your current address?
22         MR. LAROSE: We're not going to give that,
23  and I'm not trying to be difficult. There's been
24  some -- just listen to me. There's been threats in

---

8

1  this case, personal threats. People could probably
2  find out where she lives, but as an officer of the
3  court, you can contact any of these corporate
4  representatives through me, you can contact them at
5  Tri-State. We're not going to give out any other
6  personal information. There's been personal threats
7  made in this case, not by your clients, by others.
8  And I was the recipient of them.
9          MS. BLAKE: Okay. Who threatened you?
10         MR. LAROSE: Jim Bracken.
11  BY MS. BLAKE:
12     Q  Okay. Did anyone threaten you, Ms. Germany?
13         MR. LAROSE: Through me.
14         MS. BLAKE: Okay. Are you testifying?
15         MR. LAROSE: No. I'm just telling you
16  she -- I received a personal phone call from Jim
17  Bracken at night, practically in the middle of the
18  night, threatening me and my client. We're not
19  giving out any personal information, and I made this
20  known to Mr. Bracken's lawyers. It wasn't your
21  client. It's really none of your business, but we're
22  not giving out any personal information.
23         Can you tell me why with that
24  explanation that you really need her address?

---

9

1          MS. BLAKE: I had no idea -- I had no idea
2  what you were going to say.
3          MR. LAROSE: I got it.
4          MS. BLAKE: Okay. I don't know about any
5  threats. It doesn't involve my client, like you
6  said. You guys are not suing Jim Bracken or
7  Riverdale Materials. You're suing the Village,
8  correct, in this case?
9          MR. LAROSE: That's correct.
10         MS. BLAKE: You filed a lawsuit. You're
11  here for a deposition. It's a discovery deposition.
12  If you object to giving her address for those
13  reasons, okay.
14         MR. LAROSE: I do.
15         MS. BLAKE: It doesn't have anything to do
16  with this lawsuit.
17         MR. LAROSE: Her address doesn't have
18  anything to do with this lawsuit either.
19         MS. BLAKE: Okay. I'm just --
20         MR. LAROSE: Again, I object. We're not
21  giving you the address.
22         MS. BLAKE: Okay. And I'll just certify the
23  question.
24

---

Pages 6 to 9

**Sheryl Germany**                                    **March 3, 2020**

10

1  BY MS. BLAKE:
2      Q  You're going to follow your attorney's advice
3  not to follow -- to answer?
4      A  Yes.
5          MS. BLAKE:  Okay.  I'll certify the
6  question.
7          MR. LAROSE:  I'm sorry, but I just love
8  getting calls from people at my house in the middle
9  of the night threatening me and my client.  It's a
10  little disturbing.
11          MS. BLAKE:  I'm sure it is.
12          MR. LAROSE:  It just happened.
13          MS. BLAKE:  I don't know anything about it.
14          MR. LAROSE:  I just told you about it.
15          MS. BLAKE:  Right.
16  BY MS. BLAKE:
17      Q  Were you at the same address in November or
18  December of 2017?
19      A  Yes.
20      Q  And do you live at home with your husband?
21      A  Yes.
22      Q  What is your cell phone number and current
23  carrier?
24          MR. LAROSE:  We're not giving you that

11

1  either.
2  BY MS. BLAKE:
3      Q  Are you going to follow your attorney's
4  advice not to provide me with your cell phone number
5  and carrier?
6      A  Yes.
7          MS. BLAKE:  Okay.  I'll certify the
8  question.
9  BY MS. BLAKE:
10      Q  Was your cell phone number and carrier the
11  same in 2017?
12      A  Yes.
13      Q  What's your highest level of education?
14      A  Associate's degree.
15      Q  Where did you obtain that degree?
16      A  Moraine.
17      Q  Pardon me?
18      A  Moraine.
19      Q  And in what year?
20      A  Oh, boy.  That would have been '78.
21      Q  And what subject matter did your associate's
22  degree cover?
23      A  Business.
24      Q  What social media sites do you belong to?

12

1      A  Facebook.
2      Q  Have you ever posted on Facebook regarding
3  this lawsuit?
4      A  No.
5      Q  Have you ever posted on Facebook regarding
6  your disagreements with the Village of Riverdale and
7  Mayor Jackson?
8      A  No.
9      Q  Have you ever posted on Facebook regarding
10  your problems with the Village of Riverdale in
11  general?
12      A  No.
13      Q  Do you belong to any other social media
14  websites?
15      A  No.
16      Q  Do you maintain a blog?
17      A  No.
18      Q  Have you ever been a plaintiff in another
19  lawsuit?
20      A  With the EPA at one point.
21      Q  Have you or your company ever sued another
22  company, municipality or individual?
23      A  No.
24      Q  You said there was a lawsuit with the

13

1  Illinois Environmental Protection Agency?
2      A  Yes.
3      Q  Did you sue the government agency?
4      A  No, no, no.
5      Q  Okay.  Did they sue Tri-State?
6      A  Yes.
7      Q  Do you recall what year that was?
8      A  No.
9      Q  Okay.  Was Mr. LaRose your attorney?
10      A  I don't remember.
11          MR. LAROSE:  Me neither.
12          THE WITNESS:  It was settled, yeah, real
13  quick, yeah.
14  BY MS. BLAKE:
15      Q  And you've never filed -- I'm sorry, I just
16  want to ask this again.
17      A  Sure.
18      Q  Have you ever filed any lawsuit against any
19  other municipality?
20      A  No.
21      Q  Have you ever been named as a defendant in a
22  lawsuit?
23      A  I'm not sure.  I'm going to say -- the
24  Illinois EPA one, I'm not sure if I was actually

Pages 10 to 13

**Sheryl Germany**                                      **March 3, 2020**

---

14

1   named or not.
2       Q   Okay.  Has Tri-State been named as a
3   defendant in any lawsuit other than that IEPA?
4       **A   No, I don't believe so.**
5       Q   Have you ever been convicted of a felony?
6       **A   No.**
7       Q   Have you ever been convicted of a
8   misdemeanor?
9       **A   No.**
10      Q   What did you do in preparation for your
11  deposition today?
12      **A   Met with my lawyer and his assistant.**
13      Q   Okay.
14      **A   Met with the two lawyers.**
15      Q   Did you review any materials or
16  documentation?
17      **A   The First Amended Complaint and some**
18  **attachments, exhibits.**
19      Q   Did you personally keep any notes or a diary
20  regarding this lawsuit against the Village?
21      **A   Regarding the lawsuit?**
22      Q   Yes.
23      **A   Yes.**
24      Q   Have you personally kept any notes regarding

---

15

1   Tri-State's interactions with the Village since 2016?
2       **A   Can you repeat that again?**
3       Q   Have you kept any notes or a diary regarding
4   Tri-State's business with the Village of Riverdale
5   since 2016, aside from the notes that you kept in
6   relation to this lawsuit?
7       **A   No.**
8       Q   Have you discussed this lawsuit with anyone
9   other than your attorneys?
10      **A   Office personnel as needed.**
11      Q   And who have you had to speak to in regards
12  to the office personnel?
13      **A   Kathy Bohse.**
14      Q   How do you spell her last name?
15      **A   B-o-h-s-e.**
16      Q   And what was discussed with Ms. Bohse?
17      **A   Since she does a lot of the phone contact**
18  **work, phone calls basically.**
19      Q   And what did you tell her in regards to the
20  phone calls?
21      **A   I didn't tell her.  I asked questions.**
22      Q   What did you ask of her?
23      **A   Just clarification.**
24      Q   What clarification were you seeking?

---

16

1       **A   If it was she who had talked to the mayor or**
2   **someone else in the office.**
3       Q   And what conversation with the mayor are you
4   referring to or multiple conversations?
5       **A   Multiple conversations.**
6       Q   And was it Ms. Bohse who spoke to the mayor?
7       **A   Yes.**
8       Q   And she had multiple conversations with the
9   mayor, according to her discussion with you?
10      **A   Yes.**
11      Q   Okay.  And what did she tell you about the
12  conversations?
13      **A   What did she tell me about the conversations?**
14  Like I said, I had asked her for clarification, if
15  **she had talked to the mayor for certain instances,**
16  **including talking about not contacting him anymore,**
17  **pretty much that was the main one.**
18      Q   Okay.  And so did the mayor call Kathy and
19  ask her not to contact --
20      **A   Kathy had called him.**
21      Q   Okay.  Did Kathy call the mayor pursuant to
22  your request?
23      **A   Pursuant to company policy.**
24      Q   Okay.  And what did she ask of the mayor?

---

17

1       **A   Looking for payment.**
2       Q   Okay.  And when was that call?
3       **A   I could not tell you that.**
4       Q   Okay.  Was it customary for Kathy to deal
5   with the mayor regarding payments to Tri-State or
6   with another employee?
7       **A   He had asked that if there were problems with**
8   **collections, that she would notify him.  He, in fact,**
9   **gave her his cell phone number.**
10      Q   Okay.  So in regards to the no-contact
11  issue -- I wasn't there.  I don't know what this
12  issue was or what this conversation could have
13  entailed.  I'm asking you to provide me with
14  information regarding what you spoke to Kathy about.
15  I don't know what clarification you needed.
16          So what clarification did you need
17  from Kathy?
18      **A   If it was she that talked to him, who had**
19  **initiated the phone call, that was pretty much it.**
20      Q   Okay.  Anything else you discussed with Kathy
21  regarding this lawsuit?
22      **A   No.**
23      Q   And is it your -- do you believe that the
24  mayor's request for no further contact with your

---

Pages 14 to 17

**Sheryl Germany**                                        **March 3, 2020**

---

18

1  company came after you filed the lawsuit?
2      **A  Yes.**
3      Q  Do you recall seeing the letter the mayor
4  sent regarding --
5      **A  Yes.**
6      Q  Okay.  And what did he explain was the reason
7  for the no contact in the letter?
8      **A  He had said that there were abusive phone**
9  **calls, I believe.**
10     Q  Okay.  Did you ever investigate that
11  complaint?
12     **A  Yes.**
13     Q  And what was the result of your
14  investigation?
15     **A  Not true.**
16     Q  Do you have a file of that investigation?
17     **A  No.**
18     Q  So Tri-State is a domestic corporation,
19  correct?
20     **A  Correct.**
21     Q  The Illinois records indicate that Tri-State
22  was incorporated on December 28th, 1995.  Is that
23  accurate?
24     **A  Yes.**

---

19

1      Q  Did Tri-State operate prior to incorporating?
2      **A  No.**
3      Q  And so the company first formed in 1995?
4      **A  I formed it in 1995.**
5      Q  When it was initially formed, where was
6  Tri-State located?
7      **A  I believe I used my home address at that**
8  **time.**
9      Q  In 1998 -- I'm sorry, when it was initially
10  incorporated, who was listed as the agent of the
11  business?
12     **A  I believe it was myself.**
13     Q  Okay.  In 1998 is that when you moved to
14  Riverdale?
15         MR. LAROSE:  Don't guess.
16         THE WITNESS:  Okay.  I'm going to say -- do
17  I answer no then?
18  BY MS. BLAKE:
19     Q  You can just tell me -- if you don't
20  remember, that's okay.
21     **A  I don't remember that because -- yeah,**
22  **it's --**
23         MR. LAROSE:  I just don't want you to guess
24  on that.  It was a long time ago.

---

20

1         THE WITNESS:  Yeah, because I -- I think it
2  was, yeah...
3  BY MS. BLAKE:
4      Q  I don't know is a perfectly acceptable
5  answer.  So if that's the truth, just tell me you
6  don't remember.
7      **A  Yeah.**
8      Q  Based on the Illinois records that I looked
9  at, in 1998 the Tri-State record was updated to have
10  an address of 13903 South Ashland.
11         Is that consistent with your memory
12  of when you moved into Riverdale?
13     **A  I don't remember.**
14     Q  Okay.
15     **A  That sounds stupid, but...**
16         MR. LAROSE:  It doesn't sound stupid.
17  BY MS. BLAKE:
18     Q  How did you get into the disposal business?
19     **A  How did I get into the disposal -- I had had**
20  **a garbage -- well, actually, I was a broker for XL**
21  **Disposal back in the '80s to early '90s, and then I**
22  **had a small garbage company up in Big Bend,**
23  **Wisconsin.**
24     Q  What was the name of that company?

---

21

1      **A  Moeller Disposal.  M-o-e-l-l-e-r.**
2      Q  Who ran Moeller Disposal with you?
3      **A  My husband.**
4      Q  Does your husband have a background in the
5  disposal business --
6      **A  Yes.**
7         MR. LAROSE:  Let her finish her question,
8  please.
9         THE WITNESS:  Okay.
10  BY MS. BLAKE:
11     Q  What is his background?
12     **A  He worked at XL Disposal from 1978 until**
13  **early '90s.  I can't tell you what year exactly.**
14     Q  Where was XL Disposal?
15     **A  Crestwood.**
16     Q  And then did you both move to Big Bend,
17  Wisconsin?
18     **A  No.**
19     Q  Okay.  Did you operate Moeller Disposal from
20  Illinois?
21     **A  The corporate office was here.**
22     Q  Okay.  What was your husband's title at
23  Moeller Disposal?
24     **A  None.**

---

Pages 18 to 21

**Sheryl Germany**                                                          **March 3, 2020**

---

22

1    Q   Did he help run the business?
2    **A   Yes.**
3    Q   How long was Moeller Disposal in existence?
4    **A   We owned it for three years.**
5    Q   And then did you sell it?
6    **A   Yes.**
7    Q   Do you recall when you sold it?
8    **A   Oh, 1995.**
9    Q   Okay.  Does your husband have a title at
10   Tri-State?
11   **A   Yes.**
12   Q   What's his title?
13   **A   Vice president.**
14   Q   What are his general job duties?
15   **A   Managing the yard.**
16   Q   And the yard, as in, Riverdale, at that 13903
17   South Ashland address?
18   **A   Correct.**
19   Q   And your title is president?
20   **A   Correct.**
21   Q   Okay.  And what are your general job duties?
22   **A   Most of it is office employment, accounting.**
23   Q   Does Tri-State employ an accountant or are
24   you --

---

23

1    **A   No.**
2    Q   -- the accountant?
3    **A   I'm the accountant.  We hire -- we have a**
4    **CPA.  That's not on a daily basis.**
5    MR. LAROSE:  Don't get confused.  I think
6    you were asking -- I don't know what you were asking,
7    but were you asking like do they have an employee
8    that's a CPA or do they hire a CPA outside?
9    MS. BLAKE:  I didn't ask either of those
10   questions.  I said, are you the accountant for your
11   company, and she said, yes, but we also hire a CPA.
12   Probably for tax season, I'm guessing.
13   MR. LAROSE:  But right before that you said
14   do you employ an accountant or are you the
15   accountant?  That's where the confusion was.
16   MS. BLAKE:  Okay.
17   MR. LAROSE:  I just don't want the record to
18   be confused.
19   MS. BLAKE:  I'm not confused.
20   BY MS. BLAKE:
21   Q   Are you confused?
22   **A   As long as you know I do the daily**
23   **accounting.**
24   Q   Yes.

---

24

1    **A   I am not a CPA.**
2    Q   Yes, I understand.
3    **A   Everything gets reviewed by a CPA that I do.**
4    Q   Okay.  So can you describe the business for
5    me?
6    **A   A family-owned refuse hauler.**
7    Q   So does Tri-State do garbage collection and
8    operate a transfer station?
9    **A   Correct.**
10   Q   And are your headquarters, in addition to
11   your transfer station, in Riverdale?
12   **A   Yes.**
13   Q   Has Tri-State ever been known by any other
14   names?
15   **A   No.**
16   Q   Does Tri-State have any other transfer
17   stations or offices?
18   **A   No.**
19   Q   Who's Riverdale Recycling?
20   **A   That was a previous -- well, that was the**
21   **owner of the property.  It was the previous owner of**
22   **the property.**
23   Q   So Riverdale Recycling previously owned 13903
24   Ashland?

---

25

1    **A   Correct.**
2    Q   And did you buy the property from Riverdale
3    Recycling?
4    **A   Yes.**
5    Q   When did you buy the property?
6    **A   2005.**
7    Q   So if you began operating in Riverdale in
8    approximately 1998, did you operate in conjunction
9    with Riverdale Recycling or how did -- how did that
10   relationship work?
11   **A   Riverdale Recycling owned the property.**
12   Q   And did you lease it from them or rent it
13   from them?
14   **A   I'm not sure what the right answer should be.**
15   **I'll just say no.**
16   Q   Did you own Riverdale Recycling?
17   **A   No.**
18   Q   Did you own any part of Riverdale Recycling?
19   **A   No.**
20   Q   Did you pay Riverdale Recycling to operate
21   your business on their property?
22   **A   No.**
23   Q   That seems like a nice deal.
24   **A   It was unique.**

---

Pages 22 to 25

**Sheryl Germany**                                        **March 3, 2020**

---

26

1    Q   Okay.  Did you provide Riverdale Recycling
2  with any of your profits or income?
3    A   No.
4    Q   Did you know the owners of Riverdale
5  Recycling?
6    A   Yes.
7    Q   Okay.  What was your relationship with them?
8    A   My husband had worked for their father.
9    Q   And based on your husband working for their
10  father, they allowed you to operate your business for
11  free on their property for seven years or so?
12        MR. LAROSE:  Objection to the form of the
13  question.  That's not what she said.  You can answer.
14        THE WITNESS:  Can you repeat that?
15  BY MS. BLAKE:
16    Q   Sure.  Based on your husband's relationship
17  with Riverdale Recycling's father, the owners of
18  Riverdale Recycling's father, did Riverdale Recycling
19  allow you to operate on their property for free for
20  approximately seven years?
21    A   I'm going to say yes.
22    Q   Okay.  In 1999 were you and Riverdale
23  Recycling notified by the Village that the Village
24  believed that the property on which Riverdale

---

27

1  Recycling and Tri-State were operating was in
2  violation of the Illinois Environmental Protection
3  Act?
4    A   Yes.
5    Q   Do you recall what allegations were made?
6    A   No, I don't.
7    Q   Do you recall having been denied a permit by
8  the Illinois Environmental Protection Act -- or
9  Agency, sorry?
10    A   No.
11    Q   Did you ever apply for amendments to a permit
12  or permits from the IEPA, which were denied to your
13  property?
14    A   I can't recall.
15    Q   Who was the president of Riverdale Recycling?
16    A   I don't have that information.
17    Q   What were the names of the persons whom you
18  and your husband knew at Riverdale Recycling?
19    A   It would have been Debbie Brakey (phonetic)
20  and Christie Vorderer (phonetic).
21    Q   Does Riverdale Recycling still operate?
22    A   I do not know.
23    Q   Was Riverdale Recycling operating when you
24  were operating Tri-State on their property in

---

28

1  Riverdale?
2    A   I really can't answer that.
3    Q   Okay.  Has anyone else been operating on the
4  property at 13903 Ashland with Tri-State?
5    A   No.
6    Q   Do you know how the property at 13903 Ashland
7  was used prior to you starting your business there?
8    A   It was a brown field.
9    Q   What's a brown field?
10    A   It was just empty property.
11    Q   Had it been used by Riverdale Recycling?
12    A   No.
13    Q   Was it ever operated as a transfer station
14  prior to Tri-State moving in?
15    A   No.
16    Q   The issue with the IEPA, the Village was
17  allowed to intervene in that proceeding.  Is that
18  true?
19    A   I'm not sure.
20    Q   Okay.  As a result of the issues with the
21  IEPA, did Tri-State enter into a settlement agreement
22  with Tri-State?
23        MR. LAROSE:  With the Village you mean?
24        MS. BLAKE:  Can you repeat my question?

---

29

1        (Record read back as requested.)
2  BY MS. BLAKE:
3    Q   Yeah, with the Village.  Thank you.
4        MR. LAROSE:  Did Tri-State enter into a
5  settlement agreement with itself?
6        MS. BLAKE:  With the village.
7        THE WITNESS:  She restated it.
8        MR. LAROSE:  I'm sorry.  I didn't hear that.
9        THE WITNESS:  We did have a settlement
10  agreement with Riverdale.  I don't know the date.
11  BY MS. BLAKE:
12    Q   And was Riverdale Recycling part of that
13  settlement agreement?
14    A   I'm unsure.
15    Q   Do you recall what the terms of that
16  settlement agreement were?
17    A   I do remember that we were required to pay a
18  host fee to the Village.  We needed to put up a
19  cleanup bond they called it, $50,000.
20    Q   Put a clean up on?
21    A   A cleanup bond they called it.
22    Q   Cleanup bond?
23    A   Cleanup bond, yeah.
24    Q   Did you also have to perform improvements on

---

Pages 26 to 29

**Sheryl Germany**                                              **March 3, 2020**

30

1 the property?
2 **A I'm unsure.**
3     MS. BLAKE: Okay. I'm going to mark this as
4 Exhibit A.
5     (S. Germany Deposition Exhibit A was marked for
6     identification.)
7 BY MS. BLAKE:
8     Q It's the settlement agreement between
9 Riverdale Recycling, Tri-State, and the Village of
10 Riverdale. It is Bates stamped TS_01992 through
11 TS_02010.
12         And Exhibit A does show that the
13 agreement is between Riverdale Recycling and
14 Tri-State and the Village, correct?
15     **A Yes.**
16     Q Why was Riverdale Recycling a part of this
17 settlement agreement? Is that solely as the property
18 owner?
19     **A Correct.**
20     Q Okay. And paragraph 2 states that, beginning
21 in 1999, the Village notified Riverdale Recycling and
22 Tri-State that the Village considered that Riverdale
23 Recycling and Tri-State were conducting operations on
24 the property which were not allowed under the IEPA.

31

1         Do you see that there?
2     **A Yes, I do.**
3     Q Okay. And then it states that, Riverdale
4 Recycling and Tri-State denied and disputed the
5 Village's conclusions, correct?
6     **A In paragraph 3 it says that.**
7     Q Okay. And then, in late 1999, Riverdale
8 Recycling and Tri-State filed an application with the
9 Illinois EPA seeking amendments to the then-existing
10 permits for the design, construction and operation of
11 a transfer station. Do you see that?
12     **A Yes.**
13     Q And the Village was opposed to the requested
14 amendments, correct?
15     **A That's what's stated.**
16     Q Okay. And the IEP -- it states, the IEP
17 denied the requested amendments, correct?
18     **A That sentence says that, yes.**
19     Q Okay. Can you turn to the last page? Did
20 you sign this agreement?
21     **A Yes.**
22     Q Okay. And so you agreed with what was stated
23 within the agreement when you signed it?
24     **A I would say yes.**

32

1     Q Okay. So based on the issues with the IEPA
2 at the property and the Village's allegations
3 regarding the property, the parties entered into a
4 settlement agreement, correct?
5     **A Correct.**
6     Q Okay. And in that settlement agreement,
7 Tri-State was allowed to continue to operate on the
8 property, correct?
9     **A Yes.**
10     Q They were allowed to operate a transfer
11 station on the property, correct?
12     **A Yes.**
13     Q Okay. And in exchange, Tri-State agreed, at
14 page 5, to facility capital improvements at the
15 property, correct?
16     **A Yes.**
17     Q And Tri-State agreed to a limitation on
18 receipt of various wastes that are listed in the
19 agreement, correct?
20     **A Yes.**
21     Q And Tri-State agreed to facility staffing
22 improvements, as shown on page 8, correct?
23     **A Yes.**
24     Q Okay. Tri-State also agreed in exchange for

33

1 being allowed to operate a transfer station on the
2 property in the Village to some certain facility
3 license and permit commitments. Do you see that?
4     **A Which page are we looking at?**
5     Q Page 9.
6     **A Yes.**
7     Q Okay. And then page 13 describes the host
8 benefits that you discussed. Do you see that?
9     **A Yes.**
10     Q Okay. And that was one factor in this
11 settlement agreement that would allow you to operate
12 a transfer station on that property in Riverdale,
13 correct?
14     **A Yes.**
15     Q So in addition to allowing you to operate a
16 transfer station on the property, the Village agreed
17 not to sue or otherwise make claims against Tri-State
18 in connection with your transfer station operation,
19 correct?
20     **A What page are we looking at?**
21     Q Page 16.
22     **A Yes.**
23     Q Okay. And so there were a lot of agreements
24 made by Tri-State and the Village within this

Pages 30 to 33

Sheryl Germany                                      March 3, 2020

34

1  settlement agreement, not solely limited to the
2  payment of a host fee or this cleanup bond. Is that
3  fair to say?
4      A  Yes.
5      Q  And did you understand that this agreement
6  was entered into to avoid the uncertainty of
7  litigation and then to allow you to continue
8  operating a transfer station at the property?
9      A  Yes.
10     Q  Do you know who represented Tri-State in
11 relation to this settlement agreement?
12     A  Mark LaRose.
13     Q  And Tri-State -- I think you said this, but
14 you're still operating a transfer station in
15 Riverdale, correct?
16     A  Correct.
17     Q  Is the transfer station still operating in
18 accordance with this settlement agreement?
19     A  Yes.
20     Q  What is Tri-State's total number of
21 employees?
22     A  47 or 48.
23     Q  Okay. What was the total number of employees
24 in 2018?

35

1      A  I'm unsure.
2      Q  Was it approximately the same or more or
3  less, do you know?
4      A  What year?
5      Q  2018.
6      A  Less.
7      Q  What is the total number of garbage
8  collection clients today?
9      A  I don't know that offhand.
10     Q  Do you know how many municipalities you
11 collect garbage for?
12     A  At the present time -- I'm drawing a blank.
13         MR. LAROSE: Just tell her the ones you
14 know. Don't guess.
15         THE WITNESS: Okay. I'm going to -- three
16 that I know of for sure.
17 BY MS. BLAKE:
18     Q  And what municipalities are those?
19     A  Marionette Park, Thornton and Robbins.
20     Q  In 2018, do you know how many municipalities
21 you collected garbage for?
22     A  That would have also -- you could have added
23 Riverdale on there.
24     Q  On your tax returns for Tri-State is your

36

1  annual gross income based on all of your business in
2  both garbage collection and garbage transfer?
3      A  Yes.
4      Q  Does Tri-State own any other businesses?
5      A  No.
6      Q  Does Tri-State have any subsidiaries?
7      A  No.
8      Q  Does Tri-State have any parent corporations?
9      A  No.
10     Q  Does Tri-State have any affiliate businesses?
11     A  No.
12     Q  Did Tri-State file taxes in 2017, 2018, 2019
13 and 2020?
14     A  Not 2020 yet or 2019.
15     Q  So you did file taxes in 2017 and 2018,
16 correct?
17     A  Correct.
18     Q  And you've not yet filed taxes for 2019 or
19 2020?
20     A  Correct.
21     Q  Do you have the 2017 and 2018 tax returns
22 available?
23         MR. LAROSE: Objection. We've objected to
24 producing that as just being totally irrelevant to

37

1  this. You asked for it in your discovery.
2          MS. BLAKE: I'm just asking if they're
3  available.
4          MR. LAROSE: Well, what does that mean?
5          MS. BLAKE: Does she have them?
6          MR. LAROSE: With her?
7          MS. BLAKE: No, just in general.
8  BY MS. BLAKE:
9      Q  Do you know where they are? Are they
10 available to you?
11     A  Yes.
12         MR. LAROSE: You can answer that.
13 BY MS. BLAKE:
14     Q  Do you know what Tri-State's gross annual
15 income was in 2017?
16     A  No.
17         MR. LAROSE: Objection. Irrelevant. We're
18 not telling you that.
19 BY MS. BLAKE:
20     Q  Do you know what Tri-State's gross annual
21 income was in 2018?
22         MR. LAROSE: Same objection.
23         THE WITNESS: No.
24

Pages 34 to 37

**Sheryl Germany**                                              **March 3, 2020**

---

38

1  BY MS. BLAKE:
2      Q  Do you know what amount of gross income was
3  generated by Tri-State through their garbage
4  collection contract with the Village of Riverdale in
5  2017?
6      **A  I'm going to say no.**
7      Q  Do you know what amount of gross income was
8  generated by Tri-State through their garbage
9  collection contract with the Village of Riverdale in
10  2018?
11      **A  No.**
12      Q  Do you know what amount of gross income was
13  generated by Tri-State through their garbage
14  collection contract with the Village of Riverdale in
15  2019?
16      **A  No.**
17      Q  When was Tri-State's contract with the
18  Village of Riverdale initially executed?
19      **A  I would have to guess.**
20      Q  So you don't remember?
21      **A  No.  I have an idea, but I'm not sure.**
22      Q  Was it around the time that Tri-State moved
23  into Riverdale?
24      **A  It was later.**

---

39

1      Q  Okay.  Was it prior to Mayor Jackson's
2  administration?
3      **A  Oh, yes.  Well, as you can see by the**
4  **settlement agreement, Mayor Z was mayor at the time.**
5  **We called her Mayor Z.**
6      Q  Okay.  That's a good point.
7          So you were at least -- were you
8  providing garbage collection services for the Village
9  of Riverdale at the time of this settlement?
10      **A  I don't remember.**
11      Q  Okay.  In 2012, the Village and Tri-State
12  entered into an Agreement For Refuse, Recyclable,
13  Yard Waste Material Collection/Processing/Disposal
14  Services.  Do you recall that agreement?
15      **A  I know there was an agreement.  Do I recall**
16  **it?  No.**
17          MS. BLAKE:  Okay.  I'm going to mark the
18  Agreement For Refuse, Recyclable, Yard Waste Material
19  Collection/Processing/Disposal Services as Exhibit B.
20          (S. Germany Deposition Exhibit B was marked for
21          identification.)
22          MS. BLAKE:  And Exhibit B has previously
23  been marked by Tri-State as Tri-State 01631-01667.
24

---

40

1  BY MS. BLAKE:
2      Q  Was this the first contract Tri-State had
3  with the Village?
4      **A  No.**
5      Q  For garbage collection services?
6      **A  No.**
7      Q  Okay.  And this contract was signed by
8  yourself; is that correct?
9      **A  Yes.**
10      Q  And who signed on behalf of the Village of
11  Riverdale, if you know?
12      **A  Oh, that would have been Mayor Deon.  I don't**
13  **remember his whole name.**
14          MR. LAROSE:  Deyon Dean.
15          THE WITNESS:  Deyon Dean.
16  BY MS. BLAKE:
17      Q  Okay.  And that -- and this contract was
18  signed in 2012, correct?
19      **A  Correct.**
20      Q  Would this contract have been signed because
21  the previous contract was expiring?
22      **A  Yes.**
23      Q  Okay.  Would you have prior contracts with
24  the Village of Riverdale in your Tri-State files?

---

41

1      **A  Yes.**
2      Q  This agreement gave Tri-State the exclusive
3  right to provide garbage collection services to
4  residential units within the Village from 8-1-12
5  through 7-31-19; is that correct?
6      **A  Only residential units, I believe it was two**
7  **units, like small apartment buildings.  I**
8  **don't -- there were no other -- two-family units,**
9  **that was the maximum that that -- that this covered.**
10      Q  Okay.  Did you have another agreement, then,
11  in place for the rest of the collection services?
12      **A  No.**
13      Q  So you only collected garbage for two-family
14  units pursuant to this time --
15      **A  Well, one- and two-family units, you know.**
16  **That was -- two-family units were the maximum that**
17  **this contract covered.**
18      Q  Okay.
19      **A  All apartments were on their own.**
20      Q  Okay.
21      **A  The owners of the apartment buildings had to**
22  **provide their own refuse hauler.**
23      Q  Okay.  What about for the single-home
24  residences?

---

Pages 38 to 41

Sheryl Germany                                                    March 3, 2020

42

1      A  Yes, that's what I --
2      Q  Okay.
3      A  Yes, single homes up to a maximum of two, two
4   families per unit.
5      Q  I understand what you're saying now.
6          So you collected garbage pursuant to
7   this 2012 agreement for all single-family homes in
8   the Village of Riverdale, correct?
9      A  Correct.
10     Q  And then also for all homes with two units?
11     A  Correct.
12     Q  Correct?  But any other unit with two or
13  more -- any other building with two or more units
14  were on their own for garbage collection, correct?
15         MR. LAROSE:  More than two units.
16         THE WITNESS:  More than two units.
17  BY MS. BLAKE:
18     Q  Okay.  So any other building with more than
19  two units was on their own for garbage collection,
20  correct?
21     A  Correct.
22     Q  Okay.  And, again, this contract served for a
23  time frame of 8-1-12 through 7-31-19, correct?
24         MR. LAROSE:  Page 3, paragraph 3.

43

1          THE WITNESS:  Okay.  Yes.
2   BY MS. BLAKE:
3      Q  Okay.  Prior to this contract, was your
4   contract to collect garbage within the Village
5   similar in that it only -- generally Tri-State only
6   collected for single-family residences or two-family
7   units?
8      A  Yes.
9      Q  Okay.  And if I can direct you to page 5 of
10  the contract, which is TS_1635.
11         You would agree that Tri-State agreed
12  to provide certain municipal services to the Village
13  at no additional cost to the Village, correct?
14     A  Yes.
15     Q  Okay.  So did -- Tri-State did not receive
16  any additional income from the services it agreed to
17  provide to Riverdale in Section 13; is that correct?
18     A  Yes.
19     Q  One of the services for which Tri-State
20  received no additional compensation from the Village
21  was a yearly spring cleanup, correct?
22     A  Yes.
23     Q  If you did not receive any additional
24  compensation for providing the spring cleanup, what

44

1   did Tri-State lose by not providing the same to the
2   Village?
3      A  Our reputation.
4      Q  And how did you lose your reputation by not
5   providing the spring cleanup?
6      A  When we wanted to provide the spring cleanup,
7   the Village did not cooperate with us, would not set
8   up a date.  So when residents called to ask when the
9   spring cleanup was, we had no information to give
10  them.
11     Q  And based on not having information to give
12  to the residents, you believe your reputation as a
13  company was damaged?
14     A  Correct.
15     Q  Okay.  And it was damaged within the Village
16  of Riverdale?
17     A  Correct.
18     Q  And can you put a value on that?
19     A  No.
20     Q  Did this contract allow the Village to cancel
21  the contract within 90-days' notice to Tri-State?
22     A  Yes.
23     Q  Between the date of your start of business in
24  Riverdale and today, did any other garbage collection

45

1   and/or transfer station open business in Riverdale?
2      A  I'm having a hard time with that.
3          MR. LAROSE:  Me too.  I don't know what open
4   business is.  Operate business?
5   BY MS. BLAKE:
6      Q  Sure.  I'll ask it that way.
7          I mean, between the date Tri-State
8   began business in Riverdale and today, did any other
9   garbage collection service operate in the Village of
10  Riverdale?
11     A  Yes.
12     Q  Do you know what garbage collection services
13  operated in the Village of Riverdale since you began
14  your business there?
15     A  I'm going to go with no.
16         MR. LAROSE:  You have to speak up.
17         THE WITNESS:  No.
18         MR. LAROSE:  No, what?  You don't know?
19         THE WITNESS:  No, I don't know.  I don't
20  know.
21         MR. LAROSE:  Okay.
22  BY MS. BLAKE:
23     Q  Between the date of the start of business --
24  of Tri-State's business in Riverdale and today, did

Pages 42 to 45

**Sheryl Germany**                                    **March 3, 2020**

---

46

1  any other transfer station operate in the Village of
2  Riverdale?
3      **A  I don't know.**
4      Q  During your company's time in Riverdale, are
5  you familiar with how the property at 1201 West 138th
6  Street was operated?
7      **A  I'm not sure what that address is.**
8      Q  That's the -- 1201 West 138th Street is the
9  address where Riverdale Materials currently operates.
10         So I'm asking during your company's
11  time in Riverdale, are you familiar with how that
12  property was operated or who operated business on
13  that property?
14     **A  Yes.**
15     Q  Okay.  Who -- what type of business was
16  operated at 1201 West 138th Street prior to Riverdale
17  Materials coming to the Village?
18     **A  I believe that was Huron Valley.**
19     Q  And what type of business was Huron Valley?
20     **A  I'm not sure.**
21     Q  Did the property sit vacant for some years
22  prior to Riverdale Materials' purchase of it?
23     **A  Yes.**
24     Q  Do you know approximately how long it was

---

47

1  vacant?
2      **A  No.**
3      Q  Do you know Charles Fritz?
4      **A  No.**
5      Q  Do you know what type of business Fritz
6  Enterprises was?
7      **A  No.**
8      Q  Were you familiar with the operation of Fritz
9  Enterprises in Riverdale?
10     **A  No.**
11     Q  So it's fair to say you didn't do business
12  with Fritz Enterprises?
13     **A  I don't know that.**
14     Q  Did you ever oppose Fritz' operation at 1201
15  West 138th Street?
16     **A  No.**
17     Q  Do you know what type of -- I'm sorry, what
18  type of business did Tri-State do with ABC Auto Parts
19  and Sales?
20     **A  Garbage collection.**
21     Q  Did Tri-State ever oppose ABC's operation in
22  the Village?
23     **A  No.**
24     Q  What type of business did you do with Circus

---

48

1  Auto Parts?
2      **A  I'm not sure.**
3      Q  Did Tri-State ever opposes Circus' operation
4  in the Village?
5      **A  No.**
6      Q  What type of business did you do with Metal
7  Management Midwest?
8      **A  I'm unsure.**
9      Q  Did you ever oppose Metal's operation at 1201
10  West 138th Street?
11     **A  No.**
12     Q  What type of business did you do with Huron
13  Valley Steel Corporation?
14     **A  I'm unsure on that one.**
15     Q  Did you ever oppose Huron's operation at 1201
16  West 138th Street?
17     **A  No.**
18     Q  What type of business did you do with
19  Riverdale Industry's Inc?
20     **A  Refuse hauling.**
21     Q  Did you ever oppose Riverdale Industry's
22  operation in the Village of Riverdale?
23     **A  No.**
24     Q  And you stated you did not do any business

---

49

1  with Charles Fritz, correct?
2      **A  I'm unsure.**
3      Q  Okay.  But you don't personally know Charles
4  Fritz?
5      **A  I couldn't pick him out in a room.**
6      Q  Do you know that your attorney also
7  represents Charles Fritz?
8      **A  Yes.**
9      Q  Did you have to sign an attorney conflict
10  waiver when you purchased property from Charles
11  Fritz?
12         MR. LAROSE:  Objection.  Where is this
13  going?
14         MS. BLAKE:  That's the last question I have
15  on it.
16         MR. LAROSE:  You can answer it.
17         THE WITNESS:  I'm sorry?
18  BY MS. BLAKE:
19     Q  Did you have to sign an attorney conflict
20  waiver when you purchased property from Charles
21  Fritz?
22     **A  No.**
23     Q  Did Tri-State purchase the retention pond
24  near 1201 West 138th Street?

Pages 46 to 49

**O'SULLIVAN REPORTING**
**(708) 671-8281 | osullivanreporting.com**

Sheryl Germany                                               March 3, 2020

50

1      MR. LAROSE:  Want this on the record or off
2  the record?
3      MS. BLAKE:  I have no idea what you're going
4  to do.
5      MR. LAROSE:  Okay.  So let's do it on the
6  record.  Right now this lawsuit, unfortunately, I
7  think, is about retaliation and breach of contract.
8  The purchase of the retention pond has nothing to do
9  with that.  So if you want to go into that, then
10 understand that my questions to your clients are not
11 going to be limited to retaliation and breach of
12 contract.  The retention pond has nothing to do with
13 those two things, nothing.  If you want to limit it
14 the way you want to limit it, and I'm okay with that,
15 then let's limit it that way, but if you open this
16 door, I'm going to charge right through it.
17     Want to take a break for a minute and
18 you can think about that?
19     MS. BLAKE:  I don't need to take a break,
20 but...
21     MR. LAROSE:  I do.
22     MS. BLAKE:  Okay.
23     (A brief recess was taken.)
24     (Record read back as requested.)

51

1      MS. BLAKE:  Okay.  So I understand what
2  you're saying in regards to the retention pond.  In
3  regards to your threatened scope of questioning of my
4  clients, are you meaning to say you're going to
5  question them on everything in the whole wide world
6  or everything relating to your complaint?
7      MR. LAROSE:  Well, it just --
8      MS. BLAKE:  Because the retention pond
9  doesn't have anything to do with my client either.
10 Does it?
11     MR. LAROSE:  But it's -- I would say no.  I
12 would say no, except for the transfer stamps, but
13 that's not part of the lawsuit, at least not yet.
14     MS. BLAKE:  Right.
15     MR. LAROSE:  Right?  The -- I don't -- it's
16 hard for me to answer your question because I don't
17 know what other areas outside of the retaliation and
18 breach of contract that you intend to go into other
19 than the retention pond.  But I would say every area
20 that you go into that's not related to those, you
21 open the door and it's fair game.
22     MS. BLAKE:  Relating to the retention pond?
23     MR. LAROSE:  Relating to anything that's not
24 retaliation or breach of contract.

52

1      MS. BLAKE:  That's what I was trying to seek
2  clarification from you about.  Okay.
3      MR. LAROSE:  So I'm okay -- so you don't
4  go -- you don't go into those areas, and I don't
5  think it's appropriate for me to go into those areas.
6  You don't -- you don't go into, you know, the due
7  process type stuff; and the retention pond is due
8  process.
9      I mean, that's really the main thing
10 to change between the First Amended Complaint and the
11 Second Amended Complaint, in addition to these other
12 claims of property rights, property interest,
13 constitutional property interest, that we now own
14 property adjacent to the site that they're leaching
15 stuff into.
16     MS. BLAKE:  Right.  But aren't you claiming
17 damages based on that harm?
18     MR. LAROSE:  Well, I don't think we can
19 because -- well, I mean, unless this thing is
20 reversed on appeal, the damages at this point -- at
21 this point, in this transaction, have to be related
22 to the retaliation and breach of contract.  I mean, I
23 hate to admit that, but it's true.  And it's -- it's
24 the law of where the case is right now.  I'm not

53

1  happy about it.  We actually looked at filing a
2  motion to reconsider, and we thought better of it.
3      So right now -- and that's why I
4  thought, you know, we were talking about depositions
5  from 10:00 to 12:00 and 12:00 to 2:00, it's a pretty
6  limited scope.  And it's going to have to be that
7  same limited scope for your guys when I take their
8  depositions and for anybody else that is deposed in
9  this case.
10     MS. BLAKE:  Okay.
11     MR. LAROSE:  I can't go through all the
12 other stuff.  I'd like to, but I can't.
13     MS. BLAKE:  I was seeking clarification of
14 your position.  I am going to move forward.
15     MR. LAROSE:  Okay.  Thanks.
16 BY MS. BLAKE:
17   Q  All right.  I'm going to move on to Riverdale
18 Materials.
19     When did you become aware that
20 Riverdale Materials would be applying for a
21 conditional use in the Village to operate a
22 construction, demolition, dirt and stone processing
23 facility?
24   **A  It was during a meeting with the mayor.**

Pages 50 to 53

**O'SULLIVAN REPORTING**
**(708) 671-8281 | osullivanreporting.com**

**Sheryl Germany**                                    **March 3, 2020**

---

54

1      Q   Do you recall when the meeting was,
2   approximately?
3      **A   I'm drawing a blank.**
4      Q   Okay.  Let me give you some context.  So the
5   first zoning board hearing was in September of 2017
6   relating to Riverdale Materials.
7      **A   It was before that.**
8      Q   It was before that?
9      **A   2016.**
10     Q   Okay.  And what were you told by the mayor in
11  2016?
12     **A   Well, actually, there were several meetings.**
13  **The one with David Gonzalez was when we kind of**
14  **clarified things and they were going to be held to**
15  **the same standards we were, meaning, clean up C/D,**
16  **host fees to the Village, drainage, all those things**
17  **and more, whatever was in our contract.**
18        MR. LAROSE:  You've got to speak up a little
19  bit.
20        THE WITNESS:  Okay.  Whatever was in our
21  contract -- it was supposed to mimic ours.
22  BY MS. BLAKE:
23     Q   Who told you that Riverdale Materials would
24  be required to perform some of the same things

---

55

1   Tri-State was required to perform pursuant to the
2   settlement agreement?
3      **A   The mayor.**
4      Q   Okay.  And you're saying Dave Gonzalez was
5   present during that meeting?
6      **A   Correct, yes.**
7      Q   Who else was present in that meeting?
8      **A   Jeff.**
9      Q   Did you know Jim Bracken prior to him
10  starting business in Riverdale?
11     **A   Yes.**
12     Q   How did you know him?
13     **A   Through Waste Management.  It was a social**
14  **function.**
15     Q   Was his company a competitor of Tri-State
16  prior to starting a business in Riverdale?
17     **A   Are we just talking about his business being**
18  **Riverdale Materials?**
19     Q   No.  Was his company Brackenbox a competitor
20  of Tri-State?
21     **A   Yes, yes, they were.**
22     Q   Okay.  And Brackenbox operated a transfer
23  station in Markham?
24     **A   I don't know that.**

---

56

1      Q   Okay.  In what manner did you see Brackenbox
2   as a competitor to Tri-State?
3      **A   They also offered roll-off service.**
4      Q   What's roll-off service?
5      **A   Dumpsters.**
6      Q   Okay.  Did you speak to Jim Bracken regarding
7   his operation -- or his plan to begin operations in
8   Riverdale?
9      **A   Not to him directly, no.**
10     Q   Did you speak to him indirectly?
11     **A   One more time?**
12     Q   You said you didn't directly talk to Jim
13  Bracken regarding his plan to begin business in
14  Riverdale.
15     **A   No.**
16     Q   My question was did you indirectly get a
17  message to him regarding his plan to operate business
18  in Riverdale?
19     **A   At one point he sent me a text message, but**
20  **that was after.**
21     Q   After what?
22     **A   After he had already started business.**
23     Q   What did the text message say?
24     **A   Well, he had tried to set up a meeting and**

---

57

1   **that didn't work out, and then he had sent me a**
2   **message that they would be taking only C and D**
3   **material and asked if we would bring our clean cement**
4   **to him.**
5      Q   How did you respond?
6      **A   I didn't.**
7      Q   Did you participate in a conference call with
8   Jim Bracken after the initial zoning hearing
9   regarding Riverdale Materials in September of 2017?
10     **A   I don't recall.**
11     Q   Do you believe Riverdale Materials is a
12  competitor of Tri-State?
13     **A   Yes.**
14     Q   And why do you believe that Riverdale
15  Materials is a competitor?
16     **A   Because he accepts concrete and C and D.**
17     Q   What is C and D an abbreviation for?
18     **A   Construction and demolition debris.**
19     Q   So Riverdale Materials is a competitor of
20  your transferring business, not your garbage
21  collection business.  Is that fair?
22     **A   Riverdale Materials, correct.**
23     Q   Yes.  Do you process municipal solid waste at
24  your facility?

---

Pages 54 to 57

**Sheryl Germany**                                                    **March 3, 2020**

---

58

1    A  Process meaning?
2    Q  Transfer.
3    A  Yes.
4    Q  Okay.  Does Riverdale Materials transfer
5    municipal solid waste at its facility?
6    A  I don't know.
7    Q  Do you know if Riverdale Materials collects
8    residential garbage?
9    A  I don't know.
10   Q  What other companies do you consider to be
11   Tri-State's competitors?
12   A  Homewood Disposal, Republic Services, Waste
13   Management.
14   Q  Okay.  Do you know where these companies are
15   located?
16   A  Well, Republic Services and Waste Management
17   have many locations.  Homewood Disposal has several
18   locations.
19   Q  Are any of them located in or near Riverdale?
20   A  Near.
21   Q  Okay.  Did you oppose Riverdale Materials
22   operating in Riverdale?
23   A  Yes.
24   Q  Why?

---

59

1    A  Environmental concerns.
2    Q  Any other issues?
3    A  Business concerns.
4    Q  What environmental concerns did you have
5    regarding Riverdale Materials operating in the
6    Village?
7    A  That piece of property was well-known to have
8    been contaminated for years.  No one touched that
9    property.  I think it was on -- the Illinois EPA had
10   had it on their hot list.
11   Q  Was Tri-State ever on the IEPA -- was the
12   property Tri-State is located on ever listed on the
13   IEPA hot list?
14   A  No.
15   Q  Had Tri-State ever attempted to purchase the
16   property where Riverdale Materials was operating for
17   business operations?
18   A  No.
19   Q  How did you believe your environmental
20   concerns with the property would affect your
21   business?
22   A  Being a corporate citizen of Riverdale, if
23   Riverdale has to have any kind of legal proceedings,
24   I'm going to pay for it.

---

60

1    Q  Okay.  As a corporate citizen of Riverdale,
2    do you believe that you're paying for this lawsuit?
3    A  Yes.
4        MR. LAROSE:  Good one.
5    BY MS. BLAKE:
6    Q  With Riverdale Materials' operation in
7    Riverdale, has Tri-State been entirely excluded from
8    the garbage collection and/or transfer station
9    business?
10       MR. LAROSE:  Could you read that one back?
11   I missed the first part of it.
12       (Record read back as requested.)
13       MR. LAROSE:  Okay.  If you understand it,
14   you can answer.
15       THE WITNESS:  I'm not sure I understand
16   that, really.
17   BY MS. BLAKE:
18   Q  Okay.  Since Riverdale Materials started
19   operating in Riverdale, does Tri-State continue to do
20   business in terms of garbage collection services?
21       MR. LAROSE:  Anywhere?
22       MS. BLAKE:  Anywhere.
23       THE WITNESS:  Oh.  Well, yes.
24

---

61

1    BY MS. BLAKE:
2    Q  And, then, also, since Riverdale Materials
3    began operations in Riverdale, you would agree that
4    Tri-State continues to operate a transfer station
5    business, correct?
6    A  Yes.
7    Q  As a sole result of the initiation of
8    Riverdale Materials' operation in the Village, has
9    Tri-State had to increase prices to consumers as it
10   relates to your transfer station?
11   A  No.
12   Q  Did you attend any zoning board hearings in
13   2017 wherein Riverdale Materials' conditional use was
14   being discussed?
15   A  Yes.
16   Q  Did you speak at any of the zoning board
17   hearings in 2017 wherein Riverdale Materials'
18   conditional use was being discussed?
19   A  Yes.
20   Q  Did you yourself speak or did you have
21   your -- Mr. LaRose speak for you?
22   A  It all depended on what meeting.  At some it
23   was him, at some it was both, at some he wasn't even
24   there and it was me, so a combination of.

---

Pages 58 to 61

62

1    Q   Okay.  So I have transcripts of some of the
2  hearings before the zoning board and none of them
3  show that you were present or that you spoke.
4        So I'm just wondering in general what
5  were you saying to the zoning board regarding
6  Riverdale Materials.  If you could summarize what
7  your argument was to those members or what your
8  conversation was with them.
9        MR. LAROSE:  By the way, you only have
10  transcripts because we ordered a court reporter, so
11  there wasn't always one there.
12        MS. BLAKE:  I'm not saying it's her fault.
13  I'm just telling her where I'm coming from, giving
14  her context.
15        MR. LAROSE:  I got it.
16        THE WITNESS:  I don't understand why I
17  wouldn't have been there.
18        MR. LAROSE:  But you were there.  So
19  explain --
20        THE WITNESS:  Right.  That's why I'm going
21  there, because I'm like, how can you say I wasn't
22  there, when I know I was there?
23  BY MS. BLAKE:
24    Q   I was trying to give you context for why I'm

63

1  asking the questions.  I wasn't being accusatory at
2  all.
3        MR. LAROSE:  Can we go off the record for a
4  second?
5        MS. BLAKE:  Sure.
6        (A discussion was had off the record.)
7  BY MS. BLAKE:
8    Q   So the Village zoning board hearings wherein
9  Riverdale Materials' conditional use was discussed,
10  some were attended by you, correct?
11    A   Correct.
12    Q   And just in general what was -- what did you
13  discuss with the board members?
14    A   The environmental impact of having another
15  transfer station in the area within a mile radius,
16  the property that they were using was already
17  contaminated, and disturbing that property was not in
18  the best interest of the community, and the drainage
19  situation.
20    Q   What did you explain to them about the
21  drainage situation?
22    A   That Riverdale Materials did not own the
23  retention pond that they were claiming to.
24    Q   Who owned it?

64

1    A   Charlie Fritz.
2    Q   How did you know he owned it?
3    A   Through Mark LaRose.
4    Q   How did you come to know about the history of
5  the property and the alleged contamination of the
6  property?
7    A   Through Huron Valley.
8    Q   What did you learn from Huron Valley?
9    A   That it was contaminated.  In fact, Kathy
10  that works for me had worked for Huron Valley.
11    Q   And what did Kathy say about the property?
12    A   It's contaminated.
13    Q   This is not directed to you.  This is
14  directed to the attorneys.
15        MS. BLAKE:  Okay.  So a lot of the
16  criticisms that are in your complaint and that are
17  being testified to by Ms. Germany are related to the
18  environmental condition of the property, which calls,
19  to me, into question why she purchased property on
20  contaminated land.  And that would be my line of
21  questioning relating to the retention pond, and it
22  directly relates to the criticisms they voice, and
23  then they went and purchased property that was
24  contaminated.  I mean --

65

1        MR. LAROSE:  I get it.
2        MS. BLAKE:  And it's not going outside the
3  retaliation.  It's not going outside the breach of
4  contract because it directly relates to the
5  criticisms you list in your First Amended Complaint
6  regarding environmental harm, and it directly relates
7  to the damages.
8        MR. LAROSE:  Okay.  I understand what you're
9  saying, but the criticisms were the criticisms and
10  the retaliation happened long before, long before
11  they ever even thought about purchasing the retention
12  pond.
13        So I'm still saying it's got nothing
14  to do with -- except with maybe the exception of
15  we're still getting jacked around a little bit on
16  these transfer stamps, but that's just a -- that's
17  just a nick in this thing.  I don't think the
18  purchase of this has anything to do with the
19  retaliation.
20        MS. BLAKE:  Or damages?  So you're not going
21  to claim all of this testimony regarding the
22  environmental impact on her as a corporate resident?
23        MR. LAROSE:  Well, we tried to claim that,
24  and you did a really good job in filing a motion to

Pages 62 to 65

**Sheryl Germany**                                                    **March 3, 2020**

66

1  dismiss that and the judge agreed with you. That's
2  all part of the due process.
3          MS. BLAKE:  I get that, but in regards to
4  the -- in regards to your damages for retaliation,
5  there will be no environmental harm damages claimed
6  or anything like that because her purchase of
7  contaminated property on that land really undermines
8  those damages, and I should be able to ask her about
9  that.
10         MR. LAROSE:  I understand that, and I would
11 say that based on the current legal posture of the
12 case, we can't claim environmental damages.
13         MS. BLAKE:  Okay.
14         MR. LAROSE:  That would be related to the
15 due process both substantive and procedural, sociare,
16 and those aren't matters left in this case, and the
17 equal protection.  It's not in the case anymore, and,
18 like I said, I'm not happy about it, but I would say
19 you're right.  If I -- if the opposite was true, that
20 somehow we could finagle in some environmental
21 damages, then I think your line of questioning is
22 totally appropriate; but without that, I don't think
23 it is.
24         MS. BLAKE:  But she's testifying about

67

1  environmental criticisms.
2          MR. LAROSE:  I got it.
3          MS. BLAKE:  Okay.
4          MR. LAROSE:  I got it.  She complained about
5  that.
6          MS. BLAKE:  And then she bought the
7  property.
8          MR. LAROSE:  Way after they retaliated
9  against her and breached their contract, way after,
10 years after, or a year after at least.
11         MS. BLAKE:  While still an environmental
12 concern?  I'm just --
13         MR. LAROSE:  Here.  Ask the questions then.
14 Go ahead, but -- but depending on where this goes,
15 I'm not telling you that I'm laying off of it either
16 then, and I'm not telling you that I'm not going to
17 claim any damages.  So if you're going to -- you
18 can't have it both ways.
19         MS. BLAKE:  I'm not trying to get it both
20 ways.  I'm just -- I'm trying to --
21         MR. LAROSE:  Ask your questions then,
22 Counsel, however you want to do it.
23         MS. BLAKE:  Oh.
24         MR. LAROSE:  No, no, no.  Erin, ask your

68

1  questions however you want to do it.
2          MS. BLAKE:  Okay.  I thought we were having
3  a productive conversation about the case.
4          MR. LAROSE:  We are.  We are, but we're
5  going nowhere, so either --
6          MS. BLAKE:  We're not going the way maybe
7  that you want it to, but I think we're going
8  somewhere.
9          MR. LAROSE:  But either -- either you're
10 going to ask your questions about the retention pond
11 or you're not.  And if you ask them, I'm not -- I'm
12 not waiving anything, not any damages, not any
13 questioning about it to anybody.
14         MS. BLAKE:  Okay.
15         MR. LAROSE:  Okay.  That's -- it's as simple
16 as that.  She has answers to your questions.  I'm not
17 sure you're going to like them, but go ahead and ask
18 them.
19         I would have liked this whole thing
20 to take seven hours because the whole is case alive,
21 unfortunately it isn't.
22 BY MS. BLAKE:
23     Q  Other than the environmental impact the
24 property would have on the Village and you as a

69

1  corporate resident, what other concerns did you voice
2  to the Village zoning board members regarding
3  Riverdale Materials' operation at that site in the
4  Village?
5          MR. LAROSE:  Can we say in addition to
6  what's in the complaint because they're all there and
7  the letters are all there?
8          THE WITNESS:  The First Amended Complaint.
9          MR. LAROSE:  Yeah.
10         MS. BLAKE:  I didn't know that those were
11 voiced by her to the board.
12         MR. LAROSE:  I'm sorry?
13         MS. BLAKE:  I didn't know that those
14 concerns were voiced by Ms. Germany to the board.
15 They're in your complaint.  They're allegations, but
16 it doesn't say Ms. Germany voiced these concerns, so
17 I was just asking.
18         MR. LAROSE:  But it says Tri-State did.
19 There's letters that were submitted.  There's
20 testimony that was given by Sheryl and me.  I'm just
21 trying to short circuit this.  They're all in there.
22 If you want more or the ones that she particularly --
23 that's fair, the ones that she particularly...
24         THE WITNESS:  I'd almost want to read the

Pages 66 to 69

**Sheryl Germany**                                    **March 3, 2020**

70

1  transcripts. I'd want to review the transcripts
2  because I am not sure exactly what conversation
3  happened at what meeting.
4  BY MS. BLAKE:
5      Q  Oh, I'm not asking you what you said at what
6  meeting. I'm just saying in general what were your
7  concerns, other than environmental hazards, regarding
8  Riverdale Materials operating in Riverdale?
9      **A  That they were being held to the same**
10  **standards we were.**
11     Q  And those are the standards pursuant to a
12  settlement agreement based on an IEPA claim?
13     **A  And based on the good of the community. The**
14  **community needs money. The community needs revenue.**
15  **Why would they not make them pay a host fee and**
16  **protect the Village with a cleanup bond?**
17     Q  Okay. Did you attend any Village board
18  meetings wherein Riverdale Materials' conditional use
19  was discussed?
20     **A  Yes.**
21     Q  Did you speak to the -- any of the board of
22  trustees regarding your concerns about Riverdale
23  Materials?
24     **A  I'm unsure.**

71

1      Q  Did you participate -- strike that.
2         Did you call the mayor regarding your
3  opposition to granting Riverdale Materials a
4  conditional use to operate in the Village?
5      **A  No.**
6      Q  Did you talk to the mayor at any time
7  regarding your opposition to granting Riverdale
8  Materials a conditional use to operate in the
9  Village?
10     **A  At meetings, yes.**
11     Q  And at these meetings did you express the
12  same concerns regarding the environmental impact and
13  the host fee and cleanup bond issues?
14     **A  Yes.**
15     Q  Did you ever individually discuss with any
16  Village board trustees your opposition to granting
17  Riverdale Materials a conditional use to operate in
18  the Village?
19     **A  I'm unsure.**
20     Q  You don't remember?
21     **A  Don't remember.**
22     Q  Did you ever review the Village ordinance
23  wherein the reasons for the Village board --
24         Did you ever review the Village

72

1  ordinance wherein the reasons for the Village board's
2  granting of the conditional use to Riverdale
3  Materials are listed?
4      MR. LAROSE:  That's the ordinance they
5  passed for the thing, for the conditional use.
6      THE WITNESS:  Oh.  Yes.
7  BY MS. BLAKE:
8      Q  Are you aware that the judge in this case has
9  found that the ordinance shows a rational basis for
10  the Village's decision to grant Riverdale Materials a
11  conditional use at that site?
12     MR. LAROSE:  What's that got to do with
13  this?  We know what the judge said, and now you are
14  getting into the due process.
15     MS. BLAKE:  No, just are you aware.  Yes or
16  no.  It doesn't have anything to do with the --
17     MR. LAROSE:  The judge's opinion and whether
18  she's aware of it or not has nothing to do with this
19  either.
20     MS. BLAKE:  Nothing to do with the lawsuit?
21     MR. LAROSE:  Nothing to do with her
22  deposition.  It has a lot to do with the lawsuit.
23  That's why it's going to be a two-hour deposition, or
24  maybe, not a seven-hour deposition, because the

73

1  lawsuit's been pared down by the judge's opinion.
2  What does her knowledge of the judge's opinion and
3  the status of this case have to do with her
4  deposition?
5      MS. BLAKE:  Are you telling her not to
6  answer the question, Mark?
7      MR. LAROSE:  No.
8      THE WITNESS:  No.  Oh.
9      MR. LAROSE:  I'm not telling her -- don't
10  listen to me.  You've got to testify.
11     THE WITNESS:  Read that to me again.
12  BY MS. BLAKE:
13     Q  Are you aware that the judge in this case
14  found that the ordinance shows a rational basis for
15  the Village's decision to grant Riverdale Materials a
16  conditional use at that site?
17     MR. LAROSE:  If you're aware, you're aware.
18  If you're not, you're not.
19     THE WITNESS:  I'm going to say no.
20  BY MS. BLAKE:
21     Q  Okay.  When Tri-State sought to operate in
22  the Village, did it have to go through a zoning
23  hearing?
24     **A  Yes.**

Pages 70 to 73

**Sheryl Germany**                                                      **March 3, 2020**

74

1    Q   Did anyone oppose Tri-State's operation in
2    the Village during this process?
3    **A   I don't know.**
4    Q   You don't remember?
5    **A   I don't remember.**
6    Q   Based on your dealings with the zoning board
7    decisions in the Village, do you recall the mayor
8    being a member of the zoning board that voted on
9    recommending or not recommending the grant of a use
10   to your business?
11   **A   I'm going to say no.  I don't remember.**
12   Q   Are you aware of any prior instances wherein
13   the Village retaliated against an independent
14   contractor working within the Village based on that
15   contractor's objections to Village zoning decisions?
16   **A   No.**
17   Q   Are you aware of any prior instances wherein
18   Mayor Jackson retaliated against independent
19   contractors working within the Village based on their
20   objections to Village zoning decisions?
21   **A   No.**
22   Q   In your complaint you state that prior to
23   August of 2017, Tri-State generally supported Mayor
24   Jackson.  What do you mean by general support?

75

1    **A   We attended -- we supported his golf outings.**
2    **We supported his election campaign.  We went to**
3    **fundraisers at -- I think it was Bellagio.**
4    Q   Were there instances wherein you did not
5    support his leadership or his decisions prior to
6    August of 2017?
7    **A   I can't answer that.  I don't know all his**
8    **dealings.**
9    Q   You were aware that Riverdale Materials was
10   planning to operate in Riverdale in 2016 based on
11   your testimony.
12          So you didn't agree with that
13   decision prior to August of 2017, correct?
14   MR. LAROSE:  Objection.  That's not what she
15   said.
16   MS. BLAKE:  She didn't say what?  I guess
17   I'm confused with your objection.
18   MR. LAROSE:  She didn't say that she didn't
19   agree with the decision.  The testimony was
20   completely opposite, that they were hunky-dory
21   because he was going to make it just like everybody
22   else, make it an even, level playing field, make
23   these guys do the right thing until that was a big
24   lie.

76

1    MS. BLAKE:  All right.  Mark, I'm going to
2    ask that you stop from speaking objections, the
3    commentary.  It's not --
4    MR. LAROSE:  Objection to the form of the
5    question.
6    MS. BLAKE:  Thank you.
7    BY MS. BLAKE:
8    Q   You testified that in 2016 during several
9    meetings with the mayor and Dave Gonzalez that you
10   were told that Riverdale Materials may be planning to
11   come to the Village, correct?
12   **A   Correct.**
13   Q   Did you support Riverdale Materials coming to
14   the Village in 2016?
15   **A   No.**
16   Q   And so there were decisions made by Mayor
17   Jackson prior to August of 2017 that you didn't
18   necessarily agree with, fair?
19   **A   Yes.**
20   Q   Were there any other instances, other than
21   the Village's decision to provide a conditional use
22   to Riverdale Materials, that you did not agree with?
23   **A   Can you read that to me one more time?**
24   Q   Yes.  Were there any instances wherein

77

1    Tri-State did not support the leadership decisions
2    made in the Village other than the Village's decision
3    to provide a conditional use to Riverdale Materials?
4    **A   So we're talking about just within Mayor**
5    **Jackson's reign?**
6    Q   Sure.
7    **A   Okay.  Then no.**
8    Q   Okay.  Prior to Mayor Jackson's reign --
9    **A   Yes.**
10   Q   -- there were instances where Tri-State
11   didn't agree with the decisionmaking of the Village?
12   **A   Yes.**
13   Q   Okay.  And what were those instances?
14   **A   There were some -- what do I want to say?**
15   **They wanted to revitalize a couple different areas**
16   **that really -- we didn't feel was going to be**
17   **profitable for the city.**
18   Q   Okay.  And did Tri-State voice its concerns
19   to the Village relating to these revitalization
20   projects?
21   **A   To the mayor at the time.**
22   Q   Okay.  And who was the mayor at the time?
23   **A   I'm not sure.**
24   Q   Okay.  Did Tri-State file a lawsuit?

Pages 74 to 77

**O'SULLIVAN REPORTING**
**(708) 671-8281 | osullivanreporting.com**

Sheryl Germany                                                          March 3, 2020

---

78

1    A.  No.
2    Q.  If Riverdale Materials would have obtained
3  proper permits and authorizations and would have been
4  required to post securities and pay royalties to the
5  Village, would Tri-State have had any objection to
6  the Village's granting of a conditional use to them?
7    A.  Yes.
8    Q.  What other objections would you have to them
9  doing business in the Village if those things were
10  done?
11    A.  It had to do with that piece of property and
12  they didn't have adequate drainage.  We had to put in
13  retention ponds.
14    Q.  So as part of the settlement agreement with
15  the Village, Tri-State had to put in retention ponds
16  on their property?
17    A.  I'm not sure if it was part of the -- I don't
18  believe it was part of the agreement.  We'd have to
19  go back and look.
20    Q.  At some point you were required by the
21  Village or the MWRD to put retention ponds in?
22    A.  I'm not sure, but we were required to have
23  the retention ponds.
24    Q.  Okay.  Do you know if Riverdale Materials has

---

79

1  proper permits and authorizations from environmental
2  agencies?
3    A.  No.
4    Q.  Do you know -- sorry.
5        Do you know if Riverdale Materials
6  pays securities and royalties to the Village?
7    A.  Read that one more time.
8    Q.  Do you know if Riverdale Materials pays
9  securities and royalties to the Village?
10    A.  No.
11    Q.  And Tri-State pays securities and royalties
12  pursuant to a settlement agreement with the Village,
13  correct?
14    A.  Correct.
15    Q.  Why did you -- why did Tri-State ultimately
16  decide to issue public statements regarding Riverdale
17  Materials' application for a conditional use?
18    A.  Public comments meaning?
19    Q.  Well, I think you said you had some meetings
20  with the mayor and Mr. Gonzalez and voiced your
21  concerns in those private meetings, and then you said
22  you attended a lot of zoning board hearings and
23  Village board meetings.
24        So what made you decide to move from

---

80

1  that private forum to a more public forum with your
2  concerns?
3    A.  Because the issue had moved forward and what
4  we had been told at the private meetings was not what
5  was being presented.
6    Q.  So that guarantee that Riverdale Materials
7  would have to pay similar host fees was not --
8    A.  And we were told that it wasn't going to
9  handle MSW waste, municipal solid waste.  When the
10  legal notice ran in the paper, that's what they had
11  applied for.  We were misled.
12    Q.  Okay.  What's MSW waste?
13    A.  Municipal solid waste.
14    Q.  Okay.
15        MR. LAROSE:  Garbage.
16  BY MS. BLAKE:
17    Q.  And the municipal solid waste request was
18  withdrawn by Riverdale Materials, correct?
19    A.  After we brought it to light.
20    Q.  Okay.  So if you don't know whether or not
21  Riverdale Materials is paying host fees, securities
22  and royalties to the Village, why was that one of
23  your main motivations for speaking publicly on
24  Riverdale Materials operating in the Village?

---

81

1    A.  I do not have the information on -- well, the
2  Village does not correspond with us, doesn't talk to
3  us, pretty much draws a line.  I don't know what --
4  or if there was ever those arrangements made with
5  Riverdale Materials.  How would I know that?
6    Q.  You didn't know, but it was one of your main
7  concerns.
8    A.  Right.
9    Q.  Okay.  Was your motivation for speaking out
10  publicly based on your private business interest?
11    A.  More than just my private interest.
12    Q.  But part of it was your private business
13  interest, correct?
14    A.  Correct.
15    Q.  And then part of it is that public
16  environmental concern regarding the property that you
17  discussed, correct?
18    A.  Correct.
19    Q.  And the public environmental concerns that
20  you had relating to Riverdale Materials was just that
21  it was a contaminated site?
22    A.  And they were working on it, they were moving
23  the contamination around on-site.
24    Q.  Do you know when you first began publicly

---

Pages 78 to 81

**Sheryl Germany**                                                **March 3, 2020**

82

1  speaking out regarding Tri-State's opposition to
2  Riverdale Materials operating in Riverdale?
3      **A  No.**
4      Q  On October 23, 2017, as noted in TS_258 --
5          MR. LAROSE:  Is this C?
6          MS. BLAKE:  We can mark it, if you want.  I
7  mean, I'll mark it as Exhibit C.
8          (S. Germany Deposition Exhibit C was marked for
9      identification.)
10 BY MS. BLAKE:
11     Q  Mayor Jackson sent you correspondence
12 indicating that the Village was contemplating
13 alternative vendors for the provision of garbage
14 collection services in the Village and intended to
15 issue an RFQ, correct?
16     **A  Correct.**
17     Q  You -- or Tri-State was encouraged to
18 participate in the bid process.  Is that fair?
19     **A  That's what that letter says.**
20     Q  Okay.  And in the interim, the Village
21 expected Tri-State to continue to provide services
22 under the current agreement, correct?
23     **A  Yes.**
24     Q  Had Tri-State publicly spoken out regarding

83

1  their opposition to Riverdale Materials operating in
2  the Village prior to receiving this letter?
3      **A  Yes.**
4      Q  So you know you spoke out prior to this
5  letter, but you don't know when you first spoke
6  out --
7      **A  No.**
8      Q  -- is that fair?
9      **A  Correct.**
10     Q  After this information was received in
11 October of 2017, did Tri-State continue to publicly
12 speak out against the Village and Mayor Jackson
13 granting Riverdale Materials a conditional use to
14 operate on the property?
15     **A  Yes.**
16     Q  Do you agree that Tri-State was able to
17 attend public hearings and voice its concerns to the
18 zoning board in the Village of Riverdale?
19     **A  Yes.**
20     Q  Do you agree that Tri-State was able to
21 attend public -- a public hearing and voice its
22 concerns to the Village board regarding Riverdale
23 Materials?
24     **A  Yes.**

84

1      Q  Do you agree that Tri-State was able to draft
2  letters to the zoning board and the Village board for
3  consideration regarding its objections to the
4  conditional use?
5      **A  Yes.**
6      Q  Do you agree that Tri-State was able to
7  provide the board with extensive exhibits regarding
8  Tri-State's objections?
9      **A  No.**
10     Q  Do you agree that Tri-State was allowed to
11 enter evidence into the zoning board record regarding
12 its objections?
13     **A  No.**
14     Q  Okay.  Why not?
15     **A  They already made their decision and wouldn't**
16 **accept our information.**
17     Q  When you say they had already made their
18 decision, who is that?
19     **A  The zoning board at the time, I believe.  If**
20 **that's what they -- planning or zoning, whatever they**
21 **call themselves.**
22     Q  So it's your understanding that the zoning
23 board did not accept any evidence from Tri-State
24 relating --

85

1      **A  At the one meeting.**
2      Q  -- to any objections?
3      **A  At the one meeting in particular.**
4      Q  Did Tri-State pass out leaflets to residents
5  regarding its objections to Riverdale Materials?
6      **A  No.**
7      Q  Was Tri-State able to issue FOIA requests
8  through today's date to the Village regarding the
9  Village's activities in relation to Riverdale
10 Materials?
11     **A  Yes.**
12     Q  And were those FOIAs answered?
13     **A  Yes.**
14     Q  You know what, I didn't -- sorry.  I'm going
15 to ask some questions about the complaint, and I
16 didn't print it out.
17         MR. LAROSE:  We have a copy.
18         MS. BLAKE:  You have a copy?
19         MR. LAROSE:  Yes.
20         MS. ALASKA:  We have the First Amended
21 Complaint.  We have the Second as well.
22         MR. LAROSE:  Will that one work?  Will the
23 First Amended Complaint work?
24         MS. BLAKE:  I was looking at the Second

Pages 82 to 85

**O'SULLIVAN REPORTING**
**(708) 671-8281 | osullivanreporting.com**

Sheryl Germany                                    March 3, 2020

86

1    Amended Complaint when I came up with the questions.
2         MR. LAROSE:  We can do that.  Why don't we
3    do this, why don't we take a break and you make a
4    couple copies of that?
5         MS. BLAKE:  Sounds good.
6         MR. LAROSE:  And we're not going to need all
7    the exhibits, are we?
8         MS. BLAKE:  Absolutely not.  I'm just going
9    to talk about the actual allegations in the
10   pleadings.
11        MR. LAROSE:  Okay.
12        (A brief recess was taken.)
13        MS. BLAKE:  I'm going to mark as Exhibit D
14   the Second Amended Complaint.
15        (S. Germany Deposition Exhibit D was marked for
16        identification.)
17   BY MS. BLAKE:
18   Q   I'll direct your attention to paragraph 58 of
19   that complaint.  It's on page 10.
20        MR. LAROSE:  That's the paragraph I was
21   going to ask her about.
22   BY MS. BLAKE:
23   Q   Are these all the criticisms Tri-State
24   publicly discussed regarding the granting of

87

1    Riverdale Materials a conditional use at the
2    property?
3         MR. LAROSE:  Take your time.  Read the whole
4    thing.
5         THE WITNESS:  Yeah, that's what I'm doing.
6    Yes.
7    BY MS. BLAKE:
8    Q   Okay.  And so those criticisms contain
9    environmental concerns, correct?
10   A   Correct.
11   Q   And those environmental concerns relate to
12   the property at 1201 West 138th Street; is that
13   correct?
14   A   If that's Riverdale Materials' address.
15   Q   And those criticisms also involve business
16   concerns by Tri-State, correct?
17   A   Yes.
18   Q   And then it also lists various other
19   criticisms.
20        What other criticisms are you
21   referring to in that kind of catchall phrase, if any?
22        MR. LAROSE:  Don't rack your brain on that
23   one.
24        THE WITNESS:  I don't remember.

88

1         MR. LAROSE:  That's just lawyering.  Every
2    lawyer writes complaints like that, and so did I.
3    BY MS. BLAKE:
4    Q   So you don't remember anything specific?
5    A   Correct.
6    Q   In addition to what's listed in that
7    paragraph?
8    A   These were the main concerns, the itemized
9    items.
10   Q   Okay.  And the last two items, criticisms
11   about Mayor Jackson stacking the deck with the
12   planning commission and the zoning board of appeals
13   and criticisms about improper procedures used at the
14   public hearings, those relate to the zoning board and
15   Village board hearings relating to this conditional
16   use?
17   A   Zoning commission, planning --
18        MR. LAROSE:  Planning commission, zoning
19   board.
20        THE WITNESS:  Planning commission, zoning
21   board.
22   BY MS. BLAKE:
23   Q   Did Tri-State continue to provide garbage
24   collection services to the Village of Riverdale

89

1    through the end of its contract term in July of
2    2019 --
3    A   Yes.
4    Q   -- despite Tri-State's criticisms relating to
5    Riverdale Materials?
6    A   Yes.
7    Q   And Tri-State to this day continues to
8    operate a business in Riverdale, correct?
9    A   Yes.
10   Q   And Tri-State to this day continues to pursue
11   this lawsuit against the Village and the mayor,
12   correct?
13   A   Yes.
14   Q   The Village eventually granted a conditional
15   use to Riverdale Materials despite your objections,
16   correct?
17   A   Yes.
18   Q   Did you consider this to be a Village action
19   against Tri-State?
20   A   No.
21   Q   And page -- I'm sorry, paragraph 73 of your
22   complaint, which is on page 14, Tri-State lists
23   actions by Mayor Jackson that Tri-State believes were
24   in retaliation for Tri-State's public criticisms of

Pages 86 to 89

**Sheryl Germany**                                              **March 3, 2020**

90

1    Riverdale Materials.
2          That list includes soliciting
3    competitors for the spring cleanup, even though that
4    was part of Tri-State's existing contract, correct?
5    **A  Yes.**
6    Q  It also includes failing to cooperate with
7    Tri-State to schedule and conduct the spring cleanup
8    as provided in Tri-State's contract and instead bid
9    it to someone else, correct?
10   **A  Yes.**
11   Q  So when did this issue regarding the spring
12   cleanup occur?
13   **A  Is that -- is that timeline in the amended**
14   **complaint?**
15         MR. LAROSE:  Let's take a look at it.  Off
16   the record real quick.
17         (A brief recess was taken.)
18         THE WITNESS:  Can I have that question
19   again?
20   BY MS. BLAKE:
21   Q  When did the issue with the spring cleanup
22   occur?
23   **A  That's going to be on or before March 16th,**
24   **2018.**

91

1    Q  And, again, the spring cleanup was a free
2    service provided by Tri-State, correct?
3    **A  It was included in our cost of operation when**
4    **we bid the contract.**
5    Q  Okay.
6    **A  And it was a good PR.**
7    Q  But the Village didn't pay you anything for
8    this -- anything additional for the spring cleanup?
9    **A  It was included in the contract.**
10   Q  So the Village didn't pay you anything
11   additional for the spring cleanup, correct?
12   **A  It was included in the contract.  It was part**
13   **of our base bid.  It was built in the cost of**
14   **operation.**
15   Q  Did the Village pay you anything additional
16   for the spring contract?  I think you already
17   answered the question as no.
18   **A  No.**
19   Q  Okay.  And you stated that not providing this
20   free service in 2018 damaged the reputation of
21   Tri-State within the Village?
22   **A  Most definitely.**
23   Q  Were you aware that Tri-State was requested
24   to schedule the 2018 spring cleanup with the Village

92

1    in May of 2018?
2    **A  In May of 2018, after the fact, that a**
3    **cleanup had occurred, we were contacted.**
4    Q  And after you were contacted by the Village
5    to perform the 2018 spring cleanup, did you decline
6    to do so?
7    **A  I'm unsure of that.**
8    Q  Are you unsure of how I asked the question
9    or...
10         So you agree in May of 2018 you were
11   contacted by the Village to perform a spring cleanup?
12         MR. LAROSE:  Contacted by you.
13         THE WITNESS:  No.
14         MS. BLAKE:  As a representative of the
15   Village.
16         MR. LAROSE:  I got it.  I got it.  You're
17   not the Village, but you are a representative of the
18   Village.  You contacted me, not them.
19   BY MS. BLAKE:
20   Q  Okay.  So were you informed by your attorney,
21   and don't provide the details of the conversation,
22   just a yes or no, that Tri-State was requested to
23   schedule the 2018 spring cleanup with the Village on
24   5-23-18?

93

1    **A  Yes.**
2    Q  Did you perform --
3    **A  This whole thing is just -- the timeline is**
4    **goofy.**
5    Q  Did Tri-State perform the spring cleanup in
6    May of 2018 in the Village of Riverdale?
7    **A  No.**
8    Q  Why not?
9    **A  Cleanup had already been done, the spring**
10   **cleanup had already been done by another vendor.**
11   **When we asked to provide the spring cleanup as**
12   **previously done, like I said before, all of our**
13   **requests were ignored.**
14   Q  Did Tri-State perform the spring cleanup in
15   2019?
16   **A  2019?  That's the year in question, isn't it?**
17   Q  No, 2018 was the year in question.
18         MR. LAROSE:  2018 was the year in question.
19         THE WITNESS:  2019, yeah, we did then, yes.
20   BY MS. BLAKE:
21   Q  Did not performing the spring cleanup in 2018
22   deter you from speaking out against the mayor or
23   continuing to pursue this lawsuit?
24   **A  One more time, please.**

Pages 90 to 93

**Sheryl Germany**                                            **March 3, 2020**

---

94

1    Q   Did not performing the spring cleanup in 2018
2   deter you from speaking out against the mayor?
3       **A   Deter me, no.**
4       Q   Did not performing the spring cleanup in 2018
5   deter you from pursuing this lawsuit?
6       **A   No.**
7       Q   Why do you believe the inability to perform
8   the free spring cleanup in 2018 was in retaliation
9   for your public criticisms of Riverdale Materials'
10  conditional use approval?
11      **A   We had never had this problem before.  We**
12  **always had had open communication with the Village,**
13  **the administration, from the mayor to the Public**
14  **Works people.**
15      Q   Is that the only reason you believe that it
16  was retaliation on the part of the Village?
17      **A   I really don't know what the Village had in**
18  **mind besides to make us look bad.**
19      Q   And the only specific damage you indicated
20  Tri-State suffered as a result of the mayor's alleged
21  denial to allow Tri-State to perform a spring cleanup
22  in 2018 was damage to Tri-State's reputation in the
23  Village, correct?
24      **A   Well, there were consequences to that.**

---

95

1    Q   Okay.  What?
2       **A   Monetary.  If we look incompetent, who wants**
3   **to hire you if you can't answer questions and if you**
4   **can't provide service?  Apartment buildings at that**
5   **time were still on an individual contract basis.**
6       Q   Okay.  Did you hold a lot of the individual
7   contracts with the apartment buildings in Riverdale?
8       **A   Like $7,000 a month.**
9       Q   Okay.  And so did you lose those contracts in
10  Riverdale?
11      **A   No, but we did not look efficient, we did not**
12  **look professional.**
13      Q   But you didn't suffer any monetary
14  consequences, correct?
15      **A   At that time, no; but going forward, yes.**
16      Q   Okay.  And do you have a detailing of that
17  monetary loss that was related to the failure to
18  perform the spring cleanup in 2018?
19      **A   No.**
20      Q   Can you put a number on that monetary loss
21  that you suffered later based on the failure to
22  perform the 2018 spring cleanup?
23      **A   I don't think there is a monetary value that**
24  **you can put on reputation.**

---

96

1    Q   Okay.
2       **A   Social media is very important these days.**
3       Q   All right.  You also list as an action by
4   Mayor Jackson -- sorry, a retaliatory action by Mayor
5   Jackson to be the issuing of a letter falsely stating
6   that Tri-State representatives had been harassed --
7   I'm sorry, that Tri-State representatives had
8   harassed the mayor and his staff.
9          Do you see that?
10      **A   Okay.  That's where?**
11      Q   This is still in paragraph 73, subsection C.
12      **A   Yes.**
13      Q   Okay.  The letter that you -- that Tri-State
14  references in this subparagraph was dated April 25,
15  2018, correct?
16      **A   I don't have that in front of me.**
17      Q   I know you don't have it in front of you --
18      **A   Okay.**
19      Q   -- but it's marked in the -- in subsection C.
20      **A   Then I'll accept that, if that's the correct**
21  **date.**
22      Q   Okay.  So April 25, 2018 was well after the
23  conditional use had been granted to Riverdale
24  Materials by the Village board, correct?

---

97

1       **A   Yes.**
2       Q   And had the Village ever complained about
3   Tri-State's services before 4-25-18?
4       **A   No.**
5       Q   Why did you consider this a false letter?
6       **A   Because that is not what happened.**
7       Q   Why wasn't it considered a client complaint?
8       **A   I'm not sure what...**
9       Q   Did you consider the letter to be a complaint
10  regarding your services from a client?
11      **A   No.**
12      Q   When you first received the letter, what did
13  you consider it to be?
14      **A   What did I consider it to be?  I considered**
15  **it to be pretty much a statement saying that they**
16  **didn't want us to try and collect the money due to**
17  **us.**
18      Q   So you believe that letter was solely in
19  relation to collections of money owed for invoices
20  outstanding?
21      **A   Correct.**
22      Q   Okay.  And earlier you stated that you did
23  investigate the mayor's complaints about Tri-State's
24  employees?

---

Pages 94 to 97

**Sheryl Germany**                                                    **March 3, 2020**

98

1    A  Yes.
2    Q  Okay.  And those were found by you to be
3  unfounded, but you don't have any records of the
4  investigation?
5    A  Correct.
6    Q  Okay.  Did this letter in April of 2018 deter
7  Tri-State from speaking out against the mayor or
8  continuing to pursue this lawsuit?
9    A  No.
10    Q  Why do you believe this letter was
11  retaliation for your public criticisms of Riverdale
12  Materials' conditional use approval?
13    A  The timing.
14    Q  And what about the timing made you consider
15  this to be retaliation?
16    A  We had never had any issues before.  Payment
17  records show that we had always gotten paid timely,
18  then once all this started happening, all of a sudden
19  at times it was six months until we got paid.  And
20  then the mayor when we tried to collect these, in
21  fact we had sent a demand letter at one point, does
22  not want to talk to anybody.  And he had given Kathy
23  his own personal cell phone years before this, so if
24  there were any issues that were unresolved, that she

99

1  should contact him personally.
2    Q  Okay.  Who is Ken Bellah?
3    A  That's my other lawyer.
4    Q  Okay.  And is he the lawyer that dealt with
5  that demand letter that you're talking about?
6    A  Yes.
7    Q  What did that demand letter have to do with,
8  outstanding --
9    A  Outstanding invoices, past due invoices.
10    Q  Okay.  All right.  What specific damage did
11  Tri-State suffer as a result of the mayor's April 25,
12  2018 letter?
13    A  Which?
14    Q  Which is the letter regarding his complaints
15  about Tri-State employees and no further contact.
16    MR. LAROSE:  Don't call us, you're harassing
17  us, that letter.
18    THE WITNESS:  Oh, okay.
19  BY MS. BLAKE:
20    Q  What damage did that letter cause to
21  Tri-State?
22    A  The inability to collect money in a prompt
23  manner.
24    Q  Okay.  Paragraph 73 of the complaint also

100

1  alleges that Mayor Jackson's retaliatory actions
2  against Tri-State included a failure and refusal to
3  pay any invoices that the Village was obligated to
4  pay to Tri-State, which to date amounts to more than
5  $260,000 for the months of January, February, March
6  and April despite -- I'm sorry, April of 2018, and to
7  date amounts to more than $199,000 for the months of
8  February, March and April of 2019, despite a demand
9  by Tri-State that these delinquent payments be made,
10  correct?
11    A  Yes.
12    Q  How much is due from the Village to Tri-State
13  as of today?
14    A  Right now there's still some outstanding
15  interest that needs to be reconciled.
16    Q  How much does that interest amount to?
17    A  We're still looking into that.
18    Q  Approximately.
19    A  I would have to look into that since we just
20  received payment yesterday.
21    Q  The payment that you received yesterday was
22  how much?
23    A  I'd have to --
24    MR. LAROSE:  65 grand and change.

101

1    THE WITNESS:  I had a copy of it with that,
2  but...
3  BY MS. BLAKE:
4    Q  Was that the last outstanding amount owed to
5  you other than interest from the Village?
6    A  Yes, and that was for service from back in
7  July.
8    Q  July of 2019?
9    A  Yes.
10    Q  The last month of your contract?
11    A  Yes.
12    Q  Okay.
13    A  So there was hardship.
14    Q  What was the process in Riverdale for
15  processing your invoices?
16    A  I don't know their internal process.  All I
17  know is we mailed them the invoices and they got
18  paid.  They went through the proper channels, were
19  approved at meetings.
20    Q  Were there other times in your several years
21  of service to the Village that Riverdale was late on
22  their payments?
23    A  Very few, and then we would get a phone call
24  from the mayor saying he was unable to pay it because

Pages 98 to 101

**Sheryl Germany**                                           **March 3, 2020**

---

102

1  they were waiting for property taxes to be remitted
2  to them.
3      Q   Did you know of any other Riverdale
4  contractors in January, February, March or April of
5  2018 or February, March and April of 2019 whose
6  payments were delayed from the Village?
7      A   No, I don't.
8      Q   Were you aware that Riverdale property tax
9  collections were lower than anticipated in prior
10  years leading to certain delays in payments to a
11  majority of their vendors, including Tri-State?
12      MR. LAROSE:  Object to the form, assumes
13  facts not in evidence.  You can answer if you know.
14  I don't know how you would know that.
15      MS. BLAKE:  She just said the mayor talked
16  to her about it.
17      THE WITNESS:  Previously, years ago.
18  BY MS. BLAKE:
19      Q   Okay.
20      A   I don't know anything about current.
21      Q   Okay.  So the conversations you had with
22  Mayor Jackson regarding property tax collections and
23  delays in payment to Tri-State were in years prior to
24  2017?

---

103

1      A   And that was -- I'll answer.
2      MR. LAROSE:  Yeah, I'm just worried whether
3  it's Jackson or somebody else.  Go ahead.
4      THE WITNESS:  No, it was Mayor Jackson.
5      MR. LAROSE:  Okay.
6      THE WITNESS:  It was Mayor Jackson, I know
7  that.  And then they were no more than 60 days out.
8  BY MS. BLAKE:
9      Q   Okay.
10      A   No more than 60 days out, probably less.
11      Q   Did you ever talk to Dave Gonzalez?
12      MR. LAROSE:  About that issue?
13      THE WITNESS:  Oh, well, he was at that
14  meeting that time, but other than that...
15  BY MS. BLAKE:
16      Q   I'm sorry.  Other than the one meeting that
17  you had with the mayor and Mr. Gonzalez, did you ever
18  talk to Mr. Gonzalez regarding collection issues?
19      A   No.
20      Q   Why did you believe that the delayed payment
21  was in response to Tri-State's actions in 2017
22  relating to Riverdale Materials?
23      A   Because of the timeline, the circumstances
24  that were surrounding it, and the Village's refusal

---

104

1  to talk to us about it.  This was not what had
2  happened previously.
3      Q   Did the delayed payments deter Tri-State from
4  speaking out against the mayor or continuing to
5  pursue this lawsuit?
6      A   No.
7      Q   What specific damage did Tri-State suffer as
8  a result of the Village's delay in invoice payments?
9      A   Okay.  We continued to provide service, as we
10  were contracted to do, which meant we had outlays of
11  union employees, union benefits.  We have trucks --
12  payments on trucks that we still had to keep current
13  with, fuel, disposal.  We have rates with the
14  landfills and we're responsible to pay within 30
15  days.
16      MR. LAROSE:  Royalties.
17      THE WITNESS:  Yeah, and the royalty fees.
18  They got theirs in full on time every month.
19  BY MS. BLAKE:
20      Q   And did you keep accounting records of the
21  delays and your continued payments of those items you
22  just described?
23      A   Delays meaning?
24      Q   The delays in payment from the Village.

---

105

1      A   We have accounting, yeah.
2      MR. LAROSE:  We gave -- you had some of
3  them, but we gave more to you on Friday.
4      MS. BLAKE:  Okay.
5      MR. LAROSE:  At least on the delays.
6  BY MS. BLAKE:
7      Q   Is there a specific dollar amount of damage
8  that Tri-State suffered as a result of the Village's
9  delay in invoice payments?
10      A   I would have to come up with that number.
11      Q   You don't know it today?
12      A   No.
13      Q   And, again, paragraph 73 lists other acts of
14  retaliation.  Are you aware of any other -- are you
15  alleging any other acts of retaliation against -- or
16  by Mayor Jackson against Tri-State in this lawsuit?
17      A   Other than these?
18      Q   Correct.
19      A   No.
20      Q   Finally, the complaint alleges at paragraph
21  135, it's page 25, that the Village breached its
22  contract with Tri-State by, A, failing to pay
23  Tri-State for invoices for January, February, March
24  and April 2018, though payment was due within 15 days

---

Pages 102 to 105

**Sheryl Germany**                                                    **March 3, 2020**

---

106

1   of receipt of invoice, correct?
2       **A   Correct.**
3       Q   Those invoices, January, February, March and
4   April of 2018, have been paid, correct?
5       **A   Yes.**
6       Q   What recourse did your agreement with the
7   Village provide for late payments?
8       **A   The contract itself I don't believe did.  It**
9   **just stipulated that payments would be made within 15**
10  **days and on good faith.  We accepted that.**
11      Q   Okay.  So there's no agreement regarding what
12  would occur if payments were late, correct?
13      **A   No, but that would have been in violation of**
14  **the contract.**
15      Q   Okay.  So currently there's no outstanding
16  invoices from the Village?
17      **A   Not invoices, but late fees or interest.**
18      Q   So what late fees do you charge them?
19      **A   One and a half percent per month.**
20      Q   And is that pursuant to a contract?
21      **A   No.**
22      Q   Okay.  So just for a clear record, there's no
23  outstanding invoices, correct?
24      **A   Not invoices, correct.**

---

107

1       Q   However, there is outstanding late fee
2   charges?
3       **A   Correct.**
4       Q   That the Village will still owe to Tri-State
5   after today's date?
6       **A   Correct.**
7       Q   And you don't know that number?
8       **A   No.**
9       Q   And you haven't charged the Village yet for
10  that amount?
11      **A   No.**
12      Q   Is that fair?
13      **A   Correct.**
14      Q   Okay.  You also allege that the Village
15  breached its contract with Tri-State by failing to
16  cooperate with Tri-State to schedule and conduct the
17  spring cleanup as provided in Tri-State's contract
18  and hiring another company to do it, correct?
19      **A   Correct.**
20      Q   Does the contract have any language that
21  required the Village to cooperate in scheduling the
22  spring cleanup?
23      **A   One minute, please.**
24          MR. LAROSE:  There is a paragraph in there

---

108

1   that says spring cleanup, part of the paragraph of
2   stuff that they do for free.  I will find it.
3          THE WITNESS:  There was some reference to
4   it, that's why I want to see what it says.
5          MR. LAROSE:  14B on page 6 of 12 is the
6   paragraph regarding the spring cleanup.
7          THE WITNESS:  14B?  Well, that paragraph
8   says that waste materials will be placed out on a
9   mutually agreed Saturday during the Riverdale public
10  school spring break vacation and the contractor will
11  collect the refuse.  If we don't have conversations
12  with the Riverdale management, how do we do that?
13  BY MS. BLAKE:
14      Q   Is there any language in the agreement
15  regarding what would occur if the free service was
16  not provided each year?
17      **A   No.**
18      Q   And then in paragraph 135 we have this
19  catchall again, regarding other breaches of the
20  agreement.
21          Is Tri-State alleging any other
22  breaches of the agreement other than those we just
23  discussed?
24      **A   No.**

---

109

1       Q   All right.  Moving to paragraph 118 of your
2   complaint, page 23, in regards to your retaliation
3   counts, you allege that Tri-State has and will
4   continue to suffer damages by loss of income through
5   unequal treatment and competitive disadvantage.
6          What evidence do you have of loss of
7   income based on Riverdale's approval of a conditional
8   use to Riverdale Materials in 2017 due to competitive
9   disadvantage?
10      **A   We no longer get the amount of concrete we**
11  **used to or C and D, which is a loss in revenue.  And**
12  **the Village doesn't get a host fee off of that money**
13  **either.**
14      Q   Do you have an itemization of damages?
15      **A   I don't know their specifics.  I don't know**
16  **the amount of material they take in.**
17      Q   Do you know -- do you have an itemization of
18  the amount of concrete or C and D which you've lost
19  since 2017?
20      **A   That's on -- that's a variable, depending on**
21  **the construction and the vendors that are disposing**
22  **of it.**
23      Q   And you haven't itemized --
24      **A   No.**

Pages 106 to 109

---

**Sheryl Germany**                                                    **March 3, 2020**

110

1    Q  -- those damages?
2         MR. LAROSE:  Let her finish the question,
3    please.  We're almost at the finish line here and we
4    haven't killed anybody yet.  She hasn't killed us
5    yet.
6         THE WITNESS:  No.
7    BY MS. BLAKE:
8    Q  Okay.  Would your tax returns show damages in
9    your income since 2017 based on Riverdale Materials
10   coming into operation in the Village?
11   **A  I'm unsure on that one.**
12   Q  You also note that Tri-State will suffer
13   damages by loss of income -- hold on.  Strike that.
14        MR. LAROSE:  Yeah, I thought we just covered
15   that one.
16        THE WITNESS:  I was going to say that
17   sounded familiar.
18   BY MS. BLAKE:
19   Q  Okay.  Paragraph 118 also states that you
20   will suffer as a direct and proximate result of
21   Riverdale Materials operating in the Village imminent
22   harm to health, safety and environment as a corporate
23   resident of the Village of Riverdale, correct?
24   **A  Yes.**

111

1         MS. BLAKE:  Will you be striking that claim
2    for damage in your retaliation counts, Counsel?
3         MR. LAROSE:  Don't know.
4         MS. BLAKE:  Do you agree that the retention
5    pond purchase --
6         MR. LAROSE:  I'm not here to answer your
7    questions.  I don't know.  I did make statements on
8    the record earlier, and I stand by those statements.
9         MS. BLAKE:  Which was that you don't believe
10   that this is relevant to the retaliation.
11        MR. LAROSE:  The record will say what I
12   said.  Okay?  I'm not going to be paraphrased and I'm
13   not going to be --
14        MS. BLAKE:  I don't -- listen.  I'm not
15   trying to paraphrase you.  I'm not trying to be
16   sneaky.  I need to know what questions I need to ask.
17   We're in a discovery deposition.  If she's going to
18   claim this as damages, then I think the retention
19   pond purchase is relevant.  If she's not, I'm not
20   going to ask about the retention pond because I
21   don't -- I agree with you regarding the scope.
22        MR. LAROSE:  Okay.  I thought we covered
23   this.  You do what you think you have to do.  Simple
24   as that.  You ask the questions.

112

1         MS. BLAKE:  Well, you were the one who
2    brought this up in the first place.
3         MR. LAROSE:  I did.  I did.
4         MS. BLAKE:  Yeah.
5         MR. LAROSE:  It's -- it needs some thought,
6    that's all.  If you -- if you think that out of
7    abundance of caution, you should ask about the
8    retention pond, then ask about the retention pond.
9         MS. BLAKE:  But you threatened then to have
10   no scope in your discovery deposition with my
11   clients.
12        MR. LAROSE:  That's not what I said.  That's
13   why I think that the record speaks for itself.
14   That's not what I said.
15        MS. BLAKE:  Okay.
16        MR. LAROSE:  The areas that you go into that
17   I think are beyond the scope of retaliation are fair
18   game to the areas that I can go into with your
19   clients.  It's as simple as that.
20        MS. BLAKE:  That's what I was trying to
21   clarify.  I thought I got a different answer from you
22   the first time.  So if that's what you're saying,
23   that's fine with me.
24        MR. LAROSE:  My first statement was broader

113

1    than that, then we had a colloquy on the record, and
2    I just said, again, what I said earlier.
3         MS. BLAKE:  Okay.  Thanks for clarifying.
4         MR. LAROSE:  You're welcome.
5    BY MS. BLAKE:
6    Q  What evidence do you have of loss of income
7    based on Riverdale's approval of a conditional use to
8    Riverdale Materials in 2017 based on imminent harm to
9    the health, safety and welfare of Tri-State as a
10   corporate resident of the Village?
11   **A  Can you read that one more time?**
12   Q  What evidence do you have of loss of income
13   due to the imminent harm to Tri-State's health,
14   safety and welfare caused by the granting of a
15   conditional use to Riverdale Materials in 2017?
16   **A  My concern as a corporate entity within the**
17   **Village of Riverdale is the possible environmental**
18   **remediation costs that may have to be addressed**
19   **because of Riverdale Materials.**
20   Q  Have you suffered any financial losses as of
21   today?
22   **A  Not as of today.**
23   Q  Have the other municipalities that you
24   provide garbage collection services to, Marionette

Pages 110 to 113

Sheryl Germany                                                                March 3, 2020

114

1    Park, Thornton or Robbins, fallen behind in paying
2    their invoices to Tri-State ever?
3       A   Nothing ever over 60 days.
4       Q   Have you ever approached the Village seeking
5    to schedule a settlement conference in relation to
6    this case?
7       A   No.
8       MR. LAROSE:  Want to?
9       MS. BLAKE:  I had --
10      MR. LAROSE:  Do you want to?
11      MS. BLAKE:  Well, the judge told Marissa
12   that you guys should issue a demand.  I just never
13   received one.
14      MR. LAROSE:  We have one in the works.
15      MS. BLAKE:  Okay.
16      MR. LAROSE:  And we'd love to have a
17   settlement conference with the magistrate or a
18   neutral mediator, we'd love to, on the record.
19      MS. BLAKE:  Okay.  And we'd love to agree to
20   it once we see a demand.
21      MR. LAROSE:  Okay.
22      MS. BLAKE:  If it's reasonable.
23      MR. LAROSE:  We're working on that, and you
24   should have it this week.

115

1       MS. BLAKE:  Okay.
2       MR. LAROSE:  We wanted to get through the
3    deps first.
4    BY MS. BLAKE:
5       Q   What is Tom Germany's role at Tri-State?
6       A   Yard manager.
7       Q   You told me already, but vice president?
8       A   Vice president, yes.
9       Q   Is he knowledgeable about the allegations in
10   this lawsuit?
11      A   No.
12      Q   Why not?  He's your husband.  He works at the
13   firm.  He's the guy with all the disposal experience.
14      A   He doesn't have anything to do with any type
15   of contracts, anything -- anything paper.  He's not a
16   paper guy.
17      MR. LAROSE:  Unless it's crumpled up and has
18   ketchup on it.
19   BY MS. BLAKE:
20      Q   Has he been involved in decisionmaking
21   relating to this lawsuit?
22      A   No.
23      Q   Has he been on phone calls?
24      A   No.  He doesn't want to be part of it.

116

1       Q   Has he had any discussions with the mayor
2    regarding these issues?
3       A   No.
4       Q   Has he had any discussions with Jim Bracken
5    regarding these issues?
6       A   No.
7       Q   Has he had any discussions with anyone in the
8    Village regarding the issues in this lawsuit?
9       A   I may take that back.
10      Q   Jerome?
11      A   I'm going to say -- that was -- he may have
12   talked to somebody in Public Works at one point when
13   they were in the yard.
14      MS. BLAKE:  Okay.  That's all the questions
15   I have for now.
16      MR. LAROSE:  I've just got a couple.
17         Are you okay?  Do you need to take a
18   break?
19      THE WITNESS:  No, I'm fine.
20      MR. LAROSE:  Can we mark this E, please?
21      (S. Germany Deposition Exhibit E was marked for
22       identification.)
23
24

117

1       EXAMINATION
2    BY MR. LAROSE:
3       Q   Okay.  So I think in response to counsel's
4    question, you said that you weren't aware of whether
5    Riverdale Materials was paying royalties to the
6    Village or was required to post an environmental
7    closure bond, correct?
8       A   Correct.
9       Q   Look at Exhibit E, as in Edward, and take
10   your time, read through it.
11      A   Oh, read the whole thing?
12      Q   Well, yeah.  It's the ordinance.  Here.  I'll
13   tell you what my question is, then you can read it,
14   then you can answer it.
15      A   I can scan for it.
16      Q   My question is does the ordinance in any way,
17   shape or form require Riverdale Materials to pay
18   royalties to the Village or to post any kind of
19   closure -- postclosure environmental bond?
20      A   Okay.
21      Q   Okay?
22      A   No.
23      Q   Okay.  Part of that ordinance requires them
24   to submit a -- can I see it for one second?

Pages 114 to 117

**Sheryl Germany**                                                      **March 3, 2020**

---

118

1    A  Sure.
2    Q  Look at Section 4, paragraph 4.  Read that to
3  yourself, then I'm going to ask you a question.
4    A  Okay.
5    Q  That paragraph relates to submitting a
6  stormwater plan to the Village and having it reviewed
7  by --
8    A  The Village engineer.
9    Q  The Village engineer.  Do you remember when
10  we FOIA'd that information?
11    A  Yes.
12    Q  And we got nothing back, correct?
13    A  Yes.
14    Q  Okay.  Look at page -- let's turn to this one
15  over here.  Let's go back to Exhibit D.  Go to
16  paragraph 73 on page 14 of 16.
17    A  Which page did you say?
18    Q  I'm sorry.  Page 14 of 16, paragraph -- I'm
19  sorry, 14 of 26, paragraph 73.
20    A  Okay.
21    Q  When Erin asked you under 73E if there was
22  other acts of retaliation that you were aware of, you
23  said no, correct?
24    A  Okay.  If that's what the record says.

---

120

1    A  No.
2    Q  With respect to that, were you ever allowed
3  to participate in any bid to either retain or get a
4  new contract from the Village of Riverdale?
5    A  No.
6    Q  And when you told Erin before that you
7  weren't sure -- I think you said you weren't sure
8  about the amount of income that you received from the
9  Village of Riverdale, you have a pretty good
10  guesstimate of that, don't you?
11    A  I could give you a rough estimate.
12    Q  Okay.  What's the rough estimate?
13    A  Well, per month it was $60,000 plus.
14    Q  Okay.  So by not having the ability to even
15  bid this contract, you lost $60,000 a month for
16  potentially five to ten years, right?
17    A  At least three for sure.
18    Q  In addition to that, when they gave this
19  contract on a no-bid basis to Flood Brothers, no-bid
20  basis, did an ordinance come along with that?
21    A  Yes.
22    Q  And what did that ordinance do?
23    A  That ordinance changed the whole groundwork,
24  where we before had only serviced, under the mass

---

119

1    Q  Take a look at Exhibit C.
2    A  Okay.
3    Q  In Exhibit C the mayor is telling you that
4  they're going to put this out for RFQ and that you're
5  encouraged to bid, right?
6    A  Right.
7    Q  Were you ever given a chance to bid?
8    A  No.
9    Q  Did it ever go out to RFQ?
10    A  No.
11    MR. LAROSE:  Let's mark this -- let's mark
12  this F.
13    (S. Germany Deposition Exhibit F was marked for
14    identification.)
15  BY MR. LAROSE:
16    Q  I have handed you what's been marked as
17  Exhibit F.  What's the date on that document?
18    A  It's going to be 4-18 of 2018.
19    Q  Okay.  And that's where they're announcing
20  that you're going to be cancelled like a year and
21  three months ahead of time --
22    A  15 months ahead of time, which was odd.
23    Q  And it doesn't say anything about you being
24  able to bid this contract, does it?

---

121

1  contract for the Village of Riverdale for residential
2  service only, household -- only housing units up to
3  two units were covered.  Now with the new ordinance
4  that they gave to Flood Brothers, apartment buildings
5  were also included in this, so they had no chance to
6  pick their own vendor for garbage service.
7    Q  What did that mean to you?
8    A  About $7,000 a month decrease in revenue and
9  a lot of unhappy customers that called us and asked
10  us why this had happened.
11    Q  And when you say $7,000 a month, you were
12  getting that money not pursuant to your contract with
13  Riverdale, but because you were contracting with the
14  individual businesses and apartment owners under your
15  own contract?
16    A  Correct.
17    Q  You weren't beholding to the Village?
18    A  No.
19    Q  And when the Village didn't give you a chance
20  to even bid on the contract, but then put it in this
21  ordinance, that business was taken away from you?
22    A  Correct.
23    Q  Okay.  Do you believe that that was in
24  retaliation?

---

Pages 118 to 121

**Sheryl Germany**                                    **March 3, 2020**

122

1    A  Yes.
2    Q  Okay.
3    A  I would think.
4        MS. BLAKE:  Are you guys amending the
5    complaint?
6        MR. LAROSE:  I'm sorry?
7        MS. BLAKE:  Are you guys going to amend the
8    complaint?
9        MR. LAROSE:  Probably.  Marissa, let's amend
10   the complaint.  And, in all fairness, maybe to take
11   some stuff out too.
12       MS. BLAKE:  Yeah.
13   BY MR. LAROSE:
14   Q  I just want to review my notes real quick.
15   Oh, I know.
16           So take a look back at D.
17       MR. LAROSE:  Off the record.
18       (A discussion was had off the record.)
19   BY MR. LAROSE:
20   Q  If we look at -- hold on.  I've got to get
21   back to this one.  Okay.  Look at page 11 of 26,
22   paragraph 59 on Exhibit D.  Are you with me?
23   Paragraph 59.
24   A  59.

123

1    Q  Okay.  So 59 kind of works in conjunction
2    with 58, right?  Here's the criticisms and here's
3    where they were set out, right?  Yes or no?
4    A  Okay.  Yes.
5    Q  Okay.  So the September 7th submittal,
6    Exhibit 2 to the original complaint, right, that was
7    a letter that you and I drafted and we jointly
8    submitted to the hearing board, correct?
9    A  Yeah.
10   Q  The -- Exhibit 3 was November 2nd, same
11   thing, you and I drafted it, you reviewed it,
12   approved it, and we submitted it to whoever -- I
13   don't know -- remember who was on first, zoning board
14   of appeals, planning commission.  They call
15   themselves different things whenever they want to.
16   Right?
17       MS. BLAKE:  Object to form.
18       MR. LAROSE:  I get it.  I'm going to
19   withdraw that.
20   BY MR. LAROSE:
21   Q  We submitted the November 7th letter that you
22   read, approved on behalf of Tri-State, raising a lot
23   of these concerns, correct?
24   A  Yes.

124

1    Q  The November 28th submittal, wasn't November
2    28th the day that the ordinance was passed?  Take a
3    look at E.
4    A  Is there a date on it?
5    Q  Yeah, I think it does.
6    A  The back, the last page maybe.
7    Q  Hold on.
8    A  November 28th, 2017.
9    Q  Okay.  Isn't that the time that they wouldn't
10   let you or I speak before they passed the ordinance,
11   and then wanted to give us like 30 seconds or a
12   minute after that, and we're like, what's the use,
13   you know?
14   A  I believe that was the meeting.
15       MS. BLAKE:  Object to form.
16   BY MR. LAROSE:
17   Q  Okay.  I'll clean that up so we -- probably a
18   good objection.
19           The November 28th meeting is the
20   meeting where the Village board passed this ordinance
21   before they gave anybody a chance to talk about it,
22   and they wouldn't even accept our November 28th
23   submittal, correct?
24   A  Correct, yes.

125

1        MR. LAROSE:  Can I have just a minute with
2    Marissa?  And I think I'm probably done.
3        MS. BLAKE:  Sounds good.
4        MR. LAROSE:  Are you done?
5        MS. BLAKE:  I just have a few follow-ups.
6        (A brief recess was taken.)
7            FURTHER EXAMINATION
8    BY MS. BLAKE:
9    Q  Your attorney asked you questions regarding a
10   stormwater FOIA that you issued to the Village.
11           Did that relate to Riverdale
12   Materials?
13   A  Yes.
14   Q  Why were you interested in it?
15   A  Because their ordinance required that they do
16   something that I don't believe was ever done.
17   Q  How did that affect Tri-State?
18   A  How did that affect Tri-State?  Because when
19   I originally built there, I needed to have proper
20   drainage.
21   Q  Do you have the same property as Riverdale
22   Materials?
23   A  No, but I'm sure that with the vast amount of
24   property they do have, there would have been some

Pages 122 to 125

**Sheryl Germany**                                                    **March 3, 2020**

126

1  **kind of a stormwater retention pond required.**
2      Q   What is your interest in having Riverdale
3  Materials have the same obligations to the Village as
4  Tri-State?
5      **A   An even ground, I mean, for competition.  I**
6  **mean, everyone should have to adhere to the same**
7  **rules.**
8      Q   Okay.  Did you bid for your contract with
9  Riverdale for collection services?
10         MR. LAROSE:  Which one?
11         MS. BLAKE:  The most recent contract that we
12  were --
13         MR. LAROSE:  Got it.
14         THE WITNESS:  The most recent one?
15         MR. LAROSE:  The one we went over that
16  started in 2012.
17         THE WITNESS:  2012?
18         MR. LAROSE:  Yeah, right.  Exhibit B.
19  BY MS. BLAKE:
20      Q   Did you bid for your most recent contract
21  with the Village of Riverdale, which we previously
22  marked as Exhibit B, to provide service between July
23  of 2012 and July of 2019?
24      **A   I do not know if it went out to bid.**

127

1      Q   Okay.  And your other municipalities,
2  Marionette Park, Robbins and Thornton, did you have
3  to bid for those collection services?
4      **A   Yes.**
5      Q   Okay.  And the agreement you had with the
6  Village of Riverdale was set to end in July of 2019,
7  correct?
8      **A   Correct.**
9      Q   And you did provide services through the end
10  of that term, correct?
11      **A   Oh, yes.**
12      Q   Okay.  Why did you believe that you lost at
13  least three years of income by not being able to bid
14  for the subsequent contract for Riverdale collection
15  services?
16      **A   Well, most contracts, most refuse contracts,**
17  **are for at least three years, if not more, because of**
18  **the cost of putting the equipment out, the toters.**
19      Q   You agree that if you -- if the project was
20  put out to bid and you bid, there was no guarantee
21  that Tri-State would get the contract, correct?
22      **A   No.**
23      Q   Okay.  And so why did you believe the
24  Village's decision to contract with another garbage

128

1  collection service provider after the term of your
2  contract was up was retaliation for your issues
3  against Riverdale Materials two years earlier?
4      **A   Because there was no bidding process.  That's**
5  **not good for the Village.  That's why contracts go**
6  **out for bid, to take care -- and for the best**
7  **interest of their residents.  Why would that not**
8  **happen?**
9      Q   So because you believe it's in the best
10  interest of the Village for the Village to put that
11  service out for bid, you believe them not doing that
12  was retaliatory against Tri-State?
13      **A   I believe the way it was done was, yes.**
14      Q   Can you explain that to me I guess is what
15  I'm asking you?
16      **A   Because why would the mayor have said that he**
17  **invited us to participate, there was no process that**
18  **ever occurred besides them giving their contract to**
19  **one provider.**
20      Q   Okay.  But you don't -- you don't know the
21  process that went on within the Village to make these
22  decisions regarding Flood Brothers, correct?
23      **A   In the past they always went out to bid.**
24  **Every other municipality goes out to bid.**

129

1      Q   But you don't know if you went out to bid in
2  2012, correct?
3      **A   I want to say that maybe at that point that**
4  **may have been a rollover contract.  They may have**
5  **been happy with our service, which is quite normal,**
6  **and asked us probably to submit to them a proposal.**
7      Q   Okay.  But you don't remember specifically?
8      **A   No, I don't.**
9      Q   Okay.
10      **A   But that's the normal course.**
11         MS. BLAKE:  Okay.  That's all I have.
12         MR. LAROSE:  Just one, maybe two follow-up
13  questions.
14             FURTHER EXAMINATION
15  BY MR. LAROSE:
16      Q   So let's look back at Exhibit C.  In Exhibit
17  C the mayor is saying we're going to do an RFQ and we
18  encourage you to participate, right?
19      **A   That's what the letter said.**
20      Q   Right.  And then, by the way, make sure you
21  do your job in the meantime, right?
22      **A   Yes.**
23      Q   Okay.  So is that part of the reason this
24  letter, that didn't result in any of this stuff

Pages 126 to 129

**Sheryl Germany**                                               **March 3, 2020**

130

1  except you doing your job, is part of the reason why
2  you think it's retaliation?
3      **A   Yes, that's fair.**
4          MR. LAROSE:  That's all I have.
5          MS. BLAKE:  Nothing further.
6          MR. LAROSE:  Okay.
7          MS. BLAKE:  Would you like to explain
8  signature?
9          MR. LAROSE:  Yeah, I think we're just going
10  to reserve it.
11         MS. BLAKE:  Okay.
12          (Proceedings concluded at 1:20 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24

132

1  STATE OF ILLINOIS    )
                          ) ss:
2  COUNTY OF C O O K    )
3
4      The within and foregoing deposition of the
5  aforementioned witness was taken before
6  STACEY L. PARR, C.S.R., at the place, date and time
7  aforementioned.
8      There were present during the taking of the
9  deposition the previously named counsel. The said
10  witness was first duly sworn and was then examined
11  upon oral interrogatories; the questions and answers
12  were taken down in shorthand by the undersigned,
13  acting as stenographer and Notary Public; and the
14  within and foregoing is a true, accurate and complete
15  record of all of the questions asked of and answers
16  made by the aforementioned witness, at the time and
17  place hereinabove referred to.
18      The reading and signing by the witness of the
19  deposition transcript was agreed upon as stated
20  herein.
21      The undersigned is not interested in the within
22  case, nor of kin or counsel to any of the parties.
23
24

131

1          UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION
3
   TRI-STATE DISPOSAL, INC., an   )
4  Illinois corporation,          )
                                  )
5        Plaintiff,      ) No. 1:18-cv-02138
                          ) Judge Sara L. Ellis
6      -vs-               ) Magistrate Judge
                          ) Mary M. Rowland
7  THE VILLAGE OF RIVERDALE, a    )
   municipal corporation;        )
8  LAWRENCE L. JACKSON, Mayor     )
   of the Village of Riverdale,  )
9                                )
        Defendants.       )
10
11
12      I, SHERYL GERMANY, being first duly sworn,
13  on oath say that I am the deponent in the aforesaid
14  deposition taken on March 3, 2020; that I have read
15  the foregoing transcript of my deposition, consisting
16  of pages 1 through 130 inclusive, and affix my
17  signature to same.
18          _____
19              SHERYL GERMANY
20
   Subscribed and sworn to
21  before me this _____ day
   of _____, 2020.
22
23  _____
   Notary Public
24

133

1      Witness my official signature and seal as
2  Notary Public in and for Cook County, Illinois on
3  this 19th day of March, A.D. 2020.
4
5
6
7
8      _____
   STACEY L. PARR, C.S.R.
9  License No. 084-004502
   Notary Public
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



Pages 130 to 133

**Sheryl Germany**                                              **March 3, 2020**

134

```
 1          ERRATA SHEET
 2   Deponent: Sheryl Germany
     Date Taken:  March 3, 2020
 3   Re:  Tri-State Disposal vs. Village of Riverdale
 4   I have read the transcript of my deposition taken on
     _____ and:
 5
     _____ is a true and correct transcript.
 6
     _____ I wish to make the following changes to
 7   my deposition:
 8
     Page _____ Change _____
 9
     Line _____ Reason _____
10
11   Page _____ Change _____
12   Line _____ Reason _____
13
     Page _____ Change _____
14
     Line _____ Reason _____
15
16   Page _____ Change _____
17   Line _____ Reason _____
18
     Page _____ Change _____
19
     Line _____ Reason _____
20
21   Page _____ Change _____
22   Line _____ Reason _____
23
     _____    _____
24       Date               Name
```

135

```
 1   March 20, 2020
 2   Re: Tri-State Disposal vs. Village of Riverdale
     Deposition:  Sheryl Germany
 3   Taken:  March 3, 2020
 4
     LaRose & Bosco, Ltd.
 5   Mr. Mark A. LaRose
     200 N. LaSalle Street, Suite 2810
 6   Chicago, Illinois 60601
 7   Dear Mr. LaRose:
 8   Transmitted herewith is a copy of your transcript of
     the deposition of Sheryl Germany taken in the
 9   above-mentioned cause.
10   Pursuant to agreement of counsel, also enclosed are
     original correction pages and a certification page
11   to be executed by the witness.  The certification
     page must be signed before a Notary Public.
12
     Please instruct the witness to read the deposition,
13   note any changes on the forms provided, and sign.
     After execution, retain a copy of the corrections
14   and  certification page for your records.  Return
     the originals to my office for distribution to all
15   interested parties.
16   Your immediate attention to this matter will be
     appreciated.  If you have any questions, please call
17   our office at (708) 671-8281.
18   Sincerely,
19      Nancy O'Sullivan
20   Nancy O'Sullivan
21   cc:  Ms. Erin Blake
22
23
24
```

Pages 134 to 135

**O'SULLIVAN REPORTING**
**(708) 671-8281 | osullivanreporting.com**

Sheryl Germany

March 3, 2020

Page 136

| A |
|---|
| **A.D** 133:3 |
| **a.m** 1:19 |
| **abbreviation** 57:17 |
| **ABC** 47:18 |
| **ABC's** 47:21 |
| **ability** 120:14 |
| **able** 66:8 83:16,20 84:1,6 85:7 119:24 127:13 |
| **above-mentioned** 135:9 |
| **Absolutely** 86:8 |
| **abundance** 112:7 |
| **abusive** 18:8 |
| **accept** 84:16,23 96:20 124:22 |
| **acceptable** 20:4 |
| **accepted** 106:10 |
| **accepts** 57:16 |
| **accountant** 22:23 23:2,3,10,14,15 |
| **accounting** 22:22 23:23 104:20 105:1 |
| **accurate** 18:23 132:14 |
| **accusatory** 63:1 |
| **Act** 27:3,8 |
| **acting** 132:13 |
| **action** 89:18 96:3,4 |
| **actions** 89:23 100:1 103:21 |
| **activities** 85:9 |
| **acts** 105:13,15 118:22 |
| **actual** 86:9 |
| **added** 35:22 |
| **addition** 24:10 33:15 52:11 69:5 88:6 120:18 |
| **additional** 43:13,16 43:20,23 91:8,11 91:15 |
| **address** 3:22 7:21 |

8:24 9:12,17,21 10:17 19:7 20:10 22:17 46:7,9 87:14
**addressed** 113:18
**adequate** 78:12
**adhere** 126:6
**adjacent** 52:14
**administration** 39:2 94:13
**admit** 52:23
**advice** 10:2 11:4
**affect** 59:20 125:17 125:18
**affiliate** 36:10
**affix** 131:16
**aforementioned** 132:5,7,16
**aforesaid** 131:13
**agencies** 79:2
**agency** 13:1,3 27:9
**agent** 19:10
**ago** 4:21 19:24 102:17
**agree** 43:11 61:3 75:12,19 76:18,22 77:11 83:16,20 84:1,6,10 92:10 111:4,21 114:19 127:19
**agreed** 31:22 32:13 32:17,21,24 33:16 43:11,16 66:1 108:9 132:19
**agreement** 28:21 29:5,10,13,16 30:8,13,17 31:20 31:23 32:4,6,19 33:11 34:1,5,11 34:18 39:4,12,14 39:15,18 41:2,10 42:7 55:2 70:12 78:14,18 79:12 82:22 106:6,11 108:14,20,22

127:5 135:10
**agreements** 33:23
**ahead** 67:14 68:17 103:3 119:21,22
**ALASKA** 2:4 85:20
**alive** 68:20
**allegations** 27:5 32:2 69:15 86:9 115:9
**allege** 107:14 109:3
**alleged** 64:5 94:20
**alleges** 100:1 105:20
**alleging** 105:15 108:21
**allow** 26:19 33:11 34:7 44:20 94:21
**allowed** 26:10 28:17 30:24 32:7 32:10 33:1 84:10 120:2
**allowing** 33:15
**alternative** 82:13
**amend** 122:7,9
**amended** 14:17 52:10,11 65:5 69:8 85:20,23 86:1,14 90:13
**amending** 122:4
**amendments** 27:11 31:9,14,17
**amount** 38:2,7,12 100:16 101:4 105:7 107:10 109:10,16,18 120:8 125:23
**amounts** 100:4,7
**and/or** 45:1 60:8
**announcing** 119:19
**annual** 36:1 37:14 37:20
**answer** 5:6,8,20 10:3 19:17 20:5 25:14 26:13 28:2

37:12 49:16 51:16 60:14 73:6 75:7 95:3 102:13 103:1 111:6 112:21 117:14
**answered** 85:12 91:17
**answering** 6:2
**answers** 4:24 68:16 132:11,15
**anticipated** 102:9
**anybody** 53:8 68:13 98:22 110:4 124:21
**anymore** 16:16 66:17
**apartment** 41:7,21 95:4,7 121:4,14
**apartments** 41:19
**appeal** 52:20
**appeals** 88:12 123:14
**applicable** 4:12
**application** 31:8 79:17
**applied** 80:11
**apply** 27:11
**applying** 53:20
**appreciated** 135:16
**approached** 114:4
**appropriate** 52:5 66:22
**approval** 94:10 98:12 109:7 113:7
**approved** 101:19 123:12,22
**approximately** 25:8 26:20 35:2 46:24 54:2 100:18
**April** 96:14,22 98:6 99:11 100:6,6,8 102:4,5 105:24 106:4
**area** 51:19 63:15
**areas** 51:17 52:4,5

77:15 112:16,18
**argue** 6:17
**argument** 62:7
**arrangements** 81:4
**Ashland** 20:10 22:17 24:24 28:4 28:6
**aside** 15:5
**asked** 5:21 6:15,16 15:21 16:14 17:7 37:1 57:3 92:8 93:11 118:21 121:9 125:9 129:6 132:15
**asking** 5:6,22 17:13 23:6,6,7 37:2 46:10 63:1 69:17 70:5 128:15
**assistant** 14:12
**associate's** 11:14 11:21
**assume** 5:21
**assumes** 102:12
**Attached** 3:10
**attachments** 14:18
**attempted** 59:15
**attend** 61:12 70:17 83:17,21
**attended** 63:10 75:1 79:22
**attention** 86:18 135:16
**attorney** 4:15 13:9 49:6,9,19 92:20 125:9
**attorney's** 10:2 11:3
**attorneys** 15:9 64:14
**August** 74:23 75:6 75:13 76:17
**authorizations** 78:3 79:1
**Auto** 47:18 48:1
**available** 36:22

Sheryl Germany

March 3, 2020

Page 137

37:3,10
**Avenue** 1:18 2:11
**avoid** 34:6
**aware** 53:19 72:8
72:15,18 73:13,17
73:17 74:12,17
75:9 91:23 102:8
105:14 117:4
118:22

**B**

**B** 3:13 39:19,20,22
126:18,22
**B-o-h-s-e** 15:15
**back** 20:21 29:1
50:24 60:10,12
78:19 101:6 116:9
118:12,15 122:16
122:21 124:6
129:16
**background** 21:4
21:11
**bad** 94:18
**base** 91:13
**based** 20:8 26:9,16
32:1 36:1 44:11
52:17 66:11 70:12
70:13 74:6,14,19
75:10 81:10 95:21
109:7 110:9 113:7
113:8
**basically** 15:18
**basis** 23:4 72:9
73:14 95:5 120:19
120:20
**Bates** 30:10
**began** 25:7 45:8,13
61:3 81:24
**beginning** 5:8
30:20
**behalf** 2:8,15 40:10
123:22
**beholding** 121:17
**believe** 6:18 14:4
17:23 18:9 19:7

19:12 41:6 44:12
46:18 57:11,14
59:19 60:2 78:18
84:19 94:7,15
97:18 98:10
103:20 106:8
111:9 121:23
124:14 125:16
127:12,23 128:9
128:11,13
**believed** 26:24
**believes** 89:23
**Bellagio** 75:3
**Bellah** 99:2
**belong** 11:24 12:13
**Bend** 20:22 21:16
**benefits** 33:8
104:11
**best** 63:18 128:6,9
**better** 53:2
**beyond** 112:17
**bid** 82:18 90:8 91:4
91:13 119:5,7,24
120:3,15 121:20
126:8,20,24 127:3
127:13,20,20
128:6,11,23,24
129:1
**bidding** 128:4
**big** 20:22 21:16
75:23
**birth** 7:11
**bit** 54:19 65:15
**Blake** 2:11 3:5 4:6
4:10,15,19 5:14
5:17,19 6:10 7:1,6
7:10 8:9,11,14 9:1
9:4,10,15,19,22
10:1,5,11,13,15
10:16 11:2,7,9
13:14 19:18 20:3
20:17 21:10 23:9
23:16,19,20 26:15
28:24 29:2,6,11
30:3,7 35:17 37:2

37:5,7,8,13,19
38:1 39:17,22
40:1,16 42:17
43:2 45:5,22
49:14,18 50:3,19
50:22 51:1,8,14
51:22 52:1,16
53:10,13,16 54:22
60:5,17,22 61:1
62:12,23 63:5,7
64:15 65:2,20
66:3,13,24 67:3,6
67:11,19,23 68:2
68:6,14,22 69:10
69:13 70:4 72:7
72:15,20 73:5,12
73:20 75:16 76:1
76:6,7 80:16 82:6
82:10 85:18,24
86:5,8,13,17,22
87:7 88:3,22
90:20 92:14,19
93:20 99:19 101:3
102:15,18 103:8
103:15 104:19
105:4,6 108:13
110:7,18 111:1,4
111:9,14 112:1,4
112:9,15,20 113:3
113:5 114:9,11,15
114:19,22 115:1,4
115:19 116:14
122:4,7,12 123:17
124:15 125:3,5,8
126:11,19 129:11
130:5,7,11 135:21
**blank** 35:12 54:3
**blog** 12:16
**board** 54:5 61:12
61:16 62:2,5 63:8
63:13 69:2,11,14
70:17,21 71:16,23
74:6,8 79:22,23
83:18,22 84:2,2,7
84:11,19,23 88:12

88:14,15,19,21
96:24 123:8,13
124:20
**board's** 72:1
**Bohse** 15:13,16
16:6
**bond** 29:19,21,22
29:23 34:2 70:16
71:13 117:7,19
**Bosco** 2:3 135:4
**bought** 67:6
**boy** 11:20
**Bracken** 8:10,17
9:6 55:9 56:6,13
57:8 116:4
**Bracken's** 8:20
**Brackenbox** 55:19
55:22 56:1
**brain** 87:22
**Brakey** 27:19
**breach** 50:7,11
51:18,24 52:22
65:3
**breached** 67:9
105:21 107:15
**breaches** 108:19,22
**break** 6:1,3 50:17
50:19 86:3 108:10
116:18
**brief** 50:23 86:12
90:17 125:6
**briefly** 4:22
**bring** 57:3
**broader** 112:24
**broker** 20:20
**Brothers** 120:19
121:4 128:22
**brought** 80:19
112:2
**brown** 28:8,9
**building** 42:13,18
**buildings** 41:7,21
95:4,7 121:4
**built** 91:13 125:19
**business** 8:21 11:23

15:4 19:11 20:18
21:5 22:1 24:4
25:21 26:10 28:7
36:1 44:23 45:1,4
45:4,8,14,23,24
46:12,15,19 47:5
47:11,18,24 48:6
48:12,18,24 55:10
55:16,17 56:13,17
56:22 57:20,21
59:3,17,21 60:9
60:20 61:5 74:10
78:9 81:10,12
87:15 89:8 121:21
**businesses** 36:4,10
121:14
**buy** 25:2,5

**C**

**C** 3:14 57:2,16,17
82:5,7,8 96:11,19
109:11,18 119:1,3
129:16,17 132:2
**C.S.R** 132:6 133:8
**C/D** 54:15
**call** 8:16 16:18,21
17:2,19 57:7 71:2
84:21 99:16
101:23 123:14
135:16
**called** 4:2 16:20
29:19,21 39:5
44:8 121:9
**calls** 10:8 15:18,20
18:9 64:18 115:23
**campaign** 75:2
**cancel** 44:20
**cancelled** 119:20
**capital** 32:14
**care** 128:6
**carrier** 3:24 10:23
11:5,10
**case** 8:1,7 9:8 52:24
53:9 66:12,16,17
68:3,20 72:8 73:3

Sheryl Germany

March 3, 2020

Page 138

73:13 114:6
132:22
**catchall** 87:21
108:19
**cause** 99:20 135:9
**caused** 113:14
**caution** 112:7
**cc** 135:21
**cell** 3:24 10:22 11:4
11:10 17:9 98:23
**cement** 57:3
**certain** 16:15 33:2
43:12 102:10
**certification** 135:10
135:11,14
**Certified** 1:17 3:20
**certify** 9:22 10:5
11:7
**chance** 119:7 121:5
121:19 124:21
**change** 52:10
100:24 134:8,11
134:13,16,18,21
**changed** 120:23
**changes** 134:6
135:13
**channels** 101:18
**charge** 50:16
106:18
**charged** 107:9
**charges** 107:2
**Charles** 47:3 49:1,3
49:7,10,20
**Charlie** 64:1
**Chicago** 2:5 135:6
**children** 7:17
**Christie** 27:20
**circuit** 69:21
**circumstances**
103:23
**Circus** 47:24
**Circus'** 48:3
**citizen** 59:22 60:1
**city** 77:17
**Civil** 1:14

**claim** 65:21,23
66:12 67:17 70:12
111:1,18
**claimed** 66:5
**claiming** 52:16
63:23
**claims** 33:17 52:12
**clarification** 15:23
15:24 16:14 17:15
17:16 52:2 53:13
**clarified** 54:14
**clarify** 112:21
**clarifying** 113:3
**clean** 29:20 54:15
57:3 124:17
**cleanup** 29:19,21
29:22,23 34:2
43:21,24 44:5,6,9
70:16 71:13 90:3
90:7,12,21 91:1,8
91:11,24 92:3,5
92:11,23 93:5,9
93:10,11,14,21
94:1,4,8,21 95:18
95:22 107:17,22
108:1,6
**clear** 5:9 106:22
**client** 8:18,21 9:5
10:9 51:9 97:7,10
**clients** 8:7 35:8
50:10 51:4 112:11
112:19
**closure** 117:7,19
**collect** 35:11 43:4
97:16 98:20 99:22
108:11
**collected** 35:21
41:13 42:6 43:6
**collection** 24:7 35:8
36:2 38:4,9,14
39:8 40:5 41:3,11
42:14,19 44:24
45:9,12 47:20
57:21 60:8,20
82:14 88:24

103:18 113:24
126:9 127:3,14
128:1
**Collection/Proce...**
39:13,19
**collections** 17:8
97:19 102:9,22
**collects** 58:7
**colloquy** 113:1
**combination** 61:24
**come** 64:4 76:11
105:10 120:20
**coming** 46:17 62:13
76:13 110:10
**commencing** 1:19
**commentary** 76:3
**comments** 79:18
**commission** 88:12
88:17,18,20
123:14
**commitments** 33:3
**communication**
94:12
**community** 63:18
70:13,14,14
**companies** 58:10
58:14
**company** 12:21,22
16:23 18:1 19:3
20:22,24 23:11
44:13 55:15,19
107:18
**company's** 46:4,10
**compensation**
43:20,24
**competition** 126:5
**competitive** 109:5
109:8
**competitor** 55:15
55:19 56:2 57:12
57:15,19
**competitors** 58:11
90:3
**complained** 67:4
97:2

**complaint** 14:17
18:11 51:6 52:10
52:11 64:16 65:5
69:6,8,15 74:22
85:15,21,23 86:1
86:14,19 89:22
90:14 97:7,9
99:24 105:20
109:2 122:5,8,10
123:6
**complaints** 88:2
97:23 99:14
**complete** 132:14
**completely** 75:20
**concern** 67:12
81:16 113:16
**concerns** 59:1,3,4
59:20 69:1,14,16
70:7,22 71:12
77:18 79:21 80:2
81:7,19 83:17,22
87:9,11,16 88:8
123:23
**concluded** 130:12
**conclusions** 31:5
**concrete** 57:16
109:10,18
**condition** 64:18
**conditional** 53:21
61:13,18 63:9
70:18 71:4,8,17
72:2,5,11 73:16
76:21 77:3 78:6
79:17 83:13 84:4
87:1 88:15 89:14
94:10 96:23 98:12
109:7 113:7,15
**conduct** 90:7
107:16
**conducting** 30:23
**conference** 57:7
114:5,17
**conflict** 49:9,19
**confused** 23:5,18
23:19,21 75:17

**confusion** 23:15
**conjunction** 25:8
123:1
**connection** 33:18
**consequences**
94:24 95:14
**consider** 58:10
89:18 97:5,9,13
97:14 98:14
**consideration** 84:3
**considered** 30:22
97:7,14
**consistent** 20:11
**consisting** 131:15
**constitutional**
52:13
**construction** 31:10
53:22 57:18
109:21
**consumers** 61:9
**contact** 8:3,4 15:17
16:19 17:24 18:7
99:1,15
**contacted** 92:3,4,11
92:12,18
**contacting** 16:16
**contain** 87:8
**contaminated** 59:8
63:17 64:9,12,20
64:24 66:7 81:21
**contamination**
64:5 81:23
**contemplating**
82:12
**context** 54:4 62:14
62:24
**continue** 32:7 34:7
60:19 82:21 83:11
88:23 109:4
**continued** 104:9,21
**continues** 61:4 89:7
89:10
**continuing** 93:23
98:8 104:4
**contract** 38:4,9,14

38:17 40:2,7,17
40:20,21 41:17
42:22 43:3,4,10
44:20,21 50:7,12
51:18,24 52:22
54:17,21 65:4
67:9 89:1 90:4,8
91:4,9,12,16 95:5
101:10 105:22
106:8,14,20
107:15,17,20
119:24 120:4,15
120:19 121:1,12
121:15,20 126:8
126:11,20 127:14
127:21,24 128:2
128:18 129:4
**contracted** 104:10
**contracting** 121:13
**contractor** 74:14
108:10
**contractor's** 74:15
**contractors** 74:19
102:4
**contracts** 40:23
95:7,9 115:15
127:16,16 128:5
**conversation** 16:3
17:12 62:8 68:3
70:2 92:21
**conversations** 16:4
16:5,8,12,13
102:21 108:11
**convicted** 14:5,7
**Cook** 133:2
**cooperate** 44:7
90:6 107:16,21
**copies** 86:4
**copy** 85:17,18
101:1 135:8,13
**corporate** 7:4,4 8:3
21:21 59:22 60:1
65:22 69:1 110:22
113:10,16
**corporation** 1:5,8

6:14,14,19,20
18:18 48:13 131:4
131:7
**corporations** 36:8
**correct** 7:20 9:8,9
18:19,20 22:18,20
24:9 25:1 30:14
30:19 31:5,14,17
32:4,5,8,11,15,19
32:22 33:13,19
34:15,16 36:16,17
36:20 40:8,18,19
41:5 42:8,9,11,12
42:14,20,21,23
43:13,17,21 44:14
44:17 49:1 55:6
57:22 61:5 63:10
63:11 75:13 76:11
76:12 79:13,14
80:18 81:13,14,17
81:18 82:15,16,22
83:9 87:9,10,13
87:16 88:5 89:8
89:12,16 90:4,9
91:2,11 94:23
95:14 96:15,20,24
97:21 98:5 100:10
105:18 106:1,2,4
106:12,23,24
107:3,6,13,18,19
110:23 117:7,8
118:12,23 121:16
121:22 123:8,23
124:23,24 127:7,8
127:10,21 128:22
129:2 134:5
**correction** 135:10
**corrections** 135:13
**correspond** 81:2
**correspondence**
82:11
**cost** 43:13 91:3,13
127:18
**costs** 113:18
**counsel** 67:22

111:2 132:9,22
135:10
**counsel's** 117:3
**counts** 109:3 111:2
**County** 132:2
133:2
**couple** 77:15 86:4
116:16
**course** 129:10
**court** 1:1 4:8,13,24
5:10 8:3 62:10
131:1
**Courts** 1:15
**cover** 11:22
**covered** 41:9,17
110:14 111:22
121:3
**CPA** 23:4,8,8,11
24:1,3
**Crestwood** 21:15
**criticisms** 64:16,22
65:5,9,9 67:1
86:23 87:8,15,19
87:20 88:10,13
89:4,24 94:9
98:11 123:2
**crumpled** 115:17
**current** 3:22,24
7:21 10:22 66:11
82:22 102:20
104:12
**currently** 46:9
106:15
**customary** 17:4
**customers** 121:9

---

**D**

**D** 3:15 57:2,16,17
86:13,15 109:11
109:18 118:15
122:16,22
**daily** 23:4,22
**damage** 94:19,22
99:10,20 104:7
105:7 111:2

**damaged** 44:13,15
91:20
**damages** 52:17,20
65:7,20 66:4,5,8
66:12,21 67:17
68:12 109:4,14
110:1,8,13 111:18
**date** 7:11 29:10
44:8,23 45:7,23
85:8 96:21 100:4
100:7 107:5
119:17 124:4
132:6 134:2,24
**dated** 96:14
**Dave** 55:4 76:9
103:11
**David** 54:13
**day** 89:7,10 124:2
131:21 133:3
**days** 96:2 103:7,10
104:15 105:24
106:10 114:3
**deal** 17:4 25:23
**dealings** 74:6 75:8
**dealt** 99:4
**Dean** 40:14,15
**Dear** 135:7
**Debbie** 27:19
**debris** 57:18
**deceased** 7:18
**December** 10:18
18:22
**decide** 79:16,24
**decision** 72:10
73:15 75:13,19
76:21 77:2 84:15
84:18 127:24
**decisionmaking**
77:11 115:20
**decisions** 74:7,15
74:20 75:5 76:16
77:1 128:22
**deck** 88:11
**decline** 92:5
**decrease** 121:8

**defendant** 13:21
14:3
**Defendants** 1:10
2:15 131:9
**definitely** 91:22
**degree** 11:14,15,22
**delay** 104:8 105:9
**delayed** 102:6
103:20 104:3
**delays** 102:10,23
104:21,23,24
105:5
**delinquent** 100:9
**demand** 98:21 99:5
99:7 100:8 114:12
114:20
**demolition** 53:22
57:18
**denial** 94:21
**denied** 27:7,12 31:4
31:17
**Deon** 40:12
**dep** 5:15
**depended** 61:22
**depending** 67:14
109:20
**deponent** 131:13
134:2
**deposed** 53:8
**deposition** 1:13 3:1
4:11,17 9:11,11
14:11 30:5 39:20
72:22,23,24 73:4
82:8 86:15 111:17
112:10 116:21
119:13 131:14,15
132:4,9,19 134:4
134:7 135:2,8,12
**deposition's** 6:15
**depositions** 1:16
4:20 53:4,8
**deps** 115:3
**describe** 24:4
**described** 104:22
**describes** 33:7

Sheryl Germany

March 3, 2020

Page 140

**design** 31:10
**despite** 89:4,15
  100:6,8
**detailing** 95:16
**details** 92:21
**deter** 93:22 94:2,3
  94:5 98:6 104:3
**Deyon** 40:14,15
**diary** 14:19 15:3
**different** 77:15
  112:21 123:15
**difficult** 7:23
**direct** 43:9 86:18
  110:20
**directed** 64:13,14
**directly** 56:9,12
  64:22 65:4,6
**dirt** 53:22
**disadvantage** 109:5
  109:9
**disagreements** 12:6
**discovery** 4:11 9:11
  37:1 111:17
  112:10
**discuss** 63:13 71:15
**discussed** 15:8,16
  17:20 33:8 61:14
  61:18 63:9 70:19
  81:17 86:24
  108:23
**discussion** 16:9
  63:6 122:18
**discussions** 116:1,4
  116:7
**dismiss** 66:1
**disposal** 1:4 20:18
  20:19,21 21:1,2,5
  21:12,14,19,23
  22:3 58:12,17
  104:13 115:13
  131:3 134:3 135:2
**disposing** 109:21
**disputed** 31:4
**distribution** 135:14
**District** 1:1,1,15

**131**:1,1
**disturbing** 10:10
  63:17
**DIVISION** 1:2
  131:2
**document** 119:17
**documentation**
  14:16
**doing** 78:9 87:5
  128:11 130:1
**dollar** 105:7
**domestic** 18:18
**door** 50:16 51:21
**draft** 84:1
**drafted** 123:7,11
**drainage** 54:16
  63:18,21 78:12
  125:20
**drawing** 35:12 54:3
**draws** 81:3
**due** 52:6,7 66:2,15
  72:14 97:16 99:9
  100:12 105:24
  109:8 113:13
**duly** 4:2 131:12
  132:10
**Dumpsters** 56:5
**duties** 22:14,21

**E**

**E** 2:11 3:16 116:20
  116:21 117:9
  124:3
**earlier** 4:15 97:22
  111:8 113:2 128:3
**early** 20:21 21:13
**easier** 5:10
**EASTERN** 1:2
  131:2
**eblake@montan...**
  2:13
**education** 11:13
**Edward** 117:9
**efficient** 95:11
**either** 9:18 11:1

23:9 51:9 67:15
  68:5,9,9 72:19
  109:13 120:3
**election** 75:2
**Ellis** 1:7 131:5
**employ** 22:23 23:14
**employee** 17:6 23:7
**employees** 34:21,23
  97:24 99:15
  104:11
**employment** 22:22
**empty** 28:10
**enclosed** 135:10
**encourage** 129:18
**encouraged** 82:17
  119:5
**engineer** 118:8,9
**entailed** 17:13
**enter** 28:21 29:4
  84:11
**entered** 32:3 34:6
  39:12
**Enterprises** 47:6,9
  47:12
**entirely** 60:7
**entitled** 6:20
**entity** 113:16
**environment**
  110:22
**environmental**
  13:1 27:2,8 59:1,4
  59:19 63:14 64:18
  65:6,22 66:5,12
  66:20 67:1,11
  68:23 70:7 71:12
  79:1 81:16,19
  87:9,11 113:17
  117:6,19
**EPA** 12:20 13:24
  31:9 59:9
**equal** 66:17
**equipment** 127:18
**Erin** 2:11 4:15 6:9
  6:15 67:24 118:21
  120:6 135:21

**ERRATA** 134:1
**estimate** 120:11,12
**eventually** 89:14
**everybody** 5:11
  75:21
**evidence** 84:11,23
  102:13 109:6
  113:6,12
**exactly** 21:13 70:2
**EXAMINATION**
  3:4 4:5 117:1
  125:7 129:14
**examined** 4:3
  132:10
**exception** 65:14
**exchange** 32:13,24
**exclude** 6:24
**excluded** 60:7
**excluding** 6:22
**exclusion** 6:13
**exclusive** 41:2
**executed** 38:18
  135:11
**execution** 135:13
**Exhibit** 3:12,13,14
  3:15,16,17 30:4,5
  30:12 39:19,20,22
  82:7,8 86:13,15
  116:21 117:9
  118:15 119:1,3,13
  119:17 122:22
  123:6,10 126:18
  126:22 129:16,16
**exhibits** 3:9 14:18
  84:7 86:7
**existence** 22:3
**existing** 90:4
**expected** 82:21
**experience** 115:13
**expiring** 40:21
**explain** 18:6 62:19
  63:20 128:14
  130:7
**explanation** 8:24
**express** 71:11

**extensive** 84:7

**F**

**F** 3:17 119:12,13,17
**Facebook** 12:1,2,5
  12:9
**facility** 32:14,21
  33:2 53:23 57:24
  58:5
**fact** 17:8 64:9 92:2
  98:21
**factor** 33:10
**facts** 102:13
**failing** 90:6 105:22
  107:15
**failure** 95:17,21
  100:2
**fair** 34:3 47:11
  51:21 57:21 69:23
  76:18 82:18 83:8
  107:12 112:17
  130:3
**fairness** 122:10
**faith** 106:10
**fallen** 114:1
**false** 97:5
**falsely** 96:5
**familiar** 46:5,11
  47:8 110:17
**families** 42:4
**family-owned** 24:6
**father** 26:8,10,17
  26:18
**fault** 62:12
**February** 100:5,8
  102:4,5 105:23
  106:3
**federal** 1:14 4:12
**fee** 29:18 34:2
  70:15 71:13 107:1
  109:12
**feel** 77:16
**fees** 54:16 80:7,21
  104:17 106:17,18
**felony** 14:5

Sheryl Germany

March 3, 2020

Page 141

**field** 28:8,9 75:22
**file** 18:16 36:12,15
  77:24
**filed** 4:18 9:10
  13:15,18 18:1
  31:8 36:18
**files** 40:24
**filing** 53:1 65:24
**finagle** 66:20
**finally** 5:24 105:20
**financial** 113:20
**find** 8:2 108:2
**fine** 112:23 116:19
**fingers** 5:3
**finish** 5:5,7 6:2,23
  21:7 110:2,3
**firm** 115:13
**first** 4:2,23 14:17
  19:3 40:2 52:10
  54:5 60:11 65:5
  69:8 81:24 83:5
  85:20,23 97:12
  112:2,22,24 115:3
  123:13 131:12
  132:10
**five** 120:16
**Flood** 120:19 121:4
  128:22
**FOIA** 85:7 125:10
**FOIA'd** 118:10
**FOIAs** 85:12
**follow** 10:2,3 11:3
**follow-up** 129:12
**follow-ups** 125:5
**following** 134:6
**follows** 4:4
**foregoing** 131:15
  132:4,14
**form** 26:12 76:4
  102:12 117:17
  123:17 124:15
**formed** 19:3,4,5
**forms** 135:13
**forum** 80:1,1
**forward** 53:14 80:3

95:15
**found** 72:9 73:14
  98:2
**frame** 42:23
**free** 26:11,19 91:1
  91:20 94:8 108:2
  108:15
**Friday** 105:3
**Fritz** 47:3,5,8,12
  49:1,4,7,11,21
  64:1
**Fritz'** 47:14
**front** 96:16,17
**fuel** 104:13
**full** 104:18
**function** 55:14
**fundraisers** 75:3
**further** 6:11 17:24
  99:15 125:7
  129:14 130:5

**G**

**G-e-r-m-a-n-y** 4:9
**game** 51:21 112:18
**garbage** 20:20,22
  24:7 35:7,11,21
  36:2,2 38:3,8,13
  39:8 40:5 41:3,13
  42:6,14,19 43:4
  44:24 45:9,12
  47:20 57:20 58:8
  60:8,20 80:15
  82:13 88:23
  113:24 121:6
  127:24
**general** 12:11 22:14
  22:21 37:7 62:4
  63:12 70:6 74:24
**generally** 43:5
  74:23
**generated** 38:3,8
  38:13
**Germany** 1:13 3:1
  3:12,13,14,15,16
  3:17 4:1,9,11,14

6:4,13 7:11,16
  8:12 30:5 39:20
  64:17 69:14,16
  82:8 86:15 116:21
  119:13 131:12,19
  134:2 135:2,8
**Germany's** 6:13
  115:5
**getting** 10:8 65:15
  72:14 121:12
**give** 7:22 8:5 44:9
  44:11 54:4 62:24
  120:11 121:19
  124:11
**given** 4:20 69:20
  98:22 119:7
**giving** 8:19,22 9:12
  9:21 10:24 62:13
  128:18
**go** 6:11 45:15 50:9
  51:18,20 52:4,4,5
  52:6 53:11 63:3
  67:14 68:17 73:22
  78:19 103:3
  112:16,18 118:15
  118:15 119:9
  128:5
**goes** 67:14 128:24
**going** 4:16,22 5:9
  5:14 6:16,17,24
  7:22 8:5 9:2 10:2
  11:3 13:23 19:16
  26:21 30:3 35:15
  38:6 39:17 45:15
  49:13 50:3,11,16
  51:4 53:6,14,17
  54:14 59:24 62:20
  65:2,3,20 67:16
  67:17 68:5,6,7,10
  68:17 72:23 73:19
  74:11 75:21 76:1
  77:16 80:8 85:14
  86:6,8,13,21
  90:23 95:15
  110:16 111:12,13

111:17,20 116:11
  118:3 119:4,18,20
  122:7 123:18
  129:17 130:9
**golf** 75:1
**Gonzalez** 54:13
  55:4 76:9 79:20
  103:11,17,18
**good** 39:6 60:4
  65:24 70:13 86:5
  91:6 106:10 120:9
  124:18 125:3
  128:5
**goofy** 93:4
**gotten** 98:17
**government** 13:3
**grand** 100:24
**grant** 72:10 73:15
  74:9
**granted** 89:14
  96:23
**granting** 71:3,7,16
  72:2 78:6 83:13
  86:24 113:14
**gross** 36:1 37:14,20
  38:2,7,12
**ground** 4:23 126:5
**groundwork**
  120:23
**guarantee** 80:6
  127:20
**guess** 19:15,23
  35:14 38:19 75:16
  128:14
**guessing** 23:12
**guesstimate** 120:10
**guy** 115:13,16
**guys** 9:6 53:7 75:23
  114:12 122:4,7

**H**

**half** 106:19
**handed** 119:16
**handle** 80:9
**happen** 128:8

**happened** 10:12
  65:10 70:3 97:6
  104:2 121:10
**happening** 98:18
**happy** 53:1 66:18
  129:5
**harassed** 96:6,8
**harassing** 99:16
**hard** 45:2 51:16
**hardship** 101:13
**Harlem** 1:18 2:11
**harm** 52:17 65:6
  66:5 110:22 113:8
  113:13
**hate** 52:23
**hauler** 24:6 41:22
**hauling** 48:20
**hazards** 70:7
**head** 5:2
**headquarters**
  24:10
**health** 110:22
  113:9,13
**hear** 29:8
**hearing** 54:5 57:8
  73:23 83:21 123:8
**hearings** 61:12,17
  62:2 63:8 79:22
  83:17 88:14,15
**Heights** 1:19 2:12
**held** 54:14 70:9
**help** 22:1
**hereinabove**
  132:17
**herewith** 135:8
**Hey** 6:9
**highest** 11:13
**hire** 23:3,8,11 95:3
**hiring** 107:18
**history** 64:4
**hold** 95:6 110:13
  122:20 124:7
**home** 10:20 19:7
**homes** 42:3,7,10
**Homewood** 58:12

Sheryl Germany

March 3, 2020

Page 142

58:17
**host** 29:18 33:7
   34:2 54:16 70:15
   71:13 80:7,21
   109:12
**hot** 59:10,13
**hours** 68:20
**house** 10:8
**household** 121:2
**housing** 121:2
**hunky-dory** 75:20
**Huron** 46:18,19
   48:12 64:7,8,10
**Huron's** 48:15
**husband** 10:20
   21:3,4 22:9 26:8,9
   27:18 115:12
**husband's** 21:22
   26:16

**I**

**idea** 9:1,1 38:21
   50:3
**identification** 30:6
   39:21 82:9 86:16
   116:22 119:14
**IEP** 31:16,16
**IEPA** 14:3 27:12
   28:16,21 30:24
   32:1 59:11,13
   70:12
**ignored** 93:18
**Illinois** 1:1,5,18,19
   2:5,12 13:1,24
   18:21 20:8 21:20
   27:2,8 31:9 59:9
   131:1,4 132:1
   133:2 135:6
**immediate** 135:16
**imminent** 110:21
   113:8,13
**impact** 63:14 65:22
   68:23 71:12
**important** 96:2
**improper** 88:13

**improvements**
   29:24 32:14,22
**inability** 94:7 99:22
**included** 91:3,9,12
   100:2 121:5
**includes** 90:2,6
**including** 16:16
   102:11
**inclusive** 131:16
**income** 26:2 36:1
   37:15,21 38:2,7
   38:12 43:16 109:4
   109:7 110:9,13
   113:6,12 120:8
   127:13
**incompetent** 95:2
**incorporated** 18:22
   19:10
**incorporating** 19:1
**increase** 61:9
**independent** 74:13
   74:18
**indicate** 18:21
**indicated** 94:19
**indicating** 82:12
**indirectly** 56:10,16
**individual** 12:22
   95:5,6 121:14
**individually** 71:15
**Industry's** 48:19,21
**information** 8:6,19
   8:22 17:14 27:16
   44:9,11 81:1
   83:10 84:16
   118:10
**informed** 92:20
**initial** 57:8
**initially** 19:5,9
   38:18
**initiated** 17:19
**initiation** 61:7
**instances** 16:15
   74:12,17 75:4
   76:20,24 77:10,13
**instruct** 135:12

**intend** 51:18
**intended** 82:14
**interactions** 15:1
**interest** 52:12,13
   63:18 81:10,11,13
   100:15,16 101:5
   106:17 126:2
   128:7,10
**interested** 125:14
   132:21 135:15
**interim** 82:20
**internal** 101:16
**interrogatories** 4:3
   132:11
**intervene** 28:17
**introduced** 4:14
**investigate** 18:10
   97:23
**investigation** 18:14
   18:16 98:4
**invited** 128:17
**invoice** 104:8 105:9
   106:1
**invoices** 97:19 99:9
   99:9 100:3 101:15
   101:17 105:23
   106:3,16,17,23,24
   114:2
**involve** 9:5 87:15
**involved** 115:20
**irrelevant** 36:24
   37:17
**issue** 17:11,12
   28:16 79:16 80:3
   82:15 85:7 90:11
   90:21 103:12
   114:12
**issued** 125:10
**issues** 28:20 32:1
   59:2 71:13 98:16
   98:24 103:18
   116:2,5,8 128:2
**issuing** 96:5
**itemization** 109:14
   109:17

**itemized** 88:8
   109:23
**items** 88:9,10
   104:21

**J**

**jacked** 65:15
**Jackson** 1:9 12:7
   74:18,24 76:17
   82:11 83:12 88:11
   89:23 96:4,5
   102:22 103:3,4,6
   105:16 131:8
**Jackson's** 39:1 77:5
   77:8 100:1
**jail** 6:1
**January** 100:5
   102:4 105:23
   106:3
**Jeff** 6:13,13 7:19
   55:8
**Jeff's** 6:24 7:7
**Jeffrey's** 6:22
**Jerome** 116:10
**Jim** 8:10,16 9:6
   55:9 56:6,12 57:8
   116:4
**job** 22:14,21 65:24
   129:21 130:1
**jointly** 123:7
**judge** 1:7,8 66:1
   72:8,13 73:13
   114:11 131:5,6
**judge's** 72:17 73:1
   73:2
**July** 89:1 101:7,8
   126:22,23 127:6

**K**

**K** 132:2
**Kathy** 15:13 16:18
   16:20,21 17:4,14
   17:17,20 64:9,11
   98:22
**keep** 4:23 14:19

104:12,20
**Ken** 99:2
**kept** 14:24 15:3,5
**ketchup** 115:18
**killed** 110:4,4
**kin** 132:22
**kind** 54:13 59:23
   87:21 117:18
   123:1 126:1
**knew** 27:18
**know** 5:8,18 9:4
   10:13 17:11,15
   20:4 23:6,22 26:4
   27:22 28:6 29:10
   34:10 35:3,9,10
   35:14,16,20 37:9
   37:14,20 38:2,7
   38:12 39:15 40:11
   41:15 45:3,12,18
   45:19,20 46:3,24
   47:3,5,13,17 49:3
   49:6 51:17 52:6
   53:4 55:9,12,24
   58:6,7,9,14 62:22
   64:2,4 69:10,13
   72:13 74:3 75:7
   78:24 79:4,5,8
   80:20 81:3,5,6,24
   83:4,5 85:14
   94:17 96:17
   101:16,17 102:3
   102:13,14,14,20
   103:6 105:11
   107:7 109:15,15
   109:17 111:3,7,16
   122:15 123:13
   124:13 126:24
   128:20 129:1
**knowledge** 73:2
**knowledgeable**
   115:9
**known** 6:4 8:20
   24:13

**L**

Sheryl Germany

March 3, 2020

Page 143

**L** 1:7,9,16 131:5,8
132:6 133:8
**land** 64:20 66:7
**landfills** 104:14
**language** 107:20
108:14
**LaRose** 2:3,3 3:7
5:11,15,16,18 6:9
6:11 7:2,8,22 8:10
8:13,15 9:3,9,14
9:17,20 10:7,12
10:14,24 13:9,11
19:15,23 20:16
21:7 23:5,13,17
26:12 28:23 29:4
29:8 34:12 35:13
36:23 37:4,6,12
37:17,22 40:14
42:15,24 45:3,16
45:18,21 49:12,16
50:1,5,21 51:7,11
51:15,23 52:3,18
53:11,15 54:18
60:4,10,13,21
61:21 62:9,15,18
63:3 64:3 65:1,8
65:23 66:10,14
67:2,4,8,13,21,24
68:4,9,15 69:5,9
69:12,18 72:4,12
72:17,21 73:7,9
73:17 75:14,18
76:4 80:15 82:5
85:17,19,22 86:2
86:6,11,20 87:3
87:22 88:1,18
90:15 92:12,16
93:18 99:16
100:24 102:12
103:2,5,12 104:16
105:2,5 107:24
108:5 110:2,14
111:3,6,11,22
112:3,5,12,16,24
113:4 114:8,10,14

114:16,21,23
115:2,17 116:16
116:20 117:2
119:11,15 122:6,9
122:13,17,19
123:18,20 124:16
125:1,4 126:10,13
126:15,18 129:12
129:15 130:4,6,9
135:4,5,7
**LaSalle** 2:4 135:5
**late** 31:7 101:21
106:7,12,17,18
107:1
**law** 52:24
**LAWRENCE** 1:9
131:8
**lawsuit** 4:17 9:10
9:16,18 12:3,19
12:24 13:18,22
14:3,20,21 15:6,8
17:21 18:1 50:6
51:13 60:2 72:20
72:22 77:24 89:11
93:23 94:5 98:8
104:5 105:16
115:10,21 116:8
**lawsuit's** 73:1
**lawyer** 14:12 88:2
99:3,4
**lawyering** 88:1
**lawyers** 8:20 14:14
**laying** 67:15
**leaching** 52:14
**leadership** 75:5
77:1
**leading** 102:10
**leaflets** 85:4
**learn** 64:8
**lease** 25:12
**left** 66:16
**legal** 59:23 66:11
80:10
**let's** 50:5,15 90:15
118:14,15 119:11

119:11 122:9
129:16
**letter** 18:3,7 82:19
83:2,5 96:5,13
97:5,9,12,18 98:6
98:10,21 99:5,7
99:12,14,17,20
123:7,21 129:19
129:24
**letters** 69:7,19 84:2
**level** 11:13 75:22
**license** 33:3 133:9
**lie** 75:24
**light** 80:19
**liked** 68:19
**limit** 50:13,14,15
**limitation** 32:17
**limited** 34:1 50:11
53:6,7
**line** 3:21 64:20
66:21 81:3 110:3
134:9,12,14,17,19
134:22
**lines** 3:23
**list** 59:10,13 65:5
90:2 96:3
**listed** 19:10 32:18
59:12 72:3 88:6
**listen** 7:24 73:10
111:14
**lists** 87:18 89:22
105:13
**litigation** 34:7
**little** 10:10 54:18
65:15
**live** 10:20
**lives** 8:2
**located** 19:6 58:15
58:19 59:12
**locations** 58:17,18
**long** 19:24 22:3
23:22 46:24 65:10
65:10
**longer** 109:10
**look** 78:19 90:15

94:18 95:2,11,12
100:19 117:9
118:2,14 119:1
122:16,20,21
124:3 129:16
**looked** 20:8 53:1
**looking** 17:1 33:4
33:20 85:24
100:17
**lose** 44:1,4 95:9
**loss** 95:17,20 109:4
109:6,11 110:13
113:6,12
**losses** 113:20
**lost** 109:18 120:15
127:12
**lot** 15:17 33:23
64:15 72:22 79:22
95:6 121:9 123:22
**loud** 4:24
**love** 10:7 114:16,18
114:19
**lower** 102:9

———————————
## M
**M** 1:9 131:6
**M-o-e-l-l-e-r** 21:1
**m.alaska@larose...**
2:7
**magistrate** 1:8
114:17 131:6
**maiden** 6:6
**mailed** 101:17
**main** 16:17 52:9
80:23 81:6 88:8
**maintain** 12:16
**majority** 102:11
**management** 48:7
55:13 58:13,16
108:12
**manager** 115:6
**Managing** 22:15
**manner** 56:1 99:23
**March** 1:20 3:2
90:23 100:5,8

102:4,5 105:23
106:3 131:14
133:3 134:2 135:1
135:3
**Marionette** 35:19
113:24 127:2
**Marissa** 2:4 114:11
122:9 125:2
**mark** 2:3 30:3
34:12 39:17 64:3
73:6 76:1 82:6,7
86:13 116:20
119:11,11 135:5
**marked** 30:5 39:20
39:23 82:8 86:15
96:19 116:21
119:13,16 126:22
**Markham** 55:23
**married** 7:13
**Mary** 1:9 131:6
**mass** 120:24
**material** 39:13,18
57:3 109:16
**materials** 9:7 14:15
46:9,17 53:18,20
54:6,23 55:18
57:9,11,15,19,22
58:4,7,21 59:5,16
60:18 61:2 62:6
63:22 70:8,23
71:3,8,17 72:3,10
73:15 75:9 76:10
76:13,22 77:3
78:2,24 79:5,8
80:6,18,21,24
81:5,20 82:2 83:1
83:13,23 85:5,10
87:1 89:5,15 90:1
96:24 103:22
108:8 109:8 110:9
110:21 113:8,15
113:19 117:5,17
125:12,22 126:3
128:3
**Materials'** 46:22

Sheryl Germany

March 3, 2020

Page 144

60:6 61:8,13,17
63:9 69:3 70:18
79:17 87:14 94:9
98:12
**matter** 11:21
135:16
**matters** 66:16
**maximum** 41:9,16
42:3
**mayor** 1:9 12:7
16:1,3,6,9,15,18
16:21,24 17:5
18:3 39:1,4,4,5
40:12 53:24 54:10
55:3 71:2,6 74:7
74:18,23 76:9,16
77:4,8,21,22
79:20 82:11 83:12
88:11 89:11,23
93:22 94:2,13
96:4,4,8 98:7,20
100:1 101:24
102:15,22 103:4,6
103:17 104:4
105:16 116:1
119:3 128:16
129:17 131:8
**mayor's** 17:24
94:20 97:23 99:11
**mean** 7:1 28:23
37:4 45:7 52:9,19
52:22 64:24 74:24
82:7 121:7 126:5
126:6
**meaning** 51:4
54:15 58:1 79:18
104:23
**meant** 104:10
**media** 11:24 12:13
96:2
**mediator** 114:18
**meeting** 53:24 54:1
55:5,7 56:24
61:22 70:3,6 85:1
85:3 103:14,16

124:14,19,20
**meetings** 54:12
70:18 71:10,11
76:9 79:19,21,23
80:4 101:19
**member** 74:8
**members** 62:7
63:13 69:2
**memory** 20:11
**message** 56:17,19
56:23 57:2
**Met** 14:12,14
**Metal** 48:6
**Metal's** 48:9
**middle** 8:17 10:8
**Midwest** 48:7
**mile** 63:15
**mimic** 54:21
**mind** 94:18
**minded** 6:16
**minute** 50:17
107:23 124:12
125:1
**misdemeanor** 14:8
**misled** 80:11
**missed** 60:11
**mlarose@laroseb...**
2:6
**Moeller** 21:1,2,19
21:23 22:3
**monetary** 95:2,13
95:17,20,23
**money** 70:14 97:16
97:19 99:22
109:12 121:12
**MONTANA** 2:10
**month** 95:8 101:10
104:18 106:19
120:13,15 121:8
121:11
**months** 98:19
100:5,7 119:21,22
**Moraine** 11:16,18
**motion** 53:2 65:24
**motivation** 81:9

**motivations** 80:23
**move** 21:16 53:14
53:17 79:24
**moved** 19:13 20:12
38:22 80:3
**moving** 28:14
81:22 109:1
**MSW** 80:9,12
**multiple** 16:4,5,8
**municipal** 1:8
43:12 57:23 58:5
80:9,13,17 131:7
**municipalities**
35:10,18,20
113:23 127:1
**municipality** 12:22
13:19 128:24
**mutually** 108:9
**MWRD** 78:21

———————
**N**
N 135:5
**name** 4:7,15 6:6
15:14 20:24 40:13
134:24
**named** 13:21 14:1
14:2 132:9
**names** 6:5 24:14
27:17
**Nancy** 135:20
**near** 49:24 58:19
58:20
**necessarily** 76:18
**need** 8:24 17:16
50:19 86:6 111:16
111:16 116:17
**needed** 15:10 17:15
29:18 125:19
**needs** 70:14,14
100:15 112:5
**neither** 13:11
**neutral** 14:18
**never** 13:15 94:11
98:16 114:12
**new** 120:4 121:3

**nice** 25:23
**nick** 65:17
**night** 8:17,18 10:9
**no-bid** 120:19,19
**no-contact** 17:10
**nod** 5:2
**normal** 129:5,10
**North** 2:4
**NORTHERN** 1:1
131:1
**Notary** 131:23
132:13 133:2,9
135:11
**note** 110:12 135:13
**noted** 82:4
**notes** 14:19,24 15:3
15:5 122:14
**notice** 44:21 80:10
**notified** 26:23
30:21
**notify** 17:8
**November** 10:17
123:10,21 124:1,1
124:8,19,22
**number** 3:24 10:22
11:4,10 17:9
34:20,23 35:7
95:20 105:10
107:7

———————
**O**
O 132:2,2
**O'Sullivan** 135:20
**oath** 131:13
**object** 9:12,20
102:12 123:17
124:15
**objected** 36:23
**objection** 5:12
26:12 36:23 37:17
37:22 49:12 75:14
75:17 76:4 78:5
124:18
**objections** 74:15,20
76:2 78:8 84:3,8

84:12 85:2,5
89:15
**obligated** 100:3
**obligations** 126:3
**obtain** 11:15
**obtained** 78:2
**occur** 90:12,22
106:12 108:15
**occurred** 92:3
128:18
**October** 82:4 83:11
**odd** 119:22
**offered** 56:3
**offhand** 35:9
**office** 15:10,12 16:2
21:21 22:22
135:14,17
**officer** 8:2
**offices** 24:17
**official** 133:1
**Oh** 11:20 22:8 39:3
40:12 60:23 67:23
70:5 72:6 73:8
99:18 103:13
117:11 122:15
127:11
**okay** 4:22 5:5,17
7:2,8 8:9,12,14
9:4,13,19,22 10:5
11:7 13:5,9 14:2
14:13 16:11,18,21
16:24 17:2,4,10
17:20 18:6,10
19:13,16,20 20:14
21:9,19,22 22:9
22:21 23:16 24:4
26:1,7,22 28:3,20
30:3,20 31:3,7,16
31:19,22 32:1,6
32:13,24 33:7,10
33:23 34:23 35:15
39:1,6,11,17 40:7
40:17,23 41:10,18
41:20,23 42:2,18
42:22 43:1,3,9,15

Sheryl Germany

March 3, 2020

Page 145

44:15 45:21 46:15
49:3 50:5,14,22
51:1 52:2,3 53:10
53:15 54:4,10,20
55:4,22 56:1,6
58:4,14,21 60:1
60:13,18 62:1
64:15 65:8 66:13
67:3 68:2,14,15
70:17 73:21 77:7
77:8,13,18,22,24
78:24 80:12,14,20
81:9 82:20 84:14
86:11 87:8 88:10
91:5,19 92:20
95:1,6,9,16 96:1
96:10,13,18,22
97:22 98:2,6 99:2
99:4,10,18,24
101:12 102:19,21
103:5,9 104:9
105:4 106:11,15
106:22 107:14
110:8,19 111:12
111:22 112:15
113:3 114:15,19
114:21 115:1
116:14,17 117:3
117:20,21,23
118:4,14,20,24
119:2,19 120:12
120:14 121:23
122:2,21 123:1,4
123:5 124:9,17
126:8 127:1,5,12
127:23 128:20
129:7,9,11,23
130:6,11
**on-site** 81:23
**once** 98:18 114:20
**one-** 41:15
**ones** 35:13 69:22
69:23
**open** 45:1,3 50:15
51:21 94:12

**operate** 19:1 21:19
24:8 25:8,20
26:10,19 27:21
32:7,10 33:1,11
33:15 45:4,9 46:1
53:21 56:17 61:4
71:4,8,17 73:21
75:10 83:14 89:8
**operated** 28:13
45:13 46:6,12,12
46:16 55:22
**operates** 46:9
**operating** 25:7 27:1
27:23,24 28:3
34:8,14,17 58:22
59:5,16 60:19
70:8 80:24 82:2
83:1 110:21
**operation** 31:10
33:18 47:8,14,21
48:3,9,15,22 56:7
60:6 61:8 69:3
74:1 91:3,14
110:10
**operations** 30:23
56:7 59:17 61:3
**opinion** 72:17 73:1
73:2
**oppose** 47:14,21
48:9,15,21 58:21
74:1
**opposed** 31:13
**opposes** 48:3
**opposite** 66:19
75:20
**opposition** 71:3,7
71:16 82:1 83:1
**oral** 4:3 132:11
**ordered** 62:10
**ordinance** 71:22
72:1,4,9 73:14
117:12,16,23
120:20,22,23
121:3,21 124:2,10
124:20 125:15

**original** 123:6
135:10
**originally** 125:19
**originals** 135:14
**outings** 75:1
**outlays** 104:10
**outside** 23:8 51:17
65:2,3
**outstanding** 97:20
99:8,9 100:14
101:4 106:15,23
107:1
**owe** 107:4
**owed** 97:19 101:4
**owned** 22:4 24:23
25:11 63:24 64:2
**owner** 24:21,21
30:18
**owners** 26:4,17
41:21 121:14

---

**P**

**p.m** 130:12
**page** 3:4,11,21,23
31:19 32:14,22
33:4,5,7,20,21
42:24 43:9 86:19
89:21,22 105:21
108:5 109:2
118:14,16,17,18
122:21 124:6
134:8,11,13,16,18
134:21 135:10,11
135:14
**pages** 131:16
135:10
**paid** 98:17,19
101:18 106:4
**Palos** 1:19 2:12
**paper** 80:10 115:15
115:16
**paragraph** 30:20
31:6 42:24 86:18
86:20 88:7 89:21
96:11 99:24

105:13,20 107:24
108:1,6,7,18
109:1 110:19
118:2,5,16,18,19
122:22,23
**paraphrase** 111:15
**paraphrased**
111:12
**Pardon** 11:17
**pared** 73:1
**parent** 36:8
**Park** 35:19 114:1
127:2
**PARR** 1:16 132:6
133:8
**part** 25:18 29:12
30:16 51:13 60:11
66:2 78:14,17,18
81:12,15 90:4
91:12 94:16 108:1
115:24 117:23
129:23 130:1
**participate** 57:7
71:1 82:18 120:3
128:17 129:18
**particular** 85:3
**particularly** 69:22
69:23
**parties** 32:3 132:22
135:15
**Parts** 47:18 48:1
**pass** 85:4
**passed** 72:5 124:2
124:10,20
**pay** 25:20 29:17
59:24 70:15 78:4
80:7 91:7,10,15
100:3,4 101:24
104:14 105:22
117:17
**paying** 60:2 80:21
114:1 117:5
**payment** 17:1 34:2
98:16 100:20,21
102:23 103:20

104:24 105:24
**payments** 17:5
100:9 101:22
102:6,10 104:3,8
104:12,21 105:9
106:7,9,12
**pays** 79:6,8,11
**pending** 6:3
**people** 8:1 10:8
94:11
**percent** 106:19
**perfectly** 20:4
**perform** 29:24
54:24 55:1 92:5
92:11 93:2,5,14
94:7,21 95:18,22
**performing** 93:21
94:1,4
**permit** 27:7,11 33:3
**permits** 27:12
31:10 78:3 79:1
**personal** 8:1,6,6,16
8:19,22 98:23
**personally** 14:19,24
49:3 99:1
**personnel** 15:10,12
**persons** 27:17
**pertaining** 1:15
**phone** 3:24 8:16
10:22 11:4,10
15:17,18,20 17:9
17:19 18:8 98:23
101:23 115:23
**phonetic** 27:19,20
**phrase** 87:21
**pick** 49:5 121:6
**piece** 59:7 78:11
**place** 41:11 112:2
132:6,17
**placed** 108:8
**plaintiff** 1:6 2:8
6:14 12:18 131:5
**plan** 56:7,13,17
118:6
**planning** 75:10

Sheryl Germany

March 3, 2020

Page 146

76:10 84:20 88:12
88:17,18,20
123:14
playing 75:22
pleadings 86:10
please 4:7 7:11 21:8
93:24 107:23
110:3 116:20
135:12,16
plus 120:13
point 5:2 12:20
39:6 52:20,21
56:19 78:20 98:21
116:12 129:3
policy 16:23
pond 49:23 50:8,12
51:2,8,19,22 52:7
63:23 64:21 65:12
68:10 111:5,19,20
112:8,8 126:1
ponds 78:13,15,21
78:23
position 53:14
possible 113:17
post 78:4 117:6,18
postclosure 117:19
posted 12:2,5,9
posture 66:11
potentially 120:16
PR 91:6
practically 8:17
preparation 14:10
present 2:1 6:21
35:12 55:5,7 62:3
132:8
presented 80:5
president 6:19
22:13,19 27:15
115:7,8
pretty 16:17 17:19
53:5 81:3 97:15
120:9
previous 24:20,21
40:21
previously 24:23

39:22 93:12
102:17 104:2
126:21 132:9
prices 61:9
print 85:16
prior 19:1 28:7,14
39:1 40:23 43:3
46:16,22 55:9,16
74:12,17,22 75:5
75:13 76:17 77:8
83:2,4 102:9,23
private 79:21 80:1
80:4 81:10,11,12
probably 4:21 8:1
23:12 103:10
122:9 124:17
125:2 129:6
problem 94:11
problems 12:10
17:7
procedural 66:15
Procedure 1:14
procedures 88:13
proceeding 28:17
proceedings 59:23
130:12
process 52:7,8
57:23 58:1 66:2
66:15 72:14 74:2
82:18 101:14,16
128:4,17,21
processing 53:22
101:15
producing 36:24
productive 68:3
professional 95:12
profitable 77:17
profits 26:2
project 127:19
projects 77:20
prompt 99:22
proper 78:3 79:1
101:18 125:19
property 24:21,22
25:2,5,11,21

26:11,19,24 27:13
27:24 28:4,6,10
30:1,17,24 32:2,3
32:8,11,15 33:2
33:12,16 34:8
46:5,12,13,21
49:10,20 52:12,12
52:13,14 59:7,9
59:12,16,20 63:16
63:17 64:5,6,11
64:18,19,23 66:7
67:7 68:24 78:11
78:16 81:16 83:14
87:2,12 102:1,8
102:22 125:21,24
proposal 129:6
protect 70:16
protection 13:1
27:2,8 66:17
provide 11:4 17:13
26:1 41:3,22
43:12,17 44:6
76:21 77:3 82:21
84:7 88:23 92:21
93:11 95:4 104:9
106:7 113:24
126:22 127:9
provided 90:8 91:2
107:17 108:16
135:13
provider 128:1,19
providing 39:8
43:24 44:1,5
91:19
provision 82:13
proximate 110:20
public 79:16,18
80:1 81:15,19
83:17,21,21 88:14
89:24 94:9,13
98:11 108:9
116:12 131:23
132:13 133:2,9
135:11
publicly 80:23

81:10,24 82:24
83:11 86:24
purchase 46:22
49:23 50:8 59:15
65:18 66:6 111:5
111:19
purchased 49:10
49:20 64:19,23
purchasing 65:11
pursuant 1:14 4:12
16:21,23 41:14
42:6 55:1 70:11
79:12 106:20
121:12 135:10
pursue 89:10 93:23
98:8 104:5
pursuing 94:5
put 29:18,20 44:18
78:12,15,21 95:20
95:24 119:4
121:20 127:20
128:10
putting 127:18

**Q**

question 5:6,7,9
6:2 9:23 10:6
11:8 21:7 26:13
28:24 49:14 51:5
51:16 56:16 64:19
73:6 76:5 90:18
91:17 92:8 93:16
93:17,18 110:2
117:4,13,16 118:3
questioning 51:3
64:21 66:21 68:13
questions 3:20 5:20
15:21 23:10 50:10
63:1 67:13,21
68:1,10,16 85:15
86:1 95:3 111:7
111:16,24 116:14
125:9 129:13
132:11,15 135:16
quick 13:13 90:16

122:14
quite 129:5

**R**

R 2:4
rack 87:22
radius 63:15
raising 123:22
ran 21:2 80:10
rates 104:13
rational 72:9 73:14
read 29:1 50:24
60:10,12 69:24
73:11 76:23 79:7
87:3 113:11
117:10,11,13
118:2 123:22
131:14 134:4
135:12
reading 132:18
real 13:12 90:16
122:14
really 8:21,24 28:2
52:9 60:16 65:24
66:7 77:16 94:17
reason 18:6 94:15
129:23 130:1
134:9,12,14,17,19
134:22
reasonable 114:22
reasons 9:13 71:23
72:1
recall 13:7 18:3
22:7 27:5,7,14
29:15 39:14,15
54:1 57:10 74:7
receipt 32:18 106:1
receive 43:15,23
received 8:16 43:20
83:10 97:12
100:20,21 114:13
120:8
receiving 83:2
recess 50:23 86:12
90:17 125:6

Sheryl Germany

March 3, 2020

Page 147

recipient 8:8
recommending
  74:9,9
reconciled 100:15
reconsider 53:2
record 4:10 5:10
  6:12 7:9 20:9
  23:17 29:1 50:1,2
  50:6,24 60:12
  63:3,6 84:11
  90:16 106:22
  111:8,11 112:13
  113:1 114:18
  118:24 122:17,18
  132:15
records 18:21 20:8
  98:3,17 104:20
  135:14
recourse 106:6
Recyclable 39:12
  39:18
Recycling 24:19,23
  25:3,9,11,16,18
  25:20 26:1,5,18
  26:23 27:1,15,18
  27:21,23 28:11
  29:12 30:9,13,16
  30:21,23 31:4,8
Recycling's 26:17
  26:18
reference 108:3
references 96:14
referred 132:17
referring 16:4
  87:21
reflect 4:10
refusal 100:2
  103:24
refuse 24:6 39:12
  39:18 41:22 48:20
  108:11 127:16
regarding 12:2,5,9
  14:20,21,24 15:3
  17:5,14,21 18:4
  32:3 56:6,13,17

57:9 59:5 62:5
65:6,21 69:2 70:7
70:22 71:2,7,12
79:16 81:16 82:1
82:24 83:22 84:3
84:7,11 85:5,8
86:24 90:11 97:10
99:14 102:22
103:18 106:11
108:6,15,19
111:21 116:2,5,8
125:9 128:22
regards 4:17 15:11
  15:19 17:10 51:2
  51:3 66:3,4 109:2
reign 77:5,8
relate 87:11 88:14
  125:11
related 51:20 52:21
  64:17 66:14 95:17
relates 61:10 64:22
  65:4,6 118:5
relating 51:6,22,23
  54:6 64:21 77:19
  81:20 84:24 88:15
  89:4 103:22
  115:21
relation 15:6 34:11
  85:9 97:19 114:5
relationship 25:10
  26:7,16
relevant 111:10,19
remediation 113:18
remember 13:10
  19:20,21 20:6,13
  29:17 38:20 39:10
  40:13 71:20,21
  74:4,5,11 87:24
  88:4 118:9 123:13
  129:7
remitted 102:1
rent 25:12
repeat 15:2 26:14
  28:24
reporter 1:17 4:8

5:1,10 62:10
representative 6:21
  7:4,5 92:14,17
representatives 8:4
  96:6,7
represented 34:10
represents 49:7
Republic 58:12,16
reputation 44:3,4
  44:12 91:20 94:22
  95:24
request 16:22
  17:24 80:17
requested 29:1
  31:13,17 50:24
  60:12 91:23 92:22
requests 85:7 93:13
require 117:17
required 29:17
  54:24 55:1 78:4
  78:20,22 107:21
  117:6 125:15
  126:1
requires 117:23
reserve 130:10
residences 41:24
  43:6
resident 65:22 69:1
  110:23 113:10
residential 41:4,6
  58:8 121:1
residents 44:8,12
  85:4 128:7
respect 120:2
respond 57:5
response 103:21
  117:3
responsible 104:14
rest 41:11
restated 29:7
result 18:13 28:20
  61:7 94:20 99:11
  104:8 105:8
  110:20 129:24
retain 120:3 135:13

retaliated 67:8
  74:13,18
retaliation 50:7,11
  51:17,24 52:22
  65:3,10,19 66:4
  89:24 94:8,16
  98:11,15 105:14
  105:15 109:2
  111:2,10 112:17
  118:22 121:24
  128:2 130:2
retaliatory 96:4
  100:1 128:12
retention 49:23
  50:8,12 51:2,8,19
  51:22 52:7 63:23
  64:21 65:11 68:10
  78:13,15,21,23
  111:4,18,20 112:8
  112:8 126:1
Return 135:14
returns 35:24 36:21
  110:8
revenue 70:14
  109:11 121:8
reversed 52:20
review 14:15 70:1
  71:22,24 122:14
reviewed 24:3
  118:6 123:11
revitalization 77:19
revitalize 77:15
RFQ 82:15 119:4,9
  129:17
right 7:6 10:15
  23:13 25:14 41:3
  50:6,16 51:14,15
  52:16,24 53:3,17
  62:20 66:19 75:23
  76:1 81:8 96:3
  99:10 100:14
  109:1 119:5,6
  120:16 123:2,3,6
  123:16 126:18
  129:18,20,21

rights 52:12
Riverdale 1:8,9
  4:16 9:7 12:6,10
  15:4 19:14 20:12
  22:16 24:11,19,23
  25:2,7,9,11,16,18
  25:20 26:1,4,17
  26:18,18,22,24
  27:15,18,21,23
  28:1,11 29:10,12
  30:9,10,13,16,21
  30:22 31:3,7
  33:12 34:15 35:23
  38:4,9,14,18,23
  39:9 40:11,24
  42:8 43:17 44:16
  44:24 45:1,8,10
  45:13,24 46:2,4,9
  46:11,16,22 47:9
  48:19,21,22 53:17
  53:20 54:6,23
  55:10,16,18 56:8
  56:14,18 57:9,11
  57:14,19,22 58:4
  58:7,19,21,22
  59:5,16,22,23
  60:1,6,7,18,19
  61:2,3,8,13,17
  62:6 63:9,22 69:3
  70:8,8,18,22 71:3
  71:7,17 72:2,10
  73:15 75:9,10
  76:10,13,22 77:3
  78:2,24 79:5,8,16
  80:6,18,21,24
  81:5,20 82:2,2
  83:1,13,18,22
  85:5,9 87:1,14
  88:24 89:5,8,15
  90:1 93:6 94:9
  95:7,10 96:23
  98:11 101:14,21
  102:3,8 103:22
  108:9,12 109:8
  110:9,21,23 113:8

Sheryl Germany

March 3, 2020

Page 148

113:15,17,19
117:5,17 120:4,9
121:1,13 125:11
125:21 126:2,9,21
127:6,14 128:3
131:7,8 134:3
135:2
**Riverdale's** 109:7
113:7
**Robbins** 35:19
114:1 127:2
**role** 115:5
**roll-off** 56:3,4
**rollover** 129:4
**room** 49:5
**rough** 120:11,12
**Rowland** 1:9 131:6
**royalties** 78:4 79:6
79:9,11 80:22
104:16 117:5,18
**royalty** 104:17
**rule** 6:21
**rules** 1:14 4:12,13
4:23 126:7
**run** 22:1

**S**

**S** 3:12,13,14,15,16
3:17 30:5 39:20
82:8 86:15 116:21
119:13
**S-h-e-r-y-l** 4:9
**S-t-r-e-i-t-b-e-r-...**
6:8
**safety** 110:22 113:9
113:14
**Sales** 47:19
**Sara** 1:7 131:5
**Saturday** 108:9
**saying** 42:5 51:2
55:4 62:5,12 65:9
65:13 70:6 97:15
101:24 112:22
129:17
**says** 31:6,18 69:18

82:19 108:1,4,8
118:24
**scan** 117:15
**schedule** 90:7
91:24 92:23
107:16 114:5
**scheduling** 107:21
**school** 108:10
**scope** 51:3 53:6,7
111:21 112:10,17
**seal** 133:1
**season** 23:12
**second** 52:11 63:4
85:21,24 86:14
117:24
**seconds** 124:11
**secretary** 6:14
**Section** 43:17 118:2
**securities** 78:4 79:6
79:9,11 80:21
**see** 31:1,11 33:3,8
39:3 56:1 96:9
108:4 114:20
117:24
**seeing** 18:3
**seek** 52:1
**seeking** 15:24 31:9
53:13 114:4
**sell** 22:5
**sense** 5:22
**sent** 18:4 56:19
57:1 82:11 98:21
**sentence** 31:18
**September** 54:5
57:9 123:5
**served** 42:22
**service** 45:9 56:3,4
91:2,20 95:4
101:6,21 104:9
108:15 121:2,6
126:22 128:1,11
129:5
**serviced** 120:24
**services** 39:8,14,19
40:5 41:3,11

43:12,16,19 45:12
58:12,16 60:20
82:14,21 88:24
97:3,10 113:24
126:9 127:3,9,15
**set** 44:7 56:24
123:3 127:6
**settled** 13:12
**settlement** 28:21
29:5,9,13,16 30:8
30:17 32:4,6
33:11 34:1,11,18
39:4,9 55:2 70:12
78:14 79:12 114:5
114:17
**seven** 26:11,20
68:20
**seven-hour** 72:24
**shape** 117:17
**SHEET** 134:1
**Sheryl** 1:13 3:1 4:1
4:9,11 6:23 7:6
69:20 131:12,19
134:2 135:2,8
**short** 69:21
**shorthand** 1:17
132:12
**show** 30:12 62:3
98:17 110:8
**shown** 32:22
**shows** 72:9 73:14
**sign** 31:20 49:9,19
135:13
**signature** 130:8
131:17 133:1
**signed** 31:23 40:7
40:10,18,20
135:11
**signing** 132:18
**similar** 43:5 80:7
**simple** 68:15
111:23 112:19
**Sincerely** 135:18
**single** 42:3
**single-family** 42:7

43:6
**single-home** 41:23
**sit** 6:16 46:21
**site** 52:14 69:3
72:11 73:16 81:21
**sites** 11:24
**situation** 63:19,21
**six** 98:19
**small** 20:22 41:7
**sneaky** 111:16
**social** 11:24 12:13
55:13 96:2
**sociare** 66:15
**sold** 22:7
**sole** 61:7
**solely** 30:17 34:1
97:18
**soliciting** 90:2
**solid** 57:23 58:5
80:9,13,17
**somebody** 103:3
116:12
**somebody's** 7:3
**son** 7:19
**sorry** 10:7 13:15
19:9 27:9 29:8
47:17 49:17 69:12
79:4 85:14 89:21
96:4,7 100:6
103:16 118:18,19
122:6
**sought** 73:21
**sound** 20:16
**sounded** 110:17
**sounds** 20:15 86:5
125:3
**South** 1:18 2:11
20:10 22:17
**speak** 15:11 45:16
54:18 56:6,10
61:16,20,21 70:21
83:12 124:10
**speaking** 76:2
80:23 81:9 82:1
93:22 94:2 98:7

104:4
**speaks** 112:13
**specific** 88:4 94:19
99:10 104:7 105:7
**specifically** 129:7
**specifics** 109:15
**spell** 4:7 15:14
**spoke** 16:6 17:14
62:3 83:4,5
**spoken** 82:24
**spring** 43:21,24
44:5,6,9 90:3,7,11
90:21 91:1,8,11
91:16,24 92:5,11
92:23 93:5,9,11
93:14,21 94:1,4,8
94:21 95:18,22
107:17,22 108:1,6
108:10
**ss** 132:1
**STACEY** 1:16
132:6 133:8
**stacking** 88:11
**staff** 96:8
**staffing** 32:21
**stamped** 30:10
**stamps** 51:12 65:16
**stand** 6:20 111:8
**standards** 54:15
70:10,11
**start** 44:23 45:23
**started** 56:22 60:18
98:18 126:16
**starting** 28:7 55:10
55:16
**state** 1:17 4:7 7:9
74:22 132:1
**stated** 31:15,22
48:24 91:19 97:22
132:19
**statement** 6:12
97:15 112:24
**statements** 79:16
111:7,8
**states** 1:1,15 30:20

Sheryl Germany

March 3, 2020

Page 149

31:3,16 110:19
131:1
**stating** 96:5
**station** 24:8,11
28:13 31:11 32:11
33:1,12,16,18
34:8,14,17 45:1
46:1 55:23 60:8
61:4,10 63:15
**stations** 24:17
**status** 73:3
**stay** 7:6
**Steel** 48:13
**stenographer**
132:13
**stipulated** 106:9
**stone** 53:22
**stop** 5:23 76:2
**stormwater** 118:6
125:10 126:1
**Street** 2:4 46:6,8,16
47:15 48:10,16
49:24 87:12 135:5
**Streitberger** 6:8
**strike** 71:1 110:13
**striking** 111:1
**stuff** 52:7,15 53:12
108:2 122:11
129:24
**stupid** 20:15,16
**subject** 11:21
**submit** 117:24
129:6
**submittal** 123:5
124:1,23
**submitted** 69:19
123:8,12,21
**submitting** 118:5
**subparagraph**
96:14
**Subscribed** 131:20
**subsection** 96:11
96:19
**subsequent** 127:14
**subsidiaries** 36:6

**substantive** 66:15
**sudden** 98:18
**sue** 13:3,5 33:17
**sued** 12:21
**suffer** 95:13 99:11
104:7 109:4
110:12,20
**suffered** 94:20
95:21 105:8
113:20
**suing** 9:6,7
**Suite** 1:18 2:5,12
135:5
**summarize** 62:6
**support** 74:24 75:5
76:13 77:1
**supported** 74:23
75:1,2
**supposed** 54:21
**Supreme** 4:12
**sure** 10:11 13:17,23
13:24 25:14 26:16
28:19 35:16 38:21
45:6 46:7,20 48:2
60:15 63:5 68:17
70:2 77:6,23
78:17,22 97:8
118:1 120:7,7,17
125:23 129:20
**surrounding**
103:24
**sworn** 4:3 131:12
131:20 132:10

——————
**T**
**T-o-m-m-y** 7:16
**take** 5:1,2 6:1,3
50:17,19 53:7
68:20 86:3 87:3
90:15 109:16
116:9,17 117:9
119:1 122:10,16
124:2 128:6
**taken** 1:13,16 3:2
4:11 50:23 86:12

90:17 121:21
125:6 131:14
132:5,12 134:2,4
135:3,8
**talk** 56:12 71:6
81:2 86:9 98:22
103:11,18 104:1
124:21
**talked** 16:1,15
17:18 102:15
116:12
**talking** 5:13 16:16
53:4 55:17 77:4
99:5
**tax** 23:12 35:24
36:21 102:8,22
110:8
**taxes** 36:12,15,18
102:1
**tell** 4:22 5:23 8:23
15:19,21 16:11,13
17:3 19:19 20:5
21:13 35:13
117:13
**telling** 8:15 37:18
62:13 67:15,16
73:5,9 119:3
**ten** 120:16
**term** 89:1 127:10
128:1
**terms** 29:15 60:20
**testified** 4:4 64:17
76:8
**testify** 73:10
**testifying** 8:14
66:24
**testimony** 65:21
69:20 75:11,19
**text** 56:19,23
**Thank** 29:3 76:6
**Thanks** 53:15
113:3
**theirs** 104:18
**then-existing** 31:9
**thing** 52:9,19 65:17

68:19 72:5 75:23
87:4 93:3 117:11
123:11
**things** 5:10 50:13
54:14,16,24 78:9
123:15
**think** 20:1 23:5
34:13 50:7,18
52:5,18 59:9
65:17 66:21,22
68:7 75:3 79:19
91:16 95:23
111:18,23 112:6
112:13,17 117:3
120:7 122:3 124:5
125:2 130:2,9
**Thornton** 35:19
114:1 127:2
**thought** 53:2,4
65:11 68:2 110:14
111:22 112,5,21
**threaten** 8:12
**threatened** 8:9 51:3
112:9
**threatening** 8:18
10:9
**threats** 7:24 8:1,6
9:5
**three** 22:4 35:15
119:21 120:17
127:13,17
**time** 5:22 6:1 19:8
19:24 35:12 38:22
39:4,9 41:14
42:23 45:2 46:4
46:11 56:11 71:6
76:23 77:21,22
79:7 84:19 87:3
93:24 95:5,15
103:14 104:18
112:22 113:11
117:10 119:21,22
124:9 132:6,16
**timeline** 90:13 93:3
103:23

**timely** 98:17
**times** 98:19 101:20
**timing** 98:13,14
**title** 21:22 22:9,12
22:19
**today** 4:17 14:11
35:8 44:24 45:8
45:24 100:13
105:11 113:21,22
**today's** 85:8 107:5
**told** 10:14 54:10,23
76:10 80:4,8
114:11 115:7
120:6
**Tom** 115:5
**Tommy** 7:16
**total** 34:20,23 35:7
**totally** 36:24 66:22
**toters** 127:18
**touched** 59:8
**transaction** 52:21
**transcript** 131:15
132:19 134:4,5
135:8
**transcripts** 62:1,10
70:1,1
**transfer** 24:8,11,16
28:13 31:11 32:10
33:1,12,16,18
34:8,14,17 36:2
45:1 46:1 51:12
55:22 58:2,4 60:8
61:4,10 63:15
65:16
**transferring** 57:20
**Transmitted** 135:8
**treatment** 109:5
**Tri-State** 1:4 8:5
13:5 14:2 17:5
18:18,21 19:1,6
20:9 22:10,23
24:7,13,16 27:1
27:24 28:4,14,21
28:22 29:4 30:9
30:14,22,23 31:4

Sheryl Germany

March 3, 2020

Page 150

31:8 32:7,13,17
32:21,24 33:17,24
34:10,13 35:24
36:4,6,8,10,12
38:3,8,13,22
39:11,23,23 40:2
40:24 41:2 43:5
43:11,15,19 44:1
44:21 45:7 47:18
47:21 48:3 49:23
55:1,15,20 56:2
57:12 59:11,12,15
60:7,19 61:4,9
69:18 73:21 74:23
77:1,10,18,24
78:5,15 79:11,15
82:17,21,24 83:11
83:16,20 84:1,6
84:10,23 85:4,7
86:23 87:16 88:23
89:7,10,19,22,23
90:7 91:2,21,23
92:22 93:5,14
94:20,21 96:6,7
96:13 98:7 99:11
99:15,21 100:2,4
100:9,12 102:11
102:23 104:3,7
105:8,16,22,23
107:4,15,16
108:21 109:3
110:12 113:9
114:2 115:5
123:22 125:17,18
126:4 127:21
128:12 131:3
134:3 135:2
**Tri-State's** 15:1,4
34:20 37:14,20
38:17 45:24 58:11
74:1 82:1 84:8
89:4,24 90:4,8
94:22 97:3,23
103:21 107:17
113:13

**trial** 6:18
**tried** 56:24 65:23
98:20
**trucks** 104:11,12
**true** 18:15 28:18
52:23 66:19
132:14 134:5
**trustees** 70:22
71:16
**truth** 20:5
**try** 5:5 97:16
**trying** 7:23 52:1
62:24 67:19,20
69:21 111:15,15
112:20
**TS_01992** 30:10
**TS_02010** 30:11
**TS_1635** 43:10
**TS_258** 82:4
**turn** 31:19 118:14
**two** 7:18 14:14 41:6
42:3,3,10,12,13
42:15,16,19 50:13
88:10 121:3 128:3
129:12
**two-family** 41:8,13
41:15,16 43:6
**two-hour** 72:23
**type** 46:15,19 47:5
47:17,18,24 48:6
48:12,18 52:7
115:14

**U**

**ultimately** 79:15
**unable** 101:24
**uncertainty** 34:6
**undermines** 66:7
**undersigned**
132:12,21
**understand** 5:3
24:2 34:5 42:5
50:10 51:1 60:13
60:15 62:16 65:8
66:10

**understanding**
84:22
**understood** 5:21
**unequal** 109:5
**unfortunately** 50:6
68:21
**unfounded** 98:3
**unhappy** 121:9
**union** 104:11,11
**unique** 25:24
**unit** 42:4,12
**United** 1:1,15
131:1
**units** 41:4,6,7,8,14
41:15,16 42:10,13
42:15,16,19 43:7
121:2,3
**unresolved** 98:24
**unsure** 29:14 30:2
35:1 48:8,14 49:2
70:24 71:19 92:7
92:8 110:11
**updated** 20:9
**use** 53:21 61:13,18
63:9 70:18 71:4,8
71:17 72:2,5,11
73:16 74:9 76:21
77:3 78:6 79:17
83:13 84:4 87:1
88:16 89:15 94:10
96:23 98:12 109:8
113:7,15 124:12

**V**

**vacant** 46:21 47:1
**vacation** 108:10
**Valley** 46:18,19
48:13 64:7,8,10
**value** 44:18 95:23
**variable** 109:20
**various** 32:18
87:18
**vast** 125:23
**vendor** 93:10 121:6
**vendors** 82:13

102:11 109:21
**verbal** 4:24
**vice** 22:13 115:7,8
**village** 1:8,9 4:16
4:18 9:7 12:6,10
14:20 15:1,4
26:23,23 28:16,23
29:3,6,18 30:9,14
30:21,22 31:13
33:2,16,24 38:4,9
38:14,18 39:8,11
40:3,10,24 41:4
42:8 43:4,12,13
43:20 44:2,7,15
44:20 45:9,13
46:1,17 47:22
48:4,22 53:21
54:16 59:6 61:8
63:8 68:24 69:2,4
70:16,17 71:4,9
71:16,18,22,23,24
72:1 73:22 74:2,7
74:13,14,15,19,20
76:11,14 77:2,11
77:19 78:5,9,15
78:21 79:6,9,12
79:23 80:22,24
81:2 82:12,14,20
83:2,12,18,22
84:2 85:8 88:15
88:24 89:11,14,18
91:7,10,15,21,24
92:4,11,15,17,18
92:23 93:6 94:12
94:16,17,23 96:24
97:2 100:3,12
101:5,21 102:6
104:24 105:21
106:7,16 107:4,9
107:14,21 109:12
110:10,21,23
113:10,17 114:4
116:8 117:6,18
118:6,8,9 120:4,9
121:1,17,19

124:20 125:10
126:3,21 127:6
128:5,10,10,21
131:7,8 134:3
135:2
**Village's** 31:5 32:2
72:10 73:15 76:21
77:2 78:6 85:9
103:24 104:8
105:8 127:24
**violation** 27:2
106:13
**voice** 64:22 69:1
77:18 83:17,21
**voiced** 69:11,14,16
79:20
**Vorderer** 27:20
**voted** 74:8
**vs** 134:3 135:2
**vs-** 1:7 131:6

**W**

**wait** 5:5,7,11
**waiting** 102:1
**waiver** 49:10,20
**waiving** 68:12
**want** 6:12 13:16
19:23 23:17 50:1
50:9,13,14,17
67:22 68:1,7
69:22,24 70:1
77:14 82:6 97:16
98:22 108:4 114:8
114:10 115:24
122:14 123:15
129:3
**wanted** 7:9 44:6
77:15 115:2
124:11
**wants** 95:2
**wasn't** 6:17 8:20
17:11 61:23 62:11
62:21 63:1 80:8
97:7 124:1
**waste** 39:13,18

Sheryl Germany

March 3, 2020

Page 151

55:13 57:23 58:5
58:12,16 80:9,9
80:12,13,17 108:8
**wastes** 32:18
**way** 45:6 50:14,15
62:9 67:8,9 68:6
117:16 128:13
129:20
**ways** 67:18,20
**we're** 5:13 6:1 7:22
8:5,18,21 9:20
10:24 37:17 65:15
68:4,6,7 77:4 86:6
100:17 104:14
110:3 111:17
114:23 124:12
129:17 130:9
**We've** 36:23
**websites** 12:14
**week** 114:24
**WELCH** 2:10
**welcome** 113:4
**welfare** 113:9,14
**well-known** 59:7
**went** 64:23 75:2
101:18 126:15,24
128:21,23 129:1
**weren't** 117:4
120:7,7 121:17
**West** 46:5,8,16
47:15 48:10,16
49:24 87:12
**wide** 51:5
**Wisconsin** 20:23
21:17
**wish** 134:6
**withdraw** 123:19
**withdrawn** 80:18
**witness** 4:2 6:19
13:12 19:16 20:1
21:9 26:14 29:7,9
35:15 37:23 40:15
42:16 43:1 45:17
45:19 49:17 54:20
60:15,23 62:16,20

69:8,24 72:6 73:8
73:11,19 87:5,24
88:20 90:18 92:13
93:19 99:18 101:1
102:17 103:4,6,13
104:17 108:3,7
110:6,16 116:19
126:14,17 132:5
132:10,16,18
133:1 135:11,12
**witnesses** 6:22
**wondering** 7:2 62:4
**work** 15:18 25:10
57:1 85:22,23
**worked** 21:12 26:8
64:10
**working** 26:9 74:14
74:19 81:22
114:23
**works** 7:3 64:10
94:14 114:14
115:12 116:12
123:1
**world** 51:5
**worried** 103:2
**wouldn't** 62:17
84:15 124:9,22
**writes** 88:2

**X**

**XL** 20:20 21:12,14

**Y**

**yard** 22:15,16
39:13,18 115:6
116:13
**yeah** 13:12,13
19:21 20:1,2,7
29:3,23 69:9 87:5
93:19 103:2
104:17 105:1
110:14 112:4
117:12 122:12
123:9 124:5
126:18 130:9

**year** 11:19 13:7
21:13 35:4 67:10
93:16,17,18
108:16 119:20
**yearly** 43:21
**years** 4:21 22:4
26:11,20 46:21
59:8 67:10 98:23
101:20 102:10,17
102:23 120:16
127:13,17 128:3
**yesterday** 100:20
100:21

**Z**

**Z** 39:4,5
**zoning** 54:5 57:8
61:12,16 62:2,5
63:8 69:2 73:22
74:6,8,15,20
79:22 83:18 84:2
84:11,19,20,22
88:12,14,17,18,20
123:13

**0**

**01631-01667** 39:23
**084-004502** 133:9

**1**

**1** 131:16
**1:18-cv-02138** 1:6
131:5
**1:20** 130:12
**10** 3:23 86:19
**10:00** 53:5
**10:05** 1:19
**102** 1:18 2:12
**11** 122:21
**116** 3:16
**117** 3:7
**118** 109:1 110:19
**119** 3:17
**11950** 1:18 2:11
**12** 108:5
**12:00** 53:5,5

**1201** 46:5,8,16
47:14 48:9,15
49:24 87:12
**125** 3:5
**129** 3:7
**13** 33:7 43:17
**130** 131:16
**135** 105:21 108:18
**138th** 46:5,8,16
47:15 48:10,16
49:24 87:12
**13903** 20:10 22:16
24:23 28:4,6
**14** 89:22 118:16,18
118:19
**14B** 108:5,7
**15** 105:24 106:9
119:22
**16** 33:21 118:16,18
**16th** 90:23
**1978** 21:12
**199,000** 100:7
**1995** 18:22 19:3,4
22:8
**1998** 19:9,13 20:9
25:8
**1999** 26:22 30:21
31:7
**19th** 133:3

**2**

**2** 30:20 123:6
**2:00** 53:5
**20** 135:1
**200** 2:4 135:5
**2005** 25:6
**2012** 39:11 40:18
42:7 126:16,17,23
129:2
**2016** 15:1,5 54:9,11
75:10 76:8,14
**2017** 10:18 11:11
36:12,15,21 37:15
38:5 54:5 57:9
61:13,17 74:23

75:6,13 76:17
82:4 83:11 102:24
103:21 109:8,19
110:9 113:8,15
124:8
**2018** 34:24 35:5,20
36:12,15,21 37:21
38:10 90:24 91:20
91:24 92:1,2,5,10
92:23 93:6,17,18
93:21 94:1,4,8,22
95:18,22 96:15,22
98:6 99:12 100:6
102:5 105:24
106:4 119:18
**2019** 36:12,14,18
38:15 89:2 93:15
93:16,19 100:8
101:8 102:5
126:23 127:6
**2020** 1:20 3:2 36:13
36:14,19 131:14
131:21 133:3
134:2 135:1,3
**21** 3:21
**22-23** 3:23
**23** 82:4 109:2
**25** 96:14,22 99:11
105:21
**26** 118:19 122:21
**260,000** 100:5
**2810** 2:5 135:5
**28th** 18:22 124:1,2
124:8,19,22
**2nd** 123:10

**3**

**3** 1:20 3:2 31:6
42:24,24 123:10
131:14 134:2
135:3
**30** 3:12 104:14
124:11
**312** 2:6
**35** 4:21

Sheryl Germany

March 3, 2020

Page 152

| | | | | | |
|---|---|---|---|---|---|
| **39** 3:13 | **86** 3:15 | | | | |
| **4** | **9** | | | | |
| **4** 3:5 118:2,2 | **9** 33:5 | | | | |
| **4-18** 119:18 | **90-days'** 44:21 | | | | |
| **4-25-18** 97:3 | **90s** 20:21 21:13 | | | | |
| **448-7005** 2:13 | | | | | |
| **47** 34:22 | | | | | |
| **48** 34:22 | | | | | |
| **5** | | | | | |
| **5** 32:14 43:9 | | | | | |
| **5-23-18** 92:24 | | | | | |
| **50,000** 29:19 | | | | | |
| **58** 86:18 123:2 | | | | | |
| **59** 122:22,23,24 123:1 | | | | | |
| **6** | | | | | |
| **6** 108:5 | | | | | |
| **60** 103:7,10 114:3 | | | | | |
| **60,000** 120:13,15 | | | | | |
| **60463** 2:12 | | | | | |
| **60601** 2:5 135:6 | | | | | |
| **642-4414** 2:6 | | | | | |
| **65** 100:24 | | | | | |
| **671-8281** 135:17 | | | | | |
| **7** | | | | | |
| **7** 3:21 | | | | | |
| **7-23-1957** 7:12 | | | | | |
| **7-31-19** 41:5 42:23 | | | | | |
| **7,000** 95:8 121:8,11 | | | | | |
| **708** 2:13 135:17 | | | | | |
| **73** 89:21 96:11 99:24 105:13 118:16,19 | | | | | |
| **73E** 118:21 | | | | | |
| **78** 11:20 | | | | | |
| **7th** 123:5,21 | | | | | |
| **8** | | | | | |
| **8** 32:22 | | | | | |
| **8-1-12** 41:4 42:23 | | | | | |
| **80s** 20:21 | | | | | |
| **82** 3:14 | | | | | |

## SETTLEMENT AGREEMENT

### I. BACKGROUND

1. Riverdale Recycling, Inc., (RRI), owns certain improved real property located primarily within the Village of Riverdale, Illinois, (Village), which real property is co-operated by RRI and Tri-State Disposal, Inc. (TSDI). The property, fronting on the east side of Ashland Avenue, south of 138th Street and north of the Indiana Belt Harbor Railroad Company marshaling yard, is commonly known as 13901 - 13903 South Ashland Avenue (the Property).

2. Beginning in 1999, the Village notified RRI and TSDI that the Village considered that RRI and TSDI were conducting operations on the Property which were not allowed under the Illinois Environmental Protection Act, under permits issued by the Illinois Environmental Protection Agency, under the conditions of a 1994 Village-issued site location approval, under the Village's Zoning Code or under other provisions of the Village Code of Ordinances.

3. RRI and TSDI have denied and disputed the Village's conclusions concerning their operations, and have expressly asserted that their operations comply with all applicable requirements of law and permits, state and local.

4. In late 1999, RRI and TSDI filed an application with Illinois EPA seeking amendments to the then-existing permits for the design, construction and operation of the Transfer Station and Materials Recovery Facility. The Village opposed the granting of the requested amendments in comments it sent to Illinois EPA. Following IEPA's denial of the requested amendments, RRI and TSDI sought review of the denial by the Illinois Pollution Control Board, in IPCB Proceeding No. 00 - 228. The Village has been granted amicus curiae status in that pending permit denial review proceeding.

5. The parties believe that their differences are best resolved through settlement, rather than through continued litigation before the Pollution Control Board or new litigation before the Board or the Cook County Circuit Court. Each party represents that this Settlement Agreement has been negotiated in good faith, that implementation of this Agreement will avoid prolonged and complicated litigation between the parties, and that this Agreement is fair, reasonable, and in the best interests of the parties and the public.

NOW, THEREFORE, the parties enter into the following agreement:

### II. PARTIES BOUND AND AUTHORIZATIONS

6. This Settlement Agreement applies to and is binding upon the parties and their successors, transferees and assigns.



1

TS_01992

7.     The undersigned representative for each party certifies that he or she is authorized to enter into the terms and conditions of this Agreement and to legally bind such party to this Agreement, and, if the party is a corporation, that the party is in good standing in the State of Illinois.

## III.  DEFINITIONS

8.     The following words and terms, when used in this Consent Order, shall have the definitions here stated:

"Act" means the Illinois Environmental Protection Act, 415 ILCS 5/1, et seq.,

"Clean Construction or Demolition Debris" shall have the meaning provided in the Act.

"Facility" means the Property and the Transfer Station.

"General Construction or Demolition Debris" or "Construction or Demolition Debris" shall mean "general construction or demolition debris," as provided in the Act.

"Municipal Solid Waste" means "household waste" as defined in the Act and "municipal waste" as defined in the Act, with the exception of landscape waste and construction or demolition debris.

"Property" means that land area acquired by RRI from The Chicago Trust Company, as trustee under Trust No. 48-05978, and the Indiana Harbor Belt Railroad Company, as beneficial owner under said Trust, pursuant to, respectively: Trustee's Deed, dated January 16, 1996, recorded on January 25, 1996, as Document No. 96081284 by the Cook County Recorder; and, Quitclaim Deed, dated January 19, 1996, recorded on January 25, 1996, as Document No. 96081284 by the Cook County Recorder. The Property is commonly known as 13901 - 13903 South Ashland Avenue, Riverdale, Illinois. A portion of the Property is physically located in the Village of Dixmoor.

"Recyclable Materials" mean materials or products which are not solid waste, and have (i) served their intended use, (ii) been discarded by their user or consumer for disposal, reuse or recovery, and (iii) which may be valuably reused or used in place of a primary, raw or virgin material in manufacturing a product.

"RRI/TSDI" means RRI and TSDI, jointly and severally.

"Siting Conditions" mean those Conditions imposed in and through the Village's November 22, 1994 "Resolution Granting Local Siting Approval for a New

2

Regional Pollution Control Facility in the Village of Riverdale," including any Village-approved amendments to such Conditions.

"Special waste" shall have that meaning provided in the Act.

"Transfer Container" shall have that meaning provided in the Act.

"Transfer Station" means all of those appurtenances to, and improvements on, the Property which are operated by RRI and TSDI for the receipt, storage, treatment, recovery and transfer of waste and recyclable materials and for the dispatch, parking, fueling and storage of trucks and portable containers used for the transportation and storage of waste and recyclable materials.

"Waste" or "solid waste" shall have the same meaning as provided at Sections 3.53 and 3.82 of the Act and regulations of the Illinois Pollution Control Board implementing the Act, including, but not limited to, 35 Ill.Admin.Code 721.102. Any materials contaminated by, or intermixed with waste shall themselves be considered waste.

## IV. GENERAL PROVISIONS

9.    Objectives of Parties.  The parties' objectives, in entering into this Agreement, are to protect public health and welfare and the environment at and in the vicinity of the Transfer Station by the expansion and clarification of Defendants' operating plans, procedures and practices, to provide for the Village's verification of implementation of such changes, and to reimburse the Village for certain of its costs.

10.    Compliance with Applicable Law.  All activities undertaken by the parties pursuant to this Agreement shall be performed in accordance with the requirements of all applicable federal, state and local laws, ordinances and regulations.

## V. FACILITY USE

11.    Except as is otherwise specifically provided for in this Agreement, or as specifically authorized in writing by the Siting Conditions or by a duly authorized permit, RRI/TSDI shall not use the Facility for any purpose other than the following:

(a)    Loading and unloading activities:

(1)    Transfer of waste from a motor vehicle directly to another motor vehicle for transportation to an authorized off-site waste disposal, treatment or storage facility; or,

3

(2) Transfer of waste from a motor vehicle directly to the floor of a totally enclosed stationary transfer building, for recovery or storage of recyclable materials; or,

(3) Transfer of clean construction and demolition debris from a motor vehicle directly to an outdoor fenced area authorized by this Order, for recovery or storage of recyclable materials in such debris;

(4) Transfer of waste from a totally enclosed stationary transfer building to a motor vehicle for transportation to an authorized off-site waste disposal, treatment or storage facility; or,

(5) Transfer of clean construction and demolition debris from an outdoor fenced area authorized by this Order to a motor vehicle for transportation to an authorized off-site disposal, treatment or storage facility;

(6) Transfer of recyclable materials from a motor vehicle directly to a motor vehicle for transportation to an authorized site for the use, reuse or recovery of such materials; or,

(7) Transfer of recyclable materials from a motor vehicle directly to the floor of a totally enclosed stationary transfer building or an outdoor fenced area authorized by this Order, for the purpose of temporary storage; and,

(8) Transfer of recyclable materials from such building or area to a motor vehicle for transportation to an authorized site for the use, reuse or recovery of such materials.

(b) Storage of waste and recyclable materials.

(1) Storage of waste, (including construction or demolition debris), and recyclable materials in the totally enclosed stationary transfer building; and,

(2) Storage of clean construction or demolition debris or separated recyclable materials in those outdoor fenced areas described in the Site Plan, Exhibit A, and as better described in the Village-issued building permits; and,

(3) Storage of separated metal recyclable materials in portable metal containers at the southeast portion of the Property in those areas described in the Site Plan, Exhibit A, and as better described in the Village-issued building permits.

4

TS_01995

(c)   Parking of Motor Vehicles and equipment, used by RRI/TSDI in the operation of its business on the Property, in those areas described in the Site Plan, Exhibit A, and as better described in the Village-issued building permits.

(d)   Parking of Motor Vehicles operated by Defendants' employees, working at the Facility, and for Motor Vehicles operated by persons visiting the Facility, on the Property in those areas described in the Site Plan, Exhibit A, and as better described in the Village-issued building permits.

(e)   Storage of empty waste and recyclable materials containers. Such containers may be stored on the Property in those areas described in the Site Plan, Exhibit A, and as better described in the Village-issued building permits.

(f)   Once RRI/TSDI has obtained the necessary approval to conduct outside storage of construction and demolition material and other recyclable materials, that portion of the Property physically located within the Village of Dixmoor will not be used for any active waste or recyclable material storage or processing.

12.   Unless otherwise expressly authorized, the following recyclable materials may not be received or stored at the Facility:

(a)   light ballasts;

(b)   liquid or hazardous wastes, (except pursuant to § 14(a), below).

## VI. FACILITY CAPITAL IMPROVEMENTS

13.   RRI/TSDI agree to commence and complete, within six months from the date of receipt of approval by applicable governmental authority, those capital improvements to the Facility generally shown in Exhibits A and B. Generally, these are: Ashland Avenue roadway upgrades (the subject of Exhibit B, and contingent upon a revised plan to be timely submitted by RRI/TSDI and approved by the appropriate highway authority) (Exhibit B shall be submitted within 60 days following execution of this Agreement); erection of concrete walls, and fencing and screening of areas of the Property to be used for outdoor clean construction or recyclables management; grading, paving, marking and curbing of designated areas for storage of recyclable materials and clean construction or demolition debris, vehicle parking, and container storage; and, landscaping. Some empty container storage and vehicle and equipment parking may be proposed in the Site Plan in areas that will not be paved or curbed. All improvements are to be the subject of complete building applications and permits.

5

## VII. FACILITY OPERATIONS

14. <u>Limitation on Receipt of Various Wastes.</u>

(a) RRI/TSDI shall not accept, treat, store, or dispose of any solid waste at the Property if it is or contains: "hazardous waste," as defined by the Illinois Environmental Protection Act, 415 ILCS 5/1, et seq. (The "Act") or regulations adopted thereunder, except such waste as may be regulatorily exempt as having been generated by "small quantity generators" and "conditionally exempt small quantity generators," as those terms are defined in 35 Ill. Adm. Code 721.105, and which is generated by Defendants at the Facility and managed in accordance with all applicable laws, rules and regulations; "potentially infectious waste," as defined in Section 3.84 of the Act; regulated levels of "polychlorinated biphenyls," as defined in the Toxic Substances Control Act, 15 U.S.C. 2601-2692, or regulations promulgated thereunder; source, special or byproduct nuclear materials, radioactive waste or low-level radioactive waste, as defined in the Atomic Energy Act, 42 U.S.C. 2014, et seq., or the Illinois Low-Level Radioactive Waste Management Act, 420 ILCS 20/1, et seq., or regulations promulgated thereunder; "used oil," as defined in Section 3.51 of the Act. All wastes meeting the foregoing criteria, or any of them, are "Hazardous Waste" for purposes of this Agreement.

(b) RRI/TSDI shall immediately orally notify the Village Fire Marshal following discovery of any Hazardous Waste that is delivered to the Property. All such Hazardous Waste, including any residuals of its treatment or release or admixtures with other wastes, shall be removed from the Property to a lawful location within a reasonable time, not to exceed 18 hours from discovery.

(c) RRI/TSDI shall not allow the delivery of any special waste into the Facility, unless it has first been the subject of a supplemental permit from IEPA, it has passed the Facility's special waste acceptance procedures and is accompanied by an IEPA form manifest showing the Transfer Station as the delivery destination.

15. <u>Waste Service Area.</u> RRI/TSDI may receive, at the Facility, solid waste which is delivered to the Facility by motor vehicle, provided such waste is generated by a source located within 50 miles of the Facility. RRI/TSDI shall maintain records evidencing the sources of all waste delivered to the Facility.

16. <u>Limit on Facility Waste Deliveries.</u> RRI/TSDI shall not, during any moving seven-day period, allow deliveries of waste to the Facility which cumulatively exceed 6,600 tons. Defendants shall not, during any calendar year of Facility operation, allow deliveries of waste to the Facility which would cumulatively exceed 350,000 tons. Defendants shall weigh, and record

6

the weight of, every load of waste which enters the Facility grounds, using a scale tested and approved for use pursuant to the Illinois Weights and Measures Act, 225 ILCS 470/1, et seq.

17.     Preconditions to Waste and Recyclable Materials Receipts.  RRI/TSDI shall not cause, allow or accept the delivery of any solid waste or recyclable materials at the Facility unless:

(a)     There are no solid wastes or recyclable materials then at the Facility which have been stored for any period  in excess of that allowed in Section 18.

(b)     Defendants have then-existing enforceable arrangements with at least two facilities to provide lawful treatment or disposal capacity for solid wastes, or lawful use, reuse or recovery capacity for recyclable materials, of that volume and type which Defendants expect to ship from the Facility; and,

(c)     The treatment, disposal, use, reuse or recovery facilities are then operating and capable of receiving the wastes or recyclable materials.

18.     Storage of Wastes and Recyclable Materials.

(a)     No waste or recyclable materials are to be stored outside totally enclosed stationary structures except those specifically identified materials authorized to be stored in outdoor fenced areas authorized by Exhibit A and Village-issued building permits.

(b)     Wastes may be stored temporarily at the Facility only during the same day of their delivery.  No wastes may be stored on or in motor vehicles located on the Property except during the same day that the vehicle checked into the Facility.  Provided, however, wastes delivered on a Saturday or the day before a legal holiday may be stored on the following Sunday or holiday, provided the storage is in a totally enclosed, leakproof vehicle.

(c)     Notwithstanding subparagraph (b), non-recyclable construction or demolition debris may be stored at the Facility for no longer than 72 hours after receipt.

(d)     Putrescible or combustible recyclable materials may be stored temporarily at the Facility, but only within a totally enclosed stationary transfer building and for no period greater than 45 days after receipt.

(f)     Non-putrescible and non-combustible recyclable materials may be stored at the Facility for no period greater than 180 days after receipt.

19.     Motor Vehicle and Container Parking and Storage.  RRI/TSDI are allowed to park motor vehicles, and to store empty containers, in specially designated areas shown on Exhibit A,

7

and in accordance with those terms and conditions set forth in such Exhibit A and Village building permits.

20.  <u>Litter and Transfer Station Policing</u>.  RRI/TSDI agree to keep all areas at and around the Property free from loose debris or litter resulting from operation and maintenance of the Transfer Station and shall keep the public streets and adjacent areas which border the Property free of mud, dust and litter from vehicles using the Property.

## VII.  FACILITY STAFFING IMPROVEMENTS

21.  <u>Position Descriptions and Qualifications.</u>  RRI/TSDI shall develop and maintain as current a list of all jobs at the Facility.

22.  <u>Preference for Village Residents and Firms.</u>  Unless such preference violates state or federal employment or civil rights laws, or conflicts with any collective bargaining agreements to which the RRI/TSDI are a party, RRI/TSDI agree that they shall give preference to suitably skilled applicants residing in the Village before hiring applicants residing in other communities for work at the Property or in driving or maintaining vehicles used to transport waste or other materials to or from the Property, or in soliciting customers for the Facility.

23.  Unless such preference violates state or federal employment or civil rights laws, or conflicts with any collective bargaining agreements to which RRI/TSDI are a party, RRI/TSDI agree that, in awarding contracts for goods or services, they shall give preference to firms based in the Village which provide a competitive price or bid (where bidding is required) and which are capable of performing the required work, before contracting with or otherwise retaining firms based elsewhere.

24.  RRI/TSDI will notify the Village Administrator promptly of each job opening and contract opportunity at the Property not less than 48 hours before RRI/TSDI publicly announce such opening or opportunity.

## IX.  IMPROVEMENTS TO FACILITY POLICIES AND PROCEDURES

25.  Within 60 days after execution of this Agreement, RRI/TSDI shall submit improvements to each of the following written Policies and Procedures, for the consideration and approval of the Village: Health and Safety Policy; Corporate Safety and Environment Policy; Load Checking Procedures (tickets and load check form); Personnel Training; Facility Inspections; and, Equipment Testing.  The improvements shall update the information, eliminate the use of contradictory terms, and tailor the language of the policies and procedures to the operations of the Transfer Station..  Within 60 days of the execution of this Agreement, RRI/TSDI shall submit a revised Contingency and Emergency Response Plan, (including, without limitation, Fire Fighting Policy and Plan; Evacuation Plan; and, equipment inspection and testing plan), to the Village for its consideration and approval, which approval shall not be unreasonably withheld.

8

## X. FACILITY LICENSE AND PERMIT COMMITMENTS

26.    RRI/TSDI shall obtain, maintain and comply with all necessary state and federal licenses, permits, authorizations and approvals required for design, construction or operation of the Transfer Station or any other uses of or operations on the Property. RRI/TSDI shall provide the Village with a complete copy of all applications for initial, amended or supplemented permits, as well as a copy of all permits issued from local, state or federal authorities, not later than three days of after submittal of the application or receipt of the permit.

27.    RRI/TSDI shall obtain and maintain as current all Village licenses or permits necessary for design, construction or operation of the Transfer Station or other uses of or operations on the Property, including, but not limited to: (1) transfer station license, as co-permittees (Village Code Sec. 5.110.010); (2) processors/recyclers license, as co-permittees (Code Sec.5.116.010); (3) scavengers license, for TSDI only (Code Sec. 5.100.010).

28.    Unless and until they first obtain a written resolution of the Village Board of Trustees that neither conditional use approval, (pursuant to the Village's Zoning Code), nor site location approval, (pursuant to Sections 3.32 and 39.2 of the Act and Chapter 15.80 of the Village Code), is necessary, RRI/TSDI agree they will not accept, offload, separate, recycle, treat or store solid waste or recyclable materials nor maintain, store or park vehicles, containers or equipment at the Facility or Property other than in those manners and locations provided in this Agreement and its Exhibits.

## XI. FINANCIAL RESPONSIBILITY AND INDEMNITY COMMITMENTS

29.    Insurance: RRI/TSDI shall obtain, and pay the premiums on, the insurance described below, covering all activities conducted or to be conducted by RRI/TSDI on or from the Facility. Such insurance shall be maintained from the date of this Agreement until IEPA acceptance of certification that the closure period for the Facility has terminated. Under all coverages endorsements shall be included: naming the Village, its officers, agents and employees as additional insureds ; waiving subrogation against the Village, its officers, agents and employees; and prohibiting cancellation or alteration of the coverages, except upon thirty days notice to the Village. RRI/TSDI shall provide the Village with insurance certificates evidencing these coverages, and, upon the request of the Village, shall provide complete copies of the policies.

(a)    Workers' Compensation. RRI/TSDI shall carry workers' compensation and occupational diseases insurance as required by the statutes of the State of Illinois from a company authorized to do business in the State of Illinois.

(b)    Automobile Liability. RRI/TSDI shall carry in their own names, automobile liability insurance with limits of not less than One Million Dollars ($1,000,000.00) for each accident combined for property damage and bodily injury.

9

(c) <u>General Liability.</u>  RRI/TSDI shall carry in their own names, a comprehensive general liability policy covering all of their operations other than automobile, with policy limits as follows:

| | |
|---|---|
| Each occurrence: | $ 1,000,000.00 |
| Fire Damage: | 50,000.00 |
| Personal and Advertising Injury | 1,000,000.00 |
| General Aggregate | 2,000,000.00 |
| Products | 100,000.00 |

with an umbrella policy with limits of $1,000,000.00 for each occurrence in excess of the primary limits.

(d) <u>Pollution Legal Liability.</u>  In the event a suit is filed against RRI/TSDI or the Village, asserting bodily injury, property damage, nuisance or trespass arising out of RRI/TSDI's operations at the Facility or on the Property, and if RRI/TSDI's liability insurer(s) decline to defend or indemnify RRI/TSDI or the Village against such suit relying, in whole or in part, on their policy's pollution exclusion, RRI/TSDI shall, within eighteen months of the filing of such suit, obtain pollution legal liability coverage, with limits of not less than $500,000.00 per occurrence and $1,000,000.00 in the aggregate.  Provided, this requirement shall not become effective if RRI/TSDI, within the eighteen month period, settles the suit with all claimants.

30.  <u>Closure Costs Identification and Guarantee.</u>

(a) Closure plan and cost estimate.  Attached as Exhibit C is RRI/TSDI's current plan for, and good faith estimate of the amount of money which would be required to provide, closure of the Facility in accordance with requirements of law, including, without limitation, requirements established by the Illinois Pollution Control Board and permits issued to Defendants by the Illinois Environmental Protection Agency.

(b) Not later than January 30 each year, RRI/TSDI shall provide the Village with an annual good faith update of its closure plan and cost estimate

31.  <u>Agreement Binding on Transferees.</u>

(a) This Agreement shall be binding upon each of RRI/TSDI, their successors and assigns. Any transfer or sale of the Facility or the Property will include a contract provision that the Purchaser agrees to be bound by the terms of this Agreement. A "transfer" includes, but is not limited to, the sale or transfer of substantially all of the Transfer Station assets or the Property, the transfer of 50 percent or more of the shares of either RRI or

10

TSDI to an owner or owners who did not, as of January 1, 2002, cumulatively own that number of shares, the lease or sublease of the Facility or Property to any entity other than RRI/TSDI themselves, or the execution of a contract or the entry of a judicial or administrative order (for example, an order appointing a receiver or trustee) by which someone other than or in addition to RRI/TSDI will operate the Facility, in whole or in part.

(b)     In the event of a transfer, RRI/TSDI shall continue to be obligated to the Village under this Agreement with respect to acts and omissions occurring, and obligations which had accrued, prior to the date of the transfer.

32.     Indemnification.

(a)     RRI/TSDI shall defend, indemnify and hold the Village and its officers, agents and employees harmless from any and all claims, actions, costs, expenses, attorneys' fees, other fees, damages and judgments ("Liability") asserted against or in any way incurred by the Village and/or its officers, agents or employees by reason of any operations by RRI/TSDI, by any RRI/TSDI subsidiary, parent or affiliate, or by any invitee or licensee of RRI/TSDI, and/or the officers, agents, employee or assigns of any of the foregoing, at the Property, or by reason of any breach of RRI/TSDI's obligations under this Agreement, or by the negligent or wilful and wanton acts or omissions of RRI/TSDI in the performance of this Agreement. Nothing herein shall be construed to subject the Village or its officers, agents or employees to liability for negligent acts for which it and/or its officers, agents or employees are immune pursuant to common law or statute or for which they are not otherwise liable. This indemnification includes but is not limited to the actual or potential liability of the Village, in whole or in part, for any releases or threatened releases of contaminants at or from other property to which solid waste, formerly managed at the Property, has been transported (or for which the transportation has been arranged) by RRI/TSDI, their agents or successors.

(b)     Further, RRI/TSDI agree to defend, indemnify and hold the Village, its officers, agents and employees harmless from and against any Liability asserted against or incurred by the Village arising in whole or in part, out of the movement of vehicles, or the transportation or spillage of solid waste, to or from the Facility.

(c)     The Village shall defend, indemnify and hold RRI/TSDI, their officers, agents or employees harmless from any and all claims, actions, costs, expenses, attorneys' fees, other fees, damages and judgments ("Liability") asserted against or in any way incurred by RRI/TSDI and/or their officers, agents or employees by reason of any breach of the Village's obligations

11

under this Agreement, or by the wilful and wanton acts of the Village, its officers, agents or employees in the performance of this Agreement.

(d)    The obligations of this Section shall have no termination date.

33.    <u>Financial Assurance for Closure and Other Obligations.</u>.  To secure the performance of RRI/TSDI's obligations hereunder, including Facility closure in accordance with the current closure plan, RRI/TSDI shall create a fund in the form of one or more certificates of deposit, each payable only upon the joint order of RRI/TSDI and the Village. Each certificate shall be issued by a financial institution with offices in the Village, and shall be issued for a term not greater than three months with automatic rollover. The fund shall be equal to at least two times the cost of the current adjusted closure plan for the Facility, but in no event less than $50,000.00. Not less than $25,000.00 of the fund shall be established upon execution of this Agreement, with the balance to be provided not later than December 31, 2002. Thereafter, the fund principal shall be redetermined and funded within fourteen (14) days of the annual closure plan cost estimate update required by Section 29(b). In the event the fund is, at the time of annual redetermination, greater than the amount here required, the Village shall agree to release the amount of the overage to RRI/TSDI. Moneys in the fund shall be available, by order of court, to pay the costs of those obligations hereunder upon which RRI/TSDI have defaulted. Within not more than seven (7) days following a reduction of the fund below the minimum amount here provided, RRI/TSDI shall restore the fund to its full required minimum.

## XII.    ENVIRONMENTAL RESPONSIBILITY COMMITMENTS

34.    <u>Environmental Impairment.</u>  RRI/TSDI promise to correct, in a timely, lawful and reasonable manner, any environmental impairment arising out of or related to operation of the Facility.

35.    For purposes of this commitment, "environmental impairment" means the "release" or "threatened release" of any substances, pollutants, or contaminants at or from the Property so as to harm or threaten harm to human health, welfare or the environment. A "release" or "threatened release" shall have the same meaning given to such term, by definition or judicial construction, in Section 107(a) of the Comprehensive Environmental Response Compensation and Liability Act. For purposes of this commitment, the parties acknowledge that RRI/TSDI are not assuming responsibility under this Order for "environmental impairment" of the Property which existed before or is not caused by or related to the operation of the Facility. Provided, in the event that substances, pollutants or contaminants are discovered in soils, surface water or groundwater, at or under the Property, the burden shall be RRI/TSDI's to establish that the substances, pollutants or contaminants did not originate at the Facility; or that they were not the subject of a release from the Facility to the affected environmental medium. In the event RRI/TSDI meet their burden, it shall be the Village's burden to otherwise establish that the presence of the substances, pollutants or contaminants was caused by or related to the operation of the Facility. This obligation shall not terminate until the IEPA acceptance of closure certification of the Facility.

12

36. <u>Commitment to Respond to Transportation Incidents.</u> RRI/TSDI shall provide or arrange for such response actions as are directed by the Village Officer, in the event of a spill, or accident involving the threatened spill, of waste in Riverdale, involving vehicles or equipment owned or operated by or on behalf of RRI/TSDI. Regarding spills or threatened spills involving vehicles or equipment owned by customers of RRI/TSDI, RRI/TSDI will use reasonable best efforts to assist the Village in responsive actions. This commitment by RRI/TSDI is not intended to be, nor shall it be construed as, an admission by RRI/TSDI or a determination by the Village that RRI/TSDI are legally liable for such spills, accidents or response costs.

## XIII. VILLAGE HOST BENEFIT FEES

37. <u>Host Benefit Fee.</u> RRI/TSDI shall pay the Village a Host Benefit Fee and, in exchange for said Fee, the Village agrees not to levy any additional fees or taxes on RRI/TSDI's management of solid waste at the Facility. Provided, however, the foregoing shall not apply to any other fee or tax validly and uniformly made against all members of a class or taxpayers other than as owner, lessee or operator of a solid waste management facility, to any Village business license, building or land use fees, or to any fees or taxes for which RRI/TSDI are obligated pursuant to state law.

    (a)    <u>Calculation.</u> Fees shall be paid at the following rates per ton or fraction thereof of waste or recyclable materials delivered to the Facility by motor vehicle.

        (1)    $0.275, starting January 1, 2002;

        (2)    $0.325, starting January 1, 2003;

        (3)    $0.375, starting January 1, 2004;

        (4)    $0.425, starting January 1, 2005;

        (5)    $0.475, starting January 1, 2006;

        (6)    $0.525, starting January 1, 2007

        (7)    Fees shall be increased on January 1 of 2008 and each calendar year thereafter, based on the previous year's fees, in accordance with the greater of the following indices: (a) Chicago All Items Consumer Price Index Urban (CPIU); or, (b) All Urban Consumer Price Index – Garbage and trash collection (Series ID: CUUR0000SEHG02).

    (b)    <u>Minimum Annual Fee.</u> RRI/TSDI shall pay the Village the amount of $25,000.00 within 14 days of the start of each calendar year, starting January 1, 2002, such sum to be the minimum host fee for each year. The

13

minimum fee shall serve as a credit toward host fees earned on a weight basis during the remainder of the year, such that RRI/TSDI shall not be obligated to make an additional fee payment to the Village in a calendar year, until the minimum fee has been fully earned.

(c)   <u>Payment.</u> The Host Benefit Fee, when required to be paid to the Village, shall be paid to the Village on a calendar monthly basis, with payments being delivered to the Village Administrator or such other person designated by the Village Board. Payments must be received by the Village by the 45th day following the end of each reported month. Any payment not received by the Village by this deadline shall be subject to a late charge of 2% of the total monthly Host Benefit Fee. Not later than the first payment of Fees subject to an annual adjustment pursuant to subsection a.(7) above, RRI/TSDI shall provide written notice to the Village Administrator of the adjustment percentage increase, how it was calculated, and a statement of the per-ton fees for the new year.

## XIV. MISCELLANEOUS COMMITMENTS TO VILLAGE

38.   <u>Household Hazardous Waste Management Day.</u> RRI/TSDI shall provide an area of the Property for use by the Village, its agents or designated contractor, to conduct a household hazardous waste collection day once per year. Provided, however, RRI/TSDI shall have no obligation to provide for the collection, treatment, storage or disposal of such household hazardous waste. Provided, further, such collection day must be conducted in accordance with all local, state and federal laws, rules and regulations, and the Village and/or its contractor must provide a written indemnity to Defendants for any actions, costs, liability or claims arising from the conduct of said household hazardous waste collection day.

39.   <u>Village's Use of Transfer Station.</u> Until closure of the Facility, RRI/TSDI shall, at no charge to the Village, accept, receive, and manage at the Facility, and arrange for the lawful disposal of, up to 5000 pounds per calendar year of non-hazardous waste or recyclable materials generated by the Village or through Village activities, provided such may be lawfully managed at the Facility.

## XVI. VILLAGE ACCESS TO TRANSFER STATION AND RECORDS

40.   <u>Village Access to the Transfer Station.</u> The Village is currently authorized under various laws and ordinances to have access to properties such as the Property and the Facility. In the event, however, that the Village desires access to the Property or to the Facility, and does not assert authority under such laws or ordinances, RRI/TSDI agree to provide such access at reasonable times, with the Village's best efforts to provide at least one hour's oral or facsimile transmitted notice to RRI/TSDI. Inspections will be by the Village Fire Marshal, but the Village Administrator, any member of the Village Board, Corporation Counsel, Special Environmental Counsel, Village Engineer and any consultant may accompany.

14

41. <u>Emergency Response Training.</u> RRI/TSDI will, at the request of the Village's Fire Marshal (which request shall not be more often than annually), provide access to the Property and Facility to provide on-site emergency response training for those personnel responsible for planning, directing or implementing the Villages's plan for responding to foreseeable emergencies at the Facility.

42. <u>Payment for Quarterly Inspections.</u> TTI/TSDI shall pay the Village for up to four annual inspections by the Village, at flat fee of $500 per inspection. Such inspection fees shall be applied by the Village to the Fire Department. This paragraph does not obligate the Village to inspect quarterly, and RRI/TSDI shall only pay this fee for actual inspections conducted up to a maximum of four (4) per year.

43. <u>Records.</u> Upon the Village's request, RRI/TSDI will allow the Village to inspect and photocopy at the Village's expense, (RRI/TSDI shall provide up to 100 pages of copies per month without cost to the Village), records regarding the following

    (a)    those submitted by RRI/TSDI or their agents or consultants to any local, state or federal environmental, emergency response or employee health and safety regulatory agency unless a claim of business confidentiality has been asserted by Defendants and approved by the relevant agency; and,

    (b)    correspondence to or from any local, state or federal environmental, emergency response or employee health and safety regulatory agency; and,

    (c)    those filed with or received from any person, including, but not limited to, any local, state or federal regulatory agency, asserting or relevant to charges, complaints or allegations of environmental violations made by any governmental authority, citizen or citizens' group; and

    (d)    records pertaining to the origin, nature, amount and destination of solid waste or recyclable materials received at, and shipped from, the Transfer Station.

    (e)    In addition, RRI/TSDI shall, at the same time they receive or send the same, mail a copy of the following to the Village Fire Marshal:

        (1)    any communication from a regulatory agency concerning a spill or release of wastes at, on their way to or on their way from the Transfer Station, and any response by RRI/TSDI to such communication; and,

        (2)    any communication from a regulatory agency complaining of or asserting a violation or apparent violation of employee safety and health or environmental laws or regulations, and any RRI/TSDI response to such communication.

15

## XVI. PAYMENT TO CITY

44.    RRI/TSDI agrees to pay to the Village the amount of $75,000.00, upon execution of this ~~Order~~ by the parties. *AGREEMENT*

45.    Payment shall be made to the Village, by first class mail or personal delivery to the Village Manager, as follows:

1.    $40,000.00 within seven (7) days of execution of this Agreement;

2.    $20,000.00 within seven (7) days following the Village's issuance of the business licenses and building permits identified in paragraph 27 above;

3.    $15,000.00 upon the Village's issuance of its letter to the Illinois EPA, as provided in paragraph 49(a) below.

## XVII. COVENANT NOT TO SUE

46.    In consideration of this Agreement herein described, the Village covenants not to sue or otherwise make a claim against RRI/TSDI, in connection with their Transfer Station operation, with respect to: any alleged violation or breach of the Siting Conditions, Village ordinances or the Act which may have occurred on any date through the effective date of this Agreement.

47.    This covenant not to sue does not extend to, and is without prejudice to, the rights of the Village with respect to the following matters:

(a)    claims based on RRI/TSDI's failure to meet a requirement of this Agreement;

(b)    claims of the Village for contribution, defense, or indemnification from RRI/TSDI with respect to third party claims, (including those by Village employees), of bodily injury, property damage (including environmental damage) or personal injury; and,

(c)    violations or breaches which RRI/TSDI, their officers, directors, agents, employees or attorneys have intentionally failed to disclose to the Village as of the effective date of this Agreement.

48.    This covenant not to sue is not intended to be binding upon, nor does it dispose of the rights of, any third party.

16

## XVII. VILLAGE COMMITMENTS

49. As additional consideration to RRI/TSDI, and upon the condition that the referenced applications seek approval or authorization for Facility construction or operations provided for by this Agreement, the Village agrees to:

   a. submit its written support, to the IEPA, for an RRI/TSDI permit application for the outdoor storage of construction and demolition debris and recyclable materials. RRI/TSDI shall make such application within 60 days after execution of this Agreement. Such application shall supersede permit log No. 1999-298, and shall be consistent with the provisions of paragraph 11 - 19 above;

   b. grant RRI/TSDI the business licenses particularly identified in Section 27 above, upon receipt of properly completed applications and the prescribed fees therefor; and,

   c. grant RRI/TSDI any necessary building permits for construction of the capital improvements set forth in paragraph 13 above.

## XIX. NOTICES AND SUBMISSIONS

50. Except as otherwise specified by the terms of this Agreement, whenever written notice is required to be given or a report or other document is required to be sent by one party to another, it shall be directed to the individuals at the addresses specified below, unless those individuals or their successors give notice of a change to the other party in writing. All notices and submissions shall be considered effective upon the earlier of: actual delivery; three days after posting with the U.S. Postal Service; or, one day after verified facsimile transmission.

| As to the Village: | Mayor<br>Village of Riverdale<br>157 W. 144th Street<br>Riverdale, IL 60827 | and | *with a copy to:*<br>Village Corporation Counsel<br>Village of Riverdale<br>157 W. 144th Street<br>Riverdale, IL 60827 |
|---|---|---|---|
| As to RRI/TSDI | Presidents<br>RRI/Tri-State Disposal, Inc.<br>13903 S. Ashland Avenue<br>Riverdale, IL 60827 | | Mark A. LaRose<br>LaRose & Bosco, Ltd.<br>734 N. Wells Street<br>Chicago, IL 60601 |

17

TS_02008

## XX. MODIFICATION OF AGREEMENT AND ATTACHMENTS

51. Exhibits attached to this Agreement may be modified by agreement of the parties in writing. Provided, however, such agreed modifications shall not be considered an agreement that the modifications do not require Illinois EPA approval or permits.

## XXI. DISPUTE RESOLUTION AND ENFORCEMENT

52. Any dispute which arises under or with respect to this Agreement shall in the first instance be the subject of informal negotiations between the parties. The dispute shall be considered to have arisen when one party receives from the other a written notice of dispute. The period for informal negotiations shall not exceed thirty (30) days from the time the dispute arises.

53. In the event the parties cannot resolve a dispute by informal negotiations, then either party may seek formal enforcement of the Agreement by filing the appropriate legal action with the Circuit Court of Cook County.

54. In any action to enforce the provisions of this Agreement, the court shall award to the prevailing party costs of the enforcement process, including any costs of appeal and reasonable attorneys' fees.

## XXII. MISCELLANEOUS PROVISIONS

55. The provisions of this Agreement replace and supersede any prior written agreement between the Village and RRI or TSDI styled as a Host Village Agreement or TIF Redevelopment Agreement

56. If any provision or subsection hereof or the application thereof to any person or circumstance, is held invalid, the other provisions of this Agreement and/or their applicability to other persons or circumstances shall not be affected thereby. It is declared to be the intent of this Agreement that the same would have been adopted had such invalid provision, if any, not been included herein.

18

## XXIII. EFFECTIVE DATE OF AGREEMENT

57.    The effective date of this Agreement shall be the date executed by the parties.

**VILLAGE OF RIVERDALE**

By: _____
       Mayor

**RIVERDALE RECYCLING, INC.**

By: _____
       President

**TRI-STATE DISPOSAL, INC.**

By: _____
       President

19

TS_02010

AGREEMENT FOR REFUSE, RECYCABLE, YARD WASTE MATERIAL
COLLECTION/PROCESSING/DISPOSAL SERVICES

This agreement is made and entered into this 24th day of July, 2012 by and between the Village of Riverdale, Cook County Illinois, a Municipal Corporation (hereinafter referred to as the "Village") and Tri-State Disposal Inc., a Corporation organized and existing under the laws of the State of Illinois and authorized to do business in Illinois, and having its principal place of business at 13903 South Ashland Avenue, Riverdale, Illinois (hereinafter referred to as the "Contractor").

WITNESSETH:

WHEREAS:

     It is in the best interest of the Village to protect the public health and welfare by requiring that all residents' refuse, yard waste and recyclable material, as herein defined, be collected within its boundaries.

WHEREAS:

     The Contractor is qualified to provide refuse, yard waste and recyclable material collection services, properly process and or dispose of said materials as agreed; and

WHEREAS:

     The Village desires the Contractor to collect and legally dispose of refuse, and process or have yard waste and recyclable materials processed, as defined in this document, within present and future boundaries of the Village.

NOW THEREFORE:

     In consideration of the premises and the mutual promises and undertakings herein contained, the parties hereby agree as follows:

1.    DEFINATIONS & SPECIFIC PROCEDURES.

    A.    "Refuse" means:

        (1)    all household and kitchen wastes, as discarded food or food residue and paper necessarily used for wrapping, aluminum and tin cans, bottles, books, newspapers, boxes and cartons, providing all such materials are of a size sufficiently small to permit being placed in the fixed volume collection cart or in a conventional waste container or plastic bag;

Page 1 of 12


EXHIBIT
German B
3/3/2020

TS_01631

(2)    furniture, selected appliances and white goods provided each of the listed items is placed out for pickup on the designated collection day; These items are typically referred to as "bulk" items. Each stop may place out for collection a total of three (3) bulk items per week.

(3)    amounts of sod, earth and rocks, provided these items are put in suitable containers not exceeding thirty-three (33) gallon capacity and fifty (50) pounds in weight each and placed out for pickup on the designated collection day; and

(4)    home remodeling and repair construction materials and lawn furniture, home recreational equipment, etc. provided such items are put in suitable containers or in bundles not exceeding four (4) feet in length and not weighing over fifty (50) pounds per container or bundle provided the total of such described material is not to exceed one (1) cubic yard and is to be placed out for pickup on the designated collection day for that area.

B.    "Yard Waste Material" (also known as landscape waste) as herein defined shall mean grass, garden clippings, branch and tree trimmings, shrubbery and leaves shall be collected by Contractor providing all such materials are placed in separate closed "Kraft" paper bags or conventional waste containers clearly marked as containing "Yard Waste Material Only" not co-mingled with refuse, recyclables or other waste material and not exceeding thirty-three (33) gallon capacity and fifty (50) pounds in weight. Branches, smaller than four (4) inches in diameter, can be collected as yard waste, but must be bundled in four (4) foot maximum lengths.

C.    "Recyclable Material" as herein defined shall mean aluminum food and beverage containers, steel or bimetal food and beverage containers, empty (cleaned) paint containers (tin and bimetal), newsprint and all material that comes with newspapers, mixed paper, junk mail, catalogs, phonebooks), all corrugated cardboard (OCC and "Kraft" paper), glass food and beverage containers (clear, amber and green), plastics PETE #1 (soft drink, liquor bottles, food containers), HDPE #2 (milk, juice, water containers, laundry detergent, bleach bottles) shall be collected by the Contractor on the designated collection day provided said recyclables are placed in a Contractor provided recycling bin, not co-mingled with any other materials/forms of refuse and placed out in the designated collection point.

D.    "Administrator" for purposes herein shall mean the Village Administrator or designee authorized to administer the terms and conditions of this Agreement for the Village.

E.    "Residential Unit" shall mean a unit established for residential living comprised of two (2) or less units not in a complex of units.

F.    "Recycling Bin" a container designated for the collection of recyclable material.

Page 2 of 12

G.    "Stop" shall mean a residential unit, which is allowed to have a mobile collection container. In the case of a residential unit having two units it shall be considered to have two (2) stops.

2.    SERVICES. Collections shall be made from the rear lot line, alley or other mutually agreed upon location for every residential dwelling in the Village comprised of two (2) or less units not in a complex of units on a per stop basis.

The total number of stops will be determined and verified by the Contractor and the Village on or before January 31st of each calendar year. It is agreed that at the start of this agreement the number of stops is 3,285.

The Contractor shall have the exclusive right to provide service to residential units within the corporate boundaries of the Village for the term of this agreement.

3.    TERM. The term of this agreement shall be commencing on the first day of August 1, 2012, and ending at midnight July 31, 2019. At the option of the Village a one year extension of this agreement may be exercised at least sixty (60) days prior to July 31, 2019. If the prior option was executed, then at the option of the Village a one year extension of this agreement may be exercised at least sixty (60) days prior to July 31, 2020. Should the Village fail to notify the Contractor in writing that either of the foregoing options are being exercised, then the options will be considered to be exercised without further action on the part of the Village; however, in that event the Village may cancel this contract with a ninety (90) day notice to the Contractor.

4.    MINIMUM SERVICE. The Contractor agrees to furnish all labor, material and equipment to make collections of refuse, recyclables and yard waste materials in the Village, consisting of one (1) weekly collection of refuse, recyclables and yard waste materials from each stop throughout the Village and in all respects per this Agreement. Each "stop" may place out one ninety-five (95) gallon collection cart for pickup on the regularly scheduled once per week pickup day and up to 5 bags and or containers of refuse of the type and weight as specified herein. Additional items as described in Section 1 definitions "Refuse" are permitted which may not be included in containers. An unlimited number of bags and or containers of yard waste materials of the type and weight per this Agreement may also be placed out for pickup on the regularly scheduled once per week pickup day.

The Contractor will supply recycling bins free of charge to each. The bins will be of sufficient size to ensure that a weekly amount of recyclable material can be held by the bin for each stop. The Contractor will either increase the size of the bin or provide an additional bin to any stop that is exceeding the capacity of the bin with recyclable material. The Contractor will institute a system whereby a resident can notify the Contractor that their bin needs to be replaced or a second bin is required. Replacement or providing a second bin must occur within 48 hours of the resident's request.

Refuse, yard waste and recyclable material will be collected by the Contractor on the resident's regular pickup day.

Exhibit I specifies the fees to be paid to the Contractor.

Page 3 of 12

5.    ADDITIONAL SERVICE. Each stop shall be responsible for or pay for any service requested of and provided by Contractor in addition to the minimum service described in Section 4. If any such additional service is are provided the service arrangement shall be between the Contractor and the customer.

6.    HOURS. Collections shall be made between the hours of 6:00 a.m. and 5:30 p.m. on the collection day subject to such modifications as the Village may grant or require. Collections shall be made as quietly as possible.

7.    LITTER. The Contractor shall not litter premises in the process of making collections, but he shall not be required to collect material that has not been placed in approved or otherwise placed out in a manner per this Agreement.

8.    APPROVED CONTAINERS. The Contractor shall provide and maintain an adequate supply of ninety-five (95) gallon capacity mobile collection containers in order to provide each residential unit per Section 4 "Minimum Service" and Section 1 definitions of this Agreement.

Additional volumes of refuse may be place in a tightly covered metal or other non- corrodible refuse material collection container which are water-tight or in a plastic bag designed for the disposal of refuse (to be set outdoors for pickup), that does not exceed thirty-three (33) gallon capacity and does not exceed a total weight when filled of fifty (50) pounds. Metal or other non-corrodible material containers shall have secure handles for convenient lifting and carrying.

Residents may also use "Kraft" or other paper disposal bags designed for the collection and disposal of yard waste materials or conventional waste containers as long as the containers are clearly marked as containing "Yard Waste Material Only" and not co-mingled with refuse, recyclables or other waste material and not exceeding thirty-three (33) gallon capacity and fifty (50) pounds in weight. No other form of waste may be placed in the "YARD WASTE ONLY" containers.

"Containers" used for the pickup of program designated recyclable materials shall be eighteen (18) gallon recycling bins.

9.    COLLECTION EQUIPMENT. The Contractor shall provide an adequate number of collection vehicles subject to the approval of the Administrator for material collection services. All vehicles shall be kept in good repair, appearance and maintained in a sanitary condition at all times. Each vehicle shall have clearly visible on each side the name, a vehicle identification number and a local phone number of the Contractor. The Contractor shall be responsible for the safe operation, maintenance and care of said vehicles and for meeting all applicable equipment license, safety, insurance and operation indemnity requirements under law and as specified for the term of this Agreement. Vehicles used for the collection of refuse, designated recyclables and yard waste materials shall not leak fluids such as oil, hydraulic fluid; if found to do so, they shall be repaired by the Contractor within ten (10) business days of a reported incident or of knowledge by the Contractor.

10.   OFFICE. The Contractor shall establish and maintain an office through which it can be contacted for

service calls and complaints. The office shall be equipped with sufficient telephone lines to handle calls from the residents of the Village of Riverdale, it shall have a responsible staff in charge and it shall be open between 8:00 a.m. and 5:00 p.m. Monday through Friday, unless a weekday is not a collection day per this Agreement.

10. HAULING. All materials hauled by the Contractor shall be so contained, tied or enclosed so leaking, spilling or blowing of litter or fluids is prevented. In the event of any spillage on the parkway, street or alley the Contractor shall immediately clean up the litter or fluids. If such litter or fluids are not cleaned up within six (6) normal working day hours after a verbal or written notice from the Village, the Village may clean up the litter or fluids and advise and bill the Contractor.

11. TITLE TO WASTES. All refuse, yard waste, and recyclable material collected per this Agreement shall become the property of the Contractor as soon as it is placed in the Contractor's vehicle.

12. DISPOSAL.

A. All refuse and yard waste materials collected shall be disposed of and processed per all applicable statutes, laws, ordinances, rules and regulations.

For the term of this Agreement the Contractor guarantees:

(1) sufficient disposal capacity in legally permitted landfills to dispose of Village refuse, and

(2) sufficient compost or land application capacity in legally permitted sites for the disposal and composting requirements of the Village.

B. The Village may approve all disposal sites whether for refuse or yard waste. The Village reserves the right to direct where refuse and yard waste materials will be disposed of or processed. The Village understands that if it exercises this right the disposal cost of this Agreement may be increased.

C. If the Village exercises its right to direct how refuse or yard waste material will be disposed, the Village will adjust the Exhibit 1 costs.

Any adjustment to the charge on Exhibit 1 shall be adjusted at the time said costs are increased to the Contractor as a result of the Village exercising its right as stated in paragraph 13, section B.

13. MUNICIPAL SERVICES TO BE PROVIDED BY THE CONTRACTOR. The following services are to be provided by the Contractor at no additional cost to the Village for the term of this Agreement.

A. The Contractor shall provide, at no additional charge, refuse disposal services (containers and collection of refuse and waste materials) to the Village's municipally owned facilities per Exhibit

Page 5 of 12

l. Should additional containers be required by the Village said containers and pickup of refuse from those containers will be provided by the Contractor during the term of this Agreement. Street containers listed in Exhibit 1 will be purchased and maintained by the Village.

B.   Contractor shall conduct each year a Spring Clean Up, whereby residents will be permitted to place out for collection any additional non-hazardous residentially generated waste materials for no extra charge. Waste material will placed out on a mutually agreed upon Saturday during the Riverdale public school spring break vacation and Contractor will collect the refuse.

C.   Christmas holiday trees will be picked up by the Contractor if said trees are placed out along side refuse containers on the resident's regularly scheduled yard waste collection day during the last full week of December and the first two weeks of January.

15.   LOCATION FOR PICKUP. Contractor shall collect all refuse, yard waste and recyclable materials placed at the rear lot line of each residence (alley collection) unless otherwise specified by the Village. Contractor shall replace collection containers in an upright position at the pickup location after collection is made.

16.   WHEN CONTRACTOR IS NOT REQUIRED TO PROVIDE SERVICE.

A.   If a residence uses service for disposal of refuse not generated at the residence.

B.   If over fifty percent of the materials to be collected are generated out of the performance of a business at a residential location the Contractor is not obligated to collect said business generated refuse from that residence under the terms of this Agreement.

C.   If a resident does not place materials out for collection per Section 15 on the designated collection day per Section 17.

D.   If a resident does not pay for any portion of a service bill within sixty (60) days from the date of any billing.

E.   The Contractor must suspend service to a resident if the Village requests.

F.   If a resident places materials out for collection which are defined by the environmental Protection Agency (EPA) as hazardous, banned, or special waste.

17.   SCHEDULES. The Contractor will inform the general public on conditions pertaining to pickup via a customer flier with copy approved by the Administrator and by providing a copy to the Administrator for publication in the Village Newsletter or release to a newspaper of local circulation in the Village.

The Village shall approve the days for collection in the Village. Should a holiday (Christmas Day, Thanksgiving Day, News Years Day, Fourth of July, Memorial Day, Labor Day) fall on or before a

Page 6 of 12

design ated pickup day, all pick ups will be delayed one day for that week only. The contractor has establi shed pickup routes within the Village boundaries. Any change to the routing schedule must meet with t  ie approval of the Administrator.

Collec able materials are to be will be placed out for pickup no later than 6:00 a.m. on the day of collec ion.

18. CUS1 DMER COMPLAINTS. All complaints shall be resolved within 24 hours. When the complaint is receiv d after normal business hours, or on the day preceding a holiday, or on a Saturday, it shall be servic d on the next working day.

19. NOTI FICATION. The Contractor shall notify the Village of the need to notify all residents served about compl int procedures, rates, regulations and the day of collection. This notification by the Contractor shall c cur no less than one month but no more than two months before any change shall be effective.

20. CON1 RACTOR'S PERSONNEL.

   A.  Contractor shall assign a qualified person or persons to be in charge of its operations in the Village and shall give the names to the Administrator, upon request.

   B.  All collection employees shall wear a work uniform and the uniform is to clearly indicate the employee is employed by the Contractor.

   C.  Contractor's employees driving a vehicle shall, at all times carry a valid Illinois operator's license for the type of vehicle the individual is operating.

   D.  Contractor shall require all employees to perform services in a workman like manner.

21. COM 'LIANCE WITH LAWS. The Contractor shall conduct operations under this Agreement in compl ance will all federal, state and local laws, ordinances and regulations.

22. INSU :ANCE INDEMNITY AND HOLD HARMLESS. The Contractor shall maintain all insurance cover ge required by law. In addition, the Contractor shall carry, at its own expense at least the follow ing insurance coverage:

   A.  General Liability:

       (1)  Bodily injury, with limits of not less than one million dollars ($1,000,000.00) per occurrence and two million dollars ($2,000,000.00) aggregate, and

       (2)  Property damage, with limits of not less than one million dollars ($1,000,000.00) per occurrence and two million dollars ($2,000,000.00) aggregate.

Page 7 of 12

B.  Automotive Liability:

This insurance must include non-owned, hired, leased or rented vehicles as well as owned vehicles.

(1)  Bodily injury with limits of not less than one million ($1,000,000.00) per occurrence and two million ($2,000,000.00) aggregate, and

(2)  Property damage with limits of not less than one million ($1,000,000.00) per occurrence and two million ($2,000,000.00) aggregate.

D.  An excess umbrella liability policy shall be provided with minimum limits of two million dollars ($2,000,000.00) per occurrence and in the aggregate.

The Contractor will name the Village of Riverdale as additional insured under all insurance policies. The Contractor will prove that all insurance is in full force and effect by filing a Certificate of Insurance with the Village Clerk. No policy shall permit termination or modification without at least ten (10) days prior written notice to the Village. A new Certificate of Insurance shall be filed with the Village Clerk at least ten (10) days prior to the expiration or termination of an existing policy of insurance.

The Contractor shall also provide Workmen's Compensation Insurance in the amounts required by statute. Proof shall be filed with the Village Clerk that all such insurance is in full force and in effect including the same terms as defined above with respect to termination and modification.

The amount of insurance required shall in no way limit the amount of insurance that the Contractor may carry, and in no way limits the liability of the Contractor for any and all liability of Contractor in connection with this Agreement. Written notice shall be given to the Village by the Contractor of any claims against the Contractor for damages for injury to persons or property within thirty (30) days after knowledge of such claim. Failure to give such notice in a timely fashion shall not Affect Contractor's liability per this Agreement.

The Contractor shall indemnify and hold harmless the Village, its officers, agents and employees against injuries or death of an person or persons, and the Contractor shall defend, indemnify and hold harmless the Village, its officers, agents and employees from any and all claims, demands, suits, actions or proceedings of any kind or nature whatsoever, including worker's compensation claims of or by anyone whomsoever, in any way resulting from or arising out of the operations in connection with the performance of this Agreement including destruction or damage to any property, contamination of or adverse effects on the environment (including Federal and State Superfund investigations, fines, assessments or remedial actions) including operations of subcontractors and acts or omissions of employees or agents of the Contractor or its subcontractors; provided however that the Contractor shall not be liable for any suits, actions, legal proceedings, claims, demands, costs, expenses and attorney's fees arising out of the award of this contract or a willful or negligent act or omission of the Village, its officers, agents and employees.

Page 8 of 12

23. ASSIGNMENTS. No assignment in whole or in part of this Agreement shall be made by the Contractor without the express written consent of the Village. In the event of any assignment, the assignee shall assume the liability of the Contractor and the Contractor shall not be relieved there from without the Village's consent.

24. BANKRUPTCY. It is agreed that if the Contractor is adjudged bankrupt, either voluntarily or involuntarily then this agreement shall terminate effective on the day and at the time the bankruptcy petition is filed, subject however to the Village's rights to recover for any under breach under such contract. The Contractor shall list the Village as a creditor in any bankruptcy filing.

25. PERMITS AND LICENSES. The Contractor shall obtain at his own expense all permits and licenses required by Federal, State or local law or ordinance, rule or regulation and maintain same in full force and effect.

26. STANDARD OF PERFORMANCE.

   A.  If the Contractor fails to collect materials per this Agreement for a period in excess of two (2) consecutive, scheduled, working days or fails to perform per the terms of this Agreement in a satisfactory manner as determined by the Village, the Village may, but shall not be required to take the following action.

      (1)  Notify the Contractor in writing of its default under the Agreement and that this Agreement will be terminated unless the Contractor shall perform to the satisfaction of the Village within five (5) days of the date of the aforesaid notice was mailed by the Village. In the event the default is not cured the Village may terminate this Agreement and the Village's obligation and Contractor's rights hereunder shall cease and be of no further force and effect.

      (2)  The Village shall have the right to contract with another party to collect garbage and refuse materials should the Contractor not perform a specified in this Agreement and any expenses incurred by the Village which are not satisfied by the revenues generated from the existing rates herein specified shall be charged to the Contractor.

   B.  Contractor agrees that in the event Contractor fails to fulfill any of the provisions stipulated in this Agreement, the Village may at its option, without waiving any of its other rights, hire such individuals and equipment and enter such contracts as it may deem necessary to perform the work described in this Agreement. In addition, the Village shall be entitled to all losses, including all costs, expenses and attorney's fees arising out of or in conjunction with or otherwise resulting from such failure of performance on the part of the Contractor.

   C.  Payment for Completed Work. In the event of any termination or suspension under this Agreement above, Contractor shall have the right to be paid for all work done prior to the

Page 9 of 12

effective date of such termination or suspension and to be paid for all work done per the requirements of this Agreement and for all costs pertaining to the work, exclusive of overhead and profit, as the Contractor may have reasonably and necessarily incurred as the result of such termination or suspension.

27.    LAW TO GOVERN AND VENUE. This agreement shall be governed by the laws of the State of Illinoi, both as to interpretation and performance and venue shall be Cook County, Illinois.

28.    MODIFICATION. This Agreement constitutes the entire Agreement and understanding between the parties hereto, and it shall not be considered modified changed or amended in any respect unless in writing, and signed by the parties hereto.

29.    RIGHT TO REQUIRE PERFORMANCE. The failure of the Village at anytime to require performance by the Contractor of any provisions hereof shall in no way affect the right of the Village hereafter to enforce same.


**VILLAGE OF RIVERDALE**

Date: July 31, 2012

By: _____
         Village President

Attest: _____
         Village Secretary


**TRI-STATE DISPOSAL INC.**

Date: September 13, 2012

By: _____
         President

Attest: _____
         Secretary


Page 10 of 12

EXHIBIT 1

CHARGES AND RATES FOR SERVICES

For the service provide per this Agreement, the Contractor shall charge according to the following schedule:

Beginning August 1, 2012 the cost would be $18.77 per home/per month*

*This rate will be adjusted yearly on the anniversary date of the contract by CPI-U (Garbage and Trash Collection)

With execution of this contract, the Contractor will give the first month (August 2012) of service at no charge to the Village, provided this contract is executed no later than July 3 , 2012.

These prices include the removal of general debris, recyclables and yard waste (May through October).

| | |
|---|---|
| Multi-Family Units | Tri-State Disposal Inc. will provide two (2) ninety-five (95) gallon collection carts at each of the two flat buildings within the Village. |
| Municipal Garage | Tri-State Disposal Inc. will provide two (2) ninety-five (95) gallon collection carts and one (1) 1.5-yard container at Riverdale's municipal garage and empty them once a week at no charge. The 30-yard box we would provide would be emptied on an on call basis for the price of $325.00 per pick-Up. |
| Village Hall | Tri-State Disposal Inc. will provide two (2) 1.5-yard containers that would be emptied twice a week on Monday and Thursday at no charge. |
| Firehouse | Tri-State Disposal Inc. will provide two (2) 1.5-yard containers that would be emptied twice a week on Monday and Thursday at no charge. |
| Spring Clean | Up Tri-State Disposal will conduct a Spring Clean Up program each year, whereby residents will be permitted to place out for collection any additional non-hazardous residentially generated waste materials for no extra charge. Waste material will placed out on a mutually agreed upon Saturday during the Riverdale public school spring break. |

Tri-State Disposal, Inc. will except at its transfer station up to 15 tons per calendar month of municipal garbage, wood chips, logs, leaves, couches etc. at no cost to the village. The Village of Riverdale's public works department would be responsible for transporting these materials. Should the village dispose of more than 15 tons of material at our transfer station during any calendar month, they will be billed at the rate of $42.00 per ton for all amounts in excess of the monthly allowance. (This disposal rate is to be adjusted yearly by CPI-U on the anniversary date of this contract)

Page 11 of 12

TS_01641

The Contracto shall invoice the Village on the last business day of each month for the term of the Agreement for the fixed volume service provided. (Units served, verified on or before January 31st of each calendar year, during the term of this Agreement multiplied by the current unit cost per month.) The number of stops shall be determined pe Section 2 of this Agreement. The Village shall reimburse Contractor within fifteen (15) business days of receipt of monthly invoice.

The Contracto will furnish each stop with one (1) brand new ninety-five (95) gallon collection cart within the first twelve (12) months of this contract. At the end of this contract, all collection carts delivered within the Village will remain the property of the Village at that time.

TS_01642

# Statement Aging Detail by Bill To Name

As of 8/25/2018 at 12:32:27PM

**TRI-STATE DISPOSAL INC**
PO BOX 627
RIVERDALE, IL 60827
708.388.9910
www.tri-statedisposal.com

| Act Nbr | Customer / Address / Phone | Current | Over 30 | Over 60 | Over 90 | Total | Inv Nbr | Inv Date | Inv Balance | Age |
|---------|---------------------------|---------|---------|---------|---------|-------|---------|----------|-------------|-----|
| 1216001 | TSDI-RIVERDALE<br>CONTRACT FOR RESIDENTIAL, RIVERDA<br>708-841-2200 | $64,918.64 | $0.00 | $0.00 | $0.00 | $64,918.64 | | | | |
| | | | | | | | 817557 | 7/31/18 | $64,918.64 | 25 |
| | | | | | | | | | $64,918.64 | |
| 1216005 | RIVERDALE, VILLAGE OF<br>14101 S HALSTED, RIVERDALE<br>708-841-2200 | $670.18 | $0.00 | $0.00 | $0.00 | $670.18 | | | | |
| | | | | | | | 817559 | 7/31/18 | $670.18 | 25 |
| | | | | | | | | | $670.18 | |

**Total of all accounts:**     **$65,588.82**

TS_01666

Generated by: COREASP\TSDJeffG on 8/25/2018 at 12:32:23PM
P:\EnCORE\TSD\Reports\_Custom Reports\Statement Aging Detail by Bill To Name.rpt
Page 1 of 1

RECEIVED OCT 2 : 2017



# VILLAGE OF RIVERDALE
157 WEST 144ᵗʰ STREET, RIVERDALE, IL 60827
PHONE (708) 841-2200 • FAX (708) 896-6570

Lawrence L. Jackson
Mayor

October 23, 2017

Tri-State Disposal Inc.
c/o Sheryl Germany, President
13903 S. Ashland Avenue
Riverdale, Illinois 60827

Re:    *Notice of Request for Qualifications*

Dear Ms. Germany:

The Village is contemplating alternative vendors for the provision of refuse, recyclable, yard waste material collection and disposal services in the Village going forward, and intends to issue an RFQ. You are encouraged to participate in the bid process. In the interim, and until an award of a new contract, the Village expects Tri-State to continue to provide services under the current arrangement. Please contact us with any questions.

Best regards,

Lawrence L. Jackson
Mayor

XC·     Karen Holcomb
        Timothy Williams
        Jerome Russell
        Matt Welch
        File



## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| TRI-STATE DISPOSAL, INC., an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 18-CV-02138 |
| vs. | ) ) | Judge Sara L. Ellis |
| THE VILLAGE OF RIVERDALE, a municipal corporation; and LAWRENCE L. JACKSON, Mayor of the Village of Riverdale, | ) ) ) ) ) | Magistrate Judge Mary M. Rowland |
| Defendants. | ) ) | |

### SECOND AMENDED COMPLAINT

Plaintiff, Tri-State Disposal, Inc., an Illinois corporation ("Tri-State"), by and through its attorneys, Mark A. LaRose, Marissa Alaska and LaRose & Bosco, Ltd, hereby brings its Second Amended Complaint against The Village of Riverdale, and Lawrence L. Jackson, Mayor of the Village of Riverdale, and in support hereof states as follows:

**I.     Introduction and Summary**

1.     This Complaint challenges Ordinance Number 2017-22 passed by the Village of Riverdale on November 28, 2017 granting a conditional use of Riverdale Materials, LLC to allow it to conduct a waste collection operation at 1201 W. 138th Street, Riverdale, Illinois. *(See* **Exhibit 1,** Village of Riverdale Ordinance Number 2017-22). It also challenges the Village's actions in retaliating against the plaintiff for the plaintiff's exercise of its first amendment rights.

2.     At every stage of the proceedings before the Village of Riverdale Zoning Board of Appeals and the Village Board, Tri-State challenged the ordinance on procedural and substantive grounds.



3.      This lawsuit challenges the procedure (or lack thereof) that resulted in the Village

passing said arbitrary and capricious ordinance, not only because the ordinance is detrimental to

the public health, safety and environment of the Village of Riverdale, but because it is

specifically detrimental to Tri-State, as the ordinance results in unequal treatment of Tri-State.

## II.      The Parties

4.      Tri-State Disposal, Inc. is an Illinois corporation that operates a solid waste

transfer station at 13903 S. Ashland Avenue in the Village of Riverdale, County of Cook,

Illinois.

5.      The Village of Riverdale is a municipal corporation operating in Riverdale,

County of Cook, Illinois.

6.      Lawrence L. Jackson is the Mayor of the Village of Riverdale, and is an elected

official who resides in Riverdale, County of Cook, Illinois.

## III.      Jurisdiction and Venue

7.      Jurisdiction for the federal claims (Counts I, II, III, and IV ) is proper in the

Northern District of Illinois, Eastern Division, pursuant to 42 U.S.C. §1983 and 28 U.S.C. §

1331, which provides that the district court shall have original jurisdiction of all civil actions

arising under the Constitution, laws, or treaties of the United States. Jurisdiction for the non-

federal claims (Count V) is proper pursuant to 28 U.S. Code § 1367(a), which provides that the

district court shall have supplemental jurisdiction over all other claims that are so related to

claims in the action within such original jurisdiction that they form part of the same case or

controversy under Article III of the United States Constitution.

8.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because defendants reside in this

district, and all of the actions of the defendant(s) occurred in this district.

## IV.    Common Allegations

### A.    Tri-State Disposal, Inc.

9.      Tri-State is an Illinois corporation that operates a solid waste and construction and demolition transfer station at 13903 S. Ashland Avenue, Riverdale, Illinois.

10.     As part of its operation, the Village of Riverdale requires Tri-State to post a $50,000 CD as security for closure/post-closure and clean up of the site. This CD is still in place for the benefit of the Village of Riverdale and its residents.

11.     The Village of Riverdale also requires Tri-State to pay royalties to the Village of Riverdale based on every ton of waste that is processed through its site.

12.     Tri-State also has rigorous requirements for permitting and environmental matters through the Illinois Environmental Protection Agency, Cook County Department of Environment, the Village of Riverdale, etc.

13.     Tri-State's facility is less than one mile from Riverdale Materials' site.

14.     Tri-State also owns real property immediately adjacent to the Riverdale Materials site, an approximate one acre retention pond. ("Retention Pond").

15.     The Retention Pond is adversely affected by runoff and other drainage from the Riverdale Materials site.

16.     Tri-State appeared at the Zoning Board of Appeals hearings on September 7, 2017 and November 2, 2017, and submitted documents at those hearings. See **Exhibit 2**, Tri-State submittal dated September 7, 2017, and **Exhibit 3**, Tri-State submittal dated November 2, 2017.

17.     Tri-State also appeared at the Village Board Meeting where the subject ordinance was passed, and attempted to present additional materials in opposition to the ordinance. See **Exhibit 4**, Tri-State's proposed verified submittal dated November 28, 2017. That attempt was

denied by the Village attorney at the board meeting. See **Exhibit 5**, Transcript of hearing held on November 28, 2017, at pp. 7-10.

18.     Transcripts of all of the hearings are attached hereto as **Exhibit 5** Transcript of hearing held on November 28, 2017; **Exhibit 6**, Transcript of hearing held on November 2, 2017; **Exhibit 7**, Transcript of hearing held on September 7, 2017.

**B.     Riverdale Materials, LLC**

19.     Riverdale Materials, LLC is a start-up company that originally applied for a solid waste transfer station, construction demolition transfer station, dirt transfer station, and stone processing facility. (See **Exhibit 8**, Riverdale Materials Conditional Use Application)

20.     After Tri-State objected, Riverdale Materials deleted from its application its request for a solid waste (trash) transfer station, but the remainder of its application stood unaffected. (See **Exhibit 9**, Riverdale Materials Amended Conditional Use Application)

21.     During the course of the hearings before the Zoning Board of Appeals, representatives from Riverdale Materials made material misrepresentations of fact in testifying in support of its application, including the following:

(a)     misrepresentations about drainage and runoff into the retention pond that Riverdale Materials does not own and has no right to use;

(b)     misrepresentations about the environmental condition of the property;

(c)     misrepresentations about having all of the necessary permits to operate the site.

22.     Riverdale Materials was operating the site during the entire period that its application for a conditional use was pending, despite the fact that it did not have the proper permits, nor did it have a conditional use approval.

C.       **The Riverdale Materials Site**

23.       The Riverdale Materials' site is the site of a former landfill that operated from the 1940's to 1962, when the operation was shut down by the courts.

24.       In 1962 the Illinois Appellate Court held that the dump located on the property was both a statutory public nuisance violative of the Illinois Criminal Code and a common law public nuisance, and operation of the dump was permanently enjoined. *City of Chicago v. Fritz*, 36 Ill. App. 2d 457, 184 N.E.2d 713 (Ill. App. Ct. 1962) (*see* **Exhibit 10,** attached).

25.       The dump was used for the deposit of garbage, refuse, chemicals, sludge, waste material and other substances. (**Exhibit 10**).

26.       Additionally, the Court found that the "dump burned seven days a week; that about fifty trucks a day dumped garbage and that chemical and septic tank waste were also dumped there." (**Exhibit 10** at 463).

27.       The Court also found that the dump was burned on a 24-hour basis, and "flames in the dump shoot hundreds of feet into the air, that the flames were caused by magnesium burning, and that the magnesium smoke would rise hundreds of feet in the air and then explode." (**Exhibit 10**)

28.       Accordingly, the Appellate Court affirmed permanently closing the dump due to the horrendous and dangerous environmental condition of the property.

29.       The site remains an unremediated, unlined hazardous waste landfill.

30.       The environmental condition of the site is such that the surface is unimproved, and placing more waste on top of the site will only increase the detrimental and environmental condition of the site.

31.     Riverdale Materials' application states that it proposes to use the site for delivery and processing of municipal solid waste in the form of street sweepings from the City of Chicago.

32.     Riverdale Materials' application and testimony identified an "on-site" retention pond to be used for drainage and storm water control. In reality, the retention pond is not "on" Riverdale Materials' site, is not owned by Riverdale Materials, and Riverdale Materials has no right to use the retention pond.

33.     The site has a substantial adverse effect on the adjacent Retention Pond owned by Tri-State.

**D.      The Village of Riverdale Zoning Board of Appeals Hearings**

34.     The Village ordinance requires that a conditional use be subject to hearings and recommendation by the Village Plan Commission.  Riverdale, Illinois, Municipal Code §17.03.040 and § 17.03.110.

35.     However, the Village of Riverdale does not have a Plan Commission. The Public Notices with respect to the hearings identify that the hearings would be held before the Zoning Board of Appeals "sitting as the Plan Commission."  (See **Exhibit 11**, Public Notices for September 7, 2017 and November 2, 2017 Zoning Board of Appeals hearings)

36.     There are no documents, records, etc. identifying that the Zoning Board of Appeals was ever compiled, appointed, or certified as the Plan Commission, or to "act" as the Plan Commission.

37.     As such, the entire process under which the hearings was not in accordance with the Village Zoning Ordinance.

38.     The hearings before the Zoning Board of Appeals were also improper and illegal, since in the middle of the hearing process, and after substantive testimony had been given, Mayor Lawrence Jackson fired the chairperson of the Zoning Board of Appeals, and loaded the Zoning Board of Appeals with persons politically connected to the mayor.

39.     The newly-appointed persons had not heard any of the substantive testimony to date, were unfamiliar with the situation.

40.     The Zoning Board of Appeals hearings were also improper because they were chaired by Village Attorney Matt Welch or Matthew Ingersoll, from the law firm Montana and Welch, without any authority to do so. There is no statute, rule, regulation or ordinance that allows for or authorizes the Village attorney to chair the Zoning Board of Appeals and/or Plan Commission meetings.

41.     Not only did Matt Welch chair the hearings, make rulings on evidence, but he specifically persuaded the members of the Zoning Board of Appeals that the ordinance should be passed, and which conditions should apply.

42.     The involvement of the Village Attorney in *de facto* chairing the Zoning Board of Appeals meetings was objected to both by Tri-State and several members of the public during the hearings.

43.     During the Zoning Board of Appeals hearing on November 2, 2017, **thirteen (13)** members of the public gave testimony and opposition on the proposed conditional use, including Carmelia Shipp, Ms. Horton, Thomas Watson, James Reynolds, Deyon Dean, Roy McKay, William Clark, Cynthia Gilmore, Kay Randall, Janice Sims, Paula Williams, Patricia Plevens, and Ms. Meadors. The objections included:

(a)     Riverdale Materials' proposed facility would endanger public health due to a history of contamination at the proposed site, which was previously the subject of a lawsuit due to the pollution;

(b)     Riverdale residents suffer the effects of low property values, and granting the conditional use would cause property values to decline and worsen the issue;

(c)     Riverdale Materials' facility did not have adequate drainage;

(d)     Riverdale has no need for a new transfer station, particularly in such close proximity (within .5 miles) of a transfer station that performs the same functions proposed by Riverdale Materials;

(e)     Riverdale Materials was already operating without the required permits;

(f)     Riverdale Materials was illegally dumping and covering it up.

44.     On November 2, 2017, Riverdale Materials submitted documentation to the Zoning Board of Appeals in an attempt to support its false contention that it had obtained all of the permits required in order to operate, when in reality it began operating before it obtained an IEPA permit. (See **Exhibit 12**, Permit Summary).

45.     Riverdale Materials testified at the November 2, 2017 hearing that it covered up contaminated dirt at the site. Tom Mate, general manager of the facility, testified, "You could see where the land was, and I put 2 feet of bricks and concrete over the contaminated stuff because that's what we were told to do. Then we covered with crush stone. Then we put asphalt grinds six inches thick on the material." (See **Exhibit 6**, November 2, 2017 transcript of hearing at p. 80).

46.     On November 2, 2017, the Zoning Board of Appeals voted 4 to 2 to recommend to the Village Board granting the conditional use.

### E.    Actions of the Village of Riverdale

47.    At the time that the ordinance passed at the hearing on November 28, 2017, Mayor Lawrence L. Jackson was the President of the Village Board.

48.    Despite strong opposition from the plaintiff and the public, this matter was politically rigged from the beginning in favor of Riverdale Materials and to the detriment of the people of the Village of Riverdale, and their health, safety, welfare and environment, and to other businesses in Riverdale, including that of the plaintiff.

49.    Mayor Jackson was a vocal proponent of the project. He even had a sign with his picture posted at the Riverdale Materials' site stating "ANOTHER BUSINESS BROUGHT TO YOU BY THE HONORABLE MAYOR LAWRENCE JACKSON."

### F.    The Ordinance

50.    On November 28, 2017, ordinance number 2017-22 was passed by unanimous vote without any ability for the public to present any public comment to the board.

51.    This arbitrary and capricious ordinance was passed without any requirement that Riverdale Materials post any bond, CD, or security for closure, post-closure, or clean-up of the site, and without any requirement for Riverdale Materials to pay any royalties to the Village. Yet, unlike Riverdale Materials, Tri-Sate has been burdened to comply with all of these requirements as well as others.

52.    The ordinance also passed despite the documented history of environmental contamination and the lack of any on site storm water or drainage facility.

### G.    First Amendment Retaliation

53.    Prior to August 2017, the Plaintiff generally supported the administration of Lawrence J. Jackson.

54.     When it became known that a competing disposal business was proposing to come into Riverdale and was supported by Mayor Jackson's regime, Mayor Jackson assured representatives of the plaintiff that all proper procedures for giving permits and necessary authorizations to Riverdale Materials would be followed, and that Riverdale Materials would be required to post security and to pay royalties to the Village like the plaintiff has been required to do for many years.

55.     It soon became evident that none of that was true.

56.     The proceedings were a mere sham for the will of the Jackson administration, and did not include any provisions to protect the public health and safety, to require Riverdale Materials to post any security, or to require Riverdale Materials to pay royalties.

57.     Once this became evident, Tri-State issued public statements protected by the first amendment critical of the process, critical of Mayor Jackson's administration, and critical of the lack of any protection afforded to the general public regarding the health, safety and welfare of the residents of the Village of Riverdale.

58.     Those criticisms include:

        (a)     Criticisms about hazardous waste;

        (b)     Criticisms about the already contaminated state of the proposed Riverdale Materials'' site;

        (c)     Criticisms about storm water runoff and the lack of adequate drainage;

        (d)     Criticisms about the lack of any financial security required by the Village to be posted by Riverdale Materials;

        (e)     Criticisms about the lack of any requirement that Riverdale Materials pay any royalties to the Village;

(f)     Criticisms about how Riverdale Materials' site will cause a decline in adjoining property values;

(g)     Criticisms about there being no need for an additional waste transfer station in Riverdale;

(h)     Criticisms about Mayor Jackson stacking the deck with the planning commission and the zoning board of appeals;

(i)     Criticisms about improper procedures used at the public hearings; and,

(j)     Various other criticisms.

59.     All the criticisms set forth in paragraph 54(a)-(j), above, are set forth in the following exhibits to Plaintiff's original Verified Complaint: **Exhibit 2** (Tri-State's September 7, 2017 submittal); **Exhibit 3** (Tri-State's November 2, 2017 submittal); **Exhibit 4** (Tri-State's November 28, 2017 proposed verified submittal); **Exhibit 5** (November 28, 2017 transcript of hearing); **Exhibit 6** (November 2, 2017 transcript of hearing); **Exhibit 7** (September 7, 2017 transcript of hearing); **Exhibit 10** (Illinois Appellate court case *City of Chicago v. Fritz*, 36 Ill.App.2d 457, 184 N.E.2d 713 (Ill. App. Ct. 1962); and **Exhibit 14** (Photo of Mayor Jackson posted on a sign at Riverdale Materials' site).

60.     At the final public hearing, Mayor Jackson did not allow any further criticism or testimony before a vote was taken in the Riverdale Materials' matter, and he and the village attorney refused to put into the record additional written criticisms by the plaintiff and its representatives. (*See* **Exhibit 4** to Plaintiff's original Verified Complaint, Tri-State's proposed verified submittal dated November 28, 2017)

61.     The Village of Riverdale and the plaintiff have entered into a long-term written contract that requires, among other things:

      (a)     Tri-State to pick up trash from the Village residents;

      (b)     Tri-State to conduct a spring clean-up;

      (c)     Village of Riverdale to pay Tri-State for invoices within 15 days;

      (d)     Tri-State to post a $50,000 CD for the benefit of Village of Riverdale as security for its site;

      (e)     Tri-State to pay royalties to Village of Riverdale, which it has done, in excess of $1 million over the last 15 years.

62.    The contract between the Village of Riverdale and the Plaintiff that relates to paragraph 57(a)-(c), above, is entitled Agreement for Refuse, Recyclable, Yard Waste Material Collection/Processing/Disposal Services. This agreement is dated July 24, 2012, is in full force and effect and runs until July 31, 2019. Tri-State Disposal has fulfilled all of its obligations under this contract, without incident or complaint.

63.    The provisions that relate to paragraph 57(d)-(e), above, are pursuant to a settlement agreement between the Village of Riverdale and the Plaintiff, which addresses Village Host Benefit Fees. Tri-State Disposal has fulfilled all of its obligations under this contract, without incident or complaint.

64.    On or before March 16, 2018, Tri-State representatives made at least two phone calls to the public works department in order to schedule the Spring Clean Up and comply with its contract.

65.    Having had no response from the Village, on March 16, 2018, Tri-State sent an e-mail to Mr. Russell regarding scheduling the Spring Clean Up.

66.     Still having received no response from anyone from the Village regarding the Spring Clean Up, on March 20, 2018, Tri-State sent an e-mail to Mayor Jackson and copied the Village Trustees following up on scheduling the Spring Clean Up.

67.     Without any response to Tri-State's phone calls or e-mails, the Village advertised the May 5, 2018 Clean Up, and on information and belief, conducted the Clean Up with another waste contractor, Flood Brothers.  Also on information and belief, the Village incurred costs of approximately $20,000.00 to the third-party contractor to perform the clean up.

68.     In prior years, it was the Village who reached out to Tri-State to schedule the Spring Clean Up.

69.     At a March 27, 2018 Village of Riverdale Board of Trustees' meeting, a motion was passed directing the Chief of Staff, on behalf of the Village:

        (a)        to provide notice to Tri-State that the Village is declining any and all extensions provided in its July 24, 2012 agreement with Tri-State, and inform Tri-State that said agreement shall therefore expire on July 19, 2019; and

        (b)        to obtain proposals from alternative waste disposal contractors for review by the Village Board on or before June 15, 2018.

70.     The motion to terminate the Village's agreement with Tri-State was made in retaliation for Plaintiff's free speech and because Plaintiff filed this lawsuit, and was not as a result of any alleged complaint against Tri-State for failure to perform its obligations under the contract.  In fact, Tri-State performed all of its obligations under the contract, without incident or complaint.

71.     On February 23, 2018, Tri-State filed this lawsuit, which was removed to this court by the defendants on March 23, 2018.

72.     Ever since Tri-State began its free speech criticisms of Mayor Jackson, Mayor

Jackson has taken retaliatory actions against Tri-State and contrary to the interests of the general

public, welfare, and safety of the residents of the Village of Riverdale.

73.     Those actions include:

(a)     soliciting competitors for the Spring Clean-Up even though this was part

of Tri-State's existing contract;

(b)     failing to cooperate with Tri-State to schedule and conduct the Spring

Clean Up as provided in Tri-State's contract, and instead bidding it to someone else;

(c)     issuing a letter falsely stating that Tri-State representatives have harassed

the Mayor and his staff (*see* **Exhibit 15 attached hereto**, Mayor Jackson's letter to Tri-State

dated April 25, 2018);

(d)     failing and refusing to pay any invoices that the Village is obligated to pay

to Tri-State which on 6-08-2019 (when the First Amended Complaint was filed) amounted to

more than $260,000.00 for the months of January, February, March, and April of 2018 and to

date amounts to more than $199,000, for the months of February, March, and April of 2019,

despite demand by Tri-State that these delinquent amounts be paid; and,

(e)     other acts of retaliation.

## COUNT I

### (Violation of Procedural Due Process – Village of Riverdale)

74.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through

73, above, as though fully stated herein.

75.     The Village of Riverdale Zoning Ordinance sets forth the procedure to be

followed for the administrative granting or denying a request for a conditional use.  (*See* **Exhibit**

Page **14** of **26**

**13**, attached, portions of Riverdale Municipal Code, Zoning Code § 17.03.040 (The plan commission) and § 17.03.110 (Conditional use).

76.     Among the procedures to be followed is that hearing(s) are to be held before the Village of Riverdale Plan Commission, and at the end of those hearings, the Plan Commission is to make a recommendation to deny or grant, with or without conditions, the conditional use to the full Village Board.

77.     These procedures were not followed in many respects, including but not limited to:

(a)     The Plan Commission did not do anything with respect to this matter, as the Village of Riverdale does not have a Plan Commission;

(b)     The Village of Riverdale allowed the Zoning Board of Appeals to conduct the hearings in this matter, not the Plan Commission. The Zoning Board of Appeals previously was never authorized, compiled or constituted to act as the Plan Commission;

(c)     After the initial hearing was held on September 7, 2017, at which testimony was presented by the applicant and Tri-State, the Chairman of the Zoning Board of Appeals, Carmelia Shipp, expressed some reservation in opposition to the application. Almost immediately following her expressed opposition, she was fired from the Zoning Board of Appeals by Mayor Jackson under the pretext that her term had expired, even though it had expired two years earlier, and she was allowed to participate in the first and probably most significant round of hearings;

(d)     That same day, Mayor Jackson appointed three new members to the Zoning Board of Appeals, all of whom were politically aligned with the mayor;

(e)     The new members of the Zoning Board of Appeals had not heard any of the testimony prior to this, and, therefore, were improperly seated in the middle of the pending administrative hearing process to render a recommendation with respect to this application that they neither knew about, heard testimony about, or were qualified to recommend;

(f)     The Village Attorney is the law firm of Montana & Welch. The Village Attorney has no statutory or other authority that authorizes it to chair meetings of the Zoning Board of Appeals or Plan Commission;

(g)     That is exactly what Montana & Welch did – they chaired the meetings of the Zoning Board of Appeals, ruling on evidence and objections, and improperly advising the Zoning Board of Appeals as to how they should vote on this ordinance and what conditions they should include. This improper involvement by the Village attorney, and tainted the entire process;

(h)     The Village allowed the applicant to operate the site even before any application was filed, and before any hearings or recommendations were made;

(i)     In response to FOIA requests, there were no documents of any kind supporting the Village's decision to allow the applicant to operate "temporarily" pending the conditional use application and hearings related thereto.

78.     Because of the improper procedure followed as outlined in paragraph 73(a)-(i), above, the entire process and the recommendation from the Zoning Board of Appeals to the full Village Board was tainted, improper, and void *ab initio*.

79.     Tri-State objected to all of these improper procedures during the course of the hearings. *See* **Exhibit 2** (September 7, 2017 submittal), **Exhibit 3** (November 2, 2017 submittal),

**Exhibit 6** (Transcript of hearing held November 2, 2017 hearing, at pp. 65-77), and **Exhibit 7** (Transcript of hearing held September 7, 2017 hearing, at pp. 47-64).

80.     As a direct and proximate result of the actions of the Village of Riverdale, Tri-State has and will continue to suffer damages by loss of income through unequal treatment and competitive disadvantage due to the challenged Village ordinance, as well as threat of imminent harm to the health, safety and environment as a corporate resident of the Village of Riverdale.

81.     Tri-State has suffered a deprivation of its Constitutional property rights regarding its business in the Village of Riverdale, as well as threat of imminent harm to the health, safety and environment as a corporate resident of the Village of Riverdale.

82.     Tri-State's adjacent property ownership of the Retention Pond is adversely affected by illegal drainage and runoff from the Riverdale Materials site.

83.     Tri-State has furthermore suffered a deprivation of its property interest in not being allowed to render its services, established by virtue of its contract with the Village of Riverdale to provide services.

84.     The procedures followed by the Village of Riverdale Zoning Board of Appeals were inadequate under the due process clause of the 14th Amendment to the United States Constitution.

85.     Tri-State has suffered an invasion of its legally protected interest which is concrete and actual/imminent.

86.     Tri-State has a significant personal stake in the outcome of this controversy.

87.     Tri-State's injury is fairly traceable to the actions of the Village of Riverdale.

88.     Tri-State's injury will likely be redressed by a favorable decision.

89. This matter was politically wired from the outset. Even before the application was filed, Mayor Jackson posted a sign at Riverdale Materials' site stating "ANOTHER BUSINESS BROUGHT TO YOU BY THE HONORABLE MAYOR LAWRENCE JACKSON." *See* **Exhibit 14**, photo.

90. The board members voted on this ordinance without allowing any comment from Tri-State or members of the public, reserving public comment to after the trustees voted on the ordinance.

91. Tri-State objected to this procedure.

92. The board members that voted on this did not have the benefit of public comment.

93. Tri-State had prepared written submissions and comments to be considered by the board. The written submissions were not allowed to become part of the record, or read into the record, and the Village attorney improperly made that decision.

94. Because of the flaws in the procedural process before the Zoning Board of Appeals set forth in Count I, paragraph 77 (a)-(i), above, the entire process before the Village board was procedurally flawed.

**WHEREFORE,** because the entire process was procedurally flawed and violated the due process clause of the 14th Amendment to the United States Constitution, Tri-State respectfully prays that this Court:

(1) Find that the Defendant Village of Riverdale violated Tri-State's rights to due process;

(2) Declare that Ordinance Number 2017-22 is null and void *ab initio*;

(3) Declare that any operation at the site by Riverdale Materials, LLC is not authorized;

(4)     Award compensatory damages to Tri-State;

(5)     Award costs to Tri-State;

(6)     For such other relief as this court deems necessary and appropriate.

## COUNT II

### (Violation of Substantive Due Process – Village of Riverdale)

95.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 73, above, as though fully stated herein.

96.     The Ordinance required the Zoning Board of Appeals to make findings with respect to various conditions, including but not limited to the following:

(a)     That the establishment, maintenance, or operation of the conditional use will not be detrimental to, or endanger the public health, safety, morals, comfort, or general welfare;

(b)     That the conditional use will not be injurious to the uses and enjoyment of other property in the immediate vicinity for the purposes already permitted, nor substantially diminish and impair property values within the neighborhood; and,

(c)     That adequate utilities, access roads, drainage and/or necessary facilities have been or are being provided.

(Riverdale, Illinois, Municipal Code §17.03.110).

97.     The Zoning Board of Appeals findings in favor of these three conditions is against the manifest weight of the evidence and is arbitrary and capricious because:

(a)     There was substantial testimony that the proposed waste operation at Riverdale Materials would be detrimental to the community and the neighboring properties, and detrimental to their property value;

(b)     The Riverdale Materials property is an unclosed, highly contaminated, hazardous waste site, and its operation on the site will only aggravate an already horrendous environmental condition;

(c)     The applicant misrepresented testimony with respect to at least the following points:

(i)     that the site did not have any environmental problems;

(ii)     that they had all the permits necessary to operate the site (which they were already operating at the time of the hearings); and

(iii)     that they had proper drainage into an on-site retention pond when in fact the retention pond is on a neighboring site, and the applicant has absolutely no right, title or interest to the retention pond or the use thereof.

(d)     Several members of the public and Tri-State objected to these matters at the various hearings.

98.     The Zoning Board of Appeals' recommendation to the Village Board that the applicant met the conditions necessary to grant a conditional use permit is against the manifest weight of the evidence and is arbitrary and capricious.

99.     As a direct and proximate result of the actions of the Village of Riverdale, Tri-State has and will continue to suffer damages by loss of income through unequal treatment and competitive disadvantage due to the challenged Village ordinance, as well as threat of imminent harm to the health, safety and environment as a corporate resident of the Village of Riverdale.

100.     Tri-State has suffered a deprivation of its property rights regarding its business in the Village of Riverdale, as well as threat of imminent harm to the health, safety and environment as a corporate resident of the Village of Riverdale.

101.    Tri-State's adjacent property ownership of the Retention Pond is adversely affected by illegal drainage and runoff from the Riverdale Materials site.

102.    Tri-State has furthermore suffered a deprivation of its property interest in not being allowed to render its services, established by virtue of its contract with the Village of Riverdale to provide services.

103.    The substantive effects of Riverdale's arbitrary and capricious approval of Ordinance 2017-22 are severely detrimental to Tri-State and its ability to conduct business.

104.    Tri-State has suffered an invasion of its legally protected interest which is concrete and actual/imminent.

105.    Tri-State has a significant personal stake in the outcome of this controversy.

106.    Tri-State's injury is fairly traceable to the actions of the Village of Riverdale.

107.    Tri-State's injury will likely be redressed by a favorable decision.

**WHEREFORE,** because defendants violated substantive portions of the Village of Riverdale Ordinance, Tri-State respectfully prays that this Court:

(1)    Find that the Defendant Village of Riverdale violated Tri-State's rights to due process;

(2)    Declare that Ordinance Number 2017-22 is null and void *ab initio*;

(3)    Declare that any operation at the site by Riverdale Materials, LLC is not authorized;

(4)    Award compensatory damages to Tri-State;

(5)    Grant costs to Tri-State;

(6)    For such other relief that this court deems necessary and appropriate.

## COUNT III

### (First Amendment Political Retaliation - Village of Riverdale and Mayor Jackson)

108.　Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 73, above, as though fully stated herein.

109.　The retaliatory actions set forth in paragraphs 53-73, above, were made by policymaker Village President Defendant Mayor Jackson.

110.　The retaliatory actions were in response to protected first amendment speech by the plaintiff.

111.　The retaliatory actions were designed to quell first amendment speech and to deter free speech.

112.　The plaintiff's speech involved matters of public concern and concern and desire to protect the public health, safety and welfare.

113.　The first amendment speech was the "but for" cause for the retaliation.

114.　The retaliation by the Village has caused substantial damage to the plaintiff, in excess of $260,000 at the filing of the First Amended Complaint and more than $199,000 at the time of filing this Second Amended Complaint

115.　The retaliation was engaged in as a policy of the Village of Riverdale and its mayor - Defendant Jackson.

116.　It has long been federal law that municipalities and their policy makers cannot retaliate against independent contractors for engaging in protected first amendment speech. O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712, 116 S. Ct. 2353, 135 L. Ed. 2d 874 (1996).

117.   Mayor Jackson was not acting in his legislative capacity and, in fact, acted outside of the sphere of legitimate legislative activity in his retaliation against Tri-State.

118.   As a direct and proximate result of the actions of the Village of Riverdale and Mayor Jackson, Tri-State has and will continue to suffer damages by loss of income through unequal treatment and competitive disadvantage due to the challenged Village ordinance, as well as threat of imminent harm to the health, safety and environment as a corporate resident of the Village of Riverdale.

**WHEREFORE,** Tri-State respectfully prays that this Court enter an Order:

(1)   Finding the Defendants liable under 42 U.S.C. § 1983 for first amendment retaliation;

(2)   Granting damages to the Plaintiff in excess of $199,000;

(3)   Granting costs to Tri-State;

(4)   For such other relief that this court deems necessary and appropriate.

## COUNT IV

### (Political Retaliation for Filing a Lawsuit - Village of Riverdale and Mayor Jackson)

119.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 73, above, as though fully stated herein.

120.   The retaliatory actions set forth in paragraphs 53-73, above, were made by policymaker Village President Defendant Mayor Jackson.

121.   The retaliatory actions were in response to plaintiff filing its lawsuit.

122.   The retaliatory actions were designed to quell the plaintiff from pursuing its lawsuit.

123.    The plaintiff's lawsuit involved matters of public concern, and concern and desire to protect the public health, safety and welfare.

124.    The retaliation by the Village has caused substantial damage to the plaintiff in excess of $199,000.

125.    The retaliation was engaged in as a policy of the Village of Riverdale and its mayor - Defendant Jackson.

126.    It has long been federal law that municipalities and their policy makers cannot retaliate against persons for engaging in filing a lawsuit.

127.    As a direct and proximate result of the actions of the Village of Riverdale and Mayor Jackson, Tri-State has and will continue to suffer damages by loss of income through unequal treatment and competitive disadvantage due to the challenged Village ordinance, as well as threat of imminent harm to the health, safety and environment as a corporate resident of the Village of Riverdale.

**WHEREFORE,** Tri-State respectfully prays that this Court enter an Order:

(1)    Finding the Defendants liable under 42 U.S.C. § 1983 for first amendment retaliation;

(2)    Granting damages to the Plaintiff in excess of $199,000;

(3)    Granting costs to Tri-State;

(4)    For such other relief that this court deems necessary and appropriate.

### COUNT V

### (Breach of Contract – Village of Riverdale)

128.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 73, above, as though fully stated herein.

129.    On or before March 16, 2018, Tri-State representatives made at least two phone calls to the public works department in order to schedule the Spring Clean Up and comply with its contract.

130.    Having had no response from the Village, on March 16, 2018, Tri-State sent an e-mail to Mr. Russell regarding scheduling the Spring Clean Up.

131.    Still having received no response from anyone from the Village regarding the Spring Clean Up, on March 20, 2018, Tri-State sent an e-mail to Mayor Jackson and copied the Village Trustees following up on scheduling the Spring Clean Up.

132.    Without any response to Tri-State's phone calls and e-mails, the Village advertised the May 5, 2018 Spring Clean Up, and on information and belief, conducted the Spring Clean Up.  As a result, the Village paid a third-party contractor to perform the clean-up.

133.    In prior years, it was the Village who reached out to Tri-State to schedule the Spring Clean Up.

134.    In at least the past fifteen (15) years, the Village conducted only a single Spring Clean Up per year, and that event was conducted by Tri-State in April or May.

135.    Pursuant to the Agreement for Refuse, Recyclable, Yard Waste Material Collection/Processing/Disposal Services between the Village of Riverdale and Tri-State, the Village breached its contract as follows:

(a)    Failing to pay Tri-State for invoices for January, February, March, and April 2018, though payments are due within 15 days of receipt of invoice;

(b)    Failing to cooperate with Tri-State to schedule and conduct the Spring Clean Up as provided in Tri-State's contract, and hiring another company to do it; and,

(c)    other breaches of the Agreement.

136.    After demand, the Village has failed and refused to pay Plaintiff over $199,000 in

disposal fees, and has refused to cooperate with Plaintiff to conduct the Spring Clean Up.

137.    Plaintiff has at all times complied with its contractual obligations with the

Village.

**WHEREFORE,** Tri-State respectfully prays that this Court enter an Order:

(1)    Finding that the defendants breached the contract with plaintiff;

(2)    Granting damages to the Plaintiff in excess of $199,000 plus pre-judgment

interest;

(3)    Granting costs to Tri-State;

(4)    For such other relief that this court deems necessary and appropriate.

Respectfully submitted,

                              TRI-STATE DISPOSAL, INC., an
                              Illinois corporation, Plaintiff


                        By:    /s/ Mark A. LaRose
                              Mark A. LaRose, One of Its Attorneys

Mark A. LaRose (ARDC No. 6183288)
Marissa R. Alaska (ARDC No. 6315171)
LaRose & Bosco, Ltd.
200 N. LaSalle Street, Suite 2810
Chicago, IL 60601
(312) 642-4414
Fax (312) 642-0434
mlarose@laroseboscolaw.com
m.alaska@laroseboscolaw.com

# THE VILLAGE OF RIVERDALE
### COOK COUNTY, ILLINOIS

## ORDINANCE
### NUMBER *2017-22*

AN ORDINANCE OF THE VILLAGE OF RIVERDALE, COOK COUNTY, ILLINOIS,
GRANTING A CONDITIONAL USE TO ALLOW A "METAL RECYCLING FACILITY
AND TRANSFER STATION" WITHIN
THE I-2 GENERAL INDUSTRIAL DISTRICT
(17-05: 1201 W. 138TH STREET)

LAWRENCE L. JACKSON, Village President
KAREN HOLCOMB, Village Clerk

RODRICK JEFFERSON
ERIC LEVERE
GREGORY LEWIS
CASSANDRA RILEY-PINKNEY
BRADLEY SMITH
BRENDA WILLIAMS
Trustees

Published in pamphlet form by authority of the President and Village Clerk of the Village of Riverdale on 11/28/2017
Village of Riverdale – 157 West 144th Street - Riverdale, Illinois 60827



EXHIBIT
1



EXHIBIT
E

ORDINANCE NUMBER  *2017-22*

AN ORDINANCE OF THE VILLAGE OF RIVERDALE, COOK COUNTY, ILLINOIS,
GRANTING A CONDITIONAL USE TO ALLOW A "METAL RECYCLING FACILITY
AND TRANSFER STATION" WITHIN
THE I-2 GENERAL INDUSTRIAL DISTRICT
(17-05: 1201 W. 138TH STREET)

WHEREAS, the Village of Riverdale, Cook County, Illinois (the *"Village"*) is a home rule municipality pursuant to Section 6(a), Article VII of the 1970 Constitution of the State of Illinois, and as such may exercise any power and perform any function pertaining to its government and affairs (the *"Home Rule Powers"*); and

WHEREAS, the President and the Board of Trustees of the Village of Riverdale (the *"Corporate Authorities"*) have heretofore exercised the power conferred on them pursuant to their Home Rule Powers as well as Chapter 11-31-1, *et seq.*, of the Illinois Municipal Code by adopting Title 17 of the Municipal Code of the Village of Riverdale (the *"Zoning Code"*); and

WHEREAS, a conditional use application, ZBA 17-02, has been submitted to the Village by Universal Scrap Metals, Inc., as purchaser and prospective owner, (the *"Applicant"*) to allow within the I-2 General Industrial District the operation of a "Metal Recycling Facility and Transfer Station" use (the *"Proposed Conditional Use"*) on the property commonly known as 1201 W. 138th Street, Riverdale, Illinois and as legally described on Exhibit A (the *"Property"*); and

WHEREAS, the Zoning Board of Appeals held a public hearing on November 2, 2017 on whether the Proposed Conditional Use should be approved, at which time all persons present were afforded an opportunity to be heard; and

WHEREAS, a public notice in the form required by law was given of said public hearing dates; and

2

WHEREAS, the Zoning Board of Appeals has filed its findings of fact and recommendations that the Proposed Conditional Use be granted, and the Corporate Authorities have duly considered said findings of fact and recommendations; and

WHEREAS, the Corporate Authorities have determined, in the best interest of the health, safety and welfare of the residents of the Village, to grant the Proposed Conditional Use subject to the conditions identified herein.

NOW, THEREFORE, BE IT ORDAINED by the President and Board of Trustees of the Village of Riverdale, Cook County, Illinois, by and through the Village's Home Rule Powers, as follows:

Section 1.    The above recitals and legislative findings are found to be true and correct and are hereby incorporated herein and made a part hereof, as if fully set forth in their entirety.

Section 2.    The President and the Board of Trustees hereby adopt by reference the findings of fact of the Zoning Board of Appeals as findings of the President and the Board of Trustees as if completely set forth herein.    All documents and exhibits submitted at the aforesaid public hearings are also incorporated by reference into this Ordinance.

Section 3.    In addition to the findings set forth in Sections 1 and 2 hereof, the President and the Board of Trustees further finds in relation to the Proposed Conditional Use as follows:

1.    The establishment, maintenance or operation of the Proposed Conditional Use, subject to the conditions set forth herein, will not be detrimental to, or endanger the public health, safety, morals, comfort, or general welfare;

2.    The Proposed Conditional Use, subject to the conditions set forth herein, will not be injurious to the use and enjoyment of other property in the immediate vicinity for the purposes already permitted, nor substantially diminish and impair property values within the neighborhood;

3.    The Proposed Conditional Use, subject to the conditions set forth herein, will not

3

impede the normal and orderly development of the surrounding property for uses permitted in the I-2 General Industrial District;

4.     The Proposed Conditional Use, subject to the conditions set forth herein, will not affect the exterior architectural appeal and functional plan of structures already constructed as to cause a substantial depreciation in property values within the neighborhood as the proposed plans will be an improvement upon the existing structure;

5.     Adequate utilities, access roads, drainage and necessary facilities for the Proposed Conditional Use are already in place at the Property;

6.     Ingress and egress for the Proposed Conditional Use, subject to the conditions set forth herein, shall minimally affect traffic congestion in the public streets; and

7.     The Proposed Conditional Use shall, in all other respects, conform to the applicable regulations of the I-2 General Industrial District.

**Section 4.**     A Conditional Use, subject to the conditions set forth below, is hereby granted and issued for the operation of a "Metal Recycling Facility and Transfer Station" use in the I-2 General Industrial District located at 1201 W. 138th Street, Riverdale, Illinois, and as legally described on Exhibit A. This Conditional Use permit is subject to the following conditions:

1.     That Applicant shall obtain and maintain all necessary permits from federal, state and local governmental agencies, including without limitation the Illinois Environmental Protection Agency and the County of Cook ("*Applicable Permits*");

2.     That Applicant shall comply with all terms and conditions set forth in the Applicable Permits;

3.     That all vehicles related to the operations of the Conditional Use shall be strictly prohibited from idling, loading and/or unloading on the public way, all such activities shall occur on the Property;

4.     That Applicant shall submit a storm water prevention plan and dust control plan for the review and approval of the Village Engineer; thereafter, Applicant shall at all times comply with the terms and conditions of the approved storm water prevention plan and dust control plan;

5.     That municipal solid waste be prohibited from being processed at the Property;

4

6.     That the Conditional Use at the Property complies with all other codes and ordinances of the Village of Riverdale, the County of Cook, the State of Illinois and the federal government;

7.     That this Conditional Use shall be limited to Applicant and shall not be transferable except upon reapplication, hearing and approval in the manner provided in the Zoning Code;

8.     This Ordinance shall be signed by Applicant to signify acknowledgement of the terms hereof.

**Section 5.**     The Applicant hereunder shall at all times comply with the terms and conditions of the Conditional Use and, in the event of non-compliance, said permit shall be subject to revocation by appropriate legal proceedings.

**Section 6.**     If any section, paragraph, clause or provision of this Ordinance shall be held invalid, the invalidity thereof shall not affect any other provision of this Ordinance.

**Section 7.**     All ordinances, resolutions, motions or orders in conflict with this Ordinance are hereby repealed to the extent of such conflict.

**Section 8.**     This Ordinance shall be in full force and effect following its passage, approval and publication in pamphlet form as provided by law.

*(Intentionally Left Blank)*

5

ADOPTED by the President and Board of Trustees of the Village of Riverdale, Cook County, Illinois this 28th day of November, 2017, pursuant to a roll call vote, as follows:

|  | YES | NO | ABSTAIN | ABSENT | PRESENT |
|---|---|---|---|---|---|
| JEFFERSON | ✓ |  |  |  |  |
| LEVERE | ✓ |  |  |  |  |
| LEWIS | ✓ |  |  |  |  |
| RILEY-PINKNEY | ✓ |  |  |  |  |
| SMITH | ✓ |  |  |  |  |
| WILLIAMS | ✓ |  |  |  |  |
| PRESIDENT JACKSON |  |  |  |  |  |
| TOTAL | 6 |  |  |  |  |

APPROVED by the President of the Village of Riverdale, Cook County, Illinois on this 28th day of November, 2017.

LAWRENCE L. JACKSON
VILLAGE PRESIDENT

ATTEST:

KAREN HOLCOMB
VILLAGE CLERK

6

RECEIVED APR 2 3 2018



## Village of Riverdale
**157 W. 144th Street**
Riverdale, IL 60827-2707
Phone (708) 841-2200 • Fax (708) 841-7587

**Trustees**
Bradley Smith
Roderick Jefferson
Brenda Williams
Cassandra Riley-Pinkney
Eric LeVere
Gregory Lewis

**Lawrence L. Jackson**
Village President

**Karen Holcomb**
Village Clerk

4/18/18

VIA CERTIFIED RETURN RECEIPT MAIL

Ms. Sheryl A. Germany
President
Tri-State Disposal Inc.
13903 South Ashland Ave.
Riverdale, IL 60827

*Re: Timely notice of "cancellation" of Waste Disposal Agreement*

Dear Ms. Germany,

On behalf of the Village of Riverdale, I write to inform you that the Village of Riverdale will not exercise its option to extend the: AGREEMENT FOR REFUSE, RECYCLABLE, YARD WASTE MATERIAL COLLECTION/PROCESSING/DISPOSAL SERVICES between the Village of Riverdale and Tri-State Disposal, Inc., dated July 24, 2012 (the "*Agreement*").

Under section 3 of the Agreement, "TERM," the Agreement expires July 31, 2019. This letter serves as timely notice of our forgoing any option to extend said Agreement and that the Village wishes to "cancel" the Agreement upon its expiration.

Please don't hesitate to contact me if you have any question.

Regards,

Timothy P. Williams
Chief of Staff

CC:
Lawrence Jackson, Mayor
Karen Holcomb, Clerk
Matthew Welch, Corporate Council



EXHIBIT
S. Germany F
2/3/2020 SR