# EXHIBIT E1

## 1 of 4

Page 1

1              UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF ILLINOIS

3                    EASTERN DIVISION

4     _____

5     TRI-STATE DISPOSAL, INC., an

6     Illinois corporation,

7              Plaintiff,

8        v.                           Case No.

9     THE VILLAGE OF RIVERDALE, a      18-CV-02138

10    municipal corporation;

11    LAWRENCE L. JACKSON, Mayor

12    of the Village of Riverdale,

13             Defendants.

14    _____

15            VIDEOCONFERENCE DEPOSITION OF

16               LAWRENCE L. JACKSON

17    DATE:        Thursday, February 25, 2021

18    TIME:        10:00 a.m.

19    LOCATION:    Remote Deposition - IL

20                 Chicago, IL 60601

21    REPORTED BY: Victoria Rock, Notary Public

22    JOB No.:     4471768

23

24

Page 2

```
 1        A P P E A R A N C E S
 2  ON BEHALF OF PLAINTIFF TRI-STATE DISPOSAL, INC.:
 3     MARK LAROSE, ESQUIRE (by videoconference)
 4     LaRose & Bosco, LTD
 5     200 North LaSalle Street, Suite 2810
 6     Chicago, IL 60601-1131
 7     mlarose@laroseboscolaw.com
 8     (630) 780-8612
 9
10     MARISSA ALASKA, ESQUIRE (by videoconference)
11     LaRose & Bosco, LTD
12     200 North LaSalle Street, Suite 2810
13     Chicago, IL 60601-1131
14     m.alaska@laroseboscolaw.com
15
16  ON BEHALF OF DEFENDANTS THE VILLAGE OF RIVERDALE AND
17  LAWRENCE L. JACKSON:
18     ERIN E. BLAKE, ESQUIRE (by videoconference)
19     Montana & Welch, LLC
20     11950 South Harlem Avenue, Suite 102
21     Palos Heights, IL  60463
22     eblake@montanawelch.com
23     (708) 448-7005
24
```

Page 4

```
 1            I N D E X
 2  EXAMINATION:                          PAGE
 3     By Mr. LaRose              8
 4
 5
 6          E X H I B I T S
 7  NO.        DESCRIPTION              PAGE
 8  Exhibit C    Letter, the Mayor to Tri-State
 9              Dated October 23, 2017        44
10  Exhibit E    Village of Riverdale Ordinance
11              2017-22               123
12  Exhibit F    Letter, Timely Notice of
13              Cancellation of Waste Disposal
14              Agreement             57
15  Exhibit G    String of E-Mails on Spring
16              Clean-up, March 16, 2018 and
17              March 20             66
18  Exhibit H    Flyer for 2018 Community
19              Clean-up             90
20  Exhibit I    Photo of Banner for 2018
21              Community Clean-up        90
22  Exhibit L    Letter, Agreement for Refuse
23              Collection/Processing/Disposal
24              Services with Tri-State Disposal  87
```

Page 3

```
 1         A P P E A R A N C E S (cont.d)
 2  ALSO PRESENT:
 3     Jeff Germany, Tri-State Disposal (by
 4     videoconference)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
 1          E X H I B I T S (Cont.)
 2  NO.        DESCRIPTION            PAGE
 3  Exhibit N    Village of Riverdale Response
 4              To Plaintiff's First Set of
 5              Interrogatories        148
 6  Exhibit P    Tri-State Disposal Calendar
 7              Screenshots          139
 8  Exhibit Q    Letter, Do Not Call Request    65
 9  Exhibit W    Letter, Re: Conditional Use
10              Zoning Application by Riverdale
11              Materials, LLC        120
12  Exhibit LL   Picture of Re-Election Signs   113
13  Exhibit OO   Defendants' Response to
14              Plaintiff's Second Request for
15              Production           102
16  Exhibit QQ   Minutes from March 27, 2018
17              Board Meeting           151
18
19       (Exhibits attached.)
20
21    QUESTIONS INSTRUCTED NOT TO ANSWER
22       PAGE     LINE
23        69     25
24
```

2 (Pages 2 - 5)

Page 6

1    PROCEEDINGS
2           REPORTER: Good morning, everyone. My
3  name is Victoria Rock; I am the officer assigned by
4  Veritext to take the Zoom record of this proceeding.
5  I am a certified court reporter and a notary
6  authorized to take acknowledgements and administer
7  oaths in Illinois. We are now on the record.
8           This is the deposition of Lawrence
9  Jackson taken in the matter of Tri-State Disposal,
10  Inc., et al. vs. The Village of Riverdale et al. at
11  10:00 a.m. Central time on Thursday, February 25,
12  2021, at 11950 South Harlem in Palos Heights,
13  Illinois.
14          Due to the pandemic and out of concern
15  for public and participant safety, parties agree that
16  I will swear in the witness remotely outside of his
17  presence.
18          Absent an objection on the record
19  before the witness is sworn, all parties and the
20  witness understand and agree that any certified
21  transcript produced from the recording virtually of
22  this proceeding:
23             - is intended for all purposes and
24             uses permitted under applicable

Page 7

1              procedural and evidentiary rules and
2              laws in the same manner as a
3              deposition recorded by stenographic
4              means; and
5           - shall constitute written stipulation
6           of such.
7           At this time, will everyone appearing
8  remotely please identify yourself, and we will start
9  with Mr. LaRose.
10          MR. LAROSE: Hi, Victoria. Mark
11  LaRose, on behalf of the plaintiff, and I agree with
12  your statement on the swearing the witness.
13          REPORTER: Okay. And Ms. Alaska.
14          MS. ALASKA: I am Marissa Alaska on
15  behalf of the plaintiff.
16          REPORTER: Okay. And then, Ms. Blake.
17          MS. BLAKE: Erin Blake on behalf of the
18  defendants.
19          REPORTER: Okay. And then Mr. Jackson.
20          MR. JACKSON: I'm Lawrence L. Jackson,
21  Village of Riverdale.
22          REPORTER: Okay. And then Mr. Germany.
23          MR. GERMANY. Yes. I'm Jeff Germany of
24  Tri-State Disposal.

Page 8

1           REPORTER: Okay. All right. All
2  right. Thank you. Hearing no objection, I will swear
3  the witness.
4           Mr. Jackson, will you raise your right
5  hand.
6  WHEREUPON,
7              LAWRENCE L. JACKSON,
8  called as a witness, and having been first duly sworn
9  to tell the truth, the whole truth and nothing but the
10  truth, was examined and testified as follows:
11          REPORTER: Thank you. All right.
12  We're ready to proceed, Counsel.
13          EXAMINATION
14  BY MR. LAROSE:
15     Q    Good morning. Mayor Jackson, state your
16  full name for the record, please.
17     A    Lawrence Lee Jackson.
18     Q    Where do you live?
19     A    14501 South Union Avenue, Riverdale,
20  Illinois 60827.
21     Q    You married?
22     A    Yes, sir.
23     Q    You have children?
24     A    I have a two-year-old daughter.

Page 9

1     Q    Have you ever given a deposition before?
2     A    No.
3     Q    Okay. Are you taking any kind of medication
4  that would impair your ability to testify truthfully?
5     A    No.
6     Q    Have you ever been convicted of -- I don't
7  care about traffic violations, a felony, or any other
8  crime involving moral turpitude or dishonesty or fraud
9  or anything like that?
10     A    No.
11     Q    Okay. Since you've never given a deposition
12  before, and even if you had, I'm going to go over a
13  couple of rules. First rule, your answers must be
14  verbal rather than the nod of a head, or shrug of the
15  shoulders, or an uh-huh, or an uh-uh. Okay?
16     A    Yes.
17     Q    Okay. Second, this is a deposition, not an
18  inquisition. If you need to take a break, just say
19  so, but you can't do it if there's a pending question.
20  If there's a pending question, answer the question,
21  then say, "I want to take a break.. Then we'll decide
22  how long we're going to take a break and we'll do
23  that. Okay?
24     A    Correct.

3 (Pages 6 - 9)

Page 10

1    Q    All right.  Especially, this would happen if
2  we were in person, but especially online, we can't
3  talk over one another.  Otherwise, Victoria is going
4  to chastise us, and the record's going to be a mess.
5  So let me finish my question.  If Erin has anything to
6  say or any objection, let her finish her objection,
7  and then you can answer so we don't talk over one
8  another.  Fair enough?
9    A    Yes.
10    Q    I'm going to try my best to ask clear
11  questions.  Sometimes that's not always the case.
12  Erin always asks clear questions.  I don't,
13  necessarily.  But I'm going to try my best to ask
14  questions that you understand.  If you don't
15  understand the question, just ask me or say you don't
16  understand it, and I'll try my best to clarify it or
17  rephrase it, so you do understand it.  Fair enough?
18    A    Thank you.
19    Q    All right.  The corollary is, if I ask a
20  question and you answer it, I'm going to assume you
21  understood it.  Fair enough?
22    A    Fair enough.
23    Q    Okay.  I want to talk briefly about what you
24  did in preparation for your deposition.  I know you

Page 11

1  talked to your lawyer.  I don't care about that.
2  That's privileged.  Who else did you talk to prior to
3  your deposition related to preparing for your
4  deposition?
5    A    No one.
6    Q    Did you talk to Gonzalez about his
7  deposition?
8    A    No, sir.
9    Q    Did you talk to Jerome Russell about his
10  deposition?
11    A    No, sir.
12    Q    Did you review the transcript of either Dave
13  Gonzalez's or Jerome Russell's depositions prior to
14  your deposition?
15    A    No, sir.
16    Q    Did you review any other documents, or any
17  documents, I guess, in preparation for your deposition
18  today?
19    A    No, sir.
20    Q    Do you keep, like, a personal diary, like a,
21  you know, whether it's an appointment book, diary of
22  the things that happened during the day.  And I'm
23  talking about business-wise, not personal.  Really
24  couldn't care about your personal life.  I mean, I

Page 12

1  shouldn't say that.  I do care about your personal
2  life, but I'm not going to ask you about that.  Do you
3  keep a diary with respect to the Village of Riverdale?
4    A    No, sir.
5    Q    How do you keep track of where you have to
6  be and what you have to do?
7    A    That would be handled by my executive
8  assistant, Ms. Randolph.
9    Q    Okay.  I asked you where you live.  Do you
10  have any plans to move from your current home?
11    A    No, sir.
12    Q    What's your highest level of education,
13  Mayor?
14    A    I graduated from Governors State University
15  in 2005 with a Master of Arts in political science.
16    Q    And where did you get your undergrad?
17    A    You and I attended the same school.  SIUC.
18  1999, BA in American history.
19    Q    I'm curious how you knew I went to SIU.
20    A    You told me.  We met a few years ago in the
21  conference room when you had a developer that was
22  interested in coming into town.
23    Q    Okay.  I don't remember that, but I don't
24  remember what I had --

Page 13

1    A    You told me then.
2    Q    No.  No.  No.  I remember the meeting.  I
3  don't remember talking about SIU, but I don't remember
4  what I had for breakfast this morning, either.  So
5  that's -- well.  Anyway.  No, I remember that meeting
6  very well.  So anyway, so you went to SIU.  Did you go
7  from like '95 to '99?
8    A    No.  I was on the extended plan.  I was
9  there from, like '92 to '99, and actually, I had taken
10  a sabbatical and decided to go back.
11    Q    Okay.  There's a lot of folks that went to
12  SIU that were on the seven-year plan.  I have a good
13  buddy of mine who went there for five years and got
14  four credits.  Anyway, challenging place to keep your
15  nose to the books, so they say.  Let's talk about your
16  job experience.  Did you have a full-time job before
17  you started at SIU?
18    A    Before SIU, I was in high school then.
19    Q    Okay.  So where did you go to high school?
20    A    Near North High School, Chicago Public
21  Schools.
22    Q    Okay.  So you graduated there and then moved
23  right into SIU in 1992?
24    A    Yes.

4 (Pages 10 - 13)

Page 14

1    Q   Okay. So then you said you went to SIU for
2  a while, took a sabbatical. Approximately when was
3  that?
4    A   That was approximately 1997. I returned
5  back to Chicago. I drove school buses for a few
6  years, and from there, I had taken online to complete
7  my hours to get my BA.
8    Q   So the online courses were SIUC courses?
9    A   Yes.
10   Q   So you didn't return to Carbondale?
11   A   No.
12   Q   Okay. And you drove a school bus for what
13 district?
14   A   Chicago School Transit in Skokie.
15   Q   All right. And was that your first
16 full-time job?
17   A   Yes.
18   Q   Okay. Tell me about your next full-time
19 job.
20   A   Once I graduated SIU, I then started working
21 for Loyola University, Chicago. I worked in the
22 campus police department as a police dispatcher, and I
23 did that for three years.
24   Q   And did you say that was Loyola? I'm sorry.

Page 15

1  It was kind of garbled.
2    A   Loyola University, Chicago.
3    Q   So that would have been about '99 to 2002,
4  something like that?
5    A   Exactly.
6    Q   What did you do then?
7    A   From there, I accepted employment with the
8  Cook County Sheriff's Department.
9    Q   What did you do there?
10   A   I worked as a correctional rehabilitation
11 worker. Social --
12   Q   At -- at the jail?
13   A   Yes.
14   Q   Over on --
15   A   20th --
16   Q   26th and Cal?
17   A   Mm-hmm.
18       MS. BLAKE: Was that a yes?
19       THE WITNESS: That's yes. Thank you,
20 ma'am.
21 BY MR. LAROSE:
22   Q   I wasn't going to remind you because it
23 wasn't that important to me, but if you do the
24 "Uh-huh," on an important one, you'll hear from me, I

Page 16

1  promise you. And how long did you work for the Cook
2  County Correctional Department?
3    A   Approximately 12 years.
4    Q   All at 26 and Cal?
5    A   Yes.
6    Q   What was your next full-time job?
7    A   Mayor of the Village of Riverdale.
8    Q   So you don't have any other work except
9  being the mayor?
10   A   That's correct.
11   Q   How much does that job paid you?
12   A   My -- my current salary is approximately
13 $72,000 annually.
14   Q   Okay. Are you involved in any other side
15 businesses?
16   A   What do you mean when you say "side
17 business"?
18   Q   Anything other than being the Mayor of the
19 Village of Riverdale.
20   A   In a -- in an employment capacity, or as an
21 owner?
22   Q   Owner, consultant, employment, let's start
23 with all of the above.
24   A   Okay. So can you please make your question

Page 17

1  more direct?
2    Q   Sure. Other than being employed full-time
3  as the Mayor of the Village of Riverdale, do you have
4  any ownership in any other businesses?
5    A   My -- my wife and I, yes, we do own a family
6  business.
7    Q   And what is that family business?
8    A   Centennial Holdings. Trucking.
9    Q   And what does Centennial Holdings do?
10   A   We haul construction materials, concrete,
11 stone, dirt. Independent contractor.
12   Q   Do you do any hauling for Riverdale
13 Materials?
14   A   No, sir. Not to the best of my knowledge.
15 No.
16   Q   Do you do any hauling for any of the
17 companies owned by the Bracken family?
18   A   Possibly, yes.
19   Q   Why is it that you say possibly as opposed
20 to yes or no?
21   A   Because I -- I don't oversee the day-to-day
22 operations of the business, so I would not know.
23   Q   How is it that you're so certain that you
24 didn't do any business for Riverdale Materials?

5 (Pages 14 - 17)

Page 18

1    A    Well, that's -- that's what I was trying to
2 tell you, I'm not sure. To the best of my ability,
3 I'm not sure. I don't know.
4    Q    Okay. So just to make the record straight,
5 Centennial Holdings, owned by you and your wife, may
6 or may not have done or is doing business with
7 Riverdale Materials or any company owned by the
8 Bracken family?
9    A    I don't believe so.
10    Q    Okay. But before you said possible.
11 Possibly.
12    A    There -- there is a possibility, sir, but
13 I'm not certain because I don't handle the day-to-day
14 operations of the business.
15    Q    Okay. Who does?
16    A    That would be my wife, and also wherever we
17 are dispatched to work at.
18    Q    Okay. I'm just a little confused by that
19 answer. So your wife handles the logistics, meaning
20 setting up the jobs and things like that. Right?
21    A    No, sir.
22    Q    Sorry?
23    A    No, sir.
24    Q    How does it work then? Just explain to me

Page 19

1 how it works.
2    A    We lease our truck and our driver, and
3 wherever that person is needed to go, that's where
4 they are assigned. And that would be a dispatcher
5 that would issue the assignment to them.
6    Q    You lease your trucks to independent
7 drivers?
8    A    No. We lease our trucks to go on
9 assignments to haul materials. That would be the
10 correct statement.
11    Q    Okay. So you would lease them to the
12 customer?
13    A    Yes.
14    Q    So, for example, if the customer was
15 Riverdale Materials, you would lease your trucks and
16 your driver to Riverdale Materials for them to assign
17 that truck and that driver to do a job?
18    A    It's possible.
19    Q    Well, let's leave Riverdale -- I know you're
20 hung up on the Riverdale Materials thing. Let's leave
21 them out of it. Whoever you lease these trucks and
22 drivers to, you lease the trucks and the drivers, and
23 the company you lease them to makes a decision on
24 where they're going or what they're hauling?

Page 20

1    A    Correct.
2    Q    Do you get paid?
3    A    Yes.
4    Q    How do you get paid?
5    A    What do you mean by that question?
6    Q    The company makes income. Right?
7    A    Yes.
8    Q    How is the income direct?
9    A    We receive a monthly payment.
10    Q    So do you lease your trucks and your drivers
11 by the month?
12        MS. BLAKE: At this point, I'm just
13 going to object to relevancy.
14        MR. LAROSE: Well, the relevancy is if
15 he's doing business with Riverdale Materials or the
16 Brackens, it's clearly relevant to his bias and
17 prejudice in this case. But he says he doesn't know,
18 but I'm not going to ask too many more questions about
19 it. But your objection stands, I mean.
20 BY MR. LAROSE:
21    Q    All right. Do you lease the trucks for a
22 full month?
23    A    Yes.
24    Q    How much?

Page 21

1    A    My accountant handles that.
2    Q    Okay. Does your business keep internal
3 books and records?
4    A    My wife, she handles that as well.
5        REPORTER: I'm sorry. I didn't hear
6 that.
7        THE WITNESS: My wife handles that as
8 well.
9 BY MR. LAROSE:
10    Q    How many trucks do you have?
11    A    I have one in operation, sir.
12    Q    How many drivers?
13    A    One.
14    Q    Is the driver related to you?
15    A    No.
16    Q    Is the driver related to, in a business
17 sense, to any of your customers that lease the trucks?
18    A    Not to my knowledge.
19    Q    You ever take any cash from Riverdale
20 Materials?
21    A    Absolutely not.
22    Q    You ever accept bags of cash from one of
23 their employees, Tom Mate?
24    A    Absolutely not.

6 (Pages 18 - 21)

Page 22

1    Q    Did you accept any political contributions
2  from Riverdale Materials?
3    A    Absolutely not.
4    Q    Did you accept any political contributions
5  from any of the Bracken family?
6    A    That's possible.
7    Q    How would we find that out?
8    A    My wife is the treasurer for my PAC.
9    Q    Okay.  Do you have to report political
10 contributions --
11   A    Yes.
12   Q    -- as part of your -- and who do you report
13 that to?
14   A    The Illinois State Board of Elections.
15   Q    And is that on an annual basis?
16   A    Quarterly.
17   Q    Okay.  So the last report would have been
18 fourth quarter of 2020?
19   A    Yes, sir.
20   Q    Are those public documents, do you know?
21   A    Yes.  They are.
22   Q    Same question with respect to -- I asked
23 about the Bracken Family, what about Bracken Box
24 Company?  Any political contributions from them?

