UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TRI-STATE DISPOSAL, INC., an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:18-cv-02138 |
| vs. | ) ) | Judge Sara L. Ellis |
| THE VILLAGE OF RIVERDALE, a municipal corporation; LAWRENCE L. JACKSON, Mayor of the Village of Riverdale | ) ) ) ) ) | |
| Defendants. | ) ) | |

**TRI-STATE DISPOSAL, INC.'S 56.1 STATEMENT OF ADDITIONAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to this Court's rule[1], Tri-State submits additional issues of fact to oppose the Defendants' Motion for Summary Judgment. The following issues of fact are numbered consecutively from the last number in the parties 56.1 Joint Statement of Undisputed Material Facts. Additional exhibits are lettered consecutively from the last Exhibit in the parties 56.1 Joint Statement of Undisputed Material Facts.

78. The Mayor has a direct business relationship with the owners of Riverdale Materials (through Centennial Holdings LLC and its managers Lawrence Jackson and Tammy Watson, organized March 15, 2018). (*See* Illinois Secretary of State LLC File Detail Report on Centennial Holdings **attached as Exhibit FF**; Ex. E (Jackson deposition transcript) to 56.1 at pp. 17-19). The Mayor and Riverdale Materials' owner, Jim Bracken, frequently socialize for lunches in south suburban Midlothian. Centennial Holdings' March 15, 2018 creation, comes

---

[1] Judge Ellis' case procedure for summary judgment practice, states "… the non-moving party may include facts in its response to the motion for summary judgment that it contends are disputed in order to demonstrate that a genuine issue of material fact exists that warrants denying the motion for summary judgment."

1

almost immediately after Tri-State criticized the Mayor and Riverdale Materials and filed this lawsuit. (*See* Declaration of Jeff Germany **attached as Exhibit GG at ¶ 3**)

79. Defendant Jackson first promised Tri-State representatives that any permit to Riverdale Materials would include financial assurance, closure bond, and a requirement for Riverdale Materials to pay royalties. The Mayor reneged on that promise. (56.1 at Ex. E (Jackson Dep.), pp. 49-50, Ex. G (Jeff Germany Dep.), pp. 50-51, and Ex. C (Sheryl Germany Dep.), pp. 54-55).

80. Regarding the need for financial assurance for closure and post-closure, and the need for some royalties for Riverdale, even Riverdale Materials testified that a site in Harvey was abandoned and the owner just left all this stuff there. (56.1 at Ex. J (9/7/2017 Village Record of Proceedings Transcript) at p. 25.

81. The Mayor wrote to Tri-State in October 2017 stating the Village's intent to re-bid Riverdale's garbage disposal contract and inviting and encouraging Tri-State to participate in the re-bid process. (56.1 at ¶ 23 and Exhibit K attached thereto) Again, the Mayor reneged on this promise. No re-bid ever occurred, and Tri-State as the incumbent contract holder was not given even the opportunity to bid on the contract. (56.1 at Ex. G (Jeff Germany Dep.), pp. 80, 90-92, and Ex. C (Sheryl Germany Dep.), pp. 119-121)

82. Even though the Village admitted that trash collection was an essential service and that payment for the same was essential to the operation of the Village, almost immediately after Tri-State engaged in protected speech and continuing after it filed this lawsuit, payments to Tri-State went from being paid in less than 45 days, to being delayed more than 180 days. During the time that Tri-State was not being paid by the Village, it suffered damages because it had to scramble to pay its bills because a substantial amount of income was not coming in from

the Village. The Village still owes Tri-State some interest on late payments. (56.1 at Ex. C (Sheryl Germany Deposition Transcript) at pp. 98-103; Ex. G (Jeff Germany Deposition Transcript) at pp. 67-73; Declaration of Jeffrey Germany, **Exhibit GG at ¶4**) Tri-State continued to provide uninterrupted trash service to the Village residents and continued to pay substantial royalties to the Village, even though it was not obligated to do so based on the Village's non-payment. (Declaration of Jeffrey Germany, **Exhibit GG at ¶ 5**).

