# EXHIBIT A
# to Agreed Motion for Leave
# to File Brief in Excess of 15 Pages
# *Instanter*

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TRI-STATE DISPOSAL, INC., an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:18-cv-02138 |
| vs. | ) ) | Judge Sara L. Ellis |
| THE VILLAGE OF RIVERDALE, a municipal corporation; LAWRENCE L. JACKSON, Mayor of the Village of Riverdale | ) ) ) ) ) | |
| Defendants. | ) ) | |

**TRI-STATE DISPOSAL, INC.'S RESPONSE BRIEF IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## POINTS AND AUTHORITIES

Page

I.  INTRODUCTION AND SUMMARY OF ARGUMENT…………….  1

II.  FACTS THAT PRECLUDE SUMMARY JUDGMENT AND/OR
THAT SUPPORT TRI-STATE'S CLAIMS FOR RETALIATION
AND BREACH OF CONTRACT…………………………………..  1

    A.  Facts in Dispute that Preclude Summary Judgment……………  1

        Riverdale Village Code 2.08.070………………………………  5

        65 ILCS 5/6-4-1 and 5/6-4-2…………………………………..  5

    B.  Uncontested Facts that Support Tri-State's Claims and
Preclude Summary Judgment…………………………………..  7

III.  RELEVANT PROCEDURAL HISTORY……………………………..  11

IV.  STANDARD FOR SUMMARY JUDGMENT………………………..  12

    *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248
106 S. Ct. 2505 (1986)……………………………………………  12

    *McKenzie v. Illinois Dept. of Transp.,* 92 F.3rd 473, 479 (7th Cir. 1996)
(quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)………….  12

V.  ARGUMENT……………………………………………………………..  12

    A.  There is Sufficient Evidence of Political Retaliation for a
Reasonable Jury to Find in Favor of Tri-State and,
Therefore, Summary Judgement Should be Denied……………  12

        1.  The Village and the Mayor Have Liability in this
Matter Under *Monell*…………………………………  12

            *Monell v. Department of Social Services of the City of
New York,* 436 U.S. 658, 98 S. Ct. 2018 (1978)………..  12

            *City of St. Louis v. Praprotnik,* 485 U.S. 112, 126,
108 S.Ct. 915, 925, 926 (1988)…………………………  13

            Riverdale Village Code 2.04.010………………………..  13

Riverdale Village Code 2.04.020………………………..   13

Riverdale Village Code 2.04.030………………………..   13

Riverdale Village Code 2.08.070………………………   13

65 ILCS 5/6-4-1………………………………………   13

65 ILCS 5/6-4-2………………………………………   13

65 ILCS 5/6-4-7………………………………………   13

*Weeks v. City of Plano,* No. 88 C 0518, 1989
W.L. 20831 (N.D. Ill. Mar. 1989)………………………   13

*Pembaur v. City of Cincinnati,* 475 U.S. 469, 480
106 S.Ct. 1292, 1298 (1986)……………………………   14

*City of St. Louis v. Praprotnik,* 485 U.S. 112, 125-126
108 S.Ct. 915, 925, 926 (1988)…………………………   14

*Monell v. Department of Social Services,* 436 U.S. 658
98 S.Ct. 2018 (1978)……………………………………   14

Riverdale Village Code 2.08.010………………………..   14

2.   Tri-State Engaged in Protected Speech…………………   16

*Village of Riverdale v. 138th Street Joint Venture, et al.,*
527 F.Supp.2d 760 (N.D. Ill. 2007)……………………   18

3.   Tri-State's Protected Speech was a Substantial
Motivating Factor for the Defendants' Retaliatory Acts..   19

*Fairley v. Andrews,* 578 F.3d 518 (7th Cir. 2009)……….   21

4.   The Retaliation Would Have Deterred a Person of
Normal Sensibilities from Expressing Their First
Amendment Rights………………………………………   22

*McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006)
(quoting *Suppan v. Dadonna,* 203 F.3d 228, 235
(3d Cir. 2000)…………………………………………   22

*Lauren W. ex rel. Jean W. v. DeFlaminis,* 480 F.3d 259, 269 (3rd Cir. 2007)………………………………… 22

5.  Tri-State Suffered Injury, in Fact, and Substantial Damages in this Matter………………………….. 23

*Uzuegbunam v. Preczewski,* ___ U.S. __, 141 S.Ct. 792, 800, 802 (2021)………………………………… 25

B.  There is Sufficient Evidence of Breach of Contract for a Reasonable Jury to Find in Favor of Tri-State and, Therefore, Summary Judgement should be Denied………………………… 25

1.  The Elements of a Breach of Contract………………….. 25

*Gallagher Corp. v. Russ,* 741 N.E.2d 605, 611, 309 Ill. App. 3d 192, 242 Ill. Dec. 326 (1999)…………. 25

2.  Tri-State has Presented Competent Evidence From Which a Jury Can Find in Its Favor on Its Breach of Contract Claim…………………………………………... 25

*Alover Distributors, Inc. v,. Kroger Co.,* 513 F.2d 1137 (7th Cir. 1975)…………………………… 27

VI.  CONCLUSION…………………………………………….. 28

iv

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

While the Defendants admit that this case includes ". . . intrigue, political subterfuge, and the darkness lurking just under the surface of a seemingly picture perfect small town," they claim to be entitled to summary judgment alleging that the plaintiff relies on speculation and conjecture.  (Defendants' Memo of Law, p. 1, quoting in part this Court's March 26, 2019 opinion and order). The Defendants craft clever legal arguments to combat the Plaintiff's well-pled claims and strong evidence supporting defendants' liability for political retaliation and breach of contract.  In so doing, the Defendants ignore the direct and inappropriate retaliatory acts taken by the mayor and policy maker Defendant Jackson, and the contested and uncontested facts that preclude summary judgment on Plaintiff's claims for retaliation and breach of contract.

The approval of the highly-contaminated Riverdale Materials' site was politically rigged between the Mayor and the Bracken family from day one.  When Tri-State complained about legitimate issues of public interest (protected speech), the reaction by the Mayor was swift and harsh and in direct retaliation for Tri-State's First Amendment speech.

