UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TRI-STATE DISPOSAL, INC., an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:18-cv-02138 |
| vs. | ) ) | Judge Sara L. Ellis |
| THE VILLAGE OF RIVERDALE, a municipal corporation; LAWRENCE L. JACKSON, Mayor of the Village of Riverdale | ) ) ) ) ) ) | |
| Defendants. | ) | |

**REPLY TO PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**NOW COMES** Defendants Village of Riverdale (the "*Village*") and Lawrence L. Jackson (the "*Mayor*"), by and through their attorneys, Montana & Welch, LLC, and for their Reply to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, state as follows:

Plaintiff attempts to elude summary judgment by flooding their response brief with misleading opinions disguised as fact. As stated in Defendant's Response to Plaintiff's Additional Statement of Facts, the Plaintiff' totally distorts the evidentiary record in this matter.

However, even if the Court considers the Plaintiff's Additional Statement of Facts, no reasonable inference arises from the actual evidentiary undisputed facts in this matter that would allow a trier of fact to find a genuine issue of material fact exists as to whether the Village and Mayor Jackson engaged in retaliatory conduct or breach of contract. Accordingly, it is imperative that summary judgment enter in favor of Defendants.

**I.      INTRODUCTION**

### A. No Evidentiary Facts to Establish Retaliation.

Plaintiff did not adduce any evidence proving its *Monell* claim against the Village. Mayor Jackson is not a final policymaker as it relates to the Village's zoning decisions, the Village's garbage disposal contracts, and/or the Village's payment of invoices. Further, there is absolutely no evidence of any policy or practice within the Village of retaliation against independent business owners in the community who speak out against Village decision-making.

Further, the facts indicate that Tri-State was motivated to speak out about Riverdale Materials due to its own private business concerns, which does not equate to protected speech. The facts prove that Tri-State did not want a competing transfer station in the Village. The allegations show that there is also clearly ill-will between Riverdale Materials and Tri-State and other interactions between those parties that may be influencing Tri-State; but these new and irrelevant allegations have nothing to do with the Village or this lawsuit.

Most importantly, there is no evidence that any Village decisions were motivated by any of Tri-State's speech – protected or not protected. The Village's poor financial condition and voluminous evidence of the same, its' resultant late payments to multiple vendors not limited to Tri-State, its decision not to renew its contract with Tri-State; its decision not put the garbage contract out to bid; and its' new contract with a much less expensive garbage disposal vendor are evidentiary facts that allow only one conclusion - the Village did not extend its contract with Tri-State for substantial business purposes. It was not because of Tri-State's criticisms of the decisions the Village made relating to Riverdale Materials. The facts establish that the Village would have taken the same action, even if Tri-State had not spoken out against Riverdale Materials.

The facts also establish that Tri-State's actions were not deterred by the Village's conduct. Tri-State would like the Court to accept commentary made by a small number of Village residents

during a zoning hearing, as evidence that the Village's actions would have deterred a person of normal sensibilities from expressing their First Amendment rights. Yet, as argued in the Defendants' motion to strike, this testimony is inadmissible evidence. Further, the testimony of residents, one of whom ran against Mayor Jackson in three elections and lost, and their actions is not comparable to the actions of a business corporation fighting to keep a competitor out a town in which they have held a monopoly on the transfer station business for more than thirty years.

Finally, purported damages set forth in a sham affidavit are not considered evidentiary facts proving damages. Further, regardless of the detailed so-called damages presented in that affidavit, there is no evidence that: (1) Tri-State had no right to a contract extension; (2) that Tri-State would be given a contract extension by the Village; (3) that Tri-State had a right to require the Village to put its garbage contract out to bid; (4) or that Tri-State suffered reputational damage after its failure to perform a Spring Clean-Up in 2018.

### B. No Evidentiary Facts to Establish Breach of Contract.

The only evidentiary facts introduced into evidence in this case that impact the breach of contract claim is the Contract itself. (Statement of Material Facts Pursuant to Rule 56.1 (hereinafter "*SOMF*," Exhibit B). The contract requires payment within 15 days; but has no provision for late payments. Tri-State had options available to them to address these late payments but chose not to avail themselves of their contractual rights. Tri-State did not terminate the contract, did not file a lawsuit for specific performance, and was eventually paid in full for their services in compliance with the contractual terms.

