UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TRI-STATE DISPOSAL, INC., an Illinois corporation, <br><br> Plaintiff, <br><br> v. <br><br> THE VILLAGE OF RIVERDALE, a municipal corporation; and LAWRENCE JACKSON, Mayor of the Village of Riverdale, <br><br> Defendants. | No. 18 C 2138 <br><br> Judge Sara L. Ellis |

## OPINION AND ORDER

Plaintiff Tri-State Disposal, Inc. ("Tri-State") provided garbage collection services in the Village of Riverdale (the "Village"). After the Village passed Ordinance 2017-22, approving a competitor to do business with the Village, Tri-State filed this lawsuit against the Village and its Mayor, Lawrence J. Jackson ("Defendants"), challenging the legality of the ordinance. Tri-State has since filed a third amended complaint alleging that the Village, through Mayor Jackson, retaliated against Tri-State for First Amendment protected activity and for filing this lawsuit. Tri-State also alleges that the Village breached its contract with Tri-State. Defendants have moved for summary judgment on all Tri-State's claims. Because Tri-State cannot establish that first, its First Amendment protected activity was a motivating factor in the Village's decision to take the alleged retaliatory actions and second, that the Village's assertion of financial difficulties was simply pretext to hide its retaliatory animus, the Court grants summary judgment to the Village on Tri-State's political retaliation claims (Counts III and IV). Further, because no reasonable juror could find that the Village's delayed payments or decision to forego the 2018

Spring Clean-up constituted a material breach of the parties' contract, the Court grants the Village's motion for summary judgment as to Count V.

## BACKGROUND[1]

Tri-State has operated a refuse, yard waste, and recyclable materials collection and processing service in Riverdale since 1995. In 2012, the Village and Tri-State contracted for waste collection services for one- and two-unit buildings in the Village. The contract, which began on August 1, 2012, and ended on July 31, 2019, required Tri-State to pick up trash from Village residents and to conduct a yearly spring clean-up. The contract also required the Village to pay Tri-State's invoices within fifteen days. Additionally, pursuant to a 1999 settlement agreement arising from alleged ordinance violations and environmental issues, Tri-State agreed to pay the Village a "host benefit fee on a monthly basis," as well as a $50,000 bond "to cover the cost of cleaning up [the serviced properties] should Tri-State abandon the same[.]" Doc. 123 ¶ 7.

Throughout the duration of the Tri-State contract, the Village struggled financially. In April 2016, the Village was operating at an overall deficit of $5,715,769, with the sanitation fund having a negative balance of -$1,149,453. To continue paying Tri-State, the Village borrowed from other funds. By April 2017, the sanitation fund remained at a negative balance of -$1,149,453.

---

[1] The Court derives the facts set forth in this section from the statements of fact submitted by the parties to the extent they comport with Local Rule 56.1. The Court takes these facts in the light most favorable to Tri-State, the non-movant. The Court has considered the parties' objections to the statements of fact and supporting exhibits and included in this background section only those portions of the statements and responses that are appropriately presented, supported, and relevant to resolution of the pending motion for summary judgment.

I. **Ordinance 2017-22: Riverdale Materials**

On September 7, 2017, the Village Zoning Board of Appeals, acting as the Village Plan Commission, held a public hearing to consider an application for a new waste management company, Riverdale Materials, to operate a metal recycling facility and transfer station in the Village. Tri-State and its owners opposed Riverdale Material's application.

To Mayor Jackson and the Plan Commission, Tri-State expressed two general categories of concerns: environmental and business. From a business perspective, it wanted to ensure that Riverdale Materials would be "held to the same standards" as Tri-State. Doc. 123 ¶ 74. "If Riverdale Materials would have obtained the proper permits and authorizations and would have been required to operate in a manner similar to Tri-State, including paying [host benefit fees] to the Village and posting a bond or other financial security for closure and post-closure, Tri-State most likely would not have had an objection to the Village's granting them a conditional use to operate in the Village." Doc. 123 ¶ 75. Tri-State alleges that prior to approval of the ordinance, Mayor Jackson promised Tri-State that "any permit to Riverdale Materials would include financial assurance, closure bond, and a requirement for Riverdale Materials to pay royalties." Doc. 184-1 at 2. Tri-State also raised environmental concerns about: (1) the impact of having two transfer stations within a one-mile radius; (2) the previously contaminated and unremediated proposed site for Riverdale Materials; and (3) the fact that Riverdale Materials claimed to own the adjacent retention pond but did not. On February 19, 2019, Tri-State purchased the retention pond adjacent to the Riverdale Materials site. Tri-State alleges that it purchased the retention pond to attempt to prevent further contamination.