Page 23

1    A    Possibly, yes.
2    Q    What about Tri-State Disposal?
3    A    I received contributions from Tri-State in
4  the past.  Yes.
5    Q    Since you became the mayor, when did you
6  become mayor again?
7    A    I was first elected in 2013.
8    Q    Okay.  And it sounds like maybe reelected
9  yesterday?
10   A    Yes.
11   Q    Congratulations.
12   A    Thank you, sir.
13   Q    You're welcome.  Was that a normal election,
14 or was it a primary or --
15   A    Democratic primary.
16   Q    Okay.  So you won the primary, and then the
17 general election is what, in the spring?
18   A    April.  April 6th.
19   Q    Okay.  So we talked about the one other
20 business that you are an owner in, being the trucking
21 business.  Any other businesses that you're an owner
22 in?
23   A    No.
24   Q    Any businesses that you are employed by?

Page 24

1    A    No.
2    Q    Other than the trucking business.
3    A    The Village of Riverdale is my sole and only
4  employer.
5    Q    Okay.  Any other business that you do
6  consulting work for?
7    A    I'm not a consultant in any capacity.
8    Q    Okay.  Would you consider garbage pickup in
9  the village to be an essential service?
10   A    Yes, sir.  I do.
11   Q    If that service was suspended or terminated
12 for any reason, both literally and figuratively, it
13 would be a mess.  Wouldn't it?
14   A    I would think so.  Yes.
15   Q    As the mayor, who do you report to?
16   A    That would be the people of Riverdale.
17   Q    And is that only the voting residents of the
18 people of Riverdale, or would that include businesses
19 that might not actually live in the Village of
20 Riverdale but operate businesses there?
21   A    I would have to disagree with your question.
22 I think the residents of Riverdale are the individuals
23 that determine if I keep my job or not.
24   Q    Okay.  I didn't mean to state it the wrong

Page 25

1  way.  So you don't feel like you have to answer to any
2  of the business?
3         MS. BLAKE:  Object to form.
4         MR. LAROSE:  It's what he said.  I want
5  to get it clear.
6         MS. BLAKE:  I still object to form.
7         MR. LAROSE:  Fine.
8         MS. BLAKE:  What's the question?
9         MR. LAROSE:  You feel like you don't
10 have to answer to the corporate residents of the
11 Village of Riverdale.  Businesses.
12        MS. BLAKE:  If you don't understand,
13 then you can say.
14        THE WITNESS:  I understand.  I mean,
15 you know, they're partners in the community, and we
16 have to work with them, but I don't respond to them.
17 I mean, I try to assist them, as I do my constituency
18 that vote.
19 BY MR. LAROSE:
20   Q    You answer to the voting people in
21 Riverdale, but you don't necessarily answer to the
22 business in Riverdale that don't vote?
23        MS. BLAKE:  Just object to the
24 mischaracterization of the testimony.  It's clear what

7 (Pages 22 - 25)

Page 26

1 he stated.
2          THE WITNESS:  Thank you.
3 BY MR. LAROSE:
4    Q   Well, you still have to answer it.
5          MS. BLAKE:  That wasn't a question.
6          MR. LAROSE:  Yes.  It was.  Let me
7 state it as a question.
8          MS. BLAKE:  Thank you.
9          MR. LAROSE:  Because it certainly was a
10 question.
11 BY MR. LAROSE:
12    Q   Mayor, is it true that your testimony is
13 your answer to the voting residents of Riverdale
14 because they're the ones that decide whether you keep
15 your job or not?
16    A   Mr. LaRose, I am cooperative and work with
17 everyone, those who live in town and vote, and those
18 who do not live in town and do not vote, as well as
19 the businesspeople.  Whoever that needs the assistance
20 of the Village of Riverdale, I'm obliged to help them.
21    Q   Okay.  How did you come to know Flood
22 Brothers?
23    A   They had introduction with me through my
24 then Village Administrator, Tim Williams.

Page 27

1          REPORTER:  I'm sorry.  I -- I -- you're
2 a bit muffled.
3          THE WITNESS:  I'm sorry, ma'am.  That
4 relationship, the introduction was made through my
5 then Village Administrator, Timothy Williams.
6 BY MR. LAROSE:
7    Q   And when was that introduction made, if you
8 remember?
9    A   Approximately three, four years ago.  Maybe
10 two years ago.  I'm kind of -- my memory fails me, but
11 it was about three years ago.
12    Q   All right.  And what were the circumstances
13 of the introduction?
14    A   We were looking for ways to reduce our
15 operating costs.  We had a lot of bills that were
16 backlogged, and so we were looking for new vendors
17 that could -- so we could down-size our operating
18 costs, not just in sanitation, but in other areas as
19 well.
20    Q   Okay.  And Tim Williams, didn't he also work
21 for another municipality?
22    A   He may have.  It's been a while since I
23 looked at his resume.
24    Q   Where is he now?  Do you know?

Page 28

1    A   I'm not sure.  It was an involuntary
2 separation.
3    Q   Okay.  Do you know how that he came to
4 introduce you to Flood Brothers?
5          MS. BLAKE:  Just object to foundation.
6 You can still answer.  He's asking do you know Tim
7 knew about Floor Brothers.
8          THE WITNESS:  Oh.  I'm not sure.  It
9 was just at one of our weekly briefings, and we were
10 looking for proposals to streamline costs.
11 BY MR. LAROSE:
12    Q   Did you look at any other waste disposal
13 companies?
14    A   Yes.  Homewood Disposal was also interested
15 in working in Riverdale, along with Republic.
16    Q   Did you receive, you said, "proposal," did
17 you receive a proposal from Flood Brothers?
18    A   That would have been on the desk of Tim
19 Williams.
20    Q   I'm sorry.  It would have been on what?
21    A   That would have been on Tim Williams' desk.
22 The proposals.
23    Q   You never saw one?
24    A   I may have, but he had the proposals from

Page 29

1 other vendors as well.
2    Q   Did he have proposals from Homewood?
3    A   I believe so.
4    Q   Did he have proposals from Republic?
5    A   Possibly.  I -- I can't speak to his
6 proposals because I -- they weren't addressed to me,
7 Mr. LaRose.  They were addressed to the Village
8 Administrator.
9    Q   Who made the final decision on who to pick?
10    A   Mr. Williams gave me a recommendation for
11 Flood.
12    Q   And then you took that recommendation and
13 took it to the Board.  Right?
14    A   Yes.
15    Q   Did you receive a proposal from Tri-State?
16    A   No.  We did not.
17    Q   Did you ask for one?
18    A   I didn't ask for Flood or Homewood Disposal
19 either, sir.
20    Q   Did Tim Williams ask for one?
21    A   Possibly, yes.
22    Q   So possibly he asked for a proposal from
23 Tri-State, and for sure, you know that you didn't get
24 one.  Right?

8 (Pages 26 - 29)

Page 30

1     A    Mr. LaRose, I don't know if he reached out
2  to Tri-State.  I do know that we were trying to reduce
3  our operating costs.  If Tri-State could have given us
4  a better rate, I wish they would have, but seeing that
5  they did not, Mr. Williams, and I'm speaking on his
6  behalf, thought it was best just to look for a new
7  vendor.
8     Q    So your testimony is that you would have
9  been happy to receive a proposal from Tri-State?
10    A    I want the best possible deal for my
11 residents.  Yes.  I would have welcomed a -- a
12 proposal from Tri-State.
13    Q    We've been through thousands and thousands
14 of pieces of paper.  There wasn't a single piece of
15 paper that requested a proposal from Tri-State from
16 anybody:  you, Williams, the Board, Jerome Russell,
17 anybody.  Are you aware of any pieces of paper where
18 you requested proposals from them?
19    A    Well, as I previously stated, I wasn't
20 directly involved with that process.
21    Q    Well, kind of, you were because, in October
22 of 2017, you sent Tri-State a letter saying that you
23 were going to put this out for bid and encouraging
24 them to bid, and that's the last we heard of it.  And

Page 31

1  I'll show you that document.  It's not hide and seek.
2  We're just not there yet, but we're going to go
3  through it.  I'm trying to get the basics of this
4  because I can't understand the discrepancy between
5  we'd love to have a proposal, but we never asked for
6  one.  So can you explain that?
7         MS. BLAKE:  I'm going to object to
8  form.  That feels like a long discussion.  I have no
9  idea what the question is.
10 BY MR. LAROSE:
11    Q    The question is, you would have liked to
12 receive a proposal from Riverdale, but as far as the
13 documents from Riverdale, you never asked for one, and
14 I'm wondering if you can explain that.
15        MS. BLAKE:  Again, I'm going to object
16 to form.  You're talking about Riverdale, documents
17 from Riverdale?  I'm just confused.
18        MR. LAROSE:  Yeah.  We asked for all
19 Riverdale's documents.  We got pretty much what we
20 had.  Not much from you guys, but there isn't a single
21 piece of paper that shows that anyone asked for a
22 proposal from Tri-State.  The incumbent contract
23 holder.  So I'm asking him if he can explain that.
24 Why weren't they asked for a proposal?

Page 32

1         MS. BLAKE:  I believe that's asked and
2  answered.  He wasn't dealing with that.  Tim Williams
3  was.
4         MR. LAROSE:  Okie-dokie.  Then he can
5  answer it again, please, because you objected to my
6  question, and now I want an answer.
7         MS. BLAKE:  Well, Mr. LaRose, you had a
8  very long discussion with yourself, and then at the
9  end, asked a question that I didn't understand.  Now
10 you've asked a question that you've already asked him,
11 so it's a little run-on.  It's a long narrative that
12 gets confusing towards the end.  So if you could be
13 more direct, it would be --
14        MR. LAROSE:  But that doesn't mean that
15 he doesn't have to answer it.
16 BY MR. LAROSE:
17    Q    So here's the direct question.  If you
18 wanted a proposal from them, why didn't you ask for
19 one?  Direct enough?
20    A    Mr. LaRose --
21        MS. BLAKE:  Yeah.
22        THE WITNESS:  I did not submit a
23 request or proposal from anyone, whether it be
24 Tri-State, Flood, Homewood, or Republic.  I did not

Page 33

1  specifically pick up the phone and call them and say,
2  "Give me a proposal."  My directive, per conversation
3  with Mr. Williams, is we need to reduce our operating
4  costs.
5  BY MR. LAROSE:
6     Q    Did you tell Williams not to solicit a bid
7  from Tri-State?
8     A    No.
9     Q    Did you tell him not to solicit a bid from
10 anyone?
11    A    No.
12    Q    Do you know why he didn't solicit a bid from
13 Tri-State?
14    A    I can't speak to that reason.  No.
15    Q    How did you meet Jim Bracken?
16    A    Mr. Bracken was looking to do business in
17 town.  We had property that sat abandoned, wasn't on
18 the tax rolls, and he came in and said he wanted to
19 bring a business to town.
20    Q    He came into where?
21    A    The Village of Riverdale.
22    Q    The Village Hall?
23    A    Yes.
24    Q    Okay.  Was there a meeting set up prior to

9 (Pages 30 - 33)

Page 34

1 him just showing up?
2     A   Yes.  We met in my office.  Yes.
3     Q   Who was at the meeting?
4     A   Tim Williams, myself, the former Fire Chief.
5     Q   Anybody else?
6     A   Not that I recall.
7     Q   Why is Robbie Sharnhorst not the Fire Chief
8 anymore?
9         MS. BLAKE:  Object to relevancy.  What
10 does that have to do with anything?
11        MR. LAROSE:  Are you telling him not to
12 answer?
13        MS. BLAKE:  No.  I mean, you can answer
14 that.  "Why isn't Robbie the Fire Chief anymore?" has
15 nothing to do with this case, but you can go ahead and
16 talk about it.
17        THE WITNESS:  He resigned for personal
18 reasons, sir.
19 BY MR. LAROSE:
20    Q   So what was the result of that first meeting
21 with Jim Bracken?
22    A   The meeting was preliminary.  What type of
23 business he planned to bring to the town.  Are you
24 seeking any time of incentives or tax subsidies?  How

Page 35

1 many employees you're going to bring?  What's the
2 logistics of your business?  The usual stuff.
3     Q   What incentives did they want?
4     A   B6.
5     Q   Besides --
6         REPORTER:  What is that?
7         THE WITNESS:  B6.
8         MS. BLAKE:  B as in --
9         MR. LAROSE:  It's a tax --
10        MS. BLAKE:  Okay.
11        MR. LAROSE:  B as in boy, six tax
12 incentives.
13 BY MR. LAROSE:
14    Q   Anything else?  Any other incentives that
15 they wanted?
16    A   That's all.
17    Q   Did they end up getting B6?
18    A   The Board has the resolution supporting
19 their request with the county.
20    Q   If you wanted to lower the costs for
21 disposal, why didn't you solicit actual bids rather
22 than quotations?
23    A   I'm sorry.  Can you repeat your question?
24    Q   Sure.  If you wanted to reduce the cost for

Page 36

1 waste disposal in the Village of Riverdale, why didn't
2 you solicit actual bids, competitive bids, rather than
3 some quotes or something like that?
4         MS. BLAKE:  Object to attorney-client
5 privilege.
6         THE WITNESS:  Am I required to respond?
7         MS. BLAKE:  No.
8         MR. LAROSE:  I'm not understanding how
9 that question's attorney-client privilege.  I didn't
10 ask what his attorneys told him.
11        THE WITNESS:  I followed the advice of
12 my attorney, sir.
13        MR. LAROSE:  Oh.  I got it.  I'm
14 talking to Erin.  I don't understand how that's
15 attorney-client privilege, Erin.
16        MS. BLAKE:  You're asking why the
17 Village didn't go out for bid?
18        MR. LAROSE:  Yes.
19        MS. BLAKE:  Right.  So it was based on
20 legal advice that that wouldn't be required for this
21 type of service.
22 BY MR. LAROSE:
23    Q   Okay.  So knowing that the legal advice was
24 it wasn't required for this type of service, was there

Page 37

1 anything preventing you from going out for bids?
2     A   Yes.  There was.
3     Q   What.
4     A   We were dealing with some serious financial
5 problems, and we needed to act expeditiously.
6     Q   Okay.  Tri-State's contract ended at the end
7 of July 2019.  Right?
8     A   To the best of my memory, possibly, yes.
9     Q   And in October of 2017, you wrote to Tri-
10 State saying, "We're looking to solicit bids for fast
11 contracting."  So like a year and ten months ahead.
12 And then, in April 2018, and year and three months
13 ahead, you wrote Tri-State and told them you were
14 terminating their contract and the end of the
15 contract.
16        MS. BLAKE:  Is there --
17        MR. LAROSE:  No.  No.  There's going to
18 be.
19 BY MR. LAROSE:
20    Q   How much time does it take for solicitation
21 of bids?
22    A   You know, Mr. LaRose, let me go back.
23 There's actually a couple of things I want to clear
24 up.

10 (Pages 34 - 37)

Page 38

1      MS. BLAKE:  Okay
2      THE WITNESS:  I want to get a chance.
3 When Tri-State got this account with the Village of
4 Riverdale, they never got the contract through a bid.
5 The Board of Trustees exercised its home-rule powers
6 and awarded the contract to the Germanys' Tri-State.
7 It was only until we decided not to renew their
8 contract that now they're -- they're crying sour
9 grapes and said they wanted to go out to competitive
10 bid.  But they had the contract for twenty-some years,
11 and it's never gone out to bid.  So where's the equity
12 in that?
13 BY MR. LAROSE:
14     Q   Well, I could tell you a lot about equities
15 in this case, but I'm not really here to answer your
16 questions.  My question to you is, how long does it
17 take to issue a bid?
18     MS. BLAKE:  I think it's an incomplete
19 hypothetical.
20     MR. LAROSE:  He said the reason why
21 they didn't issue bids is because they were under a
22 time constraint.
23 BY MR. LAROSE:
24     Q   My question is, how long?  How long does it

Page 39

1 take to request, get bids and open competitive bids so
2 you can award a contract?
3     A   Can I answer?
4     MS. BLAKE:  Yeah.  Yeah.  If you know.
5     THE WITNESS:  So, Mr. LaRose, when
6 you're turning -- changing vendors for a -- a critical
7 service like sanitation, you have to make sure that
8 the new vendor is going to have an inventory to supply
9 the 4,000 units in Riverdale with receptacles, hire
10 additional equipment, transfer -- transfer over
11 accounting procedures, and things like that for
12 billing purposes, and a lot of other things that come
13 with it.  We also wanted to be considerate to
14 Tri-State and allow them time to remove their
15 inventory out of our town.  They had to go around and
16 collect all their receptacles.  So that -- that was
17 the planning in this and giving everyone sufficient
18 time to get set up so that there wasn't any mishaps
19 with people not getting their garbage picked up,
20 people trying to deliver new receptacles while they're
21 collecting old receptacles.
22 BY MR. LAROSE:
23     Q   Okay.  Now maybe you can answer the
24 question.  How long does it take to put out a

Page 40

1 competitive bid?
2     A   I wouldn't know.  We didn't put out a
3 competitive bid.  We requested proposals.
4     Q   Well, you told me the reason why you didn't
5 put out competitive bids was because it took too long.
6 So I want to know how long is --
7     A   That's not --
8     Q   -- too long?
9     A   -- what I said, sir.  I said we were dealing
10 with some serious financial challenges at the time.
11 We needed to act quickly.
12     Q   Okay.  So you needed to act quickly was one
13 of the reasons that you didn't put out competitive
14 bid.  Correct?
15     A   If you remember my answer to your other
16 question, sir, my statement, the Village of Riverdale
17 has never taken a competitive bid for sanitation.
18 When the Germanys received the contract, it was not
19 issued through a competitive bid.  The Board of
20 Trustees exercised its home-rule powers.
21     Q   So how long does it take to issue a
22 competitive bid, for like the --
23     A   I don't have an answer for you at this
24 point, sir.

Page 41

1      REPORTER:  I didn't hear the answer.
2      THE WITNESS:  I said I wouldn't have an
3 answer at this point.  I've exhausted myself trying to
4 explain this.
5 BY MR. LAROSE:
6     Q   So is your testimony that there wasn't
7 enough time to issue competitive bids?
8     MS. BLAKE:  Object to form.  Misstates
9 the testimony.
10 BY MR. LAROSE:
11     Q   Sir?
12     A   Dealing with our financial issues, we were
13 acting quickly to manage budgetary problems that were
14 forthcoming.
15     Q   What services do you issue competitive bids
16 for?
17     A   Public works projects like sewer
18 reconstruction, road pavement, street lighting.
19     MS. BLAKE:  Could we go -- hold on one
20 second.  We're having a technical difficulty.  Mr.
21 LaRose, your face is completely frozen on our TV
22 screen.
23     MR. LAROSE:  That's probably --
24     MS. BLAKE:  Is that --

11 (Pages 38 - 41)

1          MR. LAROSE:  That's probably a good
2 thing.
3          MS. BLAKE:  Hold on a minute, if you
4 will.
5          MR. LAROSE:  I'm --
6          MS. BLAKE:  See how he's frozen there?
7          MR. LAROSE:  I'm not frozen on mine.
8          MS. BLAKE:  You know what, I'm -- and
9 I'm completely frozen as well on our screen.
10          MR. LAROSE:  Well, we --
11          MS. BLAKE:  So just give me a second.
12          MR. LAROSE:  Yeah.  Yeah.  We can see
13 you and hear you fine.
14          REPORTER:  Mr. LaRose, you need to oil
15 your chair.
16          MR. LAROSE:  That's what my mother
17 says.  Are we back and good?
18          MS. BLAKE:  No.  We're using a large
19 screen, and it's frozen.  We have someone coming up to
20 fix it.  He's right here.  Just give us maybe two more
21 minutes.
22          MR. LAROSE:  Okay.
23          MS. BLAKE:  Okay.  We're back.  Sorry
24 about that.