83. In addition, Tri-State suffered damages to its reputation by not being allowed to participate in the 2018 Spring Clean-up. Residents called Tri-State for advice on when the clean-up will happen, and because of the Village's action (inaction), Tri-State could not provide them with any information, which made Tri-State look totally incompetent. Other damages include the loss of the opportunity to bid on the garbage contract, which was worth approximately $60,000 to $65,000 per month. Tri-State expected that contract to continue for least five (5)years. Also, Tri-State lost contracts that it had with multi-family building owners when the Mayor approved requiring these owners to use Flood Bros. as its sole garbage contractor. Tri-State earned approximately $6,000 per month on the multi-family contract ($72,000 per year). Tri-State expected the multi-family contract to go on indefinitely, and lost that approximate $72,000 per year. (Declaration of Jeffrey Germany, **Exhibit GG at ¶¶ 6-9**).

84. The Mayor directed the Public Works Director Jerome Russell not to respond to Tri-State regarding Tri-State's normal and annual inquiries regarding its contract obligation to conduct an annual spring clean-up at no cost to the Village. (56.1 at ¶ 44) Instead, the Mayor authorized the Village to hire and pay a separate contractor, Flood Bros., more than $18,000 to perform the service that Tri-State was obligated to perform for free. (56.1 at ¶¶ 57, 58, 62 and at Exhibit BB (which is also Exhibit 16 to Third Amended Complaint))

85. Tri-State indicated that it would not be scheduling the Spring Clean-Up in 2018 because the Spring Clean-up had already occurred with Flood Brothers at a cost of approximately $18,000 to the Village. (56.1 at ¶ 57). Russell admitted that Flood Bros. did the Spring-Clean up on 5-5-2018, and that that was the only Spring Clean-up in 2018. (56.1 at Ex. Z (Russell Dep.) at pp. 74-75)

86. The hearings before the Zoning Board of Appeals (ZBA) were improper and illegal, since in the middle of the ZBA hearing process, and after substantive testimony had already been given and ZBA Chairperson Carmelia Shipp publicly expressed a negative opinion about the Riverdale Materials project, the Mayor fired Chairperson Shipp of the ZBA, and loaded the ZBA with persons totally unaware of the situation and who had not heard substantial testimony at the September 7, 2017 hearing. (Exhibit CC to 56.1, Third Amended Complaint at ¶ 38; October 10, 2017 letter from Mayor Jackson to Carmelia Shipp **attached as Exhibit HH)**

87. ZBA Chairperson Camelia Shipp criticized the site and the process at the initial September 7, 2017 ZBA hearing by asking - Why Riverdale (pp. 29-30), expressing concerns about the retention pond and stormwater drainage (p. 77), and other concerns (70-72, 82) (56.1 at Ex. J (9/7/2017 Village Record of Proceedings Transcript) at pp. 29-30, 70-72, 77, 82).

88. At the follow-up hearing after Ms. Shipp was unilaterally terminated from the ZBA by the Mayor, Shipp testified that she was the chairperson since 2008 and because the Mayor knew she was strongly against the company coming in, the Mayor personally gave her a letter to terminate her position as chairperson and to hire people that would be on his side. (56.1 at Ex. L (11/2/2017 Village Record of Proceedings Transcript) at pp. 40-41)

89. The Zoning Board of Appeals hearings were improper because they were chaired by Village Attorney Matt Welch from the law firm Montana and Welch, without any authority to

4

do so, and over the strong objection of Village residents as well as Tri-State. (Exhibit CC to 56.1, Third Amended Complaint at ¶ 40).

90. After Ms. Shipp was fired by the Mayor as ZBA chairperson, Village Attorney Matt Welch chaired the November 2, 2017 public hearing (56.1 at Ex. L (11/2/2017 Village Record of Proceedings Transcript) at p. 4). Village resident Reynolds complains that only the chairman is supposed to call the meeting to order; Welch administers oaths (*Id.* at p. 6); Welch questions the Riverdale Materials' witnesses (*Id.* at pp. 33-34); Welch interrupts and stymies the public's testimony to which most of the public responds to things like – "Don't interrupt me." "Don't shut me down." (*Id.* at pp. 42-43); resident Horton criticizes Welch because there is no transparency (*Id.* at p. 43); resident Reynolds testifies asking if the newly-elected board even knows what a conditional use is or what a variance is. Again, Welch chimes in (*Id.* at p. 48); Welch continued to interrupt resident William Clark (*Id.* at pp. 53-57); Welch interrupts resident Kay Randall, and she says that she has the floor and do not interrupt her. She also chastises Welch for not living in Riverdale (*Id.* at p. 62); resident Gilmore chastises Welch for getting in his car and leaving Riverdale, even though Riverdale residents pay his salary, yet he is trying to cut them off (*Id.* at p. 63). Tri-State's attorney Mark LaRose also complained and Welch interrupted him, asking why he is saying anything at all (*Id.* at p. 71).