## II.   FACTS THAT PRECLUDE SUMMARY JUDGMENT AND/OR THAT SUPPORT TRI-STATE'S CLAIMS FOR RETALIATION AND BREACH OF CONTRACT

### A.    Facts in Dispute that Preclude Summary Judgment

The following contested statements of facts support Plaintiff's claims and preclude summary judgment.[1]

1.    The Mayor has a direct business relationship with Riverdale Materials,   and the Mayor and Riverdale Materials' owner, Jim Bracken, frequently socialize for lunches in south

---

[1] For ease of reference and to conserve pages, some of the following facts and exhibit cites are summarized in this Section II.A. The full facts and exhibit cites are set forth in Tri-State's 56.1 Statement of Additional Facts in Opposition to Defendants' Motion for Summary Judgment, filed contemporaneously with this Brief in Response.

suburban Midlothian.  (Tri-State's 56.1 Statement of Additional Facts at ¶ 78; Illinois Secretary of State LLC Filing Detail Report on Centennial Holdings attached as Exhibit FF; Declaration of Jeff Germany attached as Exhibit GG at ¶ 3)

2.     Defendant Jackson first promised Tri-State representatives that any permit to Riverdale Materials would include financial assurance, closure bond, and a requirement for Riverdale Materials to pay royalties. The Mayor reneged on that promise. (Tri-State's 56.1 Statement of Additional Facts at ¶ 79)

3.     Regarding the need for financial assurance for closure and post-closure, and the need for some royalties for Riverdale, even Riverdale Materials testified that a site in Harvey was abandoned and the owner just left all this stuff there.  (Tri-State's 56.1 Statement of Additional Facts at ¶ 80)

4.     The Mayor wrote to Tri-State in October 2017 stating the Village's intent to re-bid Riverdale's garbage disposal contract and inviting and encouraging Tri-State to participate in the re-bid process. Again, the Mayor reneged on this promise.  (Tri-State's 56.1 Statement of Additional Facts at ¶ 81)

5.     Even though the Village admitted that trash collection was an essential service and that payment for the same was essential to the operation of the Village, almost immediately after Tri-State engaged in protected speech and continuing after it filed this lawsuit, payments to Tri-State went from being paid in less than 45 days, to being delayed more than 180 days.   The Village still owes Tri-State some interest on the late payments. Tri-State continued to provide uninterrupted trash service to the Village residents and continued to pay substantial royalties to the Village, even though it was not obligated to do so based on the Village's non-payment. (Tri-State's 56.1 Statement of Additional Facts at ¶ 82; Exhibit GG at ¶¶ 4-5)

6.      In addition, Tri-State suffered damages to its reputation by not being allowed to participate in the 2018 Spring Clean-up. Other damages include the loss of the opportunity to bid on the garbage contract, which was worth approximately $60,000 to $65,000 per month.  Also, Tri-State lost contracts that it had with multi-family building owners when the Mayor approved requiring these owners to use Flood Bros. as its sole garbage contractor. Tri-State earned approximately $6,000 per month on the multi-family contract ($72,000 per year). (Tri-State's 56.1 Statement of Additional Facts at ¶ 83; Exhibit GG at ¶¶ 6-9)

7.      The Mayor directed the Public Works Director Jerome Russell not to respond to Tri-State regarding Tri-State's normal and annual inquiries regarding its contract obligation to conduct an annual spring clean-up at no cost to the Village. Instead, the Mayor authorized the Village to hire and pay a separate contractor, Flood Bros., more than $18,000 to perform the service that Tri-State was obligated to perform for free.  (Tri-State's 56.1 Statement of Additional Facts at ¶ 84)

8.      Russell admitted that Flood Bros. did the Spring-Clean up on 5-5-2018 and that that was the only Spring Clean-up in 2018. (Tri-State's 56.1 Statement of Additional Facts at ¶ 85)

9.      The hearings before the Zoning Board of Appeals (ZBA) were improper and illegal, since in the middle of the ZBA hearing process, and after substantive testimony had already been given and ZBA Chairperson Carmelia Shipp publicly expressed a negative opinion about the Riverdale Materials project, the Mayor fired Chairperson Shipp of the ZBA, and loaded the ZBA with persons totally unaware of the situation and who had not heard substantial testimony at the September 7, 2017 hearing.  (Tri-State's 56.1 Statement of Additional Facts at ¶ 86; October 10, 2017 letter from Mayor Jackson to Carmelia Shipp attached as Exhibit HH)

3

10.     ZBA Chairperson Camelia Shipp criticized the site and the process at the initial September 7, 2017 ZBA hearing by asking - Why Riverdale, expressing concerns about the retention pond and stormwater drainage, and other concerns. (Tri-State's 56.1 Statement of Additional Facts at ¶ 87)

11.     At the follow-up hearing after Ms. Shipp was unilaterally terminated from the ZBA by the Mayor, Shipp testified that she was the chairperson since 2008 and because the Mayor knew she was strongly against the company coming in, the Mayor personally gave her a letter to terminate her position as chairperson and to hire people that would be on his side.  (Tri-State's 56.1 Statement of Additional Facts at ¶ 88)

12.     The Zoning Board of Appeals hearings were improper because they were chaired by Village Attorney Matt Welch from the law firm Montana and Welch, without any authority to do so, and over the strong objection of Village residents as well as Tri-State.  (Tri-State's 56.1 Statement of Additional Facts at ¶ 89)

13.     After Ms. Shipp was fired by the Mayor as ZBA chairperson, Village Attorney Matt Welch chaired the November 2, 2017 public hearing and repeatedly interrupted and cut-off members of the public over objections from Tri-State and Village residents.  (Tri-State's 56.1 Additional Statement of Facts at ¶ 90)

14.     After Shipp was unilaterally terminated by the Mayor, Welch says he is chairing the meeting because a chairperson has not been assigned "at this time." (Tri-State's 56.1 Statement of Additional Facts at ¶ 91)

15.     Riverdale Ordinance 2017-22, Section 4, Condition 4, signed by the Mayor, required Riverdale Materials to submit plans for review and approval by the Village Engineer. Based on a response to a FOIA sent to the Village requesting all documents, information,

4

submittals, approvals, and/or actions pertaining to a stormwater pollution prevention plan and dust control plan, there were no responsive documents to show that anything was reviewed by a Village engineer.  (Tri-State's 56.1 Statement of Additional Facts at ¶ 92; Declaration of Mark A. LaRose attached as Exhibit NN at ¶ 6)

16.     At the final public hearing on November 28, 2017, the Village Board intended to adopt the ordinance without taking additional public comment. Mayor Jackson and Village Attorney Matt Welch did not allow any further criticism or testimony before a vote was taken in the Riverdale Materials' matter, and they refused to put in the record additional written criticisms by the plaintiff and its representatives. (Tri-State's 56.1 Statement of Additional Facts at ¶ 93; Village Record of Proceedings Transcript of 11/28/2017 attached as Exhibit II at pp. 5-10).