Furthermore, the Contract states: "The following services are to be provided by the Contractor at no additional cost to the Village for the term of this Agreement (A) ….refuse disposal services…to the Village's municipally owned facilities; (B) Contractor shall conduct each year a

Spring Clean Up.. (C) Christmas Holiday Trees will be picked up…" The Spring Clean-Up event was contracted for to benefit the Village. Spring Clean-Up was an obligation the Village could chose to enforce or not enforce; not Tri-State.

> II.     **ARGUMENT**
>
> A.     **Political and 1st Amendment Retaliation Against the Village. No Evidence that Mayor Jackson Is A Final Policymaker Or of a Widespread Practice of Retaliation. Therefore, There Is No Question of Fact – the Village Is Not Liable And Summary Judgement Should Be Entered On Its Behalf In Relation to Counts III and IV.**

Tri-State must prove (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) a constitutional injury caused by a person with final policymaking authority. *Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015).

The Plaintiff's entire case against the Village in Counts III and IV is a *Monell* claim in which Tri-State must prove that Mayor Jackson is a final policymaker who caused constitutional injury to Tri-State and the Mayor's actions subjected the Village to liability. (Plaintiff Response, hereinafter "*PR*," Page 12). The undisputed facts leave no question that Mayor Jackson is not a final policymaker; and therefore, Plaintiff can not prove this essential element of its case and summary judgment is appropriate.

Mayor Jackson is the President of the Village of Riverdale. The Village of Riverdale is a Village-Trustee form of government. The statute governing the decision-making authority in this type of government is 65 ILCS 5/3.1-45-5. Plaintiff in its response cites to municipal laws relating to a Strong Mayor form type of municipal government which are irrelevant to this case. (*PR*, Page 13).

4

The applicable state statute under which the Village of Riverdale operates is 65 ILCS 5/3.1-45-5. That statute states: "Composition; manner of acting. The board of trustees shall consist of the president and trustees and, except as otherwise provided in this Code, shall exercise the same powers and perform the same duties as the city council in cities. It shall pass ordinances, resolutions, and motions in the same manner as a city council. The president of the board of trustees may exercise the same veto power and powers in Section 3.1-40-30, and with like effect, as the mayor of a city. The trustees may pass motions, resolutions, and ordinances over the president's veto in like manner as the alderpersons of a city council." 65 ILCS 5/3.1-45-5.

Pursuant to this statute, the Mayor does NOT have final policy-making authority in the Village, as his veto of any potential ordinance/resolution may be overruled by a majority vote of Trustees. The Village Trustees are the legislative body; and thus, make the policies and laws for the Village, not the Mayor.

The undisputed facts in this case establish that the Mayor did not vote on the ordinance allowing Riverdale Materials to operate in the Village; but instead, the final decision was made by six elected Village Trustees unanimously. (*SOMF*, ¶ 30). The Mayor's signature on this ordinance was merely administrative. *Id.* Similarly, Mayor Jackson did not vote on the ordinance to contract with Flood Brothers after the expiration of the Village's contract with Tri-State (*SOMF,* ¶67) nor the ordinance that required all dwellings to utilize Flood Brothers for garbage disposal. (*SOMF,* ¶68).

Further, the sections of the Village of Riverdale Code of Ordinances cited by the plaintiff to establish Mayor Jackson as a policymaker are irrelevant in this analysis. The Mayor being elected to a four-year term; being the President of the Board of Trustees; being the CEO of the Village with supervision over executive officers; having the power to settle disputes; and/or the

5

duty to approve village ordinances or veto village ordinances (*PR*, Page 13) does not establish him as a final policymaker. Mayor Jackson could not have passed the ordinances at issue without the affirmative votes of a majority of the Village Trustees. He cannot unilaterally make law. 65 ILCS 5/3.1-45-5

Plaintiff also cites a distinguishable case in support of their contention that Mayor Jackson is an ultimate policymaker. Specifically, the *Weeks v. City of Plano* case is a §1983 lawsuit alleging unjust or improper termination. Case No. 88 C 0518 (N.D. Ill. Mar. 1989). In that case, the Court held that the Police Chief and Mayor were final policymakers as it related to police department operations and control over the municipality's departments. This case is not an employment case and the "policy" at issue that is alleged to have caused constitutional injuries to Tri-State is the passage of several ordinances, which the Mayor had no ability to pass on his own.