The Plan Commission continued the hearing until November 2, 2017, so that its members could read public submissions and conduct further research. Ahead of the second hearing, Tri-

3

State submitted a second letter opposing the application, and Tri-State spoke at the hearing. Also ahead of the second hearing, Mayor Jackson removed Chairperson Carmelia Shipp from the Village Zoning Board of Appeals. Tri-State alleges that Mayor Jackson removed her because she opposed the Riverdale Materials project.

At the end of the second hearing, the Plan Commission voted in favor of recommending that the Village Board of Trustees approve the application. On November 28, 2017, the Village Board voted unanimously to pass Ordinance 2017-22, which approved Riverdale Materials' application. Mayor Jackson did not attend either Plan Commission hearing, was not a member of the Plan Commission, and did not vote on the Ordinance. He did, however, sign the Ordinance once passed by the Village Board. Once he signed the Ordinance, Mayor Jackson placed a sign at the Riverdale Materials site that read: "Another business brought to you by the Honorable Mayor Lawrence Jackson." Doc. 123 ¶ 33.

On February 27, 2018, Tri-State issued a demand to the Village for $193,252.61, the total of unpaid invoices from November and December of 2017 and January of 2018. Then, in March 2018, Tri-State served the Village with a legal complaint seeking a declaratory judgment that Ordinance 2017-22 violated the Open Meetings Act.

## II.    2018 Spring Clean-Up Event

On March 16, 2018, shortly after filing its lawsuit against the Village, Tri-State emailed Village employee Jerome Russell about scheduling a 2018 Spring Clean-up Event, which, per the contract, Tri-State performed yearly at no additional cost to the Village. In past years, the Spring Clean-up occurred at the end of March or the beginning of April. Mayor Jackson instructed Russell not to respond to Tri-State. After not hearing from Russell for a few days, on March 20, 2018, Tri-State emailed Mayor Jackson, copying several Village Trustees, and again

4

inquired about scheduling the Spring Clean-up. The Village never scheduled the 2018 Spring Clean-up with Tri-State. Rather, on May 7, 2018, at the direction of Mayor Jackson, the Village hired a company called Flood Brothers to perform the Spring Clean-up. This cost the Village $18,537.

On May 8, 2018, Tri-State notified the Village that it believed the Village was in violation of its contract because it failed to schedule the Spring Clean-up. The Village responded and attempted to schedule the Spring Clean-up. But Tri-State refused to schedule the Spring Clean-up because, in their opinion, Flood Brothers had already done the job. Tri-State never performed a 2018 Spring Clean-up. The next year, however, the Mayor ordered Russell to organize the 2019 Spring Clean-up with Tri-State and Tri-State performed the 2019 Spring Clean-up.

### III. Termination of Tri-State Contract

On October 23, 2017, Mayor Jackson informed Tri-State by letter that, due to the Village's financial situation, the Village intended to issue a request for qualifications for waste management companies once Tri-State's contract expired. Mayor Jackson encouraged Tri-State to submit a bid.

On March 27, 2018, the Village Board voted to decline any extensions of the Tri-State contract, meaning the contract would expire on July 31, 2019. The Village Board also stated that it would seek proposals from other waste disposal contractors. On April 18, 2018, the Village officially notified Tri-State that it would not be extending the contract. On April 28, 2018, Mayor Jackson issued a "Do Not Call Request" to Tri-State because Village employees complained that Tri-State "was consistently calling the Village and being overly aggressive and

5

harassing in inquiring about past due payments." Doc. 123 ¶ 51. At the time, the Village owed Tri-State $198,342.

The Village's contract with Tri-State expired on July 31, 2019. Despite Mayor Jackson's October 2017 statement to Tri-State, the Village did not solicit bids from new waste disposal vendors. Rather, the Village Board of Trustees, which does not include Mayor Jackson, awarded the new contract to Flood Brothers, and Tri-State did not have an opportunity to submit a bid. On March 2, 2020, the Village paid Tri-State its outstanding balance of $65,653. There are no outstanding invoices between the Village and Tri-State; however, in this lawsuit Tri-State seeks interest for the delay in payment.

### IV. Ordinance 2018-22

In October 2019, the Village passed Ordinance 2018-22, which required all dwellings not already covered by the Village's waste collection contract with Flood Brothers, to utilize Flood Brothers for their waste collection services. The Village's contract covers only one- and two-unit dwellings. Prior to the passage of Ordinance 2018-22, multi-unit apartment buildings were free to contract for their own garbage collection services with any provider, including Tri-State. So, even after Tri-State lost the Village contract, it continued to earn approximately $7,000 per month from its private contracts until the Village passed Ordinance 2018-22.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record.

Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

## ANALYSIS

### I. Political Retaliation Claims

Tri-State alleges that the Village, through Mayor Jackson, retaliated against it in violation of Tri-State's First Amendment rights because Tri-State opposed the ordinance allowing Riverdale Materials to operate in the Village and Tri-State filed this lawsuit. Tri-State alleges that the Village retaliated by hiring a different vendor for the 2018 Spring Clean-up, failing to timely pay Tri-State, awarding a no-bid contract to Flood Brothers, and passing Ordinance 2018-

22. The Village argues that it is entitled to summary judgment because Tri-State cannot establish a *prima facie* case of political retaliation.

At summary judgment, "the burden of proof for causation is divided and shifts between the parties." *McGreal v. Vill. of Orland Park*, 850 F.3d 308, 312 (7th Cir. 2017). Tri-State must first make a *prima facie* showing that its protected First Amendment activity was "at least a motivating factor in the defendants' decision to take the retaliatory action." *Id.* If Tri-State establishes a *prima facie* case, the burden shifts to the Village to rebut this causal inference, which Tri-State can then attack as pretext. *Id.* at 313.

To prevail on its claims of political retaliation in violation of the First Amendment, Tri-State must prove that it: "(1) engaged in activity protected by the First Amendment; (2) suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the defendants' decision to take the retaliatory action." *McGreal*, 850 F.3d at 312 (quoting *Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015)). Additionally, because Tri-State is an independent government contractor and not a public employee, Tri-State must show that its First Amendment activity concerned a matter of public interest. *Bd. of County Comm'rs, Wabaunsee County, Kan. v. Umbehr*, 518 U.S. 668, 679, 685 (1996).

As an initial matter, the Court finds that Tri-State's speech addressed a matter of public concern. "Whether a statement rises to the level of public concern is a question of law, and in answering this question we look to the 'content, form, and context' of the statement." *Kristofek v. Vill. of Orland Hills*, 712 F.3d 979, 984 (7th Cir. 2013) (quoting *Chaklos v. Stevens*, 560 F.3d 705, 712 (7th Cir. 2009)). The parties agree that Tri-State repeatedly raised environmental concerns about the Riverdale Materials site. The Village argues that while this is true, Tri-

8

State's speech was "primarily motivated [by] its private business interests[.]" Doc. 189 at 10. While motive is relevant, the content of the speech is "the most important factor." *Kristofek*, 712 F.3d at 984 ("The motive of the speaker is relevant as part of the 'context' in which the speech was made, but content 'remains the most important factor in determining whether speech addresses a matter of public concern.'"). Further, "speech of public importance is only transformed into a matter of private concern when it is motivated *solely* by the speaker's personal interest." *Gazarkiewicz v. Town of Kingsford Heights, Ind.*, 359 F.3d 933, 942 (7th Cir. 2004) (emphasis in original). Here, the record supports that Tri-State had two motivations: (1) a private, financial motivation; and (2) environmental concerns. Therefore, although Tri-State's speech also served its private interest, it addressed a matter of public concern.

Turning to the *prima facie* elements, Tri-State's speech at a local government meeting and filing of a lawsuit challenging an ordinance are undoubtedly activities protected by the First Amendment. Further, Tri-State "suffered a deprivation that would likely deter First Amendment activity in the future," when the Village deprived it of a future contract with the Village. *McGreal*, 850 F.3d at 312. The Village claims that this is a subjective test, and thus because Tri-State continued its First Amendment activity, it was not deterred and therefore fails to establish this element. The Village, however, is incorrect. The test is objective. *See Deeren v. Anderson*, 518 F. Supp. 3d 1271, 1277 (W.D. Wis. 2021) ("The test for the [deprivation] prong is objective."). Moreover, "'[a]ny deprivation' may be actionable, 'even something as trivial as making fun of an employee for bringing a birthday cake to the office to celebrate another employee's birthday,' as long as 'the circumstances are such as to make [the deprivation] an effective deterrent to the exercise of a fragile liberty.'" *Parker v. Harper*, 2018 WL 3740617, at *7 (N.D. Ill. Aug. 6, 2018) (quoting *Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000))

9

(alteration in original). The Court finds that being denied a contract would reasonably deter other companies and individuals from exercising their First Amendment rights.