1 BY MR. LAROSE:
2    Q   Did you direct anybody not to solicit a
3 quote or a bid from Tri-State?
4    A   No, sir.
5    Q   Did they not get an opportunity to bid or
6 quote on this job because of the fact that they sued
7 you?
8    A   What do you mean, "Jim"?
9    Q   I'm sorry?
10    A   That question, could you repeat that, sir?
11    Q   Sure.  Sure.  Did they not get an
12 opportunity to bid or quote on the trash services
13 going into the future because they filed a lawsuit
14 against you?
15    A   That's not -- that's not true.
16          MR. LAROSE:  Erin, you have all the
17 exhibits we've been using handy?
18          MS. BLAKE:  I have what I think is most
19 of them.
20          MR. LAROSE:  And we sent you a few more
21 yesterday.
22          MS. BLAKE:  Yeah.
23 BY MR. LAROSE:
24    Q   So let's jump to Exhibit C --

1          MS. BLAKE:  What Exhibit?
2          MR. LAROSE:  It's Exhibit C.  It's a
3 letter from the mayor to Sheryl Germany dated October
4 23, 2017.
5          (Exhibit C was marked for
6          identification.)
7          MS. BLAKE:  Okay.  We're there.
8 BY MR. LAROSE:
9    Q   Do you remember that letter, Mayor?
10    A   Yes.
11    Q   It says that "The Village intends to issue
12 an RFQ."  What's an RFQ?
13    A   Request for Qualifications.
14    Q   Okay.  And did the Village ever issue an
15 RFQ?
16    A   No.
17    Q   Why not?
18    A   Sir, my letter said "intend," it was not a
19 commitment.
20    Q   Okay.  Even though it wasn't a contract or
21 commitment, my question is to you, why didn't you
22 issue an RFQ?
23    A   Going back to my previous statement, we were
24 under some serious financial constraints.  We had to

1 act quickly.
2    Q   Okay.  So your serious financial constraints
3 with respect to garbage, if it had anything to do with
4 my client's bills wasn't going to get resolved until
5 July of 2019.  Correct?
6    A   Possibly.
7    Q   Well, they had the contract until July of
8 2019, and they performed the contract until July of
9 2019.  Correct?
10    A   Correct.
11    Q   So from October 23, 2017, until July of
12 2019, you didn't have enough time to issue an RFQ?
13          MS. BLAKE:  Object to form.
14 BY MR. LAROSE:
15    Q   Sir?
16          THE WITNESS:  Do I have to answer?
17          MS. BLAKE:  Can you ask the question
18 again?  I'm sorry.  I missed it.
19          MR. LAROSE:  Sure.
20 BY MR. LAROSE:
21    Q   From October of 2017 to July of 2019, you
22 didn't have enough time to issue an RFQ?  Is that your
23 testimony?
24    A   That's -- Mr. LaRose, my -- my letter is

12 (Pages 42 - 45)

Page 46

1 very clear that we intended to. We did not obligate
2 ourselves to do that.
3    Q    And when I asked you why you didn't do it,
4 you told me you were under financial and time
5 constraints.
6        MS. BLAKE: And he also told you that
7 it was based on attorney advice that it wasn't
8 required. So if we're going to be asking questions,
9 let's get it all out.
10       MR. LAROSE: Thank you for your
11 testimony. I appreciate that.
12       MS. BLAKE: You've been testifying a
13 lot, too.
14       MR. LAROSE: I'm actually allowed to
15 ask the questions. I thought we were beyond this
16 petty BS, quite frankly. It's been a long, long road.
17 We're almost at the end, so --
18       MS. BLAKE: We are. We are so close,
19 aren't we?
20       MR. LAROSE: Yeah. We are.
21       MS. BLAKE: Okay.
22       MR. LAROSE: Can't wait.
23 BY MR. LAROSE:
24    Q    Did you have enough time to issue an RFQ?

Page 47

1 That's the question.
2    A    That -- those responsibilities were handled
3 by Mr. Williams.
4    Q    So you didn't have anything to do with the
5 fact that an RFQ was not issued?
6    A    That's correct, sir.
7    Q    It says in your letter that, I agree, is
8 very clear that Riverdale is encouraged to participate
9 in the bid process. Did you mean that?
10       MS. BLAKE: Object to form. I think
11 it's Tri-State. Right?
12       MR. LAROSE: Yeah. I'm sorry. You're
13 right.
14       MS. BLAKE: Okay.
15 BY MR. LAROSE:
16    Q    That Tri-State is encouraged to participate
17 in the bid process. Did you mean that?
18    A    Yes.
19    Q    How come it never happened?
20       MS. BLAKE: Object to foundation.
21 BY MR. LAROSE:
22    Q    Mayor?
23    A    I was following the advice of my attorney.
24    Q    Let's get back to Riverdale Materials. Do

Page 48

1 you remember about when this first meeting was at
2 Village Hall?
3    A    No, sir. I do not.
4    Q    In reference to the timeframe, they
5 submitted an application for this conditional use in
6 the summer of 2017. In relation to when they
7 submitted their application, was it months, a year
8 before then? Any idea?
9    A    I wouldn't have any answers for you. Those
10 matters are handled by the Zoning Board and the Zoning
11 Administrator, which was at -- at the time, Robert
12 Sharnhorst.
13    Q    But you're getting mixed up. You met with
14 them. And my question is, when? And my follow-up
15 question is, in relation to when they actually
16 submitted the application, when was the meeting?
17    A    I don't recall when we met. We did have a
18 meeting. I don't remember when.
19    Q    Did you have any subsequent meetings,
20 informal meetings with anybody from Riverdale
21 Materials after then, but before they applied?
22    A    I'm sure there were some follow-ups. Yes.
23    Q    Okay. And were those all at Village Hall?
24    A    Most of them, yes.

Page 49

1    Q    And other than the folks last time you said,
2 Jim Bracken, Tim Williams, you, Robert Sharnhorst were
3 there, other than those folks, at these subsequent
4 meetings, was anyone else present?
5    A    I don't remember any more beyond that.
6    Q    Was it always --
7    A    Sir, I'm sorry, with the exception of my
8 attorney at the time. Well, my current attorney, Matt
9 Welch.
10    Q    Okay. Was Matt at the first meeting, too?
11    A    I don't believe so.
12    Q    All right. Was Jim Bracken the only
13 representative of Riverdale Materials?
14    A    Yes.
15    Q    You ever meet his father?
16    A    At an informal gathering, yes.
17    Q    Okay. What informal gathering?
18    A    I was invited to a luncheon a few years
19 back, and he was there.
20    Q    When you met with Riverdale Materials, did
21 you discuss with them whether or not they would have
22 to pay some type of royalty to the Village for their
23 business?
24    A    That -- that we did have a conversation

13 (Pages 46 - 49)

Page 50

1 about that.

2    Q   Did you discuss with them whether or not

3 they would have to post some security for the closure

4 of their business if, in fact, they just left town?

5    A   Yes.

6    Q   Why did those two things not happen?

7    A   The Board has failed to take action on the

8 matter.

9    Q   The Board had failed to take action on

10 whether or not Riverdale Materials should pay

11 royalties and/or post-closure security?

12    A   Correct.

13    Q   How is that the post of the Board?

14    A   The recommendations from the Zoning Board.

15    Q   The Zoning Board said, "You should get

16 security from them for closure, and you should require

17 them to pay royalties."

18    A   So this is -- it's going back a couple of

19 years, and I was not directly involved with the

20 process. Normally, the Zoning Board would make those

21 recommendations to the Board of Trustees, and it's

22 solely up to the Board if they want to adopt those

23 recommendations or not.

24    Q   Okay. So we -- I remember the timeframe,

Page 51

1 and we're going over it, but from November 2nd, which

2 is, I believe, the last Zoning Board meeting, to

3 within a couple of weeks, when the Board voted to

4 grant the conditional use, was there, to your

5 knowledge, a proposal from the Zoning Board of Appeals

6 that stated that Riverdale Materials should pay

7 royalties and issue a closure bond?

8    A   I don't -- I don't recall. I know when I

9 had my initial conversations with Riverdale Materials

10 and James Bracken, those were some of the concerns

11 that I had.

12    Q   So if those were your concerns, just not

13 understanding why they didn't get implemented?

14    A   The Board would have to take the action to

15 mandate that of Riverdale Materials.

16    Q   Was there ever even a resolution or

17 ordinance drafted that would have included those?

18    A   I don't recall.

19    Q   Well, we know that the ordinance that

20 ultimately got passed to give Riverdale Materials

21 their conditional use license didn't contain that.

22 Didn't have anything to do with it. Was there another

23 ordinance that was proposed that the Board didn't vote

24 on?

Page 52

1    A   Not that I'm aware of.

2    Q   So you being in this government position for

3 like seven or eight years now, how is the Board

4 supposed to vote on something that's not before them?

5    A   Each member of the Board has the authority

6 to introduce ordinances, resolutions and make

7 amendments to pending ordinances.

8    Q   And no one did?

9    A   That's correct.

10    Q   Do you think that would have been a good

11 thing for Riverdale Materials to pay royalties and to

12 post a closure bond or some type of closure security

13 for the site?

14    A   I can't answer that.

15    Q   Why not?

16    A   I'm not in the -- I don't supervise the

17 operations.

18    Q   But you're, come on, you're the mayor. It

19 was a concern of yours. You said why it didn't get

20 implemented is that the Board didn't want it or didn't

21 vote on it. My question to you is, as the mayor,

22 would that have been a good thing for the Village of

23 Riverdale for Riverdale Materials to pay royalties and

24 to issue some type of closure security?

Page 53

1    MS. BLAKE:  Object to form.

2    THE WITNESS:  Am I required to answer?

3    MS. BLAKE:  Yeah. You can answer.

4    THE WITNESS:  I voiced my concerns

5 during the initial meetings, and the Trustees were

6 aware of my position. Ultimately, the authority rests

7 with the Board of Trustees.

8 BY MR. LAROSE:

9    Q   So you don't want to tell me whether you

10 think it would have been a good idea or not?

11    A   I don't want to interject my personal

12 feelings about it. I've already gone on record

13 seeking to get them to pay royalties and host fees.

14    Q   Yeah. That's confusing to me, too. What

15 record?

16    A   I just said --

17    Q   Because you certainly didn't go on record at

18 the time that the ordinance was passed.

19    MS. BLAKE:  But he just testified --

20    THE WITNESS:  Thank you.

21    MS. BLAKE:  -- that he had a

22 conversation about that and that he expressed his

23 views to the Board, but ultimately, it's the Board's

24 decision. So that's what he meant by "on the record."

Page 54

1       MR. LAROSE:  Right now, we're in a
2  deposition.  We're on the record.  You have some back-
3  room meeting with Bracken Box; that's not on the
4  record.  Or with the Brackens.  You talk informally to
5  the Trustees; that's not on the record.  I want to
6  know where on the Village Record, whether it be Board
7  Minutes, whether it be resolutions, whether it be
8  discussions, where on the record did you express that
9  you thought Riverdale Materials should pay royalties
10 and post a bond?
11      MS. BLAKE:  If you know.
12      THE WITNESS:  Huh?
13      MS. BLAKE:  If you know, you can answer
14 him.
15      THE WITNESS:  You -- you know what, I
16 don't have any other comments or statements that add
17 to the questions.  I answered it.  I'm being deposed
18 right now.  I went on the record saying that I wanted
19 Riverdale Materials to pay royalties and host fees,
20 and ultimately, it didn't happen due to the Board's
21 actions.  That's all I have to offer at this time.
22 BY MR. LAROSE:
23   Q   Did you tell Jeff and Sheryl Germany that
24 you would require Riverdale Materials to pay royalties

Page 55

1  and post a bond?
2    A   I never told them that.
3    Q   Did you have a meeting with them about that?
4    A   Me and Jeff Germany met often.  In my
5  office, we had lunch meetings, and I've never, never
6  ever required that of them.
7    Q   You never, ever did what?
8    A   Required a host fee or royalties or --
9  surety bonds.
10   Q   You're misunderstanding my question, and
11 it's probably my fault.  Did you have a meeting with
12 Sheryl and Jeff where you assured them that Riverdale
13 Materials would be required to pay host fees and post
14 a bond?
15   A   No, sir.  I did not do that, and -- because
16 I realized that the authority doesn't lie with me.
17 It's with the Board of Trustees.
18   Q   But you didn't tell them that?
19   A   I wouldn't tell them that 'cause I had no
20 authority to enforce it.
21   Q   Why was Tri-State's contract not renewed?
22      MS. BLAKE:  Just object to legislative
23 privilege.
24      THE WITNESS:  I have to answer?

Page 56

1       MS. BLAKE:  No.
2       THE WITNESS:  Okay.
3       MR. LAROSE:  Oh, I think you do.
4       MS. BLAKE:  Legislative privilege is
5  pretty clear.
6       MR. LAROSE:  Yeah, except when this
7  defendant in an individual capacity has been sued and
8  upheld by the court, at least so far, for retaliating
9  against my clients.  So he has no legislative immunity
10 with respect to that.  None, whatsoever.
11      MS. BLAKE:  Well, I disagree.
12      MR. LAROSE:  Well, are you going to
13 tell him not to answer the question why -- let me ask
14 it a different way.
15 BY MR. LAROSE:
16   Q   Did you have anything to do with Tri-State's
17 contract not being renewed?
18   A   Not at all.
19   Q   Take a look at Exhibit F as in Frank.
20      (Exhibit F was marked for
21      identification.)
22 BY MR. LAROSE:
23   Q   Tell me when you have got it.
24   A   May I have a second to read it over, please?

Page 57

1    Q   Sure.  That's what I said.  Tell me when
2  you're ready.
3    A   Okay, sir.
4    Q   So this is a letter.  Exhibit F is a April
5  18, 2018, letter to Sheryl Germany from Chief of Staff
6  Tim Williams copied to you terminating the contract.
7  Is it your testimony that you had nothing to do with
8  this?
9    A   That's correct.
10   Q   Were you aware of it before it happened?
11   A   Yes.  Of course, I was advised of the
12 matter.
13   Q   And does Tim Williams as Chief of Staff --
14 let's back up.  Chief of Staff, that's not an elected
15 position.  Right?
16   A   It's appointed.
17   Q   By you.  Right?
18   A   Yes, sir.
19   Q   So he answers to you, but he doesn't answer
20 to the voters because they don't elect him.  Right?
21   A   Correct.
22   Q   So when Tim Williams made this -- and by the
23 way, as an unelected official of the Village of
24 Riverdale, he has no power.  Right?

15 (Pages 54 - 57)

Page 58

1        MS. BLAKE: Object to form. Power to
2 do what?
3        MR. LAROSE: To cancel this contract
4 without talking to the Board of Directors or --
5        MS. BLAKE: Well --
6        MR. LAROSE: -- the Board of Trustees?
7        MS. BLAKE: -- you didn't ask about the
8 Board yet. You're just asking about the letter. You
9 didn't ask about the Board activity that occurred
10 before the letter.
11        MR. LAROSE: Well, I haven't gotten
12 there yet, and I'd like to ask the questions in the
13 order that I like to ask them.
14 BY MR. LAROSE:
15    Q    My question is, Tim Williams has no
16 authority to do anything without either getting your
17 approval or the Board of Trustees' approval. Correct?
18    A    That would be correct.
19    Q    So when you told me a couple of minutes ago,
20 "I had nothing to do with canceling the contract,"
21 that's not true. Is it?
22    A    That's not what you said, Mr. LaRose.
23    Q    Oh. I asked you if you were involved in
24 canceling the contract, and you said no. Then I show

Page 59

1 you this document, and your name is on it. And the
2 guy who wrote it doesn't have any power without
3 talking to you or the Board of Trustees. My question
4 now is, do you want to amend your testimony under oath
5 that you had nothing to do with this?
6        MS. BLAKE: I'm going to object to the
7 mischaracterization of the testimony and the form of
8 your question. You're getting very argumentative.
9 BY MR. LAROSE:
10    Q    All right. Let me ask it one more time. Do
11 you have anything to do with the cancellation of
12 Tri-State's contract?
13    A    What I was going to try to tell you, sir,
14 prior to this letter going out, we had Board meetings
15 where these types of decisions are discussed, and it
16 was the consensus of the Board that we should move to
17 another vendor.
18    Q    Okay. And, I'm sorry, but I've looked at
19 the minutes of the Board, and I didn't find any
20 minutes that said, "we're going to cancel the
21 contract." Hold on. Let me just strike what I just
22 said as a comment. Are there any minutes that reflect
23 the Board's decision to cancel the contract?
24    A    There should be. The clerk records our

Page 60

1 meetings, the proceedings. Yes. There should be.
2    Q    And would that have to be done pursuant to
3 resolution?
4        MS. BLAKE: Object to foundation.
5        REPORTER: What was your answer?
6        MR. LAROSE: Terminate a contract.
7 With an existing vendor.
8        THE WITNESS: We didn't terminate the
9 contract. We opted not to renew it.
10 BY MR. LAROSE:
11    Q    Exhibit F says, "cancel the agreement upon
12 its expiration." So terminate, cancel, I don't know,
13 same thing to me.
14    A    Upon expiration, meaning we're not going to
15 renew it.
16    Q    Okay. Let's stick with your interpretation
17 of this, and I'll ask the same question. Would this
18 letter have to have been the result of a Board
19 resolution?
20    A    No.
21        MS. BLAKE: Object to form.
22        THE WITNESS: I'm sorry.
23        MS. BLAKE: Yeah. That's fine.
24 BY MR. LAROSE:

Page 61

1    Q    Why not?
2    A    Again, when we were making the decision as
3 to what to do about sanitation contract, there was a
4 consensus of the Board per discussion among the
5 Trustees that we need to go in a different direction.
6    Q    When was that discussion?
7        MS. BLAKE: If you don't remember, it's
8 okay to say that. I mean, I do have the document and
9 the agenda from the March 2018 meeting if we want to
10 just get right -- right to --
11        MR. LAROSE: That would be great. I
12 don't have that document.
13        MS. BLAKE: March 27, 2018, at 7:00
14 p.m., there was a regular Board meeting in the Village
15 of Riverdale where a motion was passed directing the
16 Chief of Staff on behalf of the Village to provide
17 notice to Tri-State Disposal that the Village was
18 declining any and all extensions provided in the
19 agreement and to obtain proposals from alternative
20 waste disposal contractors for review by the Village
21 Board on or before June 15, 2018. I didn't pull the
22 minutes --
23        MR. LAROSE: Okay.
24        MS. BLAKE: I just pulled the agenda.