91. After Shipp was unilaterally terminated by the Mayor, Welch says he is chairing the meeting because a chairperson has not been assigned "at this time" (56.1 at Ex. L (11/2/2017 Village Record of Proceedings Transcript) at p. 71). There was a standing objection to Welch participating in any way and giving them any advice (*Id.* at p. 96). Welch even went so far as to suggest a condition to the stormwater pollution prevention plan to be reviewed by the Village engineer (*Id.* at p. 103).

92. Riverdale Ordinance 2017-22, Section 4, Condition 4, signed by the Mayor, required Riverdale Materials to submit plans for review and approval by the Village Engineer. (56.1 at Exhibit 1 to Exhibit AA (First Amended Complaint)) Based on a response to a FOIA sent to the Village requesting all documents, information, submittals, approvals, and/or actions pertaining to a stormwater pollution prevention plan and dust control plan, there were no responsive documents to show that anything was reviewed by a Village engineer. (*See* Declaration of Mark A. LaRose, **attached as Exhibit NN** at ¶ 6).

93. At the final public hearing on November 28, 2017, the Village Board intended to adopt the ordinance without taking additional public comment. (Village Record of Proceedings Transcript of 11/28/2017 at p. 5, **attached as Exhibit II**). Mayor Jackson and Village Attorney Matt Welch did not allow any further criticism or testimony before a vote was taken in the Riverdale Materials' matter, and they refused to put in the record additional written criticisms by the plaintiff and its representatives. (Exhibit CC to 56.1, Third Amended Complaint at ¶ 60; Village Record of Proceedings Transcript of 11/28/2017 at pp. 5-10, **Exhibit II**). Tri-State's attorney Mark LaRose questioned why they would not take additional public comment prior to voting. (Village Record of Proceedings Transcript of 11/28/2017 at p 8, **Exhibit II).** The Board refused to take Tri-State's supplemental testimony even though it could not have been delivered prior to that date (Village Record of Proceedings Transcript of 11/28/2017 at pp. 8-10, **Exhibit II**).

94. On October 9, 2018, the Village Board passed Resolution 2018-44 signed by Mayor Jackson authorizing the execution of an agreement with Flood Brothers Disposal for Residential Waste Collection. (56.1 at Exhibit 19 (Resolution 2018-44) to Exhibit CC (Third Amended Complaint)

95. While the Mayor tries to hide behind the fact that he did not vote on various matters affecting Tri-State, he did in fact sign the offending ordinances and resolutions, and was required by state and local law to approve the ordinances before signing. (*See* Riverdale Village Code 2.08.070 **attached as Exhibit JJ**; 65 ILCS 5/6-4-1 and 5/6-4-2, **attached as Exhibit KK**; (56.1 at Exhibit 19 (Resolution #2018-44) and Exhibit 20 (Ordinance #2018-22) to Exhibit CC (Third Amended Complaint); Ordinance 2017-22 attached as Exhibit 1 to Plaintiff's First and Second Amended Complaint and incorporated by reference in Plaintiff's Third Amended Complaint)

96. Throughout the process, Tri-State complained about the serious and historic contamination at the Riverdale Materials' site, and the fact that Riverdale Materials lied about stormwater runoff going into an "on-site retention pond." (56.1 at Ex. CC (Third Amended Complaint at ¶¶ 21(a)-(b), 23-30, 32, 43(a), 58(b)); 56.1 at Exhibit 2 (9/7/2017 submittal to Riverdale Zoning Board of Appeals) to Ex. AA (First Amended Complaint); 56.1 at Exhibit 3 (11/2/2017 submittal to Riverdale Zoning Board of Appeals) to Ex. AA (First Amended Complaint); 56.1 at Exhibit 4 (11/28/2017 submittal to Mayor Jackson and Village Trustees) to Ex. AA (First Amended Complaint); 56.1 at Ex. J (9/7/2017 Village Record of Proceedings Transcript) at pp. 47-64)

97. In order to protect the retention pond from further contamination, in May 2019, Tri-State purchased the retention pond and requested that its attorney issue a cease and desist notice to Riverdale Materials to stop using the retention pond for its runoff from its contaminated site. Riverdale Materials never responded to this letter. (*See* Cease and Desist Notice to Riverdale Materials dated February 10, 2020 **attached as Exhibit LL**; Declaration of Sheryl Germany **attached as Exhibit MM at ¶ 3**)