17.     On October 9, 2018, the Village Board passed Resolution 2018-44 signed by Mayor Jackson authorizing the execution of an agreement with Flood Brothers Disposal for Residential Waste Collection. (Tri-State's 56.1 Statement of Additional Facts at ¶ 94)

18.     While the Mayor tries to hide behind the fact that he did not vote on various matters affecting Tri-State, he did in fact sign the offending ordinances and resolutions, and was required by state and local law to approve the ordinances before signing. (Tri-State's 56.1 Statement of Additional Facts at ¶ 95; Riverdale Village Code 2.08.070 attached as Exhibit JJ; 65 ILCS 5/6-4-1 and 5/6-4-2 attached as Exhibit KK)

19.     Throughout the process, Tri-State complained about the serious and historic contamination at the Riverdale Materials' site, and the fact that Riverdale Materials lied about stormwater runoff going into an "on-site retention pond." (Tri-State's 56.1 Statement of Additional Facts at ¶ 96)

20.     In order to protect the retention pond from further contamination, in May 2019, Tri-State purchased the retention pond and requested that its attorney issue a cease and desist notice to Riverdale Materials to stop using the retention pond for its runoff from its contaminated site.  Riverdale Materials never responded to this letter. (Tri-State's 56.1 Statement of Additional Facts at ¶ 97; Cease and Desist Notice to Riverdale Materials dated February 10, 2020 attached as Exhibit LL; Declaration of Sheryl Germany attached as Exhibit MM at ¶ 3)

21.     The day the cease and desist letter was issued, Riverdale Materials' owner Jim Bracken, called Tri-State attorney Mark LaRose, at night, on his cell, and repeatedly threatened both LaRose and Tri-State. (Tri-State's 56.1 Statement of Additional Facts at ¶ 98; Exhibit NN at ¶ 3)

22.     Mark LaRose issued a letter to Daley and Georges (Riverdale Materials' registered agent) regarding the threatening phone calls.  Daley and Georges never responded. (Tri-State's 56.1 Statement of Additional Facts at ¶ 99; Exhibit NN at ¶¶ 4-5; Letter to Daley and Georges dated February 12, 2020, attached as Exhibit OO)

23.     While the Defendants criticize Tri-State for not expressing speech on matters of public concern, many members of the public, and in fact members of the ZBA expressed the same or similar criticisms, including no need for additional transfer station; environmental concerns about the site; concerns about drainage and stormwater retention pond; and other concerns. (Tri-State's 56.1 Statement of Additional Facts at ¶ 100).

24.     The Public Works Director, Jerome Russell, admitted the Mayor's policymaking authority when he admitted that the Village Board of Trustees and the Mayor chose Flood Brothers to perform the Spring Clean-Up in 2018.  (Tri-State's 56.1 Statement of Additional Facts at ¶ 101)

6

25.     Many residents and in fact members of the ZBA testified as to the futility and frustration that they have regarding opposing the Riverdale Materials' site, and as one resident put it "the tyranny" that has been rampant in Riverdale for years. Testimony included statements such as: all I've seen is tyranny and that's all I've seen (Ms. Plevens); you took an oath to serve and protect and you're not doing that (Ms. Shipp); there's no transparency, very rarely do we find out anything and when we do it's already at a critical stage, don't find out until it's too late (Ms. Horton); all you're going to do is approve, not thinking about the long-term, the effects on the lives of people and residents of Riverdale, stop thinking of yourself, think about the future of the community (Mr. Reynolds); a lack of information given to the community before this was even moved on, got it at the 5th hour (Mr. Dean); nobody is trying to bring anything into this community that we need, we suffer from lack of information (Mr. Clark); this community needs a lot of things, a recycling dump isn't one of them (Ms. Gilmore); praying for Riverdale and that the injustice will come to an end, no integrity (Ms. Shipp). (Tri-State's 56.1 Statement of Additional Facts at ¶ 102; Exhibit II at p. 14).

**B.     Uncontested Facts That Support Tri-State's Claims and Preclude Summary Judgment[2]**

1.     Defendant Jackson supported the Riverdale Materials project from its inception, including putting his picture and a sign on the Riverdale Materials property stating, "ANOTHER BUSINESS BROUGHT TO YOU BY THE HONORABLE MAYOR LAWRENCE JACKSON." (56.1 at ¶ 33)

2.     Tri-State had an agreement with the Village with the objective " "to protect public health and welfare and the environment at and in the vicinity of the transfer station…" (56.1 at ¶6)

---

[2] For the sake of brevity and ease of reference, some of the following sections from the 56.1 are summarized and not set forth in full.  The full facts are contained in the respective paragraphs of the 56.1.

3.      Pursuant to the agreement between Tri-State and Riverdale, Tri-State agreed to pay the Village host benefit fees (more than $1 million to date) on a monthly basis and to post a $50,000 bond to cover the cost of cleaning up the property at 13903 S. Ashland, should Tri- State abandon the same, as well as agreeing to perform many other operational and site improvements. (56.1 at ¶ 7)

4.      At no additional cost to the Village, Tri-State agreed to (1) provide refuse disposal services to Village facilities; (2) conduct a yearly spring clean-up for Village residents; and (3) perform Christmas tree pickup during the last full week of December and first two weeks of January. (56.1 at ¶ 11)

5.      Sheryl Germany had previously talked to the Mayor regarding her opposition to granting Riverdale Materials a conditional use to operate in the Village, and at these meetings expressed concerns regarding the environmental impact of the operation in addition to the request that the new business also pay the Village a host fee and provide clean-up bond. (56.1 at ¶ 19)

6.      Tri-State submitted a letter to the Plan Commission regarding Tri-State's opposition to the granting of the conditional use for this property to Riverdale Materials, and spoke to the Plan Commission regarding the same. (56.1 at ¶ 20)

7.      On October 23, 2017, the Mayor sent a letter to Tri-State indicating that the Village was contemplating alternate garbage service providers and intended to issue an RFQ for the same for which the Mayor invited and encouraged Tri-State to bid. At the time this correspondence was issued, the Village was looking at several different options to decrease operating costs due to the financial constraints it was facing. (56.1 at ¶ 23)

8.     After Tri-State filed its Complaint, Tri-State emailed the Village regarding scheduling of the annual Spring Clean-Up. Tri-State did not receive any response from this inquiry. (56.1 at ¶ 40)

9.     On March 20, 2018, Tri-State emailed the Village once again regarding the scheduling of the annual Spring Clean-Up. This email forwarded Tri-State's March 16th email to Jerome Russell and Robert Scharnhorst to Mayor Jackson and several Village Trustees including Rodrick Jefferson, Erik LeVere, Bradley Smith, Cassandra Riley-Pinkney, Greg Lewis, and Brenda Williams. (56.1 at ¶ 43) Tri-State did not receive any response to this either.