Finally, Plaintiff makes several irrelevant allegations, unsupported by evidentiary facts, in relation to Mayor Jackson's "personal involvement" in offensive actions against Tri-State. Mayor Jackson's alleged personal involvement is not a relevant legal factor in this *Monell* analysis and does not render him a final policymaker. Further, the allegations of the Mayor's personal involvement are unsupported by facts and merely based on the Plaintiff's expression of opinions regarding Riverdale Materials. For example, Plaintiff's tirade on Page 15 of its Response Brief regarding the Mayor's alleged business with the Bracken family, Jim Bracken's threatening of Tri-State's attorney, Riverdale Materials failure to respond to a cease-and-desist order from Tri-State, and other "thug-like" tactics, are unproven assertions by the Plaintiff that will be completely inadmissible at trial and have nothing to do with the Village's *Monell* liability for actions of a final policy-maker.

Plaintiff then appears to argue that there is sufficient evidence in the record, without actually citing to any evidence, that a widespread practice, not authorized by written law or express policy, is so permanent and well-settled in the Village as to constitute a custom or usage with the force of law to establish a *Monell* claim against the Village. To state a *Monell* claim, a plaintiff is required to "plead factual content that allows the Court to draw the reasonable inference that the City maintained a policy, custom, or practice that deprived him of his constitutional rights." *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) (*citing Iqbal,* 556 U.S. at 678). The Plaintiff alleges its constitutional harm was retaliation and then attempts to use inadmissible hearsay from Village residents (Plaintiff Response, Page 16) to act as support for its new allegations of widespread "tyranny" in the Village. Further, the only fact that relates to this issue indicates that even Tri-State was unaware of any prior instances wherein Mayor Jackson or the Village retaliated against independent contractors within the Village based on their objections to Village zoning decisions. (*SOMF,* ¶77).

There is no evidence that supports a reasonable inference that the Village engaged in a widespread practice of politically retaliating against independent contractors for their objections to Village decisions regarding special use permits or for speaking out against Village decisions.

Similarly, there is no ordinance, statute, or case law that establishes that Mayor Jackson acted as a policymaker. In order to hold the Village liable for Mayor Jackson's policy actions, the Plaintiff must prove that the municipal official's discretionary decision is NOT subject to review by higher authorities. *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S. Ct. 2018 (1978). The evidentiary facts do not establish Mayor Jackson as a policymaker; therefore, summary judgment for the Village for the Plaintiff's *Monell claims* in Counts III and IV is appropriate and warranted.

> **B. Political and 1st Amendment Retaliation Against Mayor Jackson. No Evidence that Tri-State Engaged in Protected First Amendment Activity Or Evidence that Tri-State's Activity Motivated Any Decisions Made By The Village. Therefore, There Is No Question of Fact – Mayor Jackson Is Entitled to Summary Judgement on Counts III and IV.**

> **1. Element 1 - Tri-State Did Not Engage in Protected Activity.**

To sufficiently prove a claim for retaliation, Tri-State must show that "(1) [it] engaged in activity protected by the First Amendment; (2) [it] suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the defendants' decision to take the retaliatory action." *McGreal v. Vill. of Orland Park, 850 F.3d 308, 312* (7th Cir. 2017) (quoting *Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015)).

The Plaintiff's Response states that the Court, in providing a decision on a motion to dismiss in 2019, indicated that Tri-State properly *alleged* that it engaged in protected speech. (*PR*, Page 16). Plaintiff then points to their third amended complaint regarding allegations of protected speech. Yet, allegations do not equate to established evidentiary facts.

The evidentiary facts establish that Tri-State did speak out about environmental concerns relating to the property in which Riverdale Materials was set to operate (*SOMF*, ¶72); but, the motivation of Tri-State's speech was purely financial and private in nature and not speech meant to be protected by the First Amendment. *See Gazarkiewicz v. Town of Kingsford Heights, Ind.*, 359 F.3d 933, 942 (7th Cir. 2004) ("[S]peech of public importance is only transformed into a matter of private concern when it is motivated solely by the speaker's personal interests.")