Tri-State fails to show, however, that its First Amendment activity was a motivating factor in the Village's alleged retaliatory actions. Tri-State's only evidence for retaliation is timing, and as Tri-State concedes, "[t]he law is clear that timing alone may not be enough to establish causation." Doc. 184-1 at 21. For timing alone to suffice, the retaliatory action must "follow[] on the close heels of [the] protected expression." *Daza v. Indiana*, 941 F.3d 303, 309 (7th Cir. 2019). The Seventh Circuit has instructed that to "be on the close heels" typically means "no more than a few days" have elapsed. *Id.* This is, however, "a context-specific analysis with no formal legal rule." *Id.*

The relevant events are as follows: (1) in summer of 2017, Mayor Jackson allegedly promised Tri-State that the Village would hold Riverdale Materials to the same standards as Tri-State, including paying host-benefit fees and posting a bond; (2) in September and November 2017, Tri-State spoke at Zoning Board hearings; (3) in October 2017, after Tri-State has already spoken at one Zoning Board hearing, Mayor Jackson notified Tri-State that the Village would be soliciting bids for a new garbage disposal company and encouraged Tri-State to apply; (4) in November 2017, the Zoning Board approved Ordinance 2017-22, allowing Riverdale Materials to operate in the Village; (5) in February 2018, Tri-State filed this lawsuit; (6) the Village delayed paying invoices for January, February, March, and April of 2018; (7) in March 2018, Tri-State tried to schedule the Spring Clean-up, but the Village did not respond; (8) in May 2018, according to Tri-State, Flood Brothers conducted the 2018 Spring Clean-up; (9) in May 2018, Tri-State notified the Village that the Village breached its contract by failing to schedule the 2018 Spring Clean-up, the Village responded and attempted to schedule it but Tri-State declined;

and (10) in October 2019, the Village passed Ordinance 2018-22 requiring all dwellings to utilize Flood Brothers for garbage collection. None of the potentially retaliatory events occurred close enough in time, without additional supporting evidence, to demonstrate causation.

But even if this series of events showed suspicious timing, Tri-State cannot overcome the Village's plausible argument that serious financial challenges, not retaliatory animus, motivated its decision to change vendors and pay its bills late. Mayor Jackson told Tri-State that the Village's financial challenges led it to solicit bids from other garbage collection vendors in the first place. Tri-State argues that this explanation is pretext because the Village paid Flood Brothers over $18,000 for the 2018 Spring Clean-Up that Tri-State was contracted to perform for free. Tri-State has the burden of establishing that this explanation is pretext. *McGreal*, 850 F.3d at 312. Because it has not done so, the Court grants summary judgment on Counts III and IV as to Mayor Jackson.

## II. *Monell* Liability

Even if Tri-State could prove political retaliation by Mayor Jackson, its claims against the Village would still fail. Under § 1983, the Village cannot be held liable for Mayor Jackson's actions under a theory of *respondeat superior*. *Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015). Rather, to proceed against the Village, Tri-State must allege: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) a constitutional injury caused by a person with final policymaking authority. *Id.* The policy or practice "must be the direct cause or moving force behind the constitutional violation." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (citation omitted) (internal quotation marks omitted).

11

Tri-State argues that the Village can be liable under *Monell* because Mayor Jackson, a person with final policymaking authority, caused the injury.[2] The Village responds that the Village Board, not Mayor Jackson, had final policymaking authority over the passage of these ordinances.

Whether Mayor Jackson was a final policymaker is a question of state or local law. *See Kujawski v. Bd. of Comm'rs of Bartholomew Cty., Ind.*, 183 F.3d 734, 737 (7th Cir. 1999) ("A person's status as a final policymaker under § 1983 is a question of state or local law."). The Seventh Circuit has explained that under Illinois law:

> In general, the [Mayor's] responsibilities are to "perform all the duties which are prescribed by law, including ordinance, and shall take care that the laws and ordinances are faithfully executed." 65 ILCS 5/3.1–35–5. By contrast, the board of trustees has the authority to "pass ordinances, resolutions, and motions in the same manner as a city council." 65 ILCS 5/3.1–45–5. Generally, a person holding only executive power does not have policymaking authority for purposes of § 1983; rather, the policymaking authority in the city structure will be the city council, or here, the Board of Trustees.

*Rasche v. Vill. of Beecher*, 336 F.3d 588, 600–01 (7th Cir. 2003).