16 (Pages 58 - 61)

Page 62

1          MR. LAROSE:  That's fine.  Do you have
2  the minutes?
3          MS. BLAKE:  I don't know.
4          MR. LAROSE:  Can --
5          MS. BLAKE:  I don't know if I have them
6  on me.
7          MR. LAROSE:  Can --
8          MS. BLAKE:  I'm sure I can get them
9  from the clerk.
10          MR. LAROSE:  Marissa, can you take a
11  look, even if we have to go off-line, and see if you
12  can find, what was it, March 18th, did you say?
13          MS. BLAKE:  March 27, 2018, and then
14  this letter was April 18, 2018.
15          MR. LAROSE:  Okay.
16          MS. ALASKA:  Okay.  I will.
17          MR. LAROSE:  Okay.  So this was made by
18  at least voice vote if not resolution, is what you're
19  telling me?
20          MS. BLAKE:  It says a motion, so I'm
21  not sure.
22          MR. LAROSE:  Okay.
23          MS. BLAKE:  You remember here?
24          THE WITNESS:  I just remember it was

Page 63

1  the consensus of the Board.
2          REPORTER:  Mr. Blake -- or Ms. Blake,
3  could you have the witness move a little bit closer to
4  the speakerphone or whatever it is that you're using?
5          MS. BLAKE:  Yeah.
6          REPORTER:  That's great.  You are --
7  you are nice and clear, but Mr. Jackson is just a
8  little bit muffled.
9          THE WITNESS:  Sorry, ma'am.
10          REPORTER:  Oh, that's much better.
11          THE WITNESS:  Thank you.
12  BY MR. LAROSE:
13     Q   So if the obtaining quotes process could
14  occur from March 27th until June 15, 2018, how come
15  the bid process couldn't take that same timeframe?
16     A   Sir, as I stated previously, I was following
17  the advice of my attorney.
18     Q   Not to bid it?
19     A   I was following the advice of my attorney.
20     Q   Why did you tell Jerome Russell not to
21  correspond with Tri-State with respect to the 2018
22  spring clean-up?
23     A   I wanted one point of contact between the
24  Village of Riverdale and Tri-State, and I was

Page 64

1  following the advice of my attorney.
2     Q   Your attorney told you to tell Tim Williams
3  not to contact the contractor that was obligated to do
4  the spring clean-up and obligated to do it free of
5  charge?  Is that what you're telling me?
6          MS. BLAKE:  Object to form.  I think
7  you said Tim Williams in there.
8          MR. LAROSE:  I did say Tim Williams.
9  Jerome Russell.
10          MS. BLAKE:  What was the question?
11  Sorry.
12  BY MR. LAROSE:
13     Q   Jerome Russell testified that when he got
14  the inquiries from Tri-State about the spring clean-up
15  in 2018, like he had gotten inquires for years prior
16  to that, he didn't respond to them because he was told
17  by you not to.  Is it your testimony that that's
18  because that's what your lawyers told you to do?
19          MS. BLAKE:  I'm objecting to
20  mischaracterization of the testimony.  Number one, Mr.
21  Russell had never coordinated a spring clean-up before
22  was his testimony.  Number two, Mayor Jackson just
23  testified that he wanted one point of contact for
24  Tri-State, and he was following his attorney's advice.

Page 65

1  There's two things there.  And so your question is
2  missing quite a few things.
3  BY MR. LAROSE:
4     Q   Who is the point of contact that you wanted?
5     A   That would have been Timothy Williams.
6     Q   Did you tell Tri-State that?
7     A   I had not had conversations with Tri-State
8  for some time prior to my attorney's advice.
9     Q   Did anyone tell Tri-State that Timothy
10  Williams was supposed to be the point of contact?
11          MS. BLAKE:  I'm going to object to
12  foundation.  If you know when other people told Tri-
13  State.
14          THE WITNESS:  Exactly.  I wouldn't know
15  when somebody else in there told Tri-State.
16  BY MR. LAROSE:
17     Q   Pull out Exhibit Q, as in Q.
18          (Exhibit Q was marked for
19          identification.)
20  BY MR. LAROSE:
21          You know, let's hold onto that one for a
22  second.  Hold on.  Hold On.  Hold on.  Let's start
23  with G first.  G as in girl.  Tell me when you.re
24  ready.

17 (Pages 62 - 65)

Page 66

1        (Exhibit G was marked for
2        identification.)
3        THE WITNESS: I'm ready, sir.
4  BY MR. LAROSE:
5    Q   Okay. So G is a, it looks like, a string of
6  two e-mails regarding the spring clean-up. The top
7  one is from Friday, March 16, 2018. The bottom one is
8  from Tuesday, March 20th. The first is to Mr.
9  Russell, copied to Chief Sharnhorst and Kathy from
10 Tri-State. The second one is to you, you know,
11 explaining that Jeff reached out to Russell and
12 Sharnhorst, and they're trying to schedule this spring
13 clean-up. Did you ever respond to this?
14   A   Not to my knowledge.
15   Q   Why not?
16   A   Again, the point of contact was Tim
17 Williams, and I was following the advice of my
18 attorney.
19   Q   Did you show this to your attorney?
20   A   He may have seen it. I don't remember.
21   Q   So if the point of contact was going to be
22 Tim Williams, why didn't you just tell Tri-State,
23 "Call Tim Williams."?
24       MS. BLAKE: Objection. Asked and

Page 67

1  answered.
2        MR. LAROSE: I don't think so.
3        THE WITNESS: I haven't had any
4  communications with the Germanys or Tri-State.
5        MR. LAROSE: Yeah. That's part of the
6  problem.
7        MS. BLAKE: That's not a question.
8  BY MR. LAROSE:
9    Q   As far as you know, did anyone write to the
10 Germanys to tell them that Tim Williams was to be the
11 only point of contact?
12       MS. BLAKE: I'm going to object to
13 foundation and asked and answered.
14 BY MR. LAROSE:
15   Q   Sir?
16   A   Mr. Williams was delegated with the
17 responsibility of communicating with the Germanys and
18 Tri-State. If he did it or didn't do it, that would
19 have been on him.
20   Q   How come you paid Flood Brothers 18,000
21 bucks to do the spring clean-up in 2018 that Tri-State
22 was obligated to do for free?
23       MS. BLAKE: Object to form.
24       THE WITNESS: Did we pay them $18,000?

Page 68

1  BY MR. LAROSE:
2    Q   You sure as hell did.
3    A   That's a matter you have got to take up with
4  Mr. Gonzalez, our Finance Budget Director.
5    Q   That bill was approved by the Board through
6  a warrant.
7        MS. BLAKE: Well, then legislative
8  immunity as to why that was done.
9  BY MR. LAROSE:
10   Q   So we'll get this straight. My client is
11 obligated to perform the spring clean-up pursuant to
12 their contract, free of charge. Right, Mayor?
13       MS. BLAKE: Do you know?
14       THE WITNESS: I'm not sure.
15 BY MR. LAROSE:
16   Q   My client reaches out to set up the spring
17 clean-up, and no one, to your knowledge, responds to
18 them. Right, Mayor?
19   A   To my knowledge, this is the first I'm
20 hearing of it. I thought that Mr. Williams was having
21 ongoing communications with Tri-State.
22   Q   Okay. Flood Brothers gets hired to do the
23 spring clean-up. Do you have anything to do with
24 that?

Page 69

1    A   No. I did not.
2    Q   Who did?
3    A   That probably would have been Mr. Williams.
4    Q   Do you know that?
5    A   I'm not certain. Probably Mr. Williams.
6  I'm not sure.
7    Q   And are you telling me that this is the
8  first time that you're aware that $18,000 was paid to
9  Flood Brothers to do the 2018 spring clean-up?
10       MS. BLAKE: Just object to form.
11 BY MR. LAROSE:
12   Q   Sir?
13   A   You know, I'm sure at the time the invoice
14 was submitted, I was aware of it, so I -- I, you know,
15 yes. I must have had some knowledge of it, yes.
16   Q   So can you explain why it is that the
17 Village would have hired somebody else, paid them
18 $18,000, for a job that my client was obligated,
19 ready, willing, and able to do for free?
20       MS. BLAKE: Object to foundation.
21 Legislative immunity. Privilege. You don't need to
22 answer.
23 BY MR. LAROSE:
24   Q   Sir?

18 (Pages 66 - 69)

Page 70

1        MS. BLAKE:  I just directed him not to
2  answer.  I think it's legislative privilege.
3        MR. LAROSE:  It's not anything of the
4  sort.  He's a defendant here, individually.  I will
5  take this to the judge right now.  We'll go off the
6  record, and we'll go to the judge right now.  This
7  legislative immunity is a bunch of BS.
8        MS. BLAKE:  Okay.
9        MR. LAROSE:  He has the legislative
10  immunity for retaliating against my client.
11        MS. BLAKE:  This isn't --
12        MR. LAROSE:  I want to know why my
13  client wasn't allowed to do the spring clean-up, and
14  people that are supposed to take care of the Village
15  of Riverdale paid eighteen grand to somebody else to
16  do it.  That's what I want to know.
17        MS. BLAKE:  Okay.
18        MR. LAROSE:  You want to direct him?
19  You want to direct him not to answer?
20        MS. BLAKE:  Yes.
21        MR. LAROSE:  We'll go off the record,
22  and we'll get the judge on the phone right now.
23        MS. BLAKE:  Sounds good.
24        MR. LAROSE:  Okie-dokie.  Let me see,

Page 71

1  so we have got to set this thing up with for the judge
2  so she doesn't get tee'd off.  So let's set it up.
3  Victoria, I'm going to ask the question.  Erin's going
4  to make her objection, and then we'll tee it up with
5  the judge.
6  BY MR. LAROSE:
7        Q    So the question, Mayor Jackson, is why did
8  the Village of Riverdale pay the Flood Brothers
9  $18,000 to do the 2018 spring clean-up that Tri-State
10  Disposal was obligated to do under their contract --
11  ready, willing, and able to do under their contract --
12  free of charge.
13        MS. BLAKE:  And my objection was, first
14  of all, it's asked and answered.  He previously said,
15  "You'd have to ask the Treasurer."  The Board approved
16  the bill, and Tim Williams was handling this.  Second
17  of all, with the Board approval of the bills is what I
18  relating was legislative privilege.  Why did they
19  approve the bill to Tri-State?  That's a Board
20  decision, and that's a -- I'm sorry, to Flood Brothers
21  -- legislative decision by the Board.  Therefore,
22  immunity.  And privilege.
23        MR. LAROSE:  Okie-dokie.  Well, let's
24  do this.  Marissa, can you try and set up, try and see

Page 72

1  if the judge is available for a call this afternoon?
2  While we still have the Mayor on the record so that
3  she can make a ruling on this and we can get this
4  question answered?  So, Victoria, I need you to --
5        MS. BLAKE:  I think that you should
6  give her the whole -- you know, if we're going to talk
7  to the judge, let's give her the whole background, not
8  just the one question.  You've been --
9        MR. LAROSE:  Okay.
10        MS. BLAKE:  -- asking the same question
11  multiple times.  He's given you multiple answers.
12        MR. LAROSE:  Yeah.
13        MS. BLAKE:  Or certify it, Mark,
14  certify it and bring a motion.
15        MR. LAROSE:  Well, that's just it.
16  Then what?  I got -- it took me nine months to get the
17  Mayor before me now.  It'll take me --
18        MS. BLAKE:  That wasn't -- that wasn't
19  all our fault.  Let's not --
20        MR. LAROSE:  I didn't say --
21        MS. BLAKE:  -- say it's all our fault.
22        MR. LAROSE:  I didn't say it was your
23  fault.  The last three times were your fault.  The
24  last three times it got canceled were your fault.

Page 73

1        MS. BLAKE:  Yeah, but it was just a
2  week's continuance.
3        MR. LAROSE:  Yeah.  A week here and a
4  week there.  No.  I asked the question, certify it,
5  whatever, that really means nothing.  You know what it
6  means?  The judge has got to make a decision.  And
7  these federal judges, and this federal judge, in
8  particular, is not going to screw around.
9        I asked a clear question.  I asked for
10  answer.  You made an objection that was completely not
11  even close to following the rules.  You could say
12  legislative immunity, and you could say form of the
13  question, and that's pretty much the only two you
14  could say.
15        I'm telling you, under the
16  circumstances, I'm asking this man as a defendant in
17  this case, a personal defendant in this case, a
18  question that he has no legislative immunity from.
19  Zero, zip zilch.  So I asked the question.  It's a
20  clear question.  You made an objection, clear or not.
21  And the judge is going to decide whether he has to
22  answer the question or not.
23        MS. BLAKE:  Okay.
24        MR. LAROSE:  So Marissa --

19 (Pages 70 - 73)

Page 74

1      MS. BLAKE:  Carry on.
2      MR. LAROSE:  Call the judge's clerk and
3  see if she's available.  Tell her we're engaging in
4  the deposition of the Mayor, it's going to go pretty
5  much all afternoon, see if she's got a time, and then
6  when we have a time, we'll take a break and give her a
7  call, and we're probably going to need Victoria on the
8  call because Victoria's going to have to read the
9  question and the answer.  Victoria, do you have the
10  question and the answer?
11      REPORTER:  Yes.  I will have to cue it
12  up.
13      MR. LAROSE:  Okay.  Well, get it queued
14  up.  Listen, we've been going now for an hour and a
15  half.  Get it queued up.  Why don't we take a 5- or
16  10-minute break, and then we'll delve back in.  In the
17  meantime, Marissa, maybe you can call the judge's
18  clerk to see if she's available for a very short
19  conference call with respect to these questions.  And
20  maybe we make it, if we can, later this afternoon,
21  right?  So that if we have any other questions that
22  we're not going to get answers to, then we could bring
23  those up, too.  And Erin, there's another way to do
24  this, I suppose.  You can make your objection, which

Page 75

1  is preserved for the record, and just let him answer
2  the question which is --
3      MS. BLAKE:  I could.  I could.  I'll
4  think about that when we take our break.
5      MR. LAROSE:  Well, think about that,
6  because I think that's the -- I don't want to -- I'm
7  not going to bother this judge piecemeal, but I think
8  this is a big question, and the question couldn't be
9  more simple.  Why did that happen?
10      MS. BLAKE:  Okay.
11      MR. LAROSE:  Okay.
12      MS. BLAKE:  All right.  We'll be back
13  in ten.
14      MR. LAROSE:  Yeah.  So back at -- I got
15  12:32, so why don't we get back at 12:45?  It's 12:45
16  my time.  I'm in Michigan.  So 11:45?  Okie-dokie.
17  Thanks.  Okay.  How do I do this?
18      REPORTER:  Okay.  We are now off the
19  record -- you just put it on mute.
20      MR. LAROSE:  Mute.
21      REPORTER:  -- and turn off your video.
22  And we are now off the record at 11:33 Central time.
23      (Off the record.)
24      REPORTER:  All right.  We're now back

Page 76

1  on the record at 11:54.
2      MR. LAROSE:  Okay.  But I need you to
3  read that -- sorry.
4      REPORTER:  Okay.
5      MR. LAROSE:  I need you to read that on
6  the record.
7      REPORTER:  Okay.
8      MR. LAROSE:  We're going to try and
9  resolve this thing by not having to call the judge, by
10  repeating the question, and seeing if they want to
11  answer.
12      REPORTER:  Okay.  All right.  All
13  right.  I went way too far.  Okay.  On the record, the
14  question is, why did the Village of Riverdale pay the
15  Flood Brothers $18,000 to do the 2018 spring clean-up
16  that Tri-State Disposal was obligated to do under the
17  contract -- ready, willing, and able to do under their
18  contract -- free of charge?
19      MS. BLAKE:  Object to form.
20  Foundation.  But I will allow him to answer over the
21  objection.
22      MR. LAROSE:  Thank you.
23      THE WITNESS:  So with -- with regards
24  to the annual clean-up, I have never supervised or

Page 77

1  managed the coordination of that program or project.
2  That was given to Mr. Tim Williams.  Mr. Williams
3  opted to go with a different vendor.  The Board of
4  Trustees upheld his decision and paid the bill.
5  BY MR. LAROSE:
6      Q    And you didn't have anything to do with it?
7      A    Not at all, sir.
8      Q    Okay.
9      MR. LAROSE:  We're going to get some
10  barking here in a minute because I have a visitor
11  delivering something.  It's the product of being a
12  country lawyer with Labradors.  Sorry, you guys.
13  BY MR. LAROSE:
14      Q    I want to follow up on something we talked
15  about a little bit earlier, Mayor.  Do you remember a
16  specific meeting with Sheryl and Jeff, Dave Gonzalez,
17  and you at city hall that discussed the issue of
18  whether Riverdale Materials would be required to pay
19  royalties and/or post a closure security?
20      A    You know what, we may have had those
21  meetings, I -- you know, prior to breakdowns in
22  communication and before I transferred the
23  communication responsibilities over to Mr. Williams,
24  Jeff and I used to talk regularly.  One of his primary

20 (Pages 74 - 77)

Page 78

1  concerns was trying to reduce his taxes. You know, at
2  one point, he even made mention of trying to have his
3  parcel annexed to the Village of Dixmoor. So him and
4  I would talk regularly. We would go out for lunch and
5  talk regularly. We had several conversations. We may
6  have -- may or may not have talked about -- about
7  these host fees that you're mentioning.
8      Q    What was the cause of the breakdown of
9  communication?
10     A    Tri-State, near to end, they were becoming
11 very hostile, very aggressive in their communication.
12 We were having some serious financial problems, and
13 we -- we were backed up on our invoices, paying them.
14 And I was trying to handle the situation as
15 professionally as possible, and -- and letting Mr.
16 Germany know that I don't handle the day-to-day
17 operations of accounts payable, but if it's a -- if a
18 vendor has a concern about non-payment, I do bring it
19 up to our Budget Director, our Treasurer, David
20 Gonzalez.
21         And I -- I think, you know, that it caused
22 some stress and some strain in the relationship, you
23 know. And I -- I understand that because, you know,
24 the Germanys have their expenditures, too. Payroll

Page 79

1  and insurance and taxes. But we were doing the best
2  we could at the time. And, you know, when things just
3  got to a point where I couldn't tolerate any longer, I
4  told Mr. Williams, "I want you to handle this vendor
5  and oversee their account."
6          You know, there were times where, you know,
7  representatives from the Germanys were calling the
8  Villages up three, four times a day, and they were
9  directing questions to people who had nothing to do
10 with accounts payable. And the clerical staff was
11 complaining about that. You know, they felt like they
12 were being interrogated, being harassed, to the point
13 where I had written a letter to the Germanys asking
14 them not to communicate with us via telephone.
15     Q    We'll go over that in a little bit. Back to
16 the point --
17     A    And Mr. Germany -- Mr. Germany and I had
18 exchanged our personal cell phones. And so I was also
19 getting the text messages as well about getting paid.
20 You know, so I -- I tried to work with them and, you
21 know, my apologies for backing away, but, you know,
22 this was something that I had no control over. You
23 know, every -- every vendor that was doing business
24 with the Village of Riverdale, their payments were

Page 80

1  backlogged for months.
2      Q    Okay. So we got a little bit off track
3  there. I appreciate all that that you just said. But
4  do you remember whether there was a specific meeting
5  with you, and Dave Gonzales, and Sheryl, and Jeff
6  where the issue of Riverdale Materials paying
7  royalties and/or closure bonds occurred?
8      A    I wouldn't have met with the Germanys about
9  Riverdale Materials paying royalties.
10     Q    Okay. So --
11     A    I did meet with the Germanys about their
12 royalties, and that matter was given to Mr. Gonzalez
13 to handle.
14     Q    Okay. And the reason why I'm following up
15 on this is because I didn't want you to get hung up.
16 I think my previous questions in this regard was, "Did
17 you assure them that Riverdale Materials would have to
18 pay royalties and/or a closure bond." I didn't want
19 you to get hung up on the word "assure," but what
20 you're telling me right now, your testimony is, you
21 never had any discussions with them with --
22     A    No. I didn't say that. I may have had a
23 conversation with them. Keep -- keep in mind, sir, I
24 meet with a lot of people regarding a lot of different

Page 81

1  issues, and even though I may take the -- the
2  preliminary meeting to find out what the issue is,
3  it's usually passed off to a department head who had
4  more knowledge or expertise of the problem. In this
5  particular case, that would have been Mr. Gonzalez.
6  Seeing that he's a CPA and he's handling our finances;
7  he would be better able to gauge how the Village would
8  be impacted by such a decision.
9      Q    Okay. I'm just trying to get to what you
10 remember about whether or not you talked to the
11 Germanys about Riverdale Materials paying royalties or
12 posting a closure bond. Do you remember anything like
13 that?
14     A    I never had a conversation with the Germanys
15 about Riverdale Materials.
16     Q    Okay. Do you think -- never mind. I think
17 we covered this already, and I don't want to -- we've
18 got plenty to go through. I don't want to backtrack.
19 Now that we're on this kind of subject let's look at
20 Exhibit Q. Q as in Q. Foods that start with the
21 letter Q? No one's laughing. No one knows what
22 that's from.
23         MS. BURKE: Quesadilla. Queen.
24         MR. LAROSE: Foods that start with the

21 (Pages 78 - 81)

Page 82

1  letter Q.  Remember?  From White Men Can't Jump?
2         MS. BURKE:  Oh.  No.  I didn't remember
3  that.  I haven't --
4         MR. LAROSE:  Woody --
5         MS. BURKE:  -- seen that movie in a
6  long time.
7         MR. LAROSE:  Woody Harrelson's
8  girlfriend went on Jeopardy, and the category was
9  "Foods that Start with the Letter Q," and she, like,
10  won, I don't know, $100,000 or something.
11  BY MR. LAROSE:
12     Q    Tell me when you're ready, Mayor.
13     A    I'm ready, sir.
14     Q    Okay.  So this is the letter you referred
15  to.  Do Not Call Request.  Do you remember ever
16  issuing a letter like this, other than this one, in
17  your entire term as Mayor since 2013?
18     A    No.  Though I -- I do have to say that I've
19  never had a vendor engage the Village in such a
20  disrespectful and offensive manner.
21     Q    So we asked, in discovery and in FOIA
22  requests, for any documents about disrespectful and
23  harassing manner, and we never got any.  And when I
24  asked Jerome Russell about it, he said he had no idea.