7

98. The day the cease and desist letter was issued, Riverdale Materials' owner Jim Bracken, called Tri-State attorney Mark LaRose, at night, on his cell, and repeatedly threatened both LaRose and Tri-State. (*See* Declaration of Mark A. LaRose, **Exhibit NN at ¶ 3**)

99. Mark LaRose issued a letter to Daley and Georges (Riverdale Materials' registered agent) regarding the threatening phone calls. Daley and Georges never responded. (*See* letter to Daley and Georges dated February 12, 2020, **attached as Exhibit OO;** Declaration of Mark A. LaRose, **Exhibit NN at ¶¶ 4-5**).

100. While the Defendants criticize Tri-State for not expressing speech on matters of public concern, many members of the public, and in fact members of the ZBA expressed the same or similar criticisms: Board Members Carmelia Shipp and Mildred Blount raised questions as to why this facility should be in Riverdale. (56.1 at Ex. J (9/7/2017 Village Record of Proceedings Transcript) at pp. 29-30) Riverdale Materials owner Jim Bracken responded that it is because rich suburbs don't want us. (*Id* at p. 30) Ms. Shipp also expressed concerns about contamination of the site and the retention pond. (*Id.* at p. 77) Resident James Reynolds testified about stormwater run-off and the fact that they don't own the retention pond. (56.1 at Ex. L (11/2/2017 Village Record of Proceedings Transcript) at p. 49). Dion Dean testified complaining that information was only given to the community at the fifth hour and expressed concerns about contamination of the site, contaminated retention pond, the need for clean-up, the materials coming from the City of Chicago (*Id.* at pp. 50-53); Roy McKay testified there was no need for two transfer stations in Riverdale (*Id.* at p. 53); William Clark testified as to matters of public concern (*Id.* at pp. 53-57); Cynthia Gilmore testified about property values being down and that there is no need for this – she is dead set against it (*Id.* at pp. 57-60; 62-63); Kay Randall testified that this is not the type of business they need in Riverdale (*Id.* at p. 60-62); Paula Williams

8

testified that they are operating without a permit and that her vote is no, and this was all done without the community's knowledge, it's not a lucrative business or a needed business and they need to reconsider (*Id.* at pp. 83-85); Patricia Plevens says this will not benefit Riverdale and she says she's been here for a while and all she sees is tyranny (*Id.* at pp. 85-86); Ms. Meadors testifies that she doesn't think it will benefit the residents (*Id.* at p. 87).

101. The Public Works Director, Jerome Russell, admitted the Mayor's policymaking authority when he admitted that the Village Board of Trustees and the Mayor chose Flood Brothers to perform the Spring Clean-Up in 2018. (56.1 at Ex. Z, Jerome Russell Deposition, pp. 31–33).

102. Many residents and in fact members of the ZBA testified as to the futility and frustration that they have regarding opposing the Riverdale Materials' site, and as one resident put it "the tyranny" that has been rampant in Riverdale for years. Testimony included statements such as: all I've seen is tyranny and that's all I've seen; you took an oath to serve and protect and you're not doing that; there's no transparency, very rarely do we find out anything and when we do it's already at a critical stage, don't find out until it's too late; all you're going to do is approve, not thinking about the long-term, the effects on the lives of people and residents of Riverdale, stop thinking of yourself, think about the future of the community; a lack of information given to the community before this was even moved on, got it at the 5th hour; nobody is trying to bring anything into this community that we need, we suffer from lack of information; this community needs a lot of things, a recycling dump isn't one of them; praying for Riverdale and that the injustice will come to an end, no integrity. (56.1 at Ex. L (11/2/2017 Village Record of Proceedings Transcript) at pp. 41, 43-44, 49-50, 56, 58, 86; **Exhibit II** (11/28/2017 Village Record of Proceedings Transcript) at p. 14).

Respectfully Submitted,

/s/ Mark A. LaRose
Mark A. LaRose

Mark A. LaRose (ARDC No. 6183288)
Ray Willis Welcher (ARDC No. 6287856)
Attorneys for Plaintiff Tri-State Disposal, Inc.
LaRose & Bosco, Ltd.
200 N. LaSalle, Suite 2810
Chicago, IL 60601
(312) 642-4414
Fax (312) 642-0434
mlarose@larosebocolaw.com
rwelcher@laroseboscolaw.com