10.     The Mayor directed Jerome Russell not to respond to Tri-State when Tri-State contacted Riverdale to set up the 2018 Spring Clean-Up. (56.1 at ¶ 44)

11.     On March 27, 2018, the Village Board passed a motion directing the Chief of Staff, on behalf of the Village, to provide notice to Tri-State that the Village would be declining any and all extensions provided in the Contract and that the Contract would expire on July 19, 2019. In addition, the Village would be obtaining proposals from alternative waste disposal contractors for review by the Village Board on or before June 15, 2018. (56.1 at ¶ 45)

12.     In April 2018, the Village was holding three checks due and owing to Tri-State in the amount of approximately $198,342.48. (56.1 at ¶ 49)

13.     On April 18, 2018, the Village officially informed Tri-State that it wished to cancel the Contract pursuant to its terms upon its expiration on July 31, 2019. This correspondence was sent by Village Administrator Tim Williams and copied to the Mayor, Village Clerk and Village Attorney. (56.1 at ¶ 50)

14.     On April 28, 2018, the Mayor sent Tri-State an email that demanded termination of any verbal contacts or phone calls between Tri-State and the Village allegedly because Tri-State

was being overly aggressive and harassing in its contacts with the Village. This was the case even though the Mayor could not specifically identify any harassing phone calls or any Village employees that complained. (56.1 at ¶ 51)

15.     As of May 1, 2018, $261,953.50 was due and owing from the Village to Tri-State for service provided from January 2018 – May 2018. (56.1 at ¶ 54).

16.     On May 8, 2018, Tri-State contacted the Village and indicated its belief that the Village was in violation of its contract with Tri-State based in part on the provision relating to the Spring Clean-Up. (56.1 at ¶ 55)

17.     The Village responded to the concern and requested that Tri-State schedule the Spring Clean-Up for a future date.  In addition, the Village requested that future communication relating to the allegations in the complaint occur amongst counsel and not amongst the parties. (56.1 at ¶ 56) (*See also,* Tri-State's Statement of Additional Facts at ¶¶ 84-85)

18.     On December 10, 2018, the Village paid Flood Brothers $18,537.90 for the Spring Clean-Up.  (56.1 at ¶ 62 and Exhibit BB thereto)

19.     In Spring 2019, Jerome Russell was ordered by the Mayor to respond to Tri-State to set up the 2019 Spring Clean-Up and the Spring Clean-Up was performed by Tri-State. (56.1 at ¶ 64)

20.     The Village did not solicit competitive bids for the successor garbage disposal service contract. Consequently, Tri -State was not allowed to participate in any bid to retain or obtain a new contract from the Village of Riverdale for garbage disposal services. (56.1 at ¶ 66)

21.     In October 2018, the Village Board of Trustees passed Ordinance 2018-22, which required all dwellings in the Village to utilize Flood Brothers, which was a change from prior practice; but required for garbage regulation within the Village.  (56.1 at ¶ 68)

10

22.     Ordinance 2018-22 effectively negated Tri-State's valid contracts with multi-unit apartment buildings and resulted in a $7,000 per month decrease in revenue to Tri-State. (56.1 at ¶ 69)

23.     The Village did not make its overdue July 2019 invoiced payment to Tri-State in the amount of $65,653.49 until March 2, 2020.   (56.1 at ¶ 70)

24.     Several criticisms voiced by Tri-State in 2017 and alleged in the Third Amended Complaint related to environmental concerns Tri-State had with the site upon which Riverdale Materials was to operate. Specifically, Tri-State publicly voiced their opposition to Riverdale Materials operating in Riverdale because of their environmental and business concerns. (56.1 at ¶ 72)

## III.     RELEVANT PROCEDURAL HISTORY

This Court has ruled two times on Defendants' 12(b) Motions to Dismiss, and the third time on Defendants' Objection to Plaintiff's Motion for Leave to File its Third Amended Complaint. Throughout these three orders, one thing remained constant – the Court allowed Tri-State to continue to prosecute its claims for political retaliation and breach of contract.  On March 26, 2019, ". . . the Court concludes that Tri-State has sufficiently stated its political retaliation and breach of contract claims, . . ." (Opinion and Order, 3/26/2019, Doc. #45) This Order made detailed findings and conclusions of law that Tri-State engaged in protected First Amendment speech. (Opinion and Order, 3/26/2019, Doc. #45 at pp. 18-19) Tri-State subsequently filed a Second Amended Complaint.  The Court found that "Tri-State may still proceed on its claims for political retaliation and breach of contract." (Opinion and Order, 1/28/2020, Doc. #67)  On September 21, 2020, the Court ruled on Plaintiff's Motion for Leave to File a Third Amended Complaint. The Court allowed the Third Amended Complaint to be filed

which alleged additional facts and allegations of retaliation and breach of contract, and sought both punitive damages and attorneys' fees.  (Opinion and Order, 9/21/2020, Doc. #82)

## IV.     STANDARD FOR SUMMARY JUDGMENT

The Defendants correctly set forth the standard for summary judgment on pages 2-3 of their Memorandum of Law in Support of its Motion, citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505 (1986), which held that the genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Tri-State must therefore make a showing sufficient to establish the existence of each element essential to its case and on which it will bear the burden of proof at trial.  *McKenzie v. Illinois Dept. of Transp.,* 92 F.3rd 473, 479 (7th Cir. 1996) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 1986)).

## V.     ARGUMENT

**A.     There is Sufficient Evidence of Political Retaliation for a Reasonable Jury to Find in Favor of Tri-State and, Therefore, Summary Judgment Should be Denied.**

1.     <u>The Village and the Mayor Have Liability in this Matter Under *Monell.*</u>

Liability under *Monell* can be established in one of three ways: (1) an express policy that when enforced causes constitutional deprivation; (2) a widespread practice that although not authorized by written law or express policy is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) a constitutional injury caused by a person of final policymaking authority. (Opinion and Order, March 26, 2019, Doc. #45 at p. 17 *citing Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S. Ct. 2018 (1978). Tri-State both alleged and the law supports that Mayor Jackson is the final policymaker, and therefore, subjects the Village to liability for his actions.

12

As the Defendants correctly point out, whether a certain person or official is a final policymaker is to be decided by the court as a matter of law and not by the jury as a matter of fact. *City of St. Louis v. Praprotnik,* 485 U.S.112 at 126, 108 S.Ct. 915, 925, 926 (1988).

The Riverdale Village Code establishes as a matter of law that the mayor is an elected official for a four-year term; he is the president of the board of trustees as is provided by statute (Village Code 2.04.010); he is the chief executive officer of the Village and shall perform all duties that may be required by him by statute or ordinance, and he shall have supervision over all executive officers of the Village (Village Code 2.04.020); he has the power to settle all disputes regarding respective duties and powers of appointed officers and to delegate any duty to any such officers (Village Code 2.04.030); he has the duty to approve all village ordinances and to sign them; those of which he disapproves he shall return to the Village Board with his written objections. (Village Code 2.08.070).