For example, the facts establish that other than environmental concerns regarding the Riverdale Materials site, Tri-State was only concerned "that they [Riverdale Materials] were being held to the same standards we were." (*SOMF*, ¶ 74). Further, the owner of Tri-State testified that

8

if Riverdale Materials would have obtained the proper permits and authorizations and would have been required to operate in a manner similar to Tri-State, including paying royalties to the Village and posting a bond or other financial security for closure and post-closure, Tri-State most likely would not have had an objection to the Village's granting them a conditional use to operate in the Village. (*SOMF,* ¶75). These evidentiary facts indicate that Tri-State was alleged to have environmental concerns on their property and entered into a settlement agreement in 1999 whereby Tri-State agreed to pay royalties to the Village and post a bond. (*SOMF,* ¶¶ 5- 7). Tri-State wanted Riverdale Materials to be subject to the same royalty and bond requirements; and if that had occurred Tri-State would not have had any objection to the conditional use. (*SOMF,* ¶75). Tri-State wanted an even playing field, not an environmentally safe property.

This is further evidenced by the Plaintiff's original verified complaint that solely sought declaratory judgment to cease the operation of Riverdale Materials in the Village. (*Exhibit 1 to Reply Brief, Verified Complaint.*) In addition, the First Amended Complaint continued to seek declaratory judgment to cease the operation of Riverdale Materials, which was subsequently dismissed. (*SOMF,* Exhibit AA.) Further, while Tri-State now argues in their response brief that their purchase of the retention pond was an attempt to prevent further contamination of the Riverdale Materials site (*PR*, Page 18), that argument is unsupported and contradicted by the actual evidence. The evidence indicates that Tri-State purchased this pond on February 19, 2019. (*SOMF,* ¶73). At this time in the litigation, the Defendants had filed a motion to dismiss the allegations based on lack of standing, amongst other issues, and a Court ruling was pending. (Docket at 45) The Court issued an opinion and order in March 2019, dismissing certain counts and allowing plaintiff to leave to replead other counts. *Id.* Plaintiff then filed a Second Amended Complaint on May 13, 2019. (Docket at 45). The Second Amended Complaint contained the

9

following allegations for the first time: "Tri-State also owns real property immediately adjacent to the Riverdale Materials site, an approximate one acre retention pond. ("Retention Pond") and the Retention Pond is adversely affected by runoff and other drainage from the Riverdale Materials site; Tri-State's adjacent property ownership of the Retention Pond is adversely affected by illegal drainage and runoff from the Riverdale Materials site" (*Exhibit 2 to Reply Brief, Second Amended Complaint.*)

In addition, as detailed in the Defendants' response to the Plaintiff's additional statement of facts, Tri-State admitted that the purchase of the retention pond was irrelevant to the remaining issues in the case and no testimony was thereafter sought on the topic. (*SOMF*, Exhibit C, Page 49-52).

Therefore, the only conclusions that can be drawn from these facts is that the retention pond was purchased while litigation was pending and is admittedly irrelevant to the remaining issues in this case. Therefore, Plaintiff can not now use the purchase of this adjacent pond to make a claim that Tri-State's speech was motivated by its public interest in protecting the environment and the residents of the Village.

There is no genuine issue of material fact as to the nature of Tri-State's speech. Tri-State's speech was primarily motivated for its private business interests; and thus, is not considered protected speech. Therefore, Plaintiff cannot prove an essential element of its First Amendment retaliation claim; and summary judgment in relation to Count III on this element alone is appropriate and necessary.

  **2.**  **Element 2 – Tri-State Did Not Suffer A Deprivation That Deterred Their First Amendment Activity and There Is No Evidence the Village's Actions Would Deter Future First Amendment Activity.**

In order to deflect from Tri-State's own testimony that the Village's actions did not deter Tri-State's First Amendment Activities, the plaintiff argues in its Response that "most folks of normal sensibilities would not have had the resources or the commitment to express their rights or pursue a lawsuit…" (*PR*, Page 22). The plaintiff concludes that the standard is an objective one, not a subjective one. The Plaintiff cites *McKee v. Hart.* 436 F.3d 165, 170 (3rd Cir. 2006) for this proposition; but misstates the holding. The entire holding in *McKee,* states that "the key question in determining whether a cognizable First Amendment claim has been stated is whether "the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights...." *McKee v. Hart.* 436 F.3d 165, 170 (3rd Cir. 2006) (internal quotation marks omitted). The effect of the alleged conduct on the employee's freedom of speech " 'need not be great in order to be actionable,' " but it must be more than de minimis. *Id. (quoting Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.1982) (Posner, J.)). The Court focuses on the impact the retaliation had on the individual/company asserting the claim and whether or not a "person of ordinary fitness" would feel similarly deterred.