While generally the board of trustees is considered the final policymaker under Illinois law, courts "look to various factors in determining whether a certain individual or group has policymaking authority on any *particular* policy decision. They are: (1) lack of constraints by policies made by others; (2) lack of meaningful review; and (3) a grant of authority to make the policy decision." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 468 (7th Cir. 2010) (emphasis in original) (cleaned up). Here, the Riverdale Municipal Code is clear: the Village Board had

---

[2] Tri-State also briefly argues that a widespread practice exists within the Village. As support, however, Tri-State points only to testimony of Village residents that the Village does not conduct its affairs in a transparent manner, "does not listen to the residents," and engages in "longstanding 'tyranny.'" Doc. 184-1 at 15. This kind of nonspecific complaint does not provide evidence of a policy of political retaliation.

12

authority to review any decision by Mayor Jackson regarding the ordinances. In Riverdale: (1) the Village Board approves an ordinance; (2) the Mayor either approves and signs the ordinance, or disapproves; (3) if the Mayor disapproves, he can veto the ordinance and return the ordinance to the Village Board with written objections; (4) the Village Board can then reconsider the ordinance and override the Mayor's veto with a two-thirds vote. Riverdale Municipal Code § 2.08.070–080. Because Mayor Jackson did not have final policymaking authority, the Court grants summary judgment for the Village on Counts III and IV as to the Village.

**III. Breach of Contract**

Under Illinois law, a breach of contract claim consists of four elements: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) injury to the plaintiff. *Gallagher Corp. v. Russ*, 309 Ill. App. 3d 192, 199 (1999). The parties agree that a contract existed and that Tri-State performed. Tri-State argues, however, that the Village breached the contract by failing to timely pay invoices and by failing to schedule the 2018 Spring Clean-up causing it reputational harm. The Village agrees that it made late payments to Tri-State but argues that Tri-State cannot prove its breach of contract claim because its outstanding invoices have since been paid, there is no contractual penalty for late payments, and Tri-State did not suffer any harm by the Village foregoing the 2018 Spring Clean-up.

The Court first considers whether the late payments or the Village failing to schedule the 2018 Spring Clean-up constitute a material breach. Under Illinois law, whether a breach is material is a question of fact that depends on "whether it is 'so substantial and fundamental as to defeat the objects of the parties in making the agreement, or whether the failure to perform renders performance of the rest of the contract different in substance from the original agreement.'" *InsureOne Indep. Ins. Agency, LLC v. Hallberg*, 2012 IL App (1st) 092385, ¶ 43

(citation omitted).  Courts consider factors such as whether the injured party can be compensated for its loss, whether the breaching party is likely to cure their failure, and whether the breaching party acted in good faith.  *Commonwealth Edison Co. v. Elston Ave. Props., LLC*, 2017 IL App (1st) 153228, ¶ 19.

First, Tri-State does not provide any admissible evidence to support its claim that the declined 2018 Spring Clean-up caused it reputational harm.  Tri-State performed the Spring Clean-up at no charge to the Village, and the Village chose not to receive this benefit in 2018.  Under Illinois law, "a contracting party may waive provisions beneficial to it or waive strict compliance by conduct or actions indicating that strict compliance with a particular provision will not be required."  *In re Krueger*, 192 F.3d 733, 738 (7th Cir. 1999) (quotation marks omitted).  That the Village decline to take advantage of the Spring Clean-up is not a material breach of the contract.

Whether the delayed payments qualify as a material breach is a closer call.  On one hand, the parties agree that the Village made numerous payments months after they became due.  But, on the other hand, the record suggests that the Village was experiencing significant financial challenges at the time of the delayed payments, and the Village has since paid Tri-State's invoices in full.  Tri-State argues that "prior to the retaliatory acts and despite Riverdale's financial difficulties, it was always able to pay Tri-State on a timely or near timely basis."  Doc. 184-1 at 26.  The record, however, supports a finding that delayed payments were not something new.  Prior to 2017, when the alleged retaliatory acts began, the Village made various delayed payments, including payments as late as 60 days.  *See* Doc. 126 at 101–03 (deposition testimony of Sheryl Germany).  Tri-State admits that "this Village has been in a difficult financial condition for decades."  Doc. 184-1 at 27.  Notwithstanding this knowledge, Tri-State entered into a

14

contract with the Village. Even after the delayed payments at issue in this case, Tri-State sought to continue its relationship with the Village. Given Tri-State's knowledge of the Village's financial situation and its past acceptance of late payments, the Court finds that no material breach occurred and grants the Village's motion for summary judgment on Count V.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment [166] and enters judgment for Defendants on Tri-State's third amended complaint. Further, the Court denies Tri-State's motion to strike [190]. Case terminated.

Dated: July 27, 2022

_____
SARA L. ELLIS
United States District Judge