Page 83

1  And when I asked Dave Gonzalez about it, he said he
2  had no idea.  So do you have pieces of paper that
3  document any of this stuff you're referring to in
4  Exhibit Q?
5     A    No.  I don't have any documentation, but
6  there were times when I would come to work, and the
7  clerks would say, you know, "We received a call from
8  Tri-State.  They want to know when they're getting
9  paid."  Or my -- my HR director would tell me that
10  some of the staff members are complaining about
11  Tri-State calling and being overly aggressive in
12  inquiring about their payments.
13     Q    Okay.  So this letter goes out on April
14  25th.  When did these employees complain about hostile
15  and harassing style of communications?
16     A    You know, that -- we didn't keep an official
17  record of it.  And I'm -- I'm going to say this to
18  you, Mr. LaRose.  I -- I took their complaints to be
19  credible because I, too, were getting the same
20  harassing calls.
21     Q    And was it harassing just because they
22  wanted to get paid the over $300,000 that you owed
23  them?
24     A    Harassing as in multiple calls about the

Page 84

1  same subject.  Wanted to know why couldn't they get
2  paid, when they were going to get paid.  But, you
3  know, I would direct them to accounts payable.  And
4  for some reason, that wasn't sufficient enough for
5  them.  I -- I really believe that the motive was to --
6  to be a nuisance and to embarrass the Village.
7     Q    Why do you believe that?
8     A    Why would you call me four or five times in
9  one day asking about payments, and --
10     Q    You have phone records that prove that?
11     A    Well, not anymore.  I mean, you would have
12  to get it from Boost Mobile.
13     Q    All right.  What's your cell phone number?
14     A    (708) 545-1770.
15     Q    And Booth Mobile is the --
16     A    Boost.  Boost Mobile.
17     Q    B-O-O-T-H?
18     A    Yeah, B-O-O-S-T.
19     Q    B-O-O-S-T.  Boost Mobile.  And is that the
20  carrier you had back in 2018?
21     A    Actually, it's still my provider.
22     Q    Okay.  Good.  So who were the employees that
23  complained?
24     A    I don't recall, sir.

Page 85

1     Q    Okay.  And after this directive, do not call
2  request, did Tri-State or anybody from Tri-State
3  continue to call?
4     A    I didn't receive any more calls.
5     Q    And did you receive any more so-called
6  complaints?
7     A    No.
8     Q    With all of the calls that supposedly
9  happened, and I don't doubt that some of them
10  happened, but that supposedly happened with respect
11  to, "When are we going to get paid?" did anyone
12  respond to them in writing that says, "We're going to
13  pay you as soon as we can.  Thank you for your
14  patience.  We just don't have the money right now."
15  Or anything like that?
16     A    So my understanding, Mr. LaRose, is that Mr.
17  Gonzalez, as well as those working in accounts
18  payable, contacted the Germanys and informed them of
19  our financial predicament.  If I'm not mistaken,
20  partial payments were made.  But, you know, this was a
21  problem that we were dealing with all of our
22  vendors.  We were behind on bills, and we had to
23  actually get an advance on our future tax revenues
24  that were going to come in.

22 (Pages 82 - 85)

Page 86

1    Q    But that didn't happen until the summer of
2  '18.
3    A    I -- I don't remember the exact time, but I
4  do know what was going on and what led up to us having
5  to get an advance.
6    Q    When I showed Mr. Gonzalez a letter from
7  another counsel for Tri-State saying that, you know,
8  the bills were past due and all that, he said he never
9  saw it before.  And he said that he didn't correspond
10  with Tri-State in any way to tell them why their bills
11  were being held up.  Do you know differently?
12    A    It would have been Mr. Gonzalez's or Mr.
13  Williams' responsibility to notify them of our
14  financial situation.
15    Q    Yeah, hold on.
16         MR. LAROSE:  Erin, you guys froze up
17  for a minute there.  And now it's saying my internet
18  connection is unstable.  I don't know.
19         MS. BLAKE:  It looks -- we --
20         MR. LAROSE:  I'm unstable, but I don't
21  know about my internet connection.
22  BY MR. LAROSE:
23    Q    So let's try this one again because you cut
24  out there for a minute there, Mayor.  When I showed

Page 87

1  Dave Gonzalez an exhibit that I'm going to show you in
2  a minute, which was a letter from another lawyer that
3  represents Tri-State about the outstanding bills,
4  first he said he had never seen it, and second, he
5  said, "I never corresponded with anybody from
6  Tri-State to tell them why we're not paying them."  Do
7  you know differently?
8    A    No.  I don't.
9    Q    All right.  Let's, while we're on that
10  subject -- okay.  Look at Exhibit L, please.  L as in
11  LaRose.
12         (Exhibit L was marked for
13         identification.)
14         MS. BLAKE:  L, you said?
15         MR. LAROSE:  L as in LaRose.  That is
16  correct.
17  BY MR. LAROSE:
18    Q    You got it, Mayor?
19    A    Okay, sir.
20    Q    So this document, Exhibit L, is dated
21  February 27, 2018.  It's a letter addressed to you by
22  Federal Express.  And it's from Ken Bellah on behalf
23  of Tri-State inquiring about outstanding bills as of
24  that date to the tune of 192,000 and change.  It's

Page 88

1  sent to you, it's copied to your Chief of Staff, and
2  it looks like the rest of the Trustees.  Do you
3  remember seeing this document?
4    A    I don't remember, but I -- I take it -- it's
5  legit.
6    Q    Okay.  Did you respond to it?
7    A    No.  If I --
8    Q    Did anyone?
9    A    I'm sorry.
10    Q    Do you know if anyone did?
11    A    When I receive letters like this from
12  counsel, I turn it over to our legal department.  So
13  most likely, that would have went to my attorney, Matt
14  Welch.
15    Q    Okay.  But since it's an inquiry just about
16  payments and not about anybody going to sue you or
17  anything like that, why wouldn't it have gone to Dave
18  Gonzales?
19    A    Sir, I've always felt it better to let
20  lawyers handle other lawyers.
21    Q    Probably a wise move.  So do you recall that
22  you didn't send it to Gonzalez because he said he
23  never saw this?
24    A    I know I sent it to my attorney.  How it was

Page 89

1  handled from there, I'm not sure.
2    Q    And do you know whether anybody, whether it
3  was your attorney or anyone else, responded to this
4  letter?
5         MS. BLAKE:  Object to foundation.
6         THE WITNESS:  I wouldn't know that.
7         MR. LAROSE:  Okay.
8         THE WITNESS:  How am I expected to know
9  that?
10         MS. BLAKE:  You're not.
11         THE WITNESS:  Okay.
12         MS. BLAKE:  He's just trying to see if
13  you did.
14  BY MR. LAROSE:
15    Q    If -- strike that.  We know that Tri-State
16  didn't perform the spring clean-up in 2018, but they
17  did in 2019.  Are you aware of that?
18    A    No.  I am not.
19    Q    So you didn't have anything to do with them
20  doing their job pursuant to the contract under the
21  spring clean-up in 2019?
22    A    Mr. LaRose, as I stated earlier, I don't
23  handle the coordination of that program.
24    Q    So the answer would be "No.  I didn't have

23 (Pages 86 - 89)

Page 90

1 anything to do with it." Correct?
2    A    Exactly.
3         MR. LAROSE: Erin?
4         MS. BLAKE: Yeah. Sorry.
5         MR. LAROSE: That's all right. Let's
6 look at H as in Henry and I as in Identical.
7         (Exhibits H and I were marked for
8         identification.)
9         MS. BLAKE: Okay.
10 BY MR. LAROSE:
11   Q    So H is a flyer for the 2018 Community
12 Clean-up. That's the spring clean-up. Right, Mayor?
13   A    Yes, sir.
14   Q    Okay. And then I is a banner or a picture
15 of a banner or sign or something like that, for the
16 same thing. Right?
17        MS. BLAKE: Say yes.
18        MR. LAROSE: Mayor?
19        MS. BLAKE: Let him know you heard him.
20        THE WITNESS: Yes.
21 BY MR. LAROSE:
22   Q    Okay. That was easy. Did you personally
23 receive any complaints about how Tri-State performed
24 the spring clean-up in the past?

Page 91

1    A    Any complaints would have gone to the Public
2 Works Director, Jerome Russell.
3    Q    I can only ask you what you know. So would
4 the answer be, "No, I never received any personal
5 complaints?"
6    A    I have gotten complaints in the past, but
7 they were directed to Mr. Russell to handle.
8    Q    Okay. About the spring clean-up?
9    A    Mm-hmm.
10   Q    You have to say yes or no.
11   A    Yes. My apologies. Yes.
12   Q    When were those?
13   A    I don't remember, you know, when they
14 occurred and the nature of them. But you do have
15 people who call and complain, as they do with
16 shoveling snow, or police calls, and other things that
17 pertain to municipal services.
18   Q    Did any of the complaints that you received
19 in any nature about Tri-State have anything to do with
20 the Village canceling or not renewing their contract?
21   A    No.
22   Q    Did any of the complaints that you received
23 of any nature have anything to do with Flood Brothers
24 performing the 2018 spring clean-up and not Tri-State?

Page 92

1    A    No.
2    Q    The complaints that you received about
3 Tri-State, could we characterize them as kind of
4 run-of-the-mill?
5    A    Exactly.
6    Q    Okay. Same type of complaints that you
7 would receive from people about any municipal service?
8    A    And -- and Flood.
9    Q    Right. And so you know, being the mayor and
10 being involved in politics, sir, people are going to
11 complain no matter what about something. Right?
12   A    Yes, sir.
13   Q    So that's kind of how I characterize
14 run-of-the-mill. Right?
15   A    Yes.
16   Q    Okay. You have any knowledge about Jim
17 Bracken calling me up and waking me up out of bed, and
18 threatening me?
19   A    No.
20   Q    Okay. You haven't talked to him about that?
21   A    No.
22   Q    So with respect to the payments to
23 Tri-State, or really, any other vendor, but I'm most
24 concerned about them, can you walk me through the

Page 93

1 process of how invoices get paid in the Village of
2 Riverdale?
3    A    Payments are at the sole discretion of the
4 Budget Director, our Treasurer. He prioritizes
5 what -- what bills need to be paid first. I know at
6 one point, he told me that payments were being
7 partially made based on some type of formula or
8 percentage basis that he was working on. But I -- I
9 don't interfere with that because I don't have the
10 expertise. I'm not a Certified Public Accountant.
11   Q    And the Budget Director and Treasurer, I
12 thought he was Finance Director, whatever. That's
13 Dave, Gonzalez. Right?
14   A    Yes. I'm sorry. The titles are
15 interchangeable.
16   Q    Right. That's fine. And I was really kind
17 of getting to the larger picture on the process. And
18 let me see if I can take you through you it from what
19 other people have testified to so that we can nail it
20 down with you. So invoice comes in from Tri-State.
21 Right?
22   A    Yes, sir.
23   Q    It goes to the department head, or at least
24 did at some time, to the department head regarding

24 (Pages 90 - 93)

Page 94

1 that type of business. In this case, for a long time,
2 Jerome Russell. Right?
3      A  Right.
4      Q  And then Russell initials it, and it goes on
5 some warrant list, a list of invoices to be approved
6 by the Board. Correct?
7      A  Yes.
8      Q  And then the next formal meeting of the
9 board after the warrant list is prepared, the Board
10 votes to approve those payments. Correct?
11      A  No. It's a process. So each invoice that
12 comes into the Village of Riverdale, it's assigned to
13 its respective department. In this case, with
14 Tri-State, it would have been Public Works. Mr.
15 Russell would have the responsibility of coding the
16 invoice. So sanitation has a budget line-item number
17 that he puts on there. He basically signs it. From
18 there, it goes to accounts payable. Then we have a
19 Trustee, our Senior Trustee who serves as our Finance
20 Chairman, will review the process, look at all the
21 invoices, sign off on it. From there, it goes to the
22 Board of Trustees for a full vote. From there, the
23 Board has now given Mr. Gonzalez the authority to
24 issue payments to these different vendors.

Page 95

1      Q  How long ago did Gonzalez get that
2 authority?
3      A  He had it upon his appointment.
4      Q  Do you remember when that was?
5      A  Mr. Gonzalez has been with me now, I'd say
6 six, almost seven years.
7      Q  Okay. So he would have had it back before
8 the time that we got into controversy about payments
9 in '15, '16, something like that?
10      A  Right. You know, I -- I understand your --
11 your question and your concerns about payments to
12 Tri-State. I really wish they had not taken so
13 personally. You know, had -- had Mr. Germany been a
14 little bit more sensible in his communication, I would
15 have been more than happy to show him the stack of
16 bills on my desk that were unpaid. You know, we
17 didn't pay our attorneys. We couldn't pay our
18 accountants. We couldn't pay our engineers. We were
19 behind on our insurance payments. At that particular
20 time, we had just enough money for operations. That's
21 payroll, utilities, things of that nature.
22      Q  Did Tri-State ever threaten to cut off their
23 services because they weren't getting paid?
24      A  It was not -- it was implied. It was

Page 96

1 implied. It never came out directly and said such,
2 but Mr. Germany, on occasion when I would talk to him
3 on the phone, he made it clear that his workers don't
4 work for free and that his trucks don't run on water.
5 So he was letting me know in a very subtle way that if
6 we didn't get them the money, don't expect the garbage
7 to be picked up.
8      Q  Did he say those words?
9      A  No. That's what I -- that's what I'm
10 saying. It was implied.
11      Q  Okay. Did you ever receive anything in
12 writing from anybody from Tri-State saying, "Since you
13 owe us $300,000, we can't continue to pick up the
14 garbage"?
15      A  I -- no. I don't recall getting any written
16 communication like that.
17      Q  But you did receive those communications
18 from Floor Brothers. Didn't you?
19      A  I don't recall that, either.
20      Q  So Flood Brothers didn't ever threaten to
21 suspend service or issue a notice that service would
22 be suspended if they didn't get paid?
23      A  If we received a letter like that, that
24 would have been handled by Mr. Gonzalez.

Page 97

1      Q  So you're not aware of that?
2      A  I don't recall that.
3      Q  If Tri-State would have threatened directly
4 to terminate the services until they got paid, what
5 would have happened then?
6      A  I would have to consult with my attorney as
7 to what options were available.
8      Q  Do you know, so I've been over all the
9 records. You don't have to believe me, but I'm going
10 to tell you what the truth is. That for years, even
11 though they were supposed to be paid in 15 days, they
12 got paid between 30 and 45 days. For years.
13 Including through 2016. Then in 2017, when they start
14 objecting to Riverdale Materials, they're two, three,
15 four, sometimes five months late. Do you know why
16 that changed from time to time?
17           MS. BLAKE: I'm going to object to the
18 form of the question.
19           MR. LAROSE: Let me try and -- it was
20 kind of a convoluted question. And a valid objection.
21 BY MR. LAROSE:
22      Q  Why did Riverdale get paid on a more timely
23 basis for an extended period of time, and later on, a
24 less timely basis?

25 (Pages 94 - 97)

Page 98

1 A  Riverdale?  What do you mean, sir?
2      MS. BLAKE:  I think he meant Tri-State.
3      MR. LAROSE:  I'm sorry.
4      THE WITNESS:  Okay.
5      MR. LAROSE.  I did.
6 BY MR. LAROSE:
7  Q  Let me say it again.  Sorry.  Do you know
8 why Tri-State got paid for an extended period of time
9 on a more timely basis, and then starting in the fall
10 of 2017, on a less timely basis?
11  A  I know that we had some serious financial
12 problems, but the decision to make payments to certain
13 vendors, that is the sole discretion of Mr. Gonzalez.
14  Q  Why did Flood Brothers get paid on a more
15 timely basis than Tri-State?
16      MS. BLAKE:  Object to foundation.
17      THE WITNESS:  Do I have to answer that?
18      MS. BLAKE:  You have to answer if you
19 know.
20      THE WITNESS:  I -- I don't know.
21 BY MR. LAROSE:
22  Q  Is that surprising to you?
23  A  I'm not surprised by it, but I have to say
24 this:  I'm usually not aware that there's a problem

Page 99

1 unless vendors are calling me or unless Mr. Gonzales
2 is saying, "Hey, we have a cash flow issue."  By the
3 time Flood Brothers came in, I think we were turning a
4 curve on our financial woes.  I'm not sure.
5  Q  And the records seem to bear that out.  But
6 if you're turning the corner on your financial woes,
7 why wouldn't the older vendors, meaning the vendors
8 that had the oldest invoices, like Tri-State, get paid
9 before the vendors that had the new invoices, like
10 Flood Brothers?
11      MS. BLAKE:  Object to foundation.
12      THE WITNESS:  That would be a Mr.
13 Gonzalez question, sir, respectfully.
14 BY MR. LAROSE:
15  Q  I asked him that.  He didn't know either.
16 Okay.  So just to clear this up, you didn't have
17 anything to do with directing anybody, Mr. Gonzalez or
18 anybody else, to hold back payments to Tri-State?
19  A  Not at all.  That -- I mean, not at -- not
20 at all.
21  Q  Okay.  There was a point in time when -- and
22 it was before Tri-State's contract terminated -- when
23 there were complaints about other garbage contractors
24 at the multi-family units.  Do you remember that?