State law also establishes the Mayor as policymaker.[3]  The Mayor shall be recognized as the official head of the City or Village by the courts for the purpose of serving civil process and by the governor for all legal purposes (65 ILCS 5/6-4-1); the Mayor shall have the veto power over any ordinance and for approval or disapproval of any ordinance that is presented to him for signature (65 ILCS 5/6-4-1 and 5/6-4-2); the Mayor shall have the powers and duties as set forth in 65 ILCS 5/6/4-7, including the power to appoint and remove heads of departments, exercising control of all departments and divisions of the Village (65 ILCS 5/6-4-7).

In *Weeks v. City of Plano,* No. 88 C 0518, 1989 WL 20831 (N.D. Ill. Mar. 1989) (attached as Exhibit PP), plaintiff filed a Section 1983 suit against the City of Plano, the mayor, the Chief of Police, and individual officers alleging a campaign of harassment and eventual

---

[3] Under state law, a Village Mayor and Village President are terms used interchangeably.

13

termination. The court observed that Illinois law provides that the powers and duties of a Mayor are, inter alia, "to exercise control of all departments and divisions ... created in this Article ... or that may be created by the council." Ill.Rev.Stat. Ch. 24, Para. 6–4–7, then held that both the Chief of Police, as the "final departmental authority on all matters of policy," and the Mayor, who is empowered to exercise control over all of the municipality's departments, including the police department, are authorized policymakers as to police department operations under state and local law. Thus, the actions of these officials " 'are, properly speaking, acts 'of the municipality.' " *Pembaur v. City of Cincinnati*, 475 U.S. 469 at 480, 106 S.Ct. 1292, 1298 (1986); *City of St. Louis v. Praprotnik*, 485 U.S. 112 at 125-126, 108 S.Ct. 915, 925, 926 (1988); *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018 (1978). The motion to dismiss Plaintiff's Section 1983 claim against the City was therefore denied.

Defendants try to diminish the policymaking authority of the Mayor by stating on page 12 of their Brief that, "The Village Code states that the Board shall be the legislative department of the village government and shall perform such duties and have such powers as delegated to it by statute. *Riverdale Village Code 2.08.010*." This argument ignores that there are ordinances, statutes, and case law that establish as a matter of law that the Mayor is a policymaker. Nothing happened in this case without the Mayor's direct involvement and/or approval, as was required by law.

With respect to the offensive actions alleged in this case, Defendant Jackson was personally involved, he directed departments of the Village to take retaliatory acts (don't talk to Tri-State; don't deal with Tri-State on the Spring Clean-up; unnecessarily pay $18,000 of taxpayer money to Flood Bros. when Tri-State was obligated to do the Spring Clean-up for free and when allegedly Riverdale didn't even have any money to pay anybody). He approved and

14

signed all applicable offensive resolutions and ordinances; he reneged on his promises to make Riverdale Materials pay royalties and post a bond; he fired ZBA Chair Carmelia Shipp in the middle of the hearings; he reneged on his assurance that Tri-State would be allowed to bid on the garbage contract; and more. The Village Mayor is a final policymaker as a matter of law and personally took actions to retaliate against Tri-State for expressing its First Amendment rights.

Why is the Mayor doing business with the Bracken family, having lunches with Jim Bracken, Jim Bracken threatening Mark LaRose, and Riverdale Materials and its lawyers not even having the courtesy to respond to either the cease and desist notice regarding the retention pond or the late night threats to Mr. LaRose are important to this case? They are important to provide the Court with an accurate picture of just who Tri-State was dealing with in this matter, and the thug-like tactics employed. The Mayor is making money off of Riverdale Materials, and he was going to approve that site no matter what. When Tri-State got in the way, it was punished severely.

The third prong of *Monell* requires that there be a "constitutional violation" by a person with final policymaking authority. In this case, the constitutional violation is not only evident but axiomatic. The First Amendment to the Constitution is violated when a person is retaliated against for expressing its First Amendment rights on matters of public concern. That is exactly what happened here.

While it is not necessary, there is sufficient evidence of record for a reasonable jury to find that the second prong of *Monell* has been satisfied – a widespread practice although not authorized by written law or express policy is so permanent and well-settled as to constitute a custom or usage with the force of law. Many of the residents testified as to longstanding practice

15

and policy within the Village to not be transparent, not listen to the residents, and engage in what one resident testified as longstanding "tyranny."

        2.     <u>Tri-State Engaged in Protected Speech</u>.

In this Court's order dated March 26, 2019, the court set forth the law and the factual allegations, and concluded that Tri-State made first amendment statements on a matter of public concern. (Doc. #45 at pp. 18-19).

The allegations of Tri-State's protected speech (speech on matters of public concern) are set forth in ¶¶ 58(a) – (j) of Tri-State's Third Amended Complaint, as follows:

58. … (a)    Criticisms about hazardous waste;
      (b)    Criticisms about the already contaminated state of the proposed Riverdale Materials'' site;
      (c)    Criticisms about storm water runoff and the lack of adequate drainage;
      (d)    Criticisms about the lack of any financial security required by the Village to be posted by Riverdale Materials;
      (e)    Criticisms about the lack of any requirement that Riverdale Materials pay any royalties to the Village;
      (f)    Criticisms about how Riverdale Materials' site will cause a decline in adjoining property values;
      (g)    Criticisms about there being no need for an additional waste transfer station in Riverdale;
      (h)    Criticisms about Mayor Jackson stacking the deck with the planning commission and the zoning board of appeals;
      (i)    Criticisms about improper procedures used at the public hearings; and,
      (j)    Various other criticisms.

(56.1 at Exhibit CC, ¶ 58(a)-(j))

In addition, Tri-State also complained about the breach of its contract and the unnecessary expenditure of funds on the Spring Clean-up, which the Mayor delegated to another company, Flood Bros. and paid $18,540.40 when the service was supposed to be free and the Village supposedly had no money to pay anyone. (*See* Exhibit CC to 56.1, Third Amended Complaint at ¶¶ 64-74)

16

Since all of the first amendment statements on matters of public concern were made via written submittal and/or testimony (transcribed at the plaintiff's expense at the Zoning Board hearings), and since those matters are and have been from the beginning a matter of the record, Tri-State has sufficiently presented evidence of expressing First Amendment speech on matters of public concern. (56.1 at Ex. J (9/7/2017 Village Record of Proceedings Transcript)**;** 56.1 at Ex. L (11/2/2017 Village Record of Proceedings Transcript); Exhibit II (11/28/2017 Village Record of Proceedings Transcript); 56.1 at Exhibit 2 (9/7/2017 submittal to Riverdale Zoning Board of Appeals) to Ex. AA (First Amended Complaint); 56.1 at Exhibit 3 (11/2/2017 submittal to Riverdale Zoning Board of Appeals) to Ex. AA (First Amended Complaint); 56.1 at Exhibit 4 (11/28/2017 submittal to Mayor Jackson and Village Trustees) to Ex. AA (First Amended Complaint); (56.1 at Exhibit CC (Third Amended Complaint), ¶ 58(a)-(j)).