First, Tri-State was never deterred from exercising its rights. Second, there is no evidence in this case that a similar individual, a corporate garbage disposal business, would be deterred by actions similar to those alleged to have been taken by the Village. The Plaintiff's argument that Village residents would be deterred by this conduct and that Village residents have complained about the Village's transparency is: (1) not admissible evidence and (2) not relevant to Tri-State's claims.

Sheryl and Jeff Germany testified that they continued to speak out against the Ordinance and the Village and continued to pursue their lawsuit against the Village despite the allegedly retaliatory actions. (*SOMF,* ¶¶53 and 60). Tri-State was not deterred in its First Amendment

11

Speech by the Village's allegedly retaliatory actions. Therefore, Plaintiff cannot prove the second element of their First Amendment retaliation claim and summary judgment as to Count III is appropriate.

### 3. Element 3 – Tri-State's Speech was Not a Motivating Factor in the Village's Decision-Making.

Tri-State argues that the evidence that Tri-State's speech motivated the Village's actions is the timing of the retaliation and the lack of any legitimate reason for the retaliation other than a harsh and illegal response to Tri-State. (*PR*, Page 19).

The actual evidence cited in the Village's motion for summary judgment is not addressed. Rather, the Plaintiff puts together a timeline of irrelevant factors that are not supported by admissible evidence.

The undisputed timeline is simple and irrefutable and is contained within the Joint Undisputed Statement of Facts. The relevant aspects include the following important dates: April 2016, the Village was operating at a deficit of $5,715,769 (*SOMF*, ¶ 13); September 2017, ZBA hearing begins for Riverdale Materials (*SOMF,* ¶18); November 2017, Village Board votes to grant conditional use to Riverdale Materials (*SOMF,* ¶29); in January 2018, the Village had a significant cash deficit and was holding more than $700,000 in invoices to multiple vendors, including Tri-State (*SOMF,* ¶36); In February 2018, Tri-State demanded payment for three months of invoices that were in arrears (*SOMF,* ¶ 37); On March 2, 2018, the Village was served with the First Verified Complaint seeking declaratory judgment to invalidate the ordinance granting Riverdale Materials a conditional use (*SOMF,* ¶ 39); The Village was experiencing cash flow problems that were directly related to its late payments to Tri-State and multiple other vendors, well before Tri-State filed a lawsuit (*SOMF,* ¶ 49). Further, it is undisputed that the Treasurer was never told not to pay, to hold back payment, or to slow down payments to Tri-State at any time. (*SOMF,* ¶34). In March

2018, after the filing of the lawsuit the Village instructed staff to have one point of contact with Tri-State because of the lawsuit (*SOMF,* Exhibit E, Page 63, lines 20-24; Page 64, line 1); after March 2018, the Village Board of Trustees made decisions regarding the next garbage disposal contract for the Village pursuant to its contract with Tri-State and state statutes governing municipal waste disposal contracts (*SOMF,* ¶¶ 68 and 69) and that there were legitimate cost saving reasons for awarding the contract to Flood Brothers. *Id.* Furthermore, it is undisputed that Tri-State was not guaranteed a contract with the Village of Riverdale past July 2019. (*SOMF,* ¶65).

To specifically address certain allegations in the Plaintiff's Response Brief, there is no evidence that Mayor "promised" anything to Tri-State in relation to Riverdale Materials' potential operation in the Village. (Response to Plaintiff's Additional Statement of Facts, ¶ 79). In fact, he testified that the Zoning Board recommended a royalty and closure fee for Riverdale Materials; but the Village Board of Trustees did not include those requirements. (*SOMF,* Exhibit E, pp. 49-50). While the Germany's may have testified regarding the alleged promise, the testimony is self-serving and only evidences that their speech against Riverdale Materials was motivated by their private business interests. Further, the evidence corroborates the law, which establishes the Board of Trustees, not the Mayor, as the final policymaker in relation to zoning decisions in the Village. Even had the Mayor "promised" Tri-State an even playing field, he had no ability to enforce that promise, as he is not the ultimate decision-maker.

In regard to the allegations regarding the ZBA meetings, the procedural processes engaged in by the ZBA, the expiration of Ms. Shipps' term, and any action allegedly taken by the Mayor in relation to the ZBA proceedings are irrelevant to this retaliation claim, as all of these actions and procedures were legally justified, related solely to Riverdale Materials, were non-binding actions

13

by a recommending body, and the Court itself dismissed the prior allegations of due process and equal protection violations in relation to the same. (Docket at 45).