Page 100

1  A  Do you mind rephrasing the question?
2  Q  Sure.  I don't mind.  Sometime before July
3 of 2019, there were complaints by multi-family
4 residents that were served by different contractors
5 about trash pickup.  Do you remember that?
6  A  Vaguely.  Yes.
7  Q  Do you remember that you made the comment
8 that you were going to contact counsel to get these
9 vendors' licenses revoked?
10  A  I don't --
11  Q  Do you remember saying anything like that?
12  A  No, sir.  I don't remember saying that.
13      MR. LAROSE:  Marissa, will you text me
14 where that came from so that I don't got to go
15 fumbling around for it, please?
16 BY MR. LAROSE:
17  Q  Was Flood Brothers one of the companies that
18 people were complaining about?
19      MS. ALASKA:  Yes.  I'm going to text
20 you the exhibit number right now.  It's double O.
21      MR. LAROSE:  Okay.  But hold on.
22      MS. ALASKA:  Yes.
23      MR. LAROSE:  I was asking him a
24 question.  So it's double O right now, which is the

Page 101

1 exhibit that I need to show him?
2      MS. ALASKA:  Yeah.
3      MR. LAROSE:  All right.
4      MS. ALASKA:  Starting page 47.
5      MR. LAROSE:  All right.
6      MS. BLAKE:  Hold on.  I've got to go
7 find double O.  Just a minute.
8      MR. LAROSE:  Yup.
9      MS. BLAKE:  My exhibits only go up to
10 double K.
11      MR. LAROSE:  Yeah.  I think you got
12 double O yesterday, but I can.
13      MS. BLAKE:  No.  Those only went up to
14 double K, and so I was looking --
15      MS. ALASKA:  No.  It was attached to
16 the e-mail here.  I don't know why --
17      MR. LAROSE:  Well, and Erin, maybe we
18 can get through this in another way.  Double O is the
19 Village's response to our second request for
20 production, and the documents attached thereto, which,
21 let's see --
22      MS. BLAKE:  That works.  Oh.  I see it
23 at the bottom there.  Little Exhibit OO.  Okay.  We
24 got it.

26 (Pages 98 - 101)

Page 102

1 BY MR. LAROSE:
2    Q    All right, so, Mayor, take a look at RD047
3 on Exhibit OO.
4             (Exhibit OO was marked for
5             identification.)
6 BY MR. LAROSE:
7    Q    Does that refresh your recollection as to
8 whether you wanted to revoke some licenses or at least
9 contact legal counsel to do so?
10   A    Yes.  And well, sir, your question, and I
11 don't mean this to be disrespectful and kind of taken
12 out of context.  This e-mail was generated to
13 department heads because we were having a problem with
14 trash everywhere, and I was on Code Enforcement to
15 clean the town up.  One of the problems that we were
16 experiencing is we have a high vacancy rate of homes
17 that are abandoned, which causes us to have dumping
18 everywhere.
19         And we have homeowners and landlords; their
20 properties were in foreclosure; they weren't paying
21 their sanitation bills.  So the tenants were sitting
22 trash out everywhere.  Raccoons and possums were
23 gnawing at the trash, and it was -- it was a mess.
24 People who were not picking up trash and landlords

Page 103

1 that were not being responsible faced revocation of
2 their occupancy permits and their business licenses
3 for not fulfilling the obligations per ordinance.
4    Q    Yeah.  But this one on page 47 doesn't refer
5 to landlords or occupants.  It refers to sanitation
6 vendors.  Garbage companies.  Right?
7    A    Correct.
8    Q    Okay.  And then behind this, page 48, that's
9 a picture of Waste Management's dumpster.  Page 49, a
10 picture of Flood Brother's dumpster.  Page 50, a
11 picture of Republic Service's dumpster.  We asked for
12 complaints, in these documents, about Tri-State.  And
13 what we got back was you're going to revoke the
14 licenses of, you know, maybe these other companies.  I
15 don't know.  Do you have any pictures about Tri-State?
16   A    Mr. LaRose, let me -- hold on for a second.
17   Q    It's all right.  Take your time.  I mean, I
18 -- that's what we're trying to get at here.  I mean,
19 we asked in discovery, a legal document in this case,
20 give us the complaints.  And what we got was, you're
21 going to revoke the licenses of some of these people,
22 or at least talk to counsel about it, and none of them
23 is us.
24         MS. BLAKE:  I'm just going to go ahead

Page 104

1 and object to form again because your second request
2 for production asks for complaints regarding
3 multi-family units in the Village.  It doesn't ask
4 about Tri-State specifically.  It asks about
5 complaints regarding multi-family units in the
6 Village.
7         MR. LAROSE:  Okay.  So were there any
8 complaints --
9         MS. BLAKE:  -- the production, and --
10        THE WITNESS:  Exactly.
11 BY MR. LAROSE:
12   Q    Well, I got it.  So have you --
13   A    My question -- my answer to you, sir, I'm
14 glad you brought this up so you -- it demonstrates
15 that Tri-State was not being singled out.  They were
16 being held to the same standard as everyone else, or
17 everyone else was being held to the same standard as
18 Tri-State.  And when we had vendors that were coming
19 to town to pick up garbage, and they would leave bulk
20 items like sofas and other things like that, that's
21 unacceptable.  You can't do that.  So yes, we did
22 threaten revocation of business licenses if they could
23 not do -- perform their duties per contract or per
24 ordinance.  But I'm glad you brought this up because

Page 105

1 Tri-State was not singled out in any way.
2    Q    Was Tri-State not part of this production
3 because they weren't behaving the same way?
4    A    Tri-State most likely was not part of this
5 production because the Board had passed an ordinance
6 requiring multi-family dwellings to use Flood.
7    Q    I think this was before that, and we're
8 going to go over that in a while.  But it's not just
9 Flood Brothers.  It was Waste Management and Republic.
10 I think your ordinance was passed a couple of months
11 later.  A couple of months after you're, you know,
12 you're going to revoke their license.  So the question
13 then is, if Flood Brothers was performing poorly
14 enough for you to contact legal counsel to revoke
15 their license, why did they get the garbage contract?
16   A    That's, you know, you've taken this out of
17 context, sir.  There were landlords in town.  For
18 whatever reasons, they had a 16-unit building with one
19 dumpster there, or maybe you had a landlord that
20 wasn't paying the bill on time, so services weren't
21 being provided to that property.  And because of that,
22 you had overflow of trash on the streets and in the
23 alleys.  It wasn't about Flood Brothers not performing
24 their services.  It's about the people who hired Flood

27 (Pages 102 - 105)

Page 106

1 Brothers that weren't paying them or not purchasing
2 enough dumpsters to accommodate their -- their
3 tenants.
4    Q   Okay.  But your e-mail to Robby and a bunch
5 of department chiefs doesn't say anything like that.
6 It says, "revoke the business licenses of these
7 sanitation vendors that can't comply with our code."
8 Isn't that what it says?
9         MS. BLAKE:  Is that what the e-mail
10 said?  Oh, I took it away.  Hold on.
11        THE WITNESS:  Sir, can I ask you a
12 question?
13 BY MR. LAROSE:
14    Q   Sure.
15    A   Why would it be necessary for me to explain
16 to my department heads the directive that I gave them?
17    Q   I don't know.  You wrote the e-mail.
18    A   That's my point.
19    Q   Why was it necessary?
20    A   I gave them a task to perform.  I didn't
21 need to explain to them why I did it.
22    Q   Okay.  But the document that you wrote to
23 them on March 6, 2019, doesn't say anything about the
24 landlords, doesn't say anything about less dumpsters

Page 107

1 than they need, doesn't say anything about too many
2 people.  It says, "to revoke the business licenses of
3 these sanitations vendors that can't comply with our
4 code."  Doesn't it say that?
5    A   The e-mail?  Yes.
6    Q   Yes.
7    A   It does.
8    Q   Okay.  So at least to this extent, when you
9 say, "I don't get involved in these trash matters," or
10 whatever, you did get involved with this one.  Right?
11        MS. BLAKE:  I'm just going to -- you're
12 badgering a little bit here, Mr. LaRose.  But I
13 also --
14        MR. LAROSE:  You've seen nothing yet,
15 but that was -- that was so far from badgering, it's
16 not even funny.  I'm asking him that -- he did say,
17 like 10 times, "I don't get involved in that mess."
18        MS. BLAKE:  Well, you -- no.  You're --
19        THE WITNESS:  That's not what I said.
20        MS. BLAKE:  What he was talking about
21 not getting involved at and this issue are two
22 different things.  It's not fair to make that
23 comparison.  You're putting your opinions and theory
24 into questions that just, you know, it's not

Page 108

1 appropriate.  You're also showing him partial exhibits
2 of page 36 of the double OO is a Tri-State garbage
3 can, I'm just finding.  You know, so it's, you know.
4        MR. LAROSE:  You've got the whole
5 double O in front of you, and you can ask him whatever
6 questions you want.  My question was about his e-mail
7 and the fact that he was directly involved.  I guess I
8 don't need him to admit that because he said he wrote
9 the e-mail.  So let's just move on.
10        THE WITNESS:  My -- my duties as mayor
11 is not totally ceremonial.  You know, there are
12 responsibilities that I delegate to other people
13 because they have more knowledge, experience, and
14 expertise.  But I can't help not seeing trash
15 everywhere when I'm driving around the town and
16 driving through alleys.  And if I see it, I'm going to
17 inquire about it.
18        How come Code Enforcement is not citing
19 these people?  How come Public Works is not cleaning
20 it up?  How come the vendors are not coming to collect
21 trash out of their receptacles?
22 BY MR. LAROSE:
23    Q   Okay.  Speaking of the alleys, why was it
24 the policy that, for a long time, that the alleys

Page 109

1 didn't get plowed?
2    A   The alleys have never gotten plowed and if
3 they --
4    Q   Except for last week, right before the
5 election, right?
6    A   Oh my god.
7    Q   Not "Oh, my god."  Were the alleys plowed
8 last week or not?
9    A   Yes.  People had to get out.
10    Q   So people didn't have to get out before last
11 week, but last week -- and let's make it clear.  It
12 was at your direction that the alleys were plowed.
13 Correct?
14        MS. BLAKE:  Object to form.  Incomplete
15 hypothetical.  Can you please rephrase your question?
16 BY MR. LAROSE:
17    Q   It was at your direction that the alleys
18 were plowed on 2/18 --
19        MS. BLAKE:  [inaudible].
20 BY MR. LAROSE:
21    Q   -- 2021?
22    A   With the snowfall that we had, it would --
23 would have been a hardship and a burden on the
24 residents to shovel out their own garages' alleys.

28 (Pages 106 - 109)

Page 110

1    Q    So the question is, "Yes, I directed that,"
2  or "No."?
3         MS. BLAKE:  The answer is what was
4  stated, Mr. LaRose.  He answered your question
5  clearly.
6         MR. LAROSE:  No, he didn't.  No, he
7  didn't, Erin.
8         MS. BLAKE:  Okay.
9         MR. LAROSE:  My question was, did he
10  direct it?  I know it got plowed.  I have pictures.  I
11  have videos.  I want to know whether he directed it or
12  not.
13         THE WITNESS:  Do I answer?
14         MS. BLAKE:  Yeah.
15         THE WITNESS:  Yes.  I did.
16  BY MR. LAROSE:
17    Q    And was Bracken Box hired to help in that
18  regard?
19         MS. BLAKE:  I'm just going to have a
20  standing objection to everything about what occurred
21  in 2021 relating to Riverdale's snow.  It has nothing
22  to do with this case.  You're going fishing.  It's
23  totally irrelevant.
24         MR. LAROSE:  I'm not going fishing, and

Page 111

1  --
2         MS. BLAKE:  You don't --
3         MR. LAROSE:  So make your relevance
4  objection, which isn't a proper objection in federal
5  court anyway.  It's form of the question, and it's
6  privilege.  That's it.  So make your objection.  Make
7  your relevance objection.  And I want to know how
8  Bracken Box, that's owned by the Bracken Company, got
9  involved in the snow removal.
10         MS. BLAKE:  Object to form.  Relevancy.
11         THE WITNESS:  Do I answer?
12         MS. BLAKE:  Go ahead.
13         THE WITNESS:  Bracken Box was not the
14  only vendor that we called in to work as independent
15  contractors.  Affordable Trees came out and worked.
16  Independent contractors -- Thomas Watson came in to
17  work.  And the Fire Chief could give you a list of
18  other people that we use for landscaping and grass
19  cutting that have pick-up trucks with snow removal
20  blades that were called in.  We also had Flood that
21  came in and worked.  Many of them worked at a
22  discounted rate, sir.
23  BY MR. LAROSE:
24    Q    Did Bracken --

Page 112

1    A    So Bracken was not the only one.
2    Q    That's fine.  That's not even close to what
3  I asked.  But who called in Bracken?
4         MS. BLAKE:  Object to form.  Relevancy.
5         THE WITNESS:  There was a -- a team
6  effort.  Anybody who was available, all hands on deck.
7  BY MR. LAROSE:
8    Q    Okay.  Did Bracken work at a discounted
9  rate?
10    A    I haven't gotten his invoice yet.
11    Q    Did they agree to work at a discounted rate?
12    A    Per our discussions.
13    Q    Who did you discuss that with?
14         MS. BLAKE:  Object to form.  Relevancy.
15  We're still talking about the snow removal a week ago,
16  right?
17         MR. LAROSE:  Who did he discuss with
18  Bracken about them working as an independent
19  contractor at a discounted rate?
20         THE WITNESS:  The initial conversation
21  was with James Bracken.  The follow-up was with my
22  Fire Chief and Mr. Bracken's foreman, Sergio.
23  BY MR. LAROSE:
24    Q    Okay.  In the last month or so, you put some

Page 113

1  signs up on 138th Street for reelection.  One sign,
2  and then next to that sign, a sign about one of your
3  opponents, Deyon Dean.  You're familiar with that?
4         MS. BLAKE:  Object to form.  Relevancy.
5  What does his election have to do with your lawsuit,
6  Mark?
7         MR. LAROSE:  Well, it depends on whose
8  property he put it on, now doesn't it?
9         MS. BLAKE:  They're on a lot of
10  properties in the Village of Riverdale.   He's
11  running --
12         MR. LAROSE:  Yeah.
13         MS. BLAKE:  -- for Mayor in Riverdale.
14         MR. LAROSE:  Yeah, but wouldn't he need
15  permission from the owner of the property?  So I want
16  an answer to the question.
17         MS. BLAKE:  I don't know what just
18  happened to my phone.  Or my screen.
19         MR. LAROSE:  Marissa, which exhibit are
20  those pictures?
21         MS. ALASKA:  The picture is Exhibit LL.
22  Double L.
23         MS. BLAKE:  Is this the snow pictures?
24         MR. LAROSE:  No.  This is the sign

29 (Pages 110 - 113)

Page 114

1  picture.  Show them LL.
2         (Exhibit LL was marked for
3         identification.)
4         MS. BLAKE:  I have to go get LL and get
5  my screen fixed because I really don't want to look at
6  myself this large on the screen.
7         MR. LAROSE:  Hold on.  We love looking
8  at you, though.  So it's 1:50 --
9         MS. BLAKE:  Thanks.
10        MR. LAROSE:  -- my time.  Hold on.
11  It's 1:50 my time.  I want to come back at 2:00.
12        MS. BLAKE:  Okay.  And it's LL,
13  Marissa?
14        MS. ALASKA:  Yeah.  Correct.  Correct.
15        MS. BLAKE:  All right.  We'll be back.
16        MR. LAROSE:  Thank you.
17        REPORTER:  We are now off the record at
18  12:50 Central time.
19        (Off the record.)
20        REPORTER:  We are now on the record at
21  1:06 p.m. Central time.
22  BY MR. LAROSE:
23    Q    So, Mayor, these election signs that are LL,
24  do you know whose property that is that the signs are

Page 115

1  on their fence?
2         MS. BLAKE:  You know what, I must have
3  grabbed II.  I don't know if I have LL.  Can you show
4  it to us?  Can you, like, screen share?
5         MR. LAROSE:  Can you see it?
6         THE WITNESS:  I see the signs, but I
7  don't know the location.  We've got them all
8  throughout Riverdale.
9  BY MR. LAROSE:
10    Q    When you have got them all through
11  Riverdale, and they're on private property, do you ask
12  permission?
13    A    Definitely.
14    Q    Okay.  Well, you didn't ask permission for
15  these because that property is owned by my client.
16  Could you take the signs down, please?
17    A    Sure.  The election is over, sir.
18    Q    Yeah, but that doesn't -- it's just really
19  kind of offensive to put signs up on private property
20  without asking permission.
21        MS. BLAKE:  Well, it looks like Deyon
22  Dean did it, too.  But what address is that?
23        MR. LAROSE:  No.  No.  Well, it's on
24  138th Street.  It's right in front of the -- but Deyon

Page 116

1  Dean didn't put up a sign saying he was a tax
2  delinquent.  The mayor put up a sign saying, "Don't
3  elect Deyon Dean because he doesn't pay his taxes."
4  BY MR. LAROSE:
5    Q    Isn't that right, Mayor?
6    A    Mr. LaRose, in the campaign, you have people
7  working for you.  Sometimes they do things, and
8  they're not aware of protocol and regulations.  But if
9  that was offensive to you, I can have it removed
10  today.
11    Q    Okay.  But it's not necessarily offensive,
12  except if somebody put a yard sign up in your property
13  that you didn't want there, it would be offensive to
14  you.  In my property, it would be offensive.  So --
15    A    If someone did that on my property, I would
16  remove it.
17    Q    I'm sorry?
18    A    If someone did that on my property, I would
19  remove it.
20        MS. BLAKE:  And, honestly, this whole
21  line of questioning is so irrelevant.  Someone could
22  have just called.  It has nothing to do with this
23  case, Mark.
24        MR. LAROSE:  Well, I'm not sure about

Page 117

1  any of that.  But I would certainly think that putting
2  up a sign on somebody's property that is involved in a
3  lawsuit with you saying they should reelect you could
4  certainly be construed as thumbing your nose at the
5  people that sued you.  So that's what happened.
6  BY MR. LAROSE:
7    Q    Deyon Dean didn't put up this sign.  Right,
8  Mayor?  Somebody on your behalf did.
9    A    Yes.
10    Q    Correct?
11    A    Yes.
12    Q    Okay.  And as far as you know, your
13  directive to anybody who works for you would have
14  been, "Please get permission from the property owner
15  before you go hanging campaign signs."  Right?
16    A    Correct.
17    Q    I can assure you that no one did that in
18  this case.  And yeah, the election's over.
19  Congratulations.  Take the signs down, please.
20        MS. BLAKE:  Object to form.  Causation.
21  Relevancy.  It's --
22        MR. LAROSE:  No.  No.  It's not even a
23  question.  It's a directive.
24        MS. BLAKE:  From you?