As the court recognized in its March 26, 2019 order (Doc. #45),

> Tri-State did, indeed, make arguments about how the Village did not need another recycling transfer station so close to the existing one Tri-State operates. But it also highlighted concerns about the potential environmental and safety issues posed by establishing a waste management facility at the proposed site, submitting documentation to support these concerns. Tri-State also raised issues of how the Riverdale Materials site may impose financial problems for the Village and its residents. These allegations amount to more than mere criticism of a Zoning Board or Village Board before they took any action to approve the ordinance. (Opinion and Order, March 26, 2019, Doc. #45 at pp. 18-19)

The Defendants criticize Tri-State because it was only complaining or making First Amendment speech because Riverdale Materials was a competitor. (Defendants' Brief at p. 15) To the contrary, uncontested fact 74 states "Other than environmental concerns regarding the Riverdale Materials site, …" (56.1 at ¶ 74) Therefore, Tri-State's public speech was not solely motivated by the fact that Riverdale Materials was a competitor. Furthermore, the Defendants criticize Tri-State for making complaints about the seriously contaminated condition of the

Riverdale Materials site which involved lawsuits going back to the late 1950's and early 1960's, and caused Riverdale itself to file a federal environmental claim with respect to the site in 2007 (*Village of Riverdale v. 138th Street Joint Venture, et al.,* 427 F.Supp.2d 760 (N.D. Ill. 2007). One of Tri-State's major concerns was the fact that Riverdale Materials lied about drainage from the site, stating under oath that the drainage would be into an on-site retention pond. Not only was that false, Riverdale Materials did not own the retention pond and had no right to use it for its contaminated drainage. (*See* Exhibit LL, Cease and Desist Notice to Riverdale Materials)

To protect the retention pond and nearby areas from further contamination by activities of Riverdale Materials, Tri-State purchased the retention pond in May of 2019. Tri-State's counsel issued a cease and desist letter to Riverdale Materials from further using the retention pond for its contaminated drainage. After this letter, the owner of Riverdale Materials, Jim Bracken, called Tri-State attorney Mark LaRose at home, at night, on his cell phone, and threatened him. LaRose wrote again to Daley and Georges to get them to control their client. Daley and Georges did not even have the courtesy to respond to either letter. Tri-State's motives were to protect the environment and the residents of the Village of Riverdale, and not motivated solely by the fact that Riverdale Materials was a competitor.

As set forth in Tri-State's Statement of Additional Facts, many residents, and in fact members of the ZBA raised similar public concerns at the various hearings in this matter – 2 members of the board, Ms. Shipp and Ms. Blount raised questions as to why this facility should even be in Riverdale; 9 others expressed various other public concerns including contamination of the site and the retention pond, the need for clean-up, property values being down, no need for this type of business, community having no prior knowledge, no benefit to the Village residents, etc. (Tri-State's Statement of Additional Facts at ¶ 100)

3.    Tri-State's Protected Speech was a Substantial Motivating Factor for the Defendants' Retaliatory Acts.

The evidence of causation is the timing of the retaliation and the lack of any legitimate reason for the retaliation other than a harsh and illegal response to Tri-State's exercise of its First Amendment rights.  Tri-State exercised its First Amendment rights in September and November 2017 (56.1 at Ex. J (9/7/2017 Village Record of Proceedings Transcript); 56.1 at Ex. L (11/2/2017 Village Record of Proceedings Transcript); Exhibit II (11/28/2017 Village Record of Proceedings Transcript); 56.1 at Exhibit 2 (9/7/2017 submittal to Riverdale Zoning Board of Appeals) to Ex. AA (First Amended Complaint); 56.1 at Exhibit 3 (11/2/2017 submittal to Riverdale Zoning Board of Appeals) to Ex. AA (First Amended Complaint); 56.1 at Exhibit 4 (11/28/2017 submittal to Mayor Jackson and Village Trustees) to Ex. AA (First Amended Complaint)), and Tri-State filed this lawsuit in February 2018.  In the summer of 2017, the Mayor promised that any approval of Riverdale Materials' site would be on a level playing field with Tri-State and would require financial assurance bond and royalties. (56.1 at Ex. E-1 (Jackson Dep.), pp. 49-50, Ex. G (Jeff Germany Dep.), pp. 50-51, and Ex. C (Sheryl Germany Dep.), pp. 54-55) Almost immediately after Tri-State offered criticism on matters of public concern, the Mayor reneged on that promise, and the approval of Riverdale Materials went through without the crucial financial assurance and required royalties.  After Tri-State expressed substantial criticism of the condition of the site that was echoed by ZBA Chairperson Carmelia Shipp, the Mayor unilaterally fired Ms. Shipp in the middle of the hearing process. (Exhibit CC to 56.1, Third Amended Complaint at ¶ 38; October 10, 2017 letter from Mayor Jackson to Carmelia Shipp attached as Exhibit HH)

In October 2017, the Mayor promised and in fact encouraged Tri-State to participate in the bidding process for the Riverdale garbage contract. (56.1 at ¶ 23 and Exhibit K attached

thereto). The Mayor reneged on that promise almost immediately after Tri-State's political speech; a non-bid contract was given to Flood Bros. (56.1 at Ex. G (Jeff Germany Dep.), pp. 80, 90-92, and Ex. C (Sheryl Germany Dep.), pp. 119-121) Almost immediately after Tri-State's protected speech, the Village stopped paying Tri-State on a regular basis, and instead, payments to Tri-State for trash pick-up went from being 30-45 days old to more than 180 days old, with outstanding balances of $261,953.50. 56.1 at Ex. C (Sheryl Germany Deposition Transcript) at pp. 98-103; Ex. G (Jeff Germany Deposition Transcript) at pp. 67-73; Declaration of Jeffrey Germany, Exhibit GG at ¶¶ 3-4) Directly on the heels of the filing of this lawsuit, the Mayor ordered Department Head Jerome Russell not to cooperate or communicate with Tri-State on this Spring Clean-up, but instead to spend $18,000 of money that the Village supposedly did not have to hire Flood Bros. to do the Spring Clean-Up that Tri-State was ready, willing, and obligated to do for free. (56.1 at ¶¶ 44, 57, 58, 62 and at Exhibit BB (which is also Exhibit 16 to Third Amended Complaint)) Right on heels of filing of this lawsuit, the Mayor directed that there be no verbal communication between any of the Village employees and Tri-State. (56.1 at ¶ 51) Finally, each and every of the offending ordinances were signed by the Mayor who was required to approve them before signing, or disapprove them and return them to the Village Board. (56.1 at Exhibit 19 (Resolution #2018-44) and Exhibit 20 (Ordinance #2018-22) to Exhibit CC (Third Amended Complaint); Ordinance 2017-22 attached as Exhibit 1 to Plaintiff's First and Second Amended Complaint and incorporated by reference in Plaintiff's Third Amended Complaint).