Plaintiff's allegation that the Village would not cooperate with Tri-State to schedule the Spring Cleaning due to the filing of the lawsuit, based on the timing of the same, is unsupported by the actual evidence in the case. The undisputed evidentiary facts establish that after the lawsuit was filed in March, Tri-State contacted the Village regarding the scheduling of the Spring Clean-Up. (*SOMF,* ¶ 43). There was no response to this inquiry and the Mayor instructed Mr. Russell not to respond. (*SOMF,* ¶ 44). While Tri-State would not agree to place the Mayor's testimony regarding the same in the Statement of Undisputed Facts, the undisputed testimony regarding this issue is the following:

> Q. Why did you tell Jerome Russell not to correspond with Tri-State with respect to the 2018 spring clean-up?
> A. I wanted one point of contact between the Village of Riverdale and Tri-State, and I was following the advice of my attorney.

(*SOMF,* Exhibit E, Page 63, lines 20-24; Page 64, line 1).

> Q. My client reaches out to set up the spring clean-up, and no one, to your knowledge, responds to them. Right, Mayor?
> A. To my knowledge, this is the first I'm hearing of it. I thought that Mr. Williams was having ongoing communications with Tri-State.
> Q. Okay. Flood Brothers gets hired to do the spring clean-up. Do you have anything to do with that?
> A. No. I did not.
> Q. Who did?
> A. That probably would have been Mr. Williams.

(*SOMF,* Exhibit E, Page 68, lines 16-24; Page 69, lines 1-4).

This sworn testimony is undisputed and corroborated by an undisputed letter sent to Tri-State by the Village Attorney on May 10, 2018 indicating that May was the first time the Village was aware that Tri-State believed it to be in breach of contract in relation to the Spring Cleaning. (*SOMF,* ¶55 (*sic*)). There was a legitimate undisputed reason for the miscommunication regarding the Spring

14

Clean-Up and it was not retaliation for the filing of the lawsuit; but rather the Village following its attorney's advice to make one point of contact with Tri-State while a lawsuit was pending. Further, it is undisputed that there was no provision in the Contract regarding the consequences of Tri-State's failure to perform the Spring Clean-Up (*SOMF*, ¶ 59) and that Tri-State was not deterred from its First Amendment Speech based on the 2018 spring cleanup issues (*SOMF*, ¶ 60).

In addition, the Plaintiff does not address the statutes, laws, and contractual obligations followed by the Village in deciding not to extend Tri-State's contract and instead granting the garbage disposal contract to Flood Brothers, facts addressed in the Memorandum in Support for Summary Judgment and supported by state statute. Instead, Plaintiff's response brief makes more allegations of reneged promises that are unsupported by admissible evidence.

For example, the fact that the Mayor did not veto the ordinances passed by the Village Board in relation to the decision not to renew the contract with Tri-State and did not veto the ordinance awarding a contract to Flood Brothers pursuant to state statute, for a significantly reduced rate without expending money on the bidding process, has no relevancy to Plaintiff's retaliation argument, as the Mayor did not have final policymaking authority on any of these issues. However, even if the Mayor had vetoed these legitimate business decisions by the Village's Board of Trustees, there is no evidence in the record that his veto would have been sustained or would have resulted in a different outcome. Further, there is no evidence that there were legitimate reasons for the Mayor to veto these ordinances. Finally, it is undisputed that the decision to contract with Flood Brothers did not deter Tri-State from its First Amendment speech.

Finally, it is undisputed that if Tri-State became aware that the Village was not paying other contractors on time in 2018 and 2019, that fact could change their assumption regarding the retaliatory nature of the Village's delays in paying Tri-State's invoices, if those delays and

outstanding payments were also severe in nature. (*SOMF,* ¶76). The Village has proven with undisputed factual evidence it was not paying multiple vendors during the same time period it fell in arrears to Tri-State. (*SOMF,* ¶¶ 13, 16, 36, 37, 48, 53). These facts lead to only one conclusion: the late payments were not retaliation for Tri-State's first amendment speech or for the failing of the lawsuit; but rather were due to low cash flow and impacted numerous vendors. Further, the late payments did not deter Tri-State from speaking out against the Village or pursuing this lawsuit and the Village has paid all outstanding invoices to Tri-State. (*SOMF,* ¶70).

No retaliatory motive is proven, nor can one be inferred from the evidence. The decision-making was statutorily permissible, reasonable, necessary, and to the benefit of the general health and welfare of the residents of the Village. Therefore, Plaintiff is unable to prove the third and final element of its retaliation claims; and summary judgment in relation to Counts III and IV is appropriate and necessary.