30 (Pages 114 - 117)

Page 118

1          MR. LAROSE:  Take the signs down.
2  Yeah.  From me.
3          MS. BLAKE:  Okay.  All right.  We're
4  going to move on, Mark?  Or are we going to --
5          MR. LAROSE:  Yeah.
6          MS. BLAKE:  -- now do you can continue
7  with some directives to my client?
8          MR. LAROSE:  Well, we're going to move
9  on, but --
10 BY MR. LAROSE:
11    Q   Okay.  Let me ask you a question, Mayor.
12 Will you take the signs down?  That's a question.
13         MS. BLAKE:  Objection.  Irrelevant.
14 Inappropriate.  Badgering.  Et cetera.  No one has
15 called and told us about it before the dep.  Why did
16 you save it to this point?  Why didn't someone just
17 call?
18         MR. LAROSE:  I could ask the same
19 question about why didn't someone call before they put
20 it up on my client's property.  Mayor, here's --
21         MS. BLAKE:  You did ask that, and he
22 did answer it.  Let's move on, Mark.
23 BY MR. LAROSE:
24    Q   Mayor, will you take the signs down?  That's

Page 119

1  a question.
2     A   Yes.
3     Q   Do you know who owns the retention pond on
4  138th Street?
5     A   That's owned by the Cook County Board of
6  Reclamation District.
7     Q   Different one.  There's a retention pond
8  that's east of the old Fritz property, and there's a
9  retention pond between the old Fritz property and the
10 Riverdale Materials property.  That's the one I'm
11 talking about.
12    A   No.  I wasn't aware of that.
13    Q   Okay.  So you're not aware of who owns it?
14    A   I wasn't even aware that there was a
15 retention pond there.
16    Q   Okay.  So when my client and I appeared at
17 the public hearings on this matter and complained that
18 Riverdale Materials said they owned the retention
19 pond, but they really don't, you don't remember
20 anything about that?
21    A   That was at the Zoning Board meetings?
22 Right?  Zoning Board?
23    Q   Right.
24    A   I wasn't a part of that process, sir.

Page 120

1     Q   But you were part of the process to approve
2  the ordinance, at which I presented both a new letter
3  and those two letters that were written to the Zoning
4  Board.  Do you remember that?
5          MS. BLAKE:  Object to form and really
6  misstates the facts and evidence.  He may have been
7  present at the meeting.  He certainly didn't vote on
8  that ordinance.
9          MR. LAROSE:  I'm sorry?
10         MS. BLAKE:  He may have been present at
11 that meeting.  He didn't vote on that ordinance.
12         MR. LAROSE:  Because he didn't need his
13 vote to break a tie.
14         MS. BLAKE:  Well, that's your
15 testimony, Mark.
16         MR. LAROSE:  I'm just asking you the
17 question.  Is that why you --
18         MS. BLAKE:  That wasn't a question.
19         MR. LAROSE:  All righty.  Let's do it
20 the other way, then.
21 BY MR. LAROSE:
22    Q   Let's take a look, Mayor, at Exhibit W.
23         (Exhibit W was marked for
24          identification.)

Page 121

1          THE WITNESS:  Okay.
2  BY MR. LAROSE:
3     Q   Do you remember receiving this document?
4     A   Yes.
5     Q   Okay.  And when you say you weren't aware
6  about the retention pond, if you look at page 3 of
7  this document, under number 6, "Applicant Testimony,
8  that it would use the on-site retention pond for storm
9  water runoff.  The Truth, in fact, it does not own the
10 retention pond.  It does not have the right to use
11 it."  We also attached the submittals to the ZBA to
12 this document.  Does this refresh your recollection as
13 to whether you knew that Riverdale Materials didn't
14 have the right to use this retention pond?
15         MS. BLAKE:  Object to form.
16         THE WITNESS:  Isn't that a private
17 matter between two parties?
18 BY MR. LAROSE:
19    Q   Well, if you want to talk to your lawyer
20 about what's a private matter between two parties,
21 that's fine.  In fact, that's why Bracken called me up
22 in the middle of the night and threatened me.  But
23 that's -- that is a private matter --
24    A   You know, I had nothing to do with that.

31 (Pages 118 - 121)

Page 122

1  I've been --
2      Q    No.  No.  No.  I'm just --
3      A    I will not be accountable for his conduct.
4      Q    I asked this question, does this letter
5  refresh your recollection as to whether --
6          MS. BLAKE:  Do you remember the letter
7  from 2017?
8          THE WITNESS:  Yes.  It was tendered to
9  the Village Attorney and the Zoning Board
10 Administrator.
11 BY MR. LAROSE:
12     Q    No.  It was hand-delivered to all of you.
13     A    Yes.  And when I got my copy, I turned it
14 over to the Zoning Board Administrator and the
15 attorney.
16     Q    Okay.  So did you read it?
17     A    Of course.
18     Q    Okay.  So the question is, you can look at
19 paragraph 6A, does this refresh your recollection as
20 to whether you knew that Riverdale Materials didn't
21 have the right to use that retention pond?
22         MS. BLAKE:  Object to form.  I mean, he
23 read it.  In 2017.  Is that what you're asking?
24         MR. LAROSE:  No.  I'm asking --

Page 123

1          MS. BLAKE:  Did you read --
2          MR. LAROSE:  I'm asking whether it
3  refreshed his recollection because not five minutes
4  ago did he say, "I had no idea there was a retention
5  pond there, and I have no idea who owns it or who has
6  a right to use it."
7  BY MR. LAROSE:
8      Q    My question is, does this refresh your
9  recollection?
10     A    I remember getting this document.  If you're
11 asking me if I remember every detail in the document,
12 no.  I do not, sir.
13     Q    So as you sit here today, you have no
14 recollection as to whether there was even a retention
15 pond there or who had the right to use it?
16         MS. BLAKE:  Asked and answered.
17         THE WITNESS:  I answered your question,
18 sir.
19 BY MR. LAROSE:
20     Q    Answer it again then, please.
21     A    I don't remember the details of this
22 document.  I remember receiving it.
23         MR. LAROSE:  Let's go to -- what
24 exhibit was that, Marissa?  Exhibit E.

Page 124

1          (Exhibit E was marked for
2          identification.)
3          THE WITNESS:  Okay.
4  BY MR. LAROSE:
5      Q    So this is the ordinance.  Ordinance Number
6  2017 22, that approved the conditional use for
7  Riverdale Materials over on 138th Street.  Right?
8      A    Yes.
9      Q    Was that a yes?
10     A    Yes, sir.
11     Q    Okay.  Take a look on page 4 under section
12 4.  So subsection 4 under that talks about the
13 applicant having, as a condition of this ordinance,
14 having to submit a storm water prevention plan and
15 dust control plan to the Village Engineer.  Do you
16 know if that ever happened?
17     A    I would have to ask the Village Engineer,
18 sir.
19     Q    Okay.  When we both FOIA'd and issued
20 discovery in this regard, the answer that we got back
21 was, "There are no documents."  Are you aware of any
22 of that?
23     A    No.  I'm not.
24     Q    I guess I stand corrected that you didn't

Page 125

1  actually vote on Exhibit E.  But you certainly signed
2  it.  Right?
3      A    Yeah.  I have a responsibility to sign it.
4  The Board enacted it.
5      Q    What do you know about the history of the
6  property that is now owned and run by Riverdale
7  Materials?
8      A    My knowledge of that property is that it was
9  abandoned, and we were looking to get it back on the
10 tax rolls.
11     Q    Do you know Charles Fritz?
12     A    No, sir.
13     Q    Do you know anyone at Huron Valley Steel?
14     A    No, sir.
15     Q    So you don't know anything about the
16 contaminated nature of the property?
17         MS. BLAKE:  Object to form.
18         THE WITNESS:  The Engineer would have
19 more knowledge about that.  The Village Engineer.
20 BY MR. LAROSE:
21     Q    I guess my question was, do you have any
22 knowledge about it?
23     A    Pertaining to what, sir?
24     Q    The contaminated nature of the property?

32 (Pages 122 - 125)

Page 126

1   A   No.
2   Q   The Montana & Welch, it's kind of back to
3   this payment thing. So we know my client had a
4   contract says they get paid in 15 days. One of the
5   testimonies by Gonzalez was, "Well, there's a lot of
6   people didn't get paid. Montana & Welch didn't get
7   paid. GW and Associates didn't get paid. Engineers
8   didn't get paid." So I looked back at all those
9   records. Question: does Montana & Welch have a
10  contract that says when they're supposed to get paid?
11          MS. BLAKE: Object to foundation. Do
12  you know what the contract says?
13          THE WITNESS: I don't remember. I
14  don't have it in front of me.
15          MR. LAROSE: That's all he needs to
16  say. I mean, we don't need to make big -- he can only
17  testify to what he testifies to.
18  BY MR. LAROSE:
19  Q   So the question was, do you know whether the
20  Montana & Welch contract or if there is one, has a
21  provision for the timing of payments?
22  A   I don't know. I -- I --
23  Q   And that's fine. Second question. Same
24  thing with GW and Associates.

Page 127

1   A   Same. I don't know.
2   Q   Same thing with, can't remember the name of
3   the Village Engineers, but same question with respect
4   to them.
5   A   I -- I don't know.
6   Q   For a long period of time, Jerome Russell
7   was signing off on and coding the invoices for trash
8   pickup. Later on, sometime later on, when Flood
9   Brothers was doing the trash pickup, Andie Randolph
10  was --
11          MR. LAROSE: Is that the name, Marissa?
12  Is that the correct name?
13  BY MR. LAROSE:
14  Q   Andie Randolph was coding and signing and
15  signing off on those invoices. Do you know why?
16          MS. BLAKE: Object to relevancy.
17          THE WITNESS: I wouldn't know the
18  reason why there was a change, but Ms. Randolph does
19  have the authority to code bills for all departments.
20  BY MR. LAROSE:
21  Q   Okay. So at some point in time, the Village
22  passed an ordinance requiring the multi-family
23  non-commercial mixed-use buildings to use Flood
24  Brothers. Do you remember that?

Page 128

1   A   Yes.
2   Q   Why? Why was that passed?
3          MS. BLAKE: Object to legislative
4   privilege. Don't answer.
5          MR. LAROSE: So he's a public official.
6   He's involved in the passage of an ordinance. He's
7   involved in a lawsuit, and I say, "Why?" and you say,
8   "Legislative privilege"?
9          MS. BLAKE: Well, number one --
10         MR. LAROSE: Good luck with that.
11         MS. BLAKE: Mark, I've read up on it.
12  I'm aware of it. It's been used before. This was a
13  Board decision. You're asking the reason why Board
14  decisions were made. That's not allowed. It's not
15  allowed.
16  BY MR. LAROSE:
17  Q   Did you have any personal involvement in
18  that, Mayor?
19  A   In what, sir?
20  Q   Passing the ordinance that required
21  multi-family units to use Flood Brothers.
22  A   Are you saying personal involvement or
23  official involvement?
24  Q   Personal involvement.

Page 129

1   A   No. I have no personal interest in that.
2   Q   Okay. Then people started complaining about
3   their bills, and you passed another ordinance that
4   said that if they -- kind of paraphrasing -- if they
5   appealed to the Village and could show that they're
6   now paying more than they used to pay, that they got
7   some kind of discount or something like that. Do you
8   remember that ordinance?
9   A   Yes.
10  Q   Did you have any personal involvement in
11  that one?
12  A   No.
13  Q   Was that one passed because the people that
14  were paying the bills now to Flood Brothers were
15  paying more than they used to pay to their other
16  contractors?
17         MS. BLAKE: Objection. Legislative
18  privilege. It's a Board decision. You're asking for
19  the reason behind it.
20  BY MR. LAROSE:
21  Q   Were you aware that Tri-State had existing
22  contracts to service multi-family residential units
23  within the Village of Riverdale prior to the time that
24  the ordinance requiring these buildings to use Flood

33 (Pages 126 - 129)

Page 130

1 Brothers was passed?
2    A   When we --
3       REPORTER:  Wait
4       THE WITNESS:  --enacted the
5 ordinance --
6       REPORTER:  I cannot -- I'm sorry.  Can
7 you repeat that?  For some reason, your voice is
8 reverberating, and I can't get all the --
9       MR. LAROSE:  Me or him?
10       THE WITNESS:  Can you hear me better?
11       REPORTER:  Yes.
12       THE WITNESS:  When the board enacted
13 that ordinance, we had multiple sanitation companies
14 in town.  Republic, Waste Management, and a few
15 others, along with Tri-State.  And they all voiced
16 concerns about having the Village designate one vendor
17 to collect sanitation.
18 BY MR. LAROSE:
19    Q   How did Flood Brothers' pricing on these
20 multi-family residential units compare to the other
21 vendors?
22       MS. BLAKE:  I'm going to object to
23 foundation.  You just tell him you don't --
24       THE WITNESS:  I don't know.

Page 131

1 BY MR. LAROSE:
2    Q   So are you aware that for several years
3 before, as you said, things kind of went south, that
4 Riverdale would plow the alley so that they could
5 remove the trash?  I'm sorry.  Tri-State would plow
6 the alley so that they could remove the trash.
7       MS. BLAKE:  Object to form.  I just
8 don't know what time period you're talking about.
9 I --
10       MR. LAROSE:  Well, I think the mayor
11 said that things turned for the worse or something
12 like that, I'm paraphrasing, in early 2018 or late
13 2017.  So prior to that time, before things --
14       MS. BLAKE:  Prior to the financial
15 things?  Is that what we're talking about?
16       MR. LAROSE:  Sorry?
17       MS. BLAKE:  Are we talking about the
18 financial difficulty of the Village in 2017, 2018?
19       MR. LAROSE:  No.  No.  No.  He said
20 that things went worse with Tri-State.  That's what
21 we're talking about.
22       MS. BLAKE:  Oh.  See, that's what
23 I'm -- I was totally confused.
24       MR. LAROSE:  No.  That's fine.

Page 132

1 BY MR. LAROSE:
2    Q   So whenever that was.  And I want to say in
3 the fall of '17 and has continued today.  But sometime
4 prior to then, my question is, were you aware that
5 Tri-State was plowing the alleys so that it could
6 remove the trash?
7    A   I wasn't aware of that.
8    Q   Okay.  After 2017, when Tri-State tried to
9 do that, continue to do that, they were told by
10 Russell that they couldn.t.  "Don't do that.  Let the
11 alleys go unplowed."  Were you aware of that?
12    A   No.
13    Q   Okay.  So then we get back to the fact that
14 you directed these alleys to be plowed a couple weeks
15 ago, in admittedly, a lot of snow, man.  A lot of
16 snow, and same thing here, same thing at my house in
17 Chicago.  As much as we've had in a long time.  But
18 the reason for that, I guess what I'm trying to get at
19 is, we've had a lot of snow before, and you didn't
20 want it -- not you, the Village didn't want Tri-State
21 to plow.  Now we get a lot of snow, and the Village
22 not only wants it plowed but employs independent
23 contractors to do that.  What changed?
24       MS. BLAKE:  Object to form.  Relevancy.

Page 133

1 BY MR. LAROSE:
2    Q   What changed, Mayor?
3       MS. BLAKE:  You need to answer that
4 question.
5       THE WITNESS:  I wasn't aware that
6 Tri-State was plowing the alleys.  You know what, I've
7 been involved in elected office in Riverdale for 12
8 years now.  I'm not aware of them ever doing that.  I
9 do know that this last snowstorm we had was very
10 crippling to the town, and we had to take some
11 unprecedented steps to make sure that our utility
12 vehicles and emergency vehicles can get through the
13 roads and get to people in cases of emergency.
14       MR. LAROSE:  Okay.  Give me a minute
15 here.  I want to just review this one document, and
16 then we'll move on.  So this is all done.  That's all
17 done.
18 BY MR. LAROSE:
19    Q   So when Riverdale Materials was coming into
20 town, you did put a sign close to their property
21 saying something like, "Another business brought to
22 the Village of Riverdale by Mayor Jackson."  Do you
23 remember something like that?
24    A   Yes, sir.

34 (Pages 130 - 133)

Page 134

1   Q   Okay. Did they give you a campaign
2   contribution in order for you to put that sign up, or
3   -- Let's back up. It's a dumb question. Does that
4   refresh your recollection as to whether Riverdale
5   Materials as a company gave you a campaign
6   contribution?
7   A   I've never taken a political campaign
8   contribution from Riverdale Material. I have received
9   them from Tri-State, and I didn't have a sign up at
10  their business.
11  Q   Okay. And you're not sure if you received
12  campaign contributions from any of the Bracken family,
13  or Bracken Box, or any of their other companies?
14  A   That's not what you asked me, sir.
15  Q   No, I asked you quite a long time ago, and
16  you told me that you weren't sure.
17      MS. BLAKE: Well, it's been asked and
18  answered. It's in the record, so let's move on.
19      MR. LAROSE: Okay. But now he's saying
20  that's not what he said. So what do you want to say
21  now?
22      MS. BLAKE: That's not what's going on
23  here.
24      MR. LAROSE: No. It is what's going

Page 135

1   on. He just said that's not what I said. So if it's
2   not what you said, then it doesn't matter what the
3   record said, because if he wants to change his
4   testimony, then I want to know that.
5       MS. BLAKE: No. I think you're
6   mischaracterizing the testimony, and he was trying to
7   correct it. And I'm telling you it's in the record.
8   He's already answered. Let's just move on.
9   BY MR. LAROSE:
10  Q   Do you recall whether you received campaign
11  contributions from Bracken Box, any of the Bracken
12  family, or any of their companies?
13  A   What do you mean, Bracken family?
14  Q   Jim Bracken, his father, his wife, his
15  daughter, his dog, the Bracken family. Come on.
16  A   I have never received any contributions from
17  an individual named Bracken. I have never received
18  any campaign contributions from Riverdale Materials.
19  Now if you're asking me if I received --
20      MS. BLAKE: Don't.
21      THE WITNESS: Okay.
22      MS. BLAKE: Let him ask the question.
23  BY MR. LAROSE:
24  Q   Okay. You make me nervous when you say, "an

Page 136

1   individual with the last name Bracken."
2       MS. BLAKE: It's because he's confused
3   by your question.
4       MR. LAROSE: Yeah. Maybe he is. I
5   said the Bracken family. I don't know. How about the
6   Blake family, or the LaRose family, or the Alaska
7   family? It's a pretty simple effing question. Okay?
8   And I think I'm getting dicked around about this.
9   It's a simple question. So let's get to it. Let's
10  get to it.
11  BY MR. LAROSE:
12  Q   Did you receive any campaign contributions
13  that you're aware of from any companies owned by the
14  Brackens?
15      MS. BLAKE: Different question.
16      MR. LAROSE: Yes. It is.
17      THE WITNESS: Now if you're asking me
18  if I received campaign contributions from any company
19  owned by the Brackens, yes.
20  BY MR. LAROSE:
21  Q   And that's a different answer than you gave
22  me before. But that's fine.
23      MS. BLAKE: It's not.
24      MR. LAROSE: Well, it is because he

Page 137

1   said he didn't know. He said possibly. But that's
2   okay.
3       MS. BLAKE: It's all irrelevant to me.
4       MR. LAROSE: Yeah. Hold on. I've got
5   to let the dogs in. Sorry, and thanks for your
6   patience. Duty calls. All right. Hold on. I'm
7   still going through this list.
8       REPORTER: Ms. Blake, do you want to
9   unmute yourself?
10  BY MR. LAROSE:
11  Q   Okay. Let's move on to number two. You're
12  aware that Tri-State pays royalties to the Village.
13  Right?
14      MS. BLAKE: Sorry.
15      MR. LAROSE: That's all right.
16  BY MR. LAROSE:
17  Q   Mayor?
18  A   Yes, sir?
19  Q   As far as you know, did they ever delay any
20  payments in payment of the royalties to the Village?
21  A   I'm not sure. I wouldn't have that
22  information. Meaning I don't handle account
23  receivables.
24  Q   So no one informed you that you're aware