There is a total void of a legitimate motivation for these retaliatory acts – what legitimate motive could cause the Mayor to order its department heads not to communicate with Tri-State on the Spring Clean-up that it was obligated to do for free, and instead hire Flood Bros. and pay it $18,000 of money the Village supposedly did not have to do that task; what could be the

legitimate motivation for reneging on the commitment to allow Tri-State to bid on the new contract; what could be the legitimate motivation not to require Riverdale Materials to protect the Village and the environment by posting a bond to protect the Village in the event of abandonment and to pay the Village host fees for the tons of material that are being brought in by Riverdale Materials; what could be the legitimate motive for punishing Tri-State by failing to timely pay several hundred thousand dollars in money due to Tri-State for its performance of trash pick-up for the Village residents – something that everyone agrees was an essential service.

The law is clear that timing alone may not be enough to establish causation.  However, in this case, the timing aspect is not only compelling, but when combined with the lack of any legitimate motivation for these harsh and retaliatory acts, causation has been established.

Some courts have held that the protected speech should be a "but for" causation for the retaliatory acts.  *Fairley v. Andrews*, 578 F.3d 518 (7th Cir. 2009)  If that standard applies here, it has been met.  For going on 20 years, Tri-State's relationship with the Village was good, and its relationship with this Mayor has been okay.  Before the retaliation, Tri-State contributed to the Mayor's campaign fund.  Over the years, payments to Tri-State were made on a timely basis; there were zero complaints about Tri-State's garbage collection service to the Village; zero issues with scheduling and performing the Spring Clean-up; zero issues with communications with the Village; and Tri-State had every expectation that its contract would either be renewed or that it would be allowed to participate in bidding on a new contract.  All of that changed once Tri-State exercised its First Amendment rights on matters of public concern.  The payments stopped; the Mayor ordered the Public Works Department not to cooperate with Tri-State on the Spring Clean-up; the Mayor ordered that Flood Bros. conduct and be paid $18,000 to do the 2018 Spring Clean-up; the Mayor reneged on his promise to require Riverdale Materials to post a

closure bond and to pay royalties; the Mayor and the Board cancelled Tri-State's contract without any renewal; the Mayor reneged on his promise to allow Tri-State to bid on the garbage contract; the Mayor and the Board provided a no-bid contract to Flood Bros.; and the Mayor and the Board passed an ordinance requiring multi-unit owners to use Flood Bros. effectively terminating Tri-State's contracts with these buildings. The history of Tri-State's relationship with the Village and the stark changes to that relationship after Tri-State's protected speech establishes enough "but for" causation for a reasonable jury to find in Tri-State's favor.

    4.    <u>The Retaliation Would Have Deterred a Person of Normal Sensibilities from Expressing Their First Amendment Rights.</u>

The law requires that the suppression of free speech would likely deter a person of normal sensibilities from expressing their First Amendment rights. *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (quoting *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000)); *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3rd Cir. 2007). The Defendants claim, and Tri-State agrees, that the retaliatory acts did not stop it from expressing its First Amendment rights or continuing to pursue this case. But simply because Tri-State had the means and the wherewithal to survive the retaliatory acts and to continue to pursue its rights does not mean that a person of normal sensibilities would not have been deterred from expressing their First Amendment rights. The standard is an objective one, not a subjective one. Most folks of normal sensibilities would not have had the resources or the commitment to continue to express the rights or pursue a lawsuit once they have been deprived of hundreds of thousands of dollars of payment, opportunities to bid on future contracts, subjected to breaches of contract, and other retaliatory acts. In fact, a close review of the transcripts in this matter reveals the sense of futility among members of the public (persons of normal sensibility) to the actions of the Village government regarding the Riverdale Materials' site. Some residents and ZBA board members

22

testified as to the futility of further action -- all I've seen is tyranny (Ms. Plevens); you took an oath to serve and protect and you're not doing that (Ms. Shipp); there's no transparency, very rarely do we find out anything and when we do it's already at a critical stage, don't find out until it's too late (Ms. Horton); you're going to approve, not thinking about the long-term, the effects on the lives of people and residents of Riverdale, stop thinking of yourself, think about the future of the community (Mr. Reynolds); lack of information given to the community before this was even moved on, got it at the 5th hour (Mr. Dean); nobody is trying to bring anything into this community that we need, we suffer from lack of information (Mr. Clark); this community needs a lot of things, a recycling dump isn't one of them (Ms. Gilmore); praying for Riverdale and that the injustice will come to an end, no integrity (Ms. Shipp). (Tri-State's 56.1 Statement of Additional Facts at ¶ 102); .

It is telling that even though many of the residents (persons of ordinary sensibilities) spoke out against the ordinance, once the ordinance was passed, they went silent. No one challenged the ordinance, filed a lawsuit, or issued additional statements of public concern with respect to the Riverdale Materials' site or the actions of the Mayor and Riverdale. Only Tri-State continued to try and right these wrongs.

     5.    <u>Tri-State Suffered Injury, in Fact, and Substantial Damages in this Matter</u>.

This Court already ruled that Tri-State sufficiently alleged facts in its First Amended Complaint that establish standing – injury in fact. (Opinion and Order, March 26, 2019, Doc. #45 at pp. 6-11) Since then, Tri-State has set forth sufficient evidence from which a reasonable jury can find that it suffered injury and damages based on the retaliatory acts of the Village and its policymaker Defendant Lawrence Jackson – losing the opportunity at a  contract by the Mayor's actions not to allow Tri-State to bid on the contract; suffering damages to its reputation by not

being allowed to conduct the Spring Clean-up; suffering damages relating to non-payment or substantial delays in payment, including interest on that money that has not yet been paid; suffering damages from the Mayor's approval of the ordinance requiring multi-family building owners to use Flood Bros., which effectively negated Tri-State's contract with the building owners.

On March 28, 2018, the Village was still operating under a plan to not extend Tri-State's contract, to provide notice of such to Tri-State, and to put the garbage contract out for competitive bid. (56.1 at Ex. S, ¶ 6) As Village attorney Matt Welch put it, "the Village is to test the market to get the best service and price." (56.1 at Ex. S, ¶ 6). That never happened. Tri-State was not given an opportunity to even participate in the process and a no bid contract was given to Flood Bros. It is also telling that the Village moved not to renew Tri-State's contract on the heels of its political speech and filing this lawsuit, and an unprecedented year and four months before the expiration of the contract. (56.1 at Ex. G, pp. 80, 89-93)

Tri-State's damages for the retaliatory acts are set forth in detail in the Declaration of Jeffrey Germany as follows:

6. In addition, Tri-State suffered damages to its reputation by not being allowed to participate in the 2018 Spring Clean-up. Residents called us for advice on when the clean-up will happen, and because of the Village's action (inaction) we could not provide them with any information, which made us look totally incompetent.

7. Tri-State's other damages include the loss of the opportunity to bid on the garbage contract. Also, Tri-State lost contracts that it had with multi-family building owners when the Mayor approved requiring these owners to use Flood Bros. as its sole garbage contractor.

8. The Village contract that Tri-State was not given an opportunity to bid on, was worth approximately $60,000 to $65,000 per month, and Tri-State expected it to continue for at least five (5) years.

9. Tri-State lost contracts that it had with multi-family building owners when the Mayor approved requiring these owners to use Flood Bros. as its sole garbage contractor. In

addition, Tri-State earned approximately $6,000 per month on the multi-family contract, or approximately $72,000 a year. Tri-State expected the multi-family contract to go on indefinitely, but because of the ordinance the Mayor approved requiring multi-family owners to use Flood Bros. as its sole garbage contractor, Tri-State lost that approximate $72,000 per year.

Even though Tri-State can prove substantial and actual damages, both quantifiable and calculatable, it is not required to do so. Recent Supreme Court case of *Uzuegbunam v. Preczewski*, ___ U.S. ___, 141 S.Ct. 792, 800 (2021). Plaintiff was only required to allege nominal damages where a claim is based on a violation of a legal right and that nominal damages could redress a constitutional injury even if plaintiff could not or chose not to quantify the harm in economic terms. Certainly the evidence in this case has satisfied that standard. *Uzuegbunam v. Preczewski*, ___ U.S. ___, 141 S.Ct. 792, 802 (2021).

**B.     There is Sufficient Evidence of Breach of Contract for a Reasonable Jury to Find in Favor of Tri-State and, Therefore, Summary Judgment Should be Denied.**

1.     <u>The Elements of a Breach of Contract</u>

As set forth in this Court's order, under Illinois law, a breach of contract claim consists of four elements: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) injury to the plaintiff. (Opinion and Order, March 26, 2019, Doc. #45 citing *Gallagher Corp. v. Russ,* 741 N.E.2d 605, 611, 309 Ill. App. 3d 192, 242 Ill. Dec. 326 (1999). This Court held that Tri-State's pleadings sufficiently alleged each element to prove Tri-State's claim for breach of contract. (Opinion and Order, March 26, 2019, Doc. #45, at p. 22)

2.     <u>Tri-State has Presented Competent Evidence From Which a Jury Can Find in Its Favor on Its Breach of Contract Claim.</u>

There is a contract between Tri-State and Riverdale dated July 24, 2012 (56.1 at Ex. B). The contract required at least two things that are relevant to the breach of contract claim: (a) that payment for services be made within 15 business days (56.1 at Ex. B, p. 12); and (b) that Tri-

State conduct a Spring Clean-Up event for the Riverdale residents at no cost to the Village (56.1 at Ex. B, ¶ 13.B.)

There is no evidence in the record that Tri-State did not perform its obligations under the contract. To the contrary, even in the face of breaches and retaliatory acts, Tri-State continued to service the residents of Riverdale, and continued to be ready, willing and able to perform its obligations for the Spring Clean-up.

The Defendants' breach is also established by the evidence. The substantial non-payment or delays in payment were a breach of the contract. Riverdale claims that it did not have the money to pay. However, even if that were true, which it is not, that is not a valid excuse for lack of performance of the contract. An excuse, however, is just what it is. At the same time that Riverdale claims it had no money to pay Tri-State for this essential service, somehow it found $18,000 that it should not have been obligated to pay to provide to Flood Bros. to perform the Spring Clean-up in 2018. Also, prior to the retaliatory acts and despite Riverdale's financial difficulties, it was always able to pay Tri-State on a timely or near timely basis. In addition, the failure of the Village to even cooperate with Tri-State on the 2018 Spring Clean-up is a stark and telling example of Riverdale's breach of contract. Rather than perform its obligation under the contract which would benefit all of the residents and at no cost to the Village, they deprived Tri-State of the opportunity to conduct the Spring Clean-up which resulted in serious damage to its reputation.

The Village is likely to argue that the decision on non-payment to Tri-State following its First Amendment speech was made by Village Treasurer David Gonzalez, not Mayor Jackson. However, Mr. Gonzalez was not appointed as treasurer until March 28, 2018 and by that time, several months of payments and over $160,000 was past due from the Village to Tri-State. (56.1

26

at Ex. S, ¶ 2)  Moreover, this Village has been in a difficult financial condition for decades. During that same period of time, it always paid Tri-State on a timely basis.  All of a sudden, after Tri-State's protected First Amendment speech, Riverdale can't possibly find money to pay for its essential garbage collection services. A reasonable jury is likely to see through this and conclude that Tri-State's protected speech was the cause for non-payment and other retaliatory acts.

The lack of payment and delays in payment caused injury to Tri-State. Tri-State depended on the income it was receiving from the Village, and when it was no longer receiving payments from the Village, Tri-State had to scramble to pay all of its other bills (payroll, expenses, loan payments, utilities, property taxes, etc.). It even continued to pay royalties to the Village, and provided essential trash pick-up services to the Village residents during this non-payment period. The Village contract that Tri-State was not given an opportunity to bid on, was worth approximately $60,000 to $65,000 per month, and Tri-State expected it to continue for at least five (5) years. In addition, Tri-State earned approximately $6,000 per month on the multi-family contract, or approximately $72,000 a year.  Tri-State expected the multi-family contract to go on indefinitely, but because of the ordinance the Mayor approved requiring multi-family owners to use Flood Bros. as its sole garbage contractor, Tri-State lost that approximate $72,000 per year.

Compensation for breach of contract should place the injured party in a position that that party would have been in had the contract been fully performed, and the amount of damages need not be proven with mathematical precision and proof need not be direct but may be circumstantial.  *Alover Distributors, Inc. v. Kroger Co.,* 513 F.2d 1137 (7th Cir. 1975).

## VI.    CONCLUSION

For the reasons stated above, the Defendants' Motion for Summary Judgment should be denied in its entirety and the Court should require this matter to proceed to trial.

Respectfully Submitted,

**TRI-STATE DISPOSAL, INC., Plaintiff**

By:    /s/ Mark A. LaRose
         Mark A. LaRose, One of Its Attorneys

Mark A. LaRose (ARDC No. 6183288)
Ray Willis Welcher (ARDC No. 6287856)
Attorneys for Plaintiff Tri-State Disposal, Inc.
LaRose & Bosco, Ltd.
200 N. LaSalle, Suite 2810
Chicago, IL 60601
(312) 642-4414
Fax (312) 642-0434
mlarose@laroseboscolaw.com
rwelcher@laroseboscolaw.com