### 4. Conclusion – Retaliation Claims Can Not Be Proven.

Tri-State cannot establish that the Village engaged in First Amendment Political Retaliation for speaking out against Riverdale Materials or in Political Retaliation for filing this lawsuit. In regard to the Plaintiff's First Amendment Retaliation claims against the Village and the Mayor, it is undisputed that Tri-State (1) engaged in speech motivated by its private business interests; (2) Tri-State's speech was NOT a motivating factor in any action taken by the Village; (3) the Mayor was not a final policy-maker for the Village and (4) the alleged retaliation did not deter Tri-State from operating in the Village or pursuing this lawsuit. Finally, in regard to the Political Retaliation claims against the Mayor, it is undisputed that Tri-State's lawsuit was NOT a motivating factor in any action taken by the Village and Tri-State was not deterred from filing and

16

pursuing this lawsuit. Therefore, the Court should grant summary judgement in favor of the Mayor in regard to Counts III and IV of the TAC.

      **C.     Breach of Contract – No Question of Fact – Plaintiff Can Not Prove Elements of This Claim and Summary Judgment as to Count V is Appropriate.**

Plaintiff's response brief is devoid of undisputed facts that establish its claim for breach of contract. Tri-State's argument is that the Village's late payments constitute a breach of the contract. (*PR*, Page 26). There is no dispute that the Village was late in making certain payments to Tri-State and other vendors. (*SOMF*, ¶¶ 36, 37, 49, 52, 53). There is similarly no dispute that the contract did not contain any provisions for the payment of late fees, should the Village pay invoices more than 15 days after the due date. (*SOMF*, ¶ 70). Tri-State was aware of the late payments and made demands relating to the same; but did not avail itself of any other legal remedies. (*SOMF*, ¶ 37). Further, as of March 2020, there were no outstanding invoices owed to Tri-State by the Village. (*SOMF*, ¶ 70).

In the response brief, Plaintiff claims to have suffered injury because Tri-State had to "scramble to pay its other bills (payroll, expenses, loan payments, utilities, property taxes) ect" due to the Village's late payments. (*PR*, Page 27); but there is no evidence of these claims, and nothing cited to in the record by the Plaintiff.

Based on the same, there is no question of fact relating to the late payments – there was no contractual provision for late fees that was breached by the Village nor was there evidence of injury to Tri-State based on the same.

Tri-State also argues that the Village's failure to schedule the Spring Clean-Up in 2018 was a breach of contract that damaged Tri-State's reputation. (*PR*, Page 26). Yet, the plaintiff does not cite any evidence of their ability to enforce a benefit in the contract negotiated for the

17

Village's benefit or any evidence of the reputational damages it claims to have suffered. (*PR*, Page 26).

Based on the same, there is no question of fact relating to the 2018 Spring Clean-Up – there is no breach of the contract for Tri-State's failure to perform a free service and there is no evidence of injury to Tri-State based on the same.

Finally, Tri-State does not allege that the Village breached the Contract in relation to its decision not to renew the Contract, in its decision not to bid for new waste removal services, or in its decision to require all dwellings to utilize Flood Brothers; and therefore, any damages Plaintiff claims based on the same are irrelevant. *Gallagher Corp. v. Russ*, 309 Ill. App. 3d 192, 199, 741 N.E.2d 605, 611 (Ill. App. 1999).

Plaintiff has not proven that a breach of contract occurred causing Tri-State injury. Therefore, no reasonable factfinder could determine that Tri-State has established or will ever be able to establish a breach of contract claim; and summary judgment as to Count V should be entered.

### Conclusion

Defendants respectfully request this Honorable Court enter summary judgment in their favor and against the plaintiff.

| | |
|---|---|
| John P. Wise (ARDC No. 6238380)<br>Erin E. Blake (ARDC No. 6295914)<br>**MONTANA & WELCH, LLC**<br>11950 S. Harlem Avenue, Suite 102<br>Palos Heights, IL 60463<br>(708) 448-7005<br>jwise@montanawelch.com<br>eblake@montanawelch.com | Respectfully submitted,<br>***VILLAGE OF RIVERDALE and***<br>***LAWRENCE JACKSON, DEFENDANTS***<br><br>By:  */s/ Erin E. Blake*<br>         One of Defendants' Attorneys |