35 (Pages 134 - 137)

Page 138

1 that Tri-State was ever late with the royalty
2 payments?
3     A.  No.  I've never gotten a report that
4 Tri-State was late.
5     Q.  So the Village Board, once they get this
6 warrant list, votes on paying the bills.  Right?  Or
7 approving payment of the bills?
8     A.  Okay.
9     Q.  Is that right?
10     A.  Can -- can you repeat your question?
11     Q.  Sure.  Once the Village Board gets this
12 warrant list of outstanding invoices, then at the next
13 meeting, they vote on approving, not necessarily
14 paying at that time, but approving for payment, those
15 bills.  Correct?
16     A.  That's correct.
17     Q.  Okay.  Are you aware in the eight years that
18 you've been mayor whether the Board ever disapproved
19 any invoices that were on the warrant list?
20     A.  Not in my eight years as mayor, but I can
21 tell you as a Trustee, we've had to make motions to
22 amend the amounts or strike certain vendors from the
23 warrant list.
24     Q.  Okay.  And you were a Trustee for what, four

Page 139

1 years before that?
2     A.  2009 to 2013.
3     Q.  So 2009 to 2013, you were a Trustee.
4 '13 until now, you're the mayor.  Right?
5     A.  Correct, sir.
6         MR. LAROSE:  Take a look, Erin, at
7 Exhibit P as in Paul, please.
8         (Exhibit P was marked for
9         identification.)
10     MS. BLAKE:  Is this the Tri-State
11 calendar?
12         MR. LAROSE:  Yes.
13         MS. BLAKE:  Okay.
14         THE WITNESS:  Okay.
15 BY MR. LAROSE:
16     Q.  So if you look, on the first page of this,
17 it looks like there was a scheduled meeting at the
18 Village with Sheryl and Jeff and supposedly you on
19 September 22, 2016.  Do you remember that meeting
20 occurring?
21     A.  I don't remember this particular meeting,
22 but I had several meetings with Jeff and Mrs. Germany
23 over the years.
24     Q.  Okay.  If you look at the second part of

Page 140

1 this, second page, it talks about a Thursday, December
2 22, 2016, meeting with Jeff, and David Gonzalez, and
3 you.  Do you remember that meeting?
4     A.  Yes.
5     Q.  And is that the one where Jeff was talking
6 to you about taxes and royalties?
7     A.  I remember the conversation.  I don't know
8 the particular date that we talked about it, but we
9 did have a meeting about it, and it did involve Mr.
10 Gonzalez.
11     Q.  Okay.  And your best recollection is that at
12 no meeting with Sheryl and Jeff, or Jeff, there was
13 discussions about Riverdale Materials.
14         MS. BLAKE:  Object to the
15 mischaracterization of the testimony.  You keep going
16 back over the same things and then testifying for him
17 in your questions.
18         MR. LAROSE:  Well, it's a question, and
19 you see, Erin, and I know you know this, when you say,
20 "Isn't it true that" and you ask the question, then I
21 am testifying and asking him if it's true or not.  And
22 you're one of the finest young lawyers I know, so
23 let's just stop messing around.
24         MS. BLAKE:  I appreciate flattery, but

Page 141

1 I do have to advocate for my client.  And I just --
2         MR. LAROSE:  And you're doing a great
3 job, but you're being obstructionist.  So now that I
4 showed him a piece of paper that might refresh his
5 recollection as to meetings and what was said, I'm
6 just making sure that he wants to stick to his
7 testimony that he never talked to them about Riverdale
8 Materials.
9         MS. BLAKE:  That wasn't his testimony.
10 Or was it?  I don't --
11         THE WITNESS:  No.  No.
12         MS. BLAKE:  -- remember at this point.
13 I don't even know.
14         THE WITNESS:  No.  Mr. LaRose, what you
15 just showed me does not refresh my memory.
16         MS. BLAKE:  There we go.
17         MR. LAROSE:  That's fine because his
18 other testimony stands absolutely crystal clear that
19 he didn't talk to them about it.  That's his story,
20 and he's sticking to it.  "Anywho."
21 BY MR. LAROSE:
22     Q.  In your meetings with Riverdale Materials,
23 did you also meet with their lawyers Daley & Georges?
24     A.  Yes.

36 (Pages 138 - 141)

Page 142

1   Q   Michael Synowiecki?
2   A   Yeah.  I know Mr. Synowiecki.
3   Q   Was he there in the meetings?
4   A   I don't recall.  No.
5   Q   Who was there in the meetings with Riverdale
6   Materials from Daley & Georges?
7   A   Me and Mr. Synowiecki met at another time.
8   It wasn't at the Village Hall.
9   Q   Okay.  So maybe I'm getting confused.  When
10  you met with Synowiecki, was it with Riverdale
11  Materials or Jim Bracken or separate from them?
12  A   It was at a fundraiser I had.
13  Q   Okay.  And was that the only time you met
14  with Synowiecki?
15  A   To the best of my knowledge, yes.
16  Q   Anybody else from Daley & Georges did you
17  meet with, with respect to Riverdale Materials?
18  A   No.  The only person I know from Daley &
19  Georges is Michael Synowiecki.
20  Q   Okay.  Did they make campaign contributions
21  to you?
22  A   I believe so.
23  Q   Him personally, or the firm?
24  A   The firm.

Page 143

1   Q   The trucking business that you and your wife
2   are in -- I might have asked you this before, I
3   apologize -- do you do business with Flood Brothers?
4   A   No.  But you know what, let me refer to
5   that, sir.  To my knowledge, we don't.  Remember, I
6   told you, I don't handle the day-to-day operations of
7   that.
8   Q   I'm totally cool with that.  I can only ask
9   you what you know.
10  A   Thank you.
11  Q   The companies that were servicing the
12  multi-family units prior to the ordinance requiring
13  them to use Flood Brothers were billing directly to
14  those buildings.  Are you aware of that?
15  A   That's correct.
16  Q   And after the ordinance was passed, the
17  invoices were issued by the Village.  Are you aware of
18  that?
19  A   I'm sorry, sir.  Had to stand up.
20  Q   No.  I hear you.  It's been a long day.
21  We're getting there.  After the ordinance was passed,
22  rather than the Flood Brothers issuing the invoices,
23  the Village issued the invoices.  Were you aware of
24  that?

Page 144

1   A   Billing for multi-family dwelling is now
2   attached to your water bill.
3   Q   Do you know why that was changed?
4   A   Yes.
5   Q   Why?
6   A   As I stated earlier, we had a lot of
7   landlords and property owners that were irresponsible.
8   They -- they weren't paying the sanitation bills on
9   time.  Some of them were only providing one dumpster
10  at 12, 15-unit properties.  And so we wanted to
11  regulate this a little better to get the town cleaner.
12  But, you know, there's one other important to this as
13  well.  By including multi-family dwellings, we were
14  able to get a lower rate from Flood.
15  Q   On the multi-family, or on everything?
16  A   Overall.
17  Q   Okay.  So these minutes that Erin referenced
18  earlier about, it was like March of '18 that
19  authorized someone to notify Tri-State that their
20  contract was not going to be renewed.  I think it was
21  March 27.  I read through those real quickly, and I
22  think I know the answer to this, but I want to be
23  sure.  It says on that day that Gonzalez was appointed
24  Village Treasurer.  You had told me earlier that you

Page 145

1   thought he had been, you know, Finance Director or
2   whatever as long as you had been there.  So was this
3   Village Treasurer thing just some add-on title to
4   functions that he was already doing?
5   A   So when you asked me that question earlier,
6   I said about seven years.  It may have been six or
7   seven years.  He has not been with me the entirety of
8   both terms.  The Treasurer spot, along with the Budget
9   Director, Finance Director, all of those are
10  interchangeable.  He was nominated by me and appointed
11  by the Board, and there's an ordinance or resolution
12  approved by the Board allowing him to serve in that
13  capacity.
14  Q   Yeah, and that's my question because that
15  resolution was March 27, 2018.  So is that the first
16  time he had those interchangeable titles?
17  A   He was on before that.
18  Q   Okay.  So back to what I thought.  He was
19  doing informally, you know, without an official
20  appointment, what he was later appointed to do.
21  Something like that?
22  A   That's -- that's not --
23       MS. BLAKE:  Object to form.
24       THE WITNESS:  I'm sorry, Erin.

37 (Pages 142 - 145)

Page 146

1    MS. BLAKE:  No.  That's okay.
2    THE WITNESS:  That's not possible, and
3  I'm going to tell you why.  You have someone handling
4  municipal funds, public funds.  We have to be on
5  record as to who's responsible for that.  It would
6  have had to have been an ordinance enacted allowing
7  him to serve in that role.
8  BY MR. LAROSE:
9    Q    Okay.  So I'm looking back at this, and we
10  haven't marked it as an exhibit, and I guess we could,
11  but it's what Erin directed us to earlier, which were
12  the minutes of the March 27, 2018 meeting.  When I
13  look at item number two, it says, "A resolution of the
14  Village of Riverdale, Cook County, Illinois appointing
15  David Gonzalez as Village Treasurer.  Mayor Jackson
16  entertained a motion to adopt, motion by Trustee
17  LeVere and seconded by Trustee Lewis.  Roll call, all
18  yeas, no nos.  So --
19    A    Okay.  Okay.
20    Q    I just want to know when he officially took
21  over these, you know, bill-paying responsibilities.
22    A    So what -- what happened, sir, when I was
23  reelected in 2017, I'm not confident, but most likely,
24  you know, that I renominated him for his position, you

Page 147

1  know --
2    Q    So he was probably nominated before then,
3  and then renominated, like, department heads, like
4  often gets done when there's new elections.  Right?
5    A    The Police Chief, the Fire Chief, the
6  attorneys, they're appointed for four-year terms and
7  serve at the pleasure of the Mayor, and when the term
8  expired, I renominated them.
9    Q    Best decision you ever made was to
10  renominate Erin.  All right.  That straightens that
11  out.  Now I know Dave Gonzalez firm get, like, I think
12  it's 14,000 a month, maybe it's 12,000 a month.  I
13  think it's 14 as their pay.  Does Dave Gonzalez get
14  separate pay?  I can't remember whether I asked him
15  this.  I think he said he doesn't, but does he get
16  separate pay as the Finance Director or the Treasurer?
17    A    He receives no additional compensation.
18    Q    In addition to the, whether it 12- or
19  14,000?  I think it's 14,000 a month.  Am I right on
20  that?
21    A    I would have to look at his contract, but
22  that sounds about right.
23    Q    Okay.  Bear with me here.  Trying to get
24  through this and make it shorter.  So this whole issue

Page 148

1  with Ms. Ship and her term being up and her being
2  replaced in the middle of these ZBA hearings, I know
3  what your response was in interrogatories.  We can
4  look at them if you want to.  In fact, let's do that
5  just so I don't get accused of putting words in your
6  mouth.
7    MR. LAROSE:  Look at Number N, Erin.
8  Letter N.  N as in Nancy.
9    (Exhibit N was marked for
10    identification.)
11  BY MR. LAROSE:
12    Q    Mayor, don't let anybody accuse us that us
13  SIU people confuse numbers with letters.  We're
14  actually smarter than that.  Do you know when I came
15  here as a lawyer in 1982, I had to fight my way into
16  the city of Chicago because all they thought we did in
17  Carbondale was party and smoke weed?
18    A    I've heard that before.
19    Q    Which was not necessarily -- the statute of
20  limitations is passed on that, so it's not necessarily
21  completely untrue.
22    MS. BLAKE:  This is the one that
23  he's --
24    MR. LAROSE:  So you got N?

Page 149

1    MS. BLAKE:  Yeah.
2    MR. LAROSE:  Okay.
3  BY MR. LAROSE:
4    Q    So look at number 5, answer number 5.  By
5  the way, Letter N is the Village's response to the
6  plaintiff's first set of interrogatories, and on page
7  7 of that, you verified the response under oath.
8  Correct?
9    A    Yes.
10    Q    All right.  So take a look at paragraph 5.
11  And that directly relates to Ms. Ship.  And I
12  understand what you're saying there, but my question
13  is, she was allowed to participate in the first two
14  hearings and then replaced.  Why at that time?
15    A    She served until I was able to find someone
16  competent to replace her.
17    Q    Well, did you think it was a good idea to
18  cut her out in the middle of the hearings and to being
19  in somebody new that didn't hear the testimony before
20  that?
21    MS. BLAKE:  I'll just object to form.
22  BY MR. LAROSE:
23    Q    Mayor?
24    A    Yes, sir.

38 (Pages 146 - 149)

Page 150

```
 1    Q   Was that "Yes, sir. I thought it was a good
 2  idea," or "Yes, sir. I'm listening."
 3    A   Yes, I'm listening. Can you go with the
 4  question?
 5    Q   Yeah. No problem. Did you think it was a
 6  good idea to let her go in the middle of the ZBA
 7  Process regarding Riverdale Materials, where she had
 8  her testimony, at least on two occasions, voiced some
 9  objection, and then let her go and bring in somebody
10  else that hadn't heard the testimony.
11    A   I didn't think it was a bad idea. Her term
12  had expired.
13    Q   Okay. Fair enough.
14        MS. BLAKE:  We need to take a break for
15  the bathroom.
16        MR. LAROSE:  Yeah. That's fine. Yeah.
17  No problem. And we're getting pretty close. I would
18  say we have less than an hour left. So it's, I got
19  2:57, that's my time, it would be 1:57 your time. How
20  about 2:10, and then I can feed my dogs too.
21        MS. BLAKE:  Okay. Sounds good.
22        MR. LAROSE:  All right. Thank you.
23        REPORTER:  We are now off the record at
24  1:57 Central time.
```

Page 151

```
 1        (Off the record.)
 2        REPORTER:  Okay. We are now on the
 3  record at 2:14 p.m. Central time.
 4        MR. LAROSE:  Just so that the record's
 5  clear, let's go ahead and mark these minutes of the
 6  March 27th meeting as Q, as in Q, Q. We'll get those
 7  to you, Victoria.
 8        REPORTER:  Okay. That's QQ? Double Q?
 9        MR. LAROSE:  Q as in Q and Q as in Q.
10        REPORTER:  Okay.
11        (Exhibit QQ was marked for
12        identification.)
13        MR. LAROSE:  If there was a B and a B
14  in front of it, it would be barbeque, barbeque. Three
15  twenty-seven, what is it, eighteen Board meeting.
16  Okay. All right. Erin, I assume you don't have any
17  objection to that?
18        MS. BLAKE:  No. I don't have the
19  minutes, though.
20        MR. LAROSE:  So I know that you guys
21  took a break, and we might have to take another break
22  because you didn't consult with Marissa and Jeff
23  during the break, but I think I might be done. So
24  let's take another just five minutes, right? And
```

Page 152

```
 1  then, if I'm not done, I'm really close to being done.
 2        MS. BLAKE:  Okay.
 3        MR. LAROSE:  Okay. Five minutes.
 4        REPORTER:  We're off the record at 2:15
 5  Central time.
 6        (Off the record.)
 7        REPORTER:  We're now on the record at
 8  2:25 p.m. Central standard time.
 9        MR. LAROSE:  Just a couple more
10  questions unless has Erin has questions. Then I might
11  have to ask more, but anyway.
12  BY MR. LAROSE:
13    Q   So Hancock Engineering had a -- I don't
14  know, principal, employee, somebody affiliated with
15  them -- named Paul Flood. Do you know that
16  individual, Mayor?
17    A   Yes, sir.
18    Q   Okay. Do you know whether he's any relation
19  to Flood Brothers?
20    A   Not at all. I've asked him that, and he
21  said there's no relation that he's aware of. He said
22  he -- from the company.
23    Q   Okay. So he didn't have anything to do with
24  recommending Flood Brothers or anything like that?
```

Page 153

```
 1    A   Not at all.
 2    Q   And did Hancock have anything to do with
 3  recommending Flood Brothers?
 4    A   Not at all.
 5    Q   Okay.
 6        MR. LAROSE:  Erin, that's all I have.
 7        MS. BLAKE:  Okay. I have no questions,
 8  either. So do you want me to explain signature to
 9  him?
10        MR. LAROSE:  Yes, and let me explain
11  another thing. If she's not asking any questions of
12  you, that means that you did a really good job. If
13  she felt compelled to ask questions of you, that means
14  you screwed up somehow. So bravo, Mayor, you did a
15  really good job. So explain, Lucy, what the signature
16  thing is.
17        MS. BLAKE:  So you can reserve
18  signature if you want to read this transcript. You
19  would only be able to make grammatical and punctual
20  changes. You can't make any substantive changes to
21  your testimony. Or you waive testimony and trust that
22  Ms. Victoria got everything done right and that I'll
23  review it for you.
24        THE WITNESS:  I defer to you.
```

39 (Pages 150 - 153)

Page 154

1 MS. BLAKE: Okay. We'll waive
2 signature.
3 MR. LAROSE: Okay. And that's what the
4 other fellows did, too. So, Victoria, I'm going to
5 order this just on a regular basis, the same way we
6 did last time. I don't know, ten days or whatever. I
7 don't remember how we ordered it. You know, an e-mail
8 and a mini, or whatever the heck it was. Whatever we
9 got the last time, that's what I want this time.
10 REPORTER: Okay. All right. Thank you
11 very much.
12 MS. BLAKE: And I'll take a PDF,
13 please.
14 REPORTER: Oh, you'll order, too?
15 Okay.
16 MR. LAROSE: It's her star witness.
17 She has to order it.
18 REPORTER: Okay.
19 MR. LAROSE: Mayor, thanks a lot for
20 your time. Congratulations on the reelection.
21 THE WITNESS: Thank you, sir.
22 MS. BLAKE: All right. Thanks,
23 everybody. Take care.
24 MR. LAROSE: You're welcome. All

Page 155

1 right. Bye-bye.
2 REPORTER: All right. We are now off
3 the record at 2:27 p.m.
4 (Signature waived.)
5 (Whereupon, at 2:27 p.m., the
6 proceeding was concluded.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 156

1 CERTIFICATE OF NOTARY PUBLIC
2 I, VICTORIA ROCK, the officer before whom
3 the foregoing proceedings were taken, do hereby
4 certify that any witness(es) in the foregoing
5 proceedings, prior to testifying, were duly sworn;
6 that the proceedings were recorded by me and
7 thereafter reduced to typewriting by a qualified
8 transcriptionist; that said digital audio recording of
9 said proceedings are a true and accurate record to the
10 best of my knowledge, skills, and ability; that I am
11 neither counsel for, related to, nor employed by any
12 of the parties to the action in which this was taken;
13 and, further, that I am not a relative or employee of
14 any counsel or attorney employed by the parties
15 hereto, nor financially or ot'_____ ___ _____ __ ___
16 outcome of this action.
17 VICTORIA ROCK
18 Notary Public in and for the
19 State of Illinois
20
21
22
23
24

Page 157

1 CERTIFICATE OF TRANSCRIBER
2 I, NATASCHA WISE, do hereby certify that
3 this transcript was prepared from the digital audio
4 recording of the foregoing proceeding, that said
5 transcript is a true and accurate record of the
6 proceedings to the best of my knowledge, skills, and
7 ability; that I am neither counsel for, related to,
8 nor employed by any of the parties to the action in
9 which this was taken; and, further, that I am not a
10 relative or employee of any counsel or attorney
11 employed by the parties hereto, nor financially or
12 otherwise interested in the outcome of this action.
13
14
15 NATASCHA WISE
16
17
18
19
20
21
22
23
24

40 (Pages 154 